# EXHIBIT 6

In The Matter Of:

## In Re: CR Bard 200

---

## Daniel Elliott M.D., Vol. II

November 16, 2014

---

**Tiffany Alley Global Reporting & Video**

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696

www.tiffanyalley.com



IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:  C.R. BARD, INC.,
PELVIC REPAIR SYSTEM PRODUCTS
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO ALL
CASES IN MDL NO. 2187 AND
SPECIFICALLY TO:
_____
ROSAIDA ALONSO,
Plaintiff,           Civil Action File
                     No. 2:14-cv-07112
vs.
C.R. BARD, INC.,
Defendant.
_____
PATRICIA BOLYARD, et al.,
Plaintiffs,          Civil Action File
                     No. 2:12-cv-00126
vs.
C.R. BARD, INC.,
Defendant,
_____
MARTINA WHEELER,
Plaintiff,           Civil Action File
                     No. 2:12-cv-04580
vs.
C.R. BARD, INC.,
Defendant.

VOLUME II
The videotaped deposition of DANIEL S. ELLIOTT, M.D.,
November 16, 2014
Wexler Wallace, 55 West Monroe Street, Suite
3300, Chicago, Illinois, commencing at 8:54 a.m.
Reporter: Jennifer L. Bernier

.

Page 473

```
 1   APPEARANCES:
 2
         AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
 3       MS. P. ANN GAYLE
         MR. BRANDON S. MORRIS
 4       17 East Main Street
         Suite 200
 5       Pensacola, Florida  32502
         Phone:  (850) 202-1010
 6       E-mail:  agayle@awkolaw.com
                  bmorris@awkolaw.com
 7
              On behalf of the Plaintiffs;
 8
         REED SMITH
 9       MS. MELISSA GEIST
         136 Main Street
10       Suite 250
         Princeton Forrestal Village
11       Princeton, New Jersey  08540
         Phone:  (609) 514-5978
12       E-mail:  Mgeist@reedsmith.com
13            On behalf of the Defendant.
14
15   ALSO PRESENT:
16   John Doody, Videographer
17
                   *  *  *  *  *  *
18
19
20
21
22
23
24
25
```

Page 474

```
 1                  I N D E X
                                             PAGE
     WITNESS
 2
     DANIEL S. ELLIOTT, M.D.
 3
         Examination by Ms. Geist        476
 4       Examination By Ms. Gayle        747
 5
                E X H I B I T S
 6
 7   ELLIOTT DEPOSITION EXHIBITS          PAGE
 8   No. #29   Alonso Report              477
     No. #30   AP IFU                     509
 9   No. #31   Suarez Op Report           559
     No. #33   Wheeler Report             608
10   No. #34   Wheeler Report             641
     No. #35   Bolyard Report             656
11   No. #36   Marlex MSDS                717
     No. #37   '93 Marlex MSDS            717
12   No. #38   '97 Marlex MSDS            717
     No. #39   Melkerson Letter           729
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 475

```
 1      VIDEO TECHNICIAN:  We're now on the record.  The
 2   time is approximately 8:51 a.m.
 3      This is the beginning of Disc 1, Volume 2, of
 4   the video deposition of Dr. Daniel S. Elliot.
 5      Will counsel please identify yourselves for
 6   the record and state who you represent.
 7      MS. GAYLE:  Patty Ann Gayle appearing for the
 8   plaintiffs, Wheeler, Alonso, and Bolyard, out of
 9   the firm of Aylstock Witkin in Pensacola,
10   Florida.
11      MR. MORRIS:  Brandon Morris for the Plaintiffs from
12   Aylstock, Witkin, Kreis & Overholtz.
13      MS. GEIST:  Melissa Geist from Reed Smith for the
14   defendant C.R. Bard.
15      VIDEO TECHNICIAN:  Would the court reporter remind
16   the witness he's still under oath?
17      THE REPORTER:  Sir, you understand you're still
18   under oath?
19      THE WITNESS:  I do.
20          (Witness previously sworn.)
21   WHEREUPON:
22          DANIEL S. ELLIOTT, M.D.,
23   called as a witness herein, having been previously duly
24   sworn, was examined and testified further as follows:
25          DIRECT EXAMINATION (continued)
```

Page 476

```
 1   BY MS. GEIST:
 2      Q.  Good morning, Dr. Elliot.
 3      A.  Good morning.
 4      Q.  We spent a considerable part of yesterday
 5   together, and I don't need to remind you of the rules of
 6   the deposition, I assume.  You understand it's a
 7   question-and-answer period.  We need to be careful not
 8   to talk over one another.  And if I ask you anything you
 9   don't understand, will you let me know?
10      A.  Yes.
11      Q.  So I can rephrase the question.  And I think
12   we worked pretty well yesterday under those rules?
13      A.  Yes.
14      Q.  Do you agree?  Okay.
15      A.  Yes.
16      MS. GAYLE:  And, Counsel, before you get started,
17   just for the record, it's our position that you're going
18   to take no more than two hours per case today on each of
19   these individual cases.
20      MS. GEIST:  Well, and let me just add that we don't
21   have any formal agreement.  I'm not going to limit
22   myself to time.  I'm going to do my best to be as
23   efficient as possible.  I know we all want to catch
24   flights.  So let me -- let me start by asking the doctor
25   if a couple of things are agreeable, and then we'll see
```

Page 477

1  if we can be efficient.
2  BY MS. GEIST:
3     Q.  Dr. Elliott, yesterday you provided testimony
4  with respect to your generic opinions that you're
5  offering in this litigation, correct?
6     A.  Correct.
7     Q.  And you understand, today, that we're focusing
8  on the specific opinions you've provided in three
9  reports for three separate plaintiffs, correct?
10    A.  Yes.
11    Q.  Would you agree with me, Doctor, that some of
12  the opinions in your report for the three separate
13  plaintiffs are identical in certain respects?
14    A.  In certain respects they're going to be, yeah,
15  very similar, if not identical.
16         (Elliott Deposition Exhibit No. 29
17         was marked for identification.)
18  BY MS. GEIST:
19    Q.  Okay.  So, for example, if you look at what
20  I've already marked as Exhibit 29 to your deposition,
21  that's a case-specific expert report for Rosaida Alonso?
22    A.  Correct.
23    Q.  If you look at page 8 of that report, in the
24  first full paragraph, it says, Set out in my general
25  causation expert report several characteristics of the

Page 478

1  Marlex polypropylene mesh render it inherently unsafe
2  for use in Ms. Alonso.  And then you describe five
3  different reasons why the Marlex polypropylene mesh is
4  inherently unsafe for use in Ms. Alonso.
5         And this paragraph is identical in the reports
6  you have also rendered for the two other plaintiffs
7  we're going to speak about today, correct?
8     A.  Correct.
9     Q.  Okay.  So what I'm trying to do is see if we
10  have an agreement that I don't need to reask or go
11  through these same issues with you in the cases for
12  Mrs. Wheeler and Mrs. -- I want to make sure I got her
13  name right -- Bolyard, B-O-L-Y-A-R-D.  So anything I ask
14  you here, when we talk about Ms. Alonso, can we apply
15  your answers to the other two cases?
16    A.  Yes.
17    Q.  And so then we don't have to repeat and try to
18  be efficient and quick as possible?
19    A.  Absolutely.
20    Q.  Okay.  Similarly, you have some opinions, in
21  each of your three case-specific expert reports, that
22  deal with the risks that you will opine Bard knew about
23  and, therefore, should have put in the IFU.  And that
24  section of your Alonso report is pages 8 through 11.  Do
25  you see that, Doctor?

Page 479

1     A.  Yes, I do.
2     Q.  Similarly, by my review, that section of the
3  report, pages 8 through 11, when you talk about the
4  risks that should have been placed in the IFU, that is
5  identical to the risks and opinions and opinions you've
6  provided in the reports for Mrs. Wheeler and
7  Mrs. Bolyard, correct?
8     A.  Yes.
9     Q.  So, again, if I can explore the basis for your
10  opinions here in Mrs. Alonso's case, we don't need to go
11  through the same information and I don't need to ask you
12  the same questions in the other two cases, do you agree?
13    MS. GAYLE:  It's our -- before I let him answer
14  that, Counsel, it's our position that these generic
15  types of opinions that are in these three are -- as
16  you've said, they are similar, but they also go back to
17  his general opinions from yesterday.  And so it's our
18  position that they really don't need to be rehashed at
19  all because they're part of his general opinions.
20  They're just incorporated into these case reports.
21    MS. GEIST:  Well, the only thing I'll say about
22  that is, I am entitled to explore them.  They're not set
23  forth as just general opinions.  In the report itself,
24  it specifically talks about how they apply to each
25  individual case.

Page 480

1  BY MS. GEIST:
2     Q.  Is that correct, Doctor?
3     A.  Correct.
4     Q.  So, anyway, the point is, I don't want to have
5  to reask you the same types of questions in the other
6  two cases.  So do you agree whatever I ask you relating
7  to the information in the IFU, et cetera, can apply to
8  the other two cases; is that fair?
9     A.  I agree with that unless I think of something
10  that does not quite correlate; but I agree with you,
11  yeah.
12    Q.  That's fine.  Thank you.  Doctor, yesterday,
13  when we began your deposition relating to your generic
14  opinions, I asked you if you could tell me how much time
15  you spent on the cases.  Do you remember that?
16    A.  Yes.
17    Q.  And you were unable to give me any information
18  or any documents really into how much time you spent on
19  the cases, correct?
20    A.  Correct.
21    Q.  I assume you didn't go back and look into that
22  so you could tell me more information today?
23    MS. GAYLE:  Object to form.
24  BY THE WITNESS:
25    A.  That is correct.

Page 481

1    Q.   And you don't have any invoices or paperwork
2  or correspondence with you that would help us understand
3  how much time you spent in formulating your generic and
4  case-specific opinions?
5    **A.   I do not have those with me, no.**
6    Q.   Did I also understand you correctly from
7  yesterday that you've never broke out separately how
8  much time you've spent on Mrs. Alonso's case
9  specifically separate from your generic opinions; is
10  that right?
11    **A.   No.  There is an itemized invoice sent to**
12  **Mr. Anderson's office of each individual and how much**
13  **time was spent reviewing medical records, IME exams,**
14  **those types of things.**
15    Q.   So -- and Mr. Anderson is an attorney
16  representing the plaintiffs in this litigation?
17    **A.   I don't know how to answer that.  He was**
18  **the -- he is the one that I've been told to send my**
19  **invoice to, to his office, his paralegal.**
20    Q.   So just so I understand, when you invoice, do
21  you provide a separate invoice for your generic work and
22  then a separate invoice for each individual plaintiff's
23  case that you work on and provide opinions for?
24    **A.   There will be a section broken down into**
25  **generic work, review of documentation, internal**

Page 482

1  **documents, medical records -- not records, excuse me --**
2  **manuscripts.  That will be in the general.  And then it**
3  **will be broken down into the various different**
4  **individuals, how much time was spent reviewing their**
5  **medical records, how much time was spent during the IME.**
6    Q.   So it's -- it's all in the same invoice, but
7  there is a separate section for Mrs. Alonso.  Is that
8  what I am hearing from you, Doctor?
9    **A.   That would be -- that would be correct.**
10    Q.   Okay.
11    **A.   But just because Alonso, or whomever, has a**
12  **certain amount of allotted time, that does not**
13  **necessarily correlate to that was the only time spent on**
14  **the individual because the general review of literature,**
15  **everything, will actually correlate to them, these**
16  **individuals, too.**
17    Q.   Your general review of literature helped you
18  inform your opinions about each specific case; is that
19  what you're telling me?
20    **A.   That is correct.**
21    Q.   Okay.  So for Mrs. Alonso, specifically, can
22  you tell me how much time you spent on her case?
23    **A.   No, I can't, because I don't have those**
24  **records.  That would be retrievable through**
25  **Mr. Anderson's office and the invoices that were**

Page 483

1  submitted.
2    Q.   Okay.  You don't have an estimate or an
3  approximation for me how much time you spent in forming
4  your opinions on Mrs. Alonso's case as you sit here
5  today?
6    **A.   No, I do not.**
7    MS. GEIST:  Okay.  And, Counsel, I would just make
8  a formal request for the invoices that Dr. Elliott has
9  submitted to Mr. Anderson's office for all of his work
10  done in formulating his generic opinions as well as his
11  opinions in the three specific plaintiffs' cases we're
12  discussing here today.  Thank you.
13  BY MS. GEIST:
14    Q.   How did you go about preparing and formulating
15  your opinions specific to Mrs. Alonso?
16    **A.   Initially, medical records were sent to me**
17  **electronic -- I don't have any paper records -- of all**
18  **of the medical records pertaining to her care prior and**
19  **after her initial surgery.  So I reviewed those and then**
20  **also reviewing the pertinent literature that would come**
21  **about through my research on her case.**
22    Q.   And if we refer to your expert report that
23  we've marked as Exhibit 29, that's the report that you
24  provided for Mrs. Alonso; is that correct, Doctor?
25    **A.   Correct.**

Page 484

1    Q.   And that has a number of attachments to it
2  starting with Exhibit A.  And that's your CV, correct?
3    **A.   Correct.**
4    Q.   And the only updates that need to be made to
5  that CV are a couple of things you noted to me yesterday
6  when we discussed your generic opinions, correct?
7    **A.   Correct.**
8    Q.   And then Exhibit B also provides your fee
9  schedule and testimony history, and that's the same as
10  you provided to us in your generic report, correct?
11    **A.   Yes.**
12    Q.   And then Exhibit C has a list of materials
13  reviewed and relied upon, and you incorporate your
14  general report here as well, correct?
15    **A.   Correct.**
16    Q.   And with respect to that general report, you
17  provided us, a day or two before your deposition
18  yesterday, with an updated literature review list or
19  bibliography, correct?
20    **A.   Well, I don't know when it arrived to you.  I**
21  **sent it to the lawyers on Monday or Tuesday, something**
22  **like that.**
23    Q.   Okay.  But I assume you wish to incorporate
24  your updated bibliography here in Mrs. Alonso's case?
25    **A.   Correct.**

Page 485

1 Q. And then, if you look at the second and third
2 page of what is Exhibit C to your report in
3 Mrs. Alonso's case, that appears to list what I will
4 call the case-specific records for Mrs. Alonso?
5 **A. Yeah.  These are the medical records that I**
6 **reviewed pertaining to her care.**
7 Q. You also have listed here depositions as well,
8 correct?
9 **A. Correct.  Yeah.  And I assume -- and there's**
10 **four -- four depositions.  So it's medical records and**
11 **depositions.**
12 Q. And who is Mr. Gill?
13 **A. Oh, Mr. Gill.  I would have to go back and**
14 **look at the records of who Mr. Gill is.  I can't recall.**
15 Q. And how about Dr. Juan Suarez?  Who is that?
16 **A. Suarez was the implanting surgeon.**
17 Q. And how about Dr. Carlos Medina?
18 **A. Carlos Medina is the surgeon who took care of**
19 **the complications, some of the complications, I should**
20 **say.**
21 Q. And on Exhibit C, on pages 2 and 3, is this a
22 complete list of all of the case-specific records you
23 reviewed in reaching your opinions with respect to
24 Mrs. Alonso?
25 **A. Correct.**

Page 486

1 Q. Were all of these records sent to you
2 initially when you were asked to do an expert report in
3 this case?
4 **A. I can't recall that.  I received large batches**
5 **of medical records.  There may be a possibility that I**
6 **went through and reviewed and found a notation to a**
7 **certain study and I requested it.  I don't recall with**
8 **this.**
9 Q. Do you know, sitting here today, whether you
10 asked for any additional records to help inform your
11 opinions with respect to Mrs. Alonso's case?
12 **A. I can't say specifically to Mrs. Alonso.  I**
13 **had requested further records of other doctors.  It**
14 **mentions there would be clinic notes, but it mentioned I**
15 **saw Dr. So-and-so.  And I didn't have that, so I'd**
16 **request it.  I cannot say in, actually, Ms. Alonso I did**
17 **that, though.**
18 Q. Did -- did you review, in their entirety, all
19 of the records listed here on pages 2 and 3 of Exhibit C
20 to your report?
21 **A. Yes.  And I believe with Ms. Alonso that came**
22 **out to something like 1925 pages.**
23 Q. And you reviewed every page?
24 **A. Yes, I did.**
25 Q. And how about the deposition transcripts that

Page 487

1 are listed there on page 3 of Exhibit C?  Did you review
2 those depositions in their entirety or were you provided
3 with excerpts only?
4 **A. Their entirety, all four.  And that would**
5 **pertain to everybody else, Bolyard and Wheeler as well.**
6 Q. Okay.  Perfect.  So I can just go ahead and
7 use your answers for those --
8 **A. Extrapolate.**
9 Q. -- cases as well?  Thank you for that.  Are
10 all of your opinions with respect to Mrs. Alonso's case
11 set forth here, Doctor, in your expert report?
12 **A. Yes, they are, unless new material were**
13 **provided to me.  But, yes.**
14 Q. As of now, this is what I would refer to as
15 your complete analysis of the case?
16 **A. That is correct.**
17 Q. You mentioned already a couple of times an
18 IME.  So let me ask you about that.  Did you perform an
19 independent medical exam for Mrs. Alonso?
20 **A. Yes, I did.**
21 Q. And did you also do that for Mrs. Wheeler
22 and --
23 **A. Bolyard.**
24 Q. -- Mrs. Bolyard?
25 **A. Yes, I did.**

Page 488

1 Q. Thank you.  For some reason, that
2 pronunciation is going to give me trouble all day, so
3 I'm going to write it down.
4   And my understanding, Doctor, from reviewing
5 your reports in those three plaintiffs' cases, is that
6 you saw all three women on the same day; is that right?
7 **A. Correct, on October 4th, 2014.**
8 Q. And where did those IMEs take place?
9 **A. Nashville.**
10 Q. Nashville, Tennessee?
11 **A. Correct.**
12 Q. Why Nashville, Tennessee?
13 **A. That's -- that's where I was told they were**
14 **being arranged.**
15 Q. Who -- strike that.
16   At what facility in Nashville, Tennessee?
17 **A. It was a -- there is an OB/GYN office that it**
18 **was taken place in.  If you would like the exact**
19 **address, I could give that to you.**
20 Q. It was a doctor's office?
21 **A. Correct.**
22 Q. Do you know the name of the OB/GYN or the name
23 of the practice?
24 **A. I don't know the name of whose office it is.**
25 **It was Legacy OB/GYN of Tennessee, actually, in Smyrna,**

1  which is, S-M-Y-R-N-A, which is a suburb in Nashville.
2      Q.  You told me yesterday that you bill for your
3  time at the rate of $700 an hour; is that right?
4      A.  That is correct.
5      Q.  So did you bill for your travel to Nashville,
6  Tennessee, to perform the IMEs?
7      A.  Correct.
8      Q.  And that was at the 700-dollar-an-hour rate?
9      A.  Correct.  Everything I do is at $700 an hour.
10     Q.  Okay.  So, for all three cases, however much
11  time you spent doing the IME, that was at the
12  700-hundred-dollar-an-hour rate?
13     A.  That is correct.
14     Q.  And then your return travel to Minnesota was
15  at the same rate?
16     A.  Correct.
17     Q.  How much time did you spend with Mrs. Alonso?
18     A.  Each -- each individual face-to-face time was,
19  roughly, 45 minutes, but that's not counting, obviously,
20  the time reviewing the records and things, but
21  face-to-face time and exam.
22     Q.  So that's the same, roughly, 45 minutes for
23  Mrs. Wheeler and Mrs. Bolyard?
24     A.  That is an estimate, a fairly accurate
25  estimate.  I can't say exactly 45 minutes with each one.

1  Some were a little bit more.  Some were a little bit
2  less.
3      Q.  Do you remember who took the longest of the
4  three plaintiffs?
5      A.  I do not recall.
6      Q.  Do you remember whether you had to spend more
7  time with Mrs. Alonso compared to Mrs. Wheeler compared
8  to Mrs. Bolyard?
9      A.  I do not recall any of them taking more or
10  less time.  I was not focused on that.  Reviewing their
11  medical records at times could take considerably more,
12  considerably less, depending upon the volume of records.
13     Q.  The volume of records for each of these
14  plaintiffs is different.  Fair summary?
15     A.  That's correct.
16     Q.  Mrs. Bolyard, for example, has a more
17  extensive and complicated medical history than
18  Mrs. Alonso and Mrs. Wheeler?
19     MS. GAYLE:  Object to form.
20  BY THE WITNESS:
21     A.  I can't necessarily say.  The volume of
22  records does not correlate to the complexity.  Sometimes
23  I would be provided 200 pages of nursing notes which had
24  very little material to it, but it took time and pages.
25  Sometimes I would spend an hour or two on one page like

1  an operative note.  So, again, there is no correlation
2  between volume and time.  So I can't answer that
3  question.
4  BY MS. GEIST:
5      Q.  Well, would you agree with me that
6  Mrs. Bolyard has a more extensive and complex medical
7  history than Mrs. Alonso and Mrs. Wheeler?
8      A.  I think her past medical history is more
9  complicated.  I deal with this on a daily basis in my
10  practice.  So as far as complicated, they're all
11  complicated.
12     Q.  Did you need to conduct the IMEs in order to
13  reach the opinions in Mrs. Alonso's case and
14  Mrs. Wheeler's case and Mrs. Bolyard's case?
15     A.  Oh, I think it's essential.  In this type of
16  thing, you have to be able to do an exam.  It's not like
17  you can do a blood test or an X-ray to know.  You have
18  to actually do a physical exam.  And much to the
19  patient's chagrin, you have to also do a pelvic exam.
20         And so, yes, in my opinion, my strong opinion,
21  it was essential to do an exam.  Without an exam, you
22  can't make an accurate diagnosis.
23     Q.  So you couldn't make an accurate diagnosis or
24  formulate your opinions in any of the cases without
25  conducting the IME; is that what you're telling me?

1      MS. GAYLE:  Object to form.
2  BY THE WITNESS:
3      A.  No.  What I'm saying is, I can review the
4  outside records, review the other individual's exams,
5  formulate somewhat of an opinion of what other people
6  think.  However, I'm going to keep an open mind because,
7  in my practice, where I practice at the tertiary care
8  center, I'm always keeping an open mind and I have to do
9  an exam to prove it for myself.  I do this daily.  So
10  it's not like an individual who might not see this very
11  often.
12         So the IME would be further -- the physical
13  exam, the interaction with the individual, talking to
14  them is a major part of coming to a conclusion, but it's
15  not everything.
16     Q.  But you're not going to reach your final
17  conclusion and analysis until you do that IME, correct?
18     MS. GAYLE:  Objection.  Asked and answered.
19  BY THE WITNESS:
20     A.  No.  I would say that I will form ideas,
21  concepts, and a differential diagnosis based upon the
22  medical records and then determine if my physical exam
23  agrees or disagrees with what others had said.
24     Q.  So you told me that you did the IME for the
25  three plaintiffs on October 14th, 2014, correct?

Page 493

1    A.  October 4th.
2    Q.  I thought you said October 14th.  Is it the
3  4th?
4    A.  I'm going off of -- I don't recall exactly
5  which day.  I have to go off of what I wrote down here.
6  And I have written down here October 4th.  I would have
7  to go through whatever date I state in here is the date.
8  Because on page 4 of Alonso, I say October 4th.  Yeah, I
9  say -- yeah, it's October 4th.
10    Q.  Okay.  That's fine.  I thought you told me
11  October 14th, which is why I was asking you.
12    A.  I may have said that.  That would be
13  incorrect.  October 4th is the correct date.
14    Q.  So my question is, so you performed your IME
15  before you signed your expert reports in each of the
16  three cases?
17    A.  That is correct.
18    Q.  And Mrs. Alonso's report is dated October 9th,
19  2014, correct?
20    A.  That is correct.
21    Q.  And that's your signature there, Dr. Elliott?
22    A.  That is an electronic signature, yes.
23    Q.  Okay.  But this is a true copy of your expert
24  report in the case, correct --
25    A.  That is correct.

Page 494

1    Q.  -- as you flip through it?
2        Did any of your opinions, with respect to
3  Mrs. Alonso, change after you performed the IME?
4    A.  Not that I recall, no, not specifically.
5  Because of what I do on a daily basis, as far as where I
6  work, and I'm used to dealing with this, I'm looking for
7  things that weren't necessarily examined before, like
8  pain over the buttock where obturator -- where the mesh
9  arms could be obturator pain, adductor pain, abductor
10  pain, A-B-D-U-C-T-O-R-S.
11        On the physical exam, I'm specifically
12  touching where -- inside the vagina on the midportion.
13  So, again, I have an idea because of what I do all of
14  the time of what the diagnosis could be.  But, again, I
15  would say it augmented my knowledge of the patient.
16    Q.  So you don't recall, with respect to
17  Mrs. Alonso's case or Mrs. Wheeler's case or
18  Mrs. Bolyard's case, whether you needed to amend or
19  change your initial opinions that you formed about each
20  of the cases after the IME was conducted?
21    A.  I don't recall doing that on either -- any of
22  these three individuals.
23    Q.  Who was present during the IMEs that you
24  performed for each of the plaintiffs?
25    A.  For the interaction, the initial history

Page 495

1  taking, it was just myself and the patient.  No one else
2  was in the room.  I did not allow anybody in the room.
3    Q.  Did you have a nurse or a physician's
4  assistant or anybody like that?
5    A.  For just the hyst- --
6    MS. GAYLE:  Excuse me.  Just let him finish the
7  question so y'all don't talk over each other.
8    MS. GEIST:  Sure.
9    MS. GAYLE:  -- for the court reporter's sake.
10    MS. GEIST:  No.  I apologize.
11  BY THE WITNESS:
12    A.  For just the history taking, confirmation of
13  what I had reviewed with the patient, I mean, as far as
14  medical records, I went over my medical records, my
15  notes, asked the patient did this correlate, did they
16  agree with this?  That was just myself and the patient.
17  That --
18    Q.  So --
19    A.  I'll finish.
20    Q.  I'm sorry.  I'm sorry.  I thought you were
21  done.
22    A.  That's all right.  Then when it came to the
23  physical exam, there was a nurse present to act as a
24  chaperone when I did just the physical exam.  So I would
25  exit the room.  The nurse would come in.  This was an

Page 496

1  employee of the OB/GYN clinic.  I did not -- I had never
2  met her before.  She would get the patient ready.  I
3  would come back and then I would do the physical exam
4  with the nurse there.  I would exit.  The nurse would
5  get the patient dressed.  I would come back, go over a
6  few things, and that was it.
7    Q.  Are you finished?
8    A.  Yes.
9    Q.  I apologize.  Sometimes I jump in a little too
10  quickly.
11    A.  No worries.
12    Q.  Were there any lawyers present at any time
13  during any of your IMEs of each of the three plaintiffs?
14    A.  I cannot speak if they had been out in the
15  waiting room.  I did not see anybody.  I did not allow
16  anyone in the room, no family members.  There was only
17  one time that a family member requested to come back.  I
18  told them, no, and I don't know if it was on this one or
19  not.  It could have been on another individual.  So
20  bottom line, no.  I didn't see anybody.
21    Q.  So, during the time that you took an initial
22  history, there wasn't any other person in the room other
23  than you and the plaintiff, correct?
24    A.  At all times, for all individuals, I was the
25  only one there with the patient alone.

In Re: CR Bard 200                Daniel Elliott M.D., Vol. II                11/16/2014

Page 497

1  Q.  And during the actual pelvic and vaginal exam
2  portion of the IME, were there any other physicians
3  present?
4  **A.  No.  It was only, at all times for all three**
5  **individuals, when it came time for the physical exam,**
6  **there was just myself, the patient, and the nurse.  That**
7  **was it.**
8  Q.  Did you -- were there any other plaintiffs'
9  experts there at the OB/GYN facility on the same day
10  examining women?
11  **A.  No.**
12  Q.  Did you examine any other women on that day
13  other than Mrs. Alonso, Mrs. Wheeler, Mrs. Bolyard who
14  have lawsuits against Bard?
15  MS. GAYLE:  Object to form.  And I'm going to ask
16  that you not answer that.  We're not here to talk about
17  any other plaintiffs in this litigation except these
18  three ladies.
19  MS. GEIST:  So you're instructing the witness not
20  to answer?
21  MS. GAYLE:  I don't think that it's relevant,
22  Counsel.
23  MS. GEIST:  I'm just trying to understand your
24  position.
25

Page 498

1  BY MS. GEIST:
2  Q.  Did you examine any other women for whom you
3  did not provide an expert report?
4  **A.  No.**
5  Q.  Did you spend any time with any of the three
6  plaintiffs after the IME?
7  **A.  No.  Once I was done with it, no.  After that,**
8  **they left.**
9  Q.  Dr. Elliott, you told me that initially you
10  had a conversation with each of the three plaintiffs and
11  you took a history; is that right?
12  **A.  Correct.**
13  Q.  Did you have them fill out any documents, any
14  forms?
15  **A.  No.**
16  Q.  Did they fill out any paperwork at any point
17  in time during the IME?
18  **A.  No.**
19  Q.  So where did you record the history and
20  information that you were provided from each of the
21  plaintiffs?
22  **A.  I had a notepad, a yellow legal notepad.**
23  Q.  And where is that notepad?
24  **A.  I took notes.  I had -- I had my printout of**
25  **the medical records that I took just the generic notes**

Page 499

1  on.  I brought that in with my yellow notepad.  I took
2  notes.  And immediately, at the finish of the IME, I go
3  out.  I would put them into an iPad, and then I had the
4  notes shredded.  So the actual handwritten notes are
5  gone.
6  Q.  So you actually took down information that
7  each of the plaintiffs provided to you on a yellow
8  notepad, correct?
9  **A.  Correct.**
10  Q.  And then, after you obtained that information,
11  you put some of it into an iPad?
12  **A.  Correct, into -- into a Word document so that**
13  **it was legible, understandable, because I take a lot of**
14  **notes.  There could be arrows pointed everywhere.  I**
15  **make it organized so it's not forgotten, immediately put**
16  **it into a document labeled that specific patient so**
17  **there is no mistake on the individual, and then get rid**
18  **of the paper copy.**
19  Q.  And so that was a Word document you're
20  describing?
21  **A.  A Word document saved in Dropbox so it would**
22  **not be lost, yes.**
23  Q.  You said you shredded the yellow notepad where
24  you took the notes regarding all three women?
25  **A.  Correct.  For confidentiality purposes, the**

Page 500

1  **handwritten notes -- not that anyone would be able to**
2  **read my writing -- but the handwritten notes were**
3  **shredded.**
4  Q.  Is there any information that was contained on
5  the yellow notepad that was not put into the Word
6  document?
7  **A.  No.  Essentially, everything was transferred**
8  **over to just a digital copy is all.**
9  Q.  Did anybody ever tell you that you needed to
10  preserve information with respect to your IME of the
11  three plaintiffs?
12  MS. GAYLE:  Object to form.  He did preserve this
13  information.
14  BY THE WITNESS:
15  **A.  Yeah.  All of the information was preserved.**
16  **It was put into a logical, legible way.  A doctor's**
17  **handwriting, as you know, tends to be scattered.  There**
18  **are arrows transferred all around, so I wanted to make**
19  **sure immediately after coming out of the room, when it**
20  **was fresh in my mind, I put it into a legible, logical**
21  **document.**
22  Q.  And do you have access to that Word document
23  now?
24  **A.  No.  All of those documents then were put into**
25  **my physical exam notes.  My history notes were then put**

In Re: CR Bard 200                    Daniel Elliott M.D., Vol. II                    11/16/2014

Page 501

1  into the IME, and so they were all just transferred all
2  over.
3       Q.  So do you still have that Word document,
4  though, for each plaintiff?
5       A.  Those documents are gone because I don't keep
6  them because then it gets confusing which document is
7  what.  So I transferred all of those into my IME, get
8  rid of the old documents, and then I would have this as
9  my official document.
10      Q.  So if we look at Mrs. Alonso's report
11  beginning on page 4 where it begins, On October 4th,
12  2014, in Nashville, Tennessee, I personally examined
13  Mrs. Alonso?
14      A.  That is correct.
15      Q.  Do the notes or the information provided here,
16  is that what came from your Word document which came
17  from your yellow notepad?
18      A.  Yes.
19      MS. GAYLE:  Object to form.
20  BY THE WITNESS:
21      A.  That is correct.
22      Q.  Is there anything that you recorded on the
23  yellow notepad or in the Word document that is not
24  contained here in the expert report?
25      A.  To the best of my knowledge, this is it.

Page 502

1       Q.  Are you sure about that?
2       A.  I just said, to the best of my knowledge, this
3  is it.
4       Q.  And did you say to me that you deleted the
5  Word document after it was prepared by you?
6       A.  Yeah.  Because it goes all into this note, so
7  there is no reason to keep two documents.
8       Q.  There is no way of retrieving that document
9  now?
10      MS. GAYLE:  Just, Counsel, so you're clear, you're
11  asking him to look at a certain section, but then your
12  next question was with regard to the case-specific
13  expert report.  And so, just so y'all are both on the
14  same page and I'm not confused, are you talking about
15  that one particular section or that -- or the entire
16  report?  I'm confused.
17      MS. GEIST:  Well, yeah.  Sure.
18  BY MS. GEIST:
19      Q.  You tell me, Dr. Elliott, if you can.  You
20  told me you recorded certain information on a yellow
21  notepad, and then you took that information and you put
22  it in a Word document for Mrs. Alonso, correct?
23      A.  Correct.
24      Q.  And it was actually labeled Rosaida Alonso?
25      A.  Correct.

Page 503

1       Q.  And that document no longer exists?
2       A.  Correct.
3       Q.  And neither does the yellow notepad?
4       A.  Correct.
5       Q.  So where, in your report, is all of the
6  information that you recorded during the IME?
7       A.  It is recorded in, as far as me going through
8  the history, there will be parts of it in there for
9  clarification of dates or feelings, pain, et cetera.
10  And then, if you go to page 4, really start at the very
11  top where it says, Currently, Mrs. Alonso is not
12  sexually active due to pain, that would probably be
13  where it actually started.  Because currently to me
14  means as of that date, October 4th.  And so, when you
15  see a Visual Analog Pain Scale, that is my records, my
16  input.
17      Q.  Is there anywhere else in the report where the
18  information you obtained via the IME could be found?
19      A.  Well, in the diagnoses, the physical exam,
20  which is that part here, the differential diagnosis, all
21  of those things.
22      Q.  Can you be sure, sitting here today, Doctor,
23  that every word and information piece you took down
24  during the IME and recorded on your yellow notepad and
25  put into a Word document is contained here in the expert

Page 504

1  report for Mrs. Alonso?
2       A.  To the best of my knowledge, it is.  There
3  would be no reason to delete or remove anything.  All
4  the notepad and the Word document are for clarification,
5  legibility.  And if I see a large number of individuals,
6  as per my habit to keep things organized, I immediately
7  take care of it at that point in time so, again, it's
8  logical so I don't get anything -- make any mistakes.
9       Q.  During your review of the medical records for
10  Mrs. Alonso, did you take notes as you went through and
11  reviewed those records?
12      A.  Yes.
13      Q.  Where are those notes?
14      A.  Those notes are in here.
15      Q.  Well, how did you -- how did you take them
16  when you initially looked at the records?  What was
17  your -- what was your method?
18      A.  I go through and, as I make a note of it, like
19  I find -- I document the -- I document the document that
20  I was reviewing, which is in the reliance list.  I'll
21  take notes as far as the date of surgery.  I'll take
22  quotes out of the operative note, doctor's comments,
23  those types of things.
24      Q.  So just so I understand, so when you're
25  reviewing the medical records, do you actually highlight

In Re: CR Bard 200                Daniel Elliott M.D., Vol. II                11/16/2014

Page 505

1  or put comments or do anything to the records
2  themselves?
3      **A.  No.**
4      Q.  Do you take handwritten notes?
5      **A.  Handwritten or electronic notes.**
6      Q.  So do you have handwritten notes somewhere
7  relating to your review of medical records for
8  Mrs. Alonso?
9      **A.  No.  Handwritten notes are taken initially.**
10  **Everything I convert over to electronic.  Handwritten**
11  **notes are just for -- because the medical records I get**
12  **don't necessarily come in any sequence, chronologic**
13  **sequence.  So it's very difficult.  I get one year, a**
14  **next year, and then they're flopped back and forth.  So**
15  **handwritten notes sometimes are just easier to take to**
16  **start off with and then I convert that to electronic.**
17      Q.  And did you also destroy any handwritten
18  notes you took with respect to the records of
19  Mrs. Alonso?
20      MS. GAYLE:  Object to form.  Mischaracterizes his
21  testimony.
22  BY MS. GEIST:
23      Q.  Did you get rid of those notes?
24      MS. GAYLE:  Object to form.
25  BY THE WITNESS:

Page 506

1      **A.  Well, those notes are all converted into**
2  **electronic digital form.**
3      Q.  So did you get rid of the written notes?
4      **A.  So the written notes are gone, yes.**
5      Q.  Same -- same method for Mrs. Wheeler and
6  Mrs. Bolyard?  Did you take written notes and then now
7  they're gone?
8      MS. GAYLE:  Object to form.
9  BY THE WITNESS:
10      **A.  Yeah.  I can't speak to all of them.  I mean,**
11  **again, there is, you know, 11,000 -- 1100 pages.  I told**
12  **you 1900 for Alonso.  I can't say what I did with each**
13  **one.  I didn't keep that kind of a record of what I did**
14  **as far as records go, I mean, handwritten notes or not.**
15  **I put Post-It notes on things to come back to it, but I**
16  **don't save Post-It notes.**
17      Q.  Those Post-It notes are not available to us
18  now either, are they?
19      **A.  No.  They're not available to me either.  I**
20  **don't have them.**
21      Q.  Did you create separate Word documents or some
22  other electronic memorialization when you went through
23  the medical records for Mrs. Alonso, Mrs. Wheeler, and
24  Mrs. Bolyard?
25      MS. GAYLE:  Object to form.

Page 507

1  BY THE WITNESS:
2      **A.  I took -- yeah, I took notation of it, yeah,**
3  **so of a chronologic sequence, which then I put into the**
4  **records here.**
5      Q.  And where is the chronologic sequence or other
6  notes that you took with respect to the medical records
7  for Mrs. Alonso, Mrs. Wheeler, and Mrs. Bolyard?
8      **A.  I have a Dropbox account they would be in.**
9      Q.  So is that information accessible and
10  available now?
11      **A.  I would be able to get access to it, yes.**
12      MS. GEIST:  So I'll just make a formal demand and
13  request for that information we just discussed, which is
14  Dr. Elliott's electronic notes regarding his review of
15  the medical records of Mrs. Alonso and Mrs. Wheeler and
16  Mrs. Bolyard.
17  BY MS. GEIST:
18      Q.  Did -- other than your communications with
19  counsel in this litigation, did you speak with anyone
20  else with respect to your opinions about Mrs. Alonso,
21  Mrs. Wheeler, and Mrs. Bolyard?
22      **A.  No.**
23      Q.  Did you talk to any other medical doctors or
24  experts for plaintiffs in the litigation about your
25  opinions?

Page 508

1      A.  No.
2      Q.  Dr. Elliott, if you look with me at your
3  report for Mrs. Alonso --
4      **A.  Yes.**
5      Q.  -- do you have that in front of you?
6      **A.  Yes, I do.**
7      Q.  Is that your -- is that your own copy?
8      **A.  This is my own highlighted copy, yes.  With no**
9  **notes on it, but it is highlighted.**
10      Q.  Well, that was my next question.  Do you have
11  any handwritten notes on that copy?
12      **A.  Yeah.  The only thing is, as I was going**
13  **through it -- yeah.  I have one note indicating, on page**
14  **6, there is an accidental duplication.  I duplicated**
15  **what was said twice.  I just noticed that.**
16      Q.  Okay.
17      **A.  So other --**
18      Q.  From page 6 to 7, and I noticed that as
19  well --
20      **A.  Yeah.**
21      Q.  -- it's a pure duplication?
22      **A.  That is -- that is correct.  Otherwise, they**
23  **are highlighted, dates are circled so I can find them**
24  **easier.  That appears to be it.  And I think -- and then**
25  **I noticed a typographical error on page 11.  I put -- I**

Page 509

1 accidentally put the Cook device down on the last
2 paragraph instead of the Bard device. That's a
3 typographical error.
4    Q.  Did you notice any other errors or
5 inaccuracies in your report that we need to change here
6 today?
7    A.  Let me go through it page by page to make
8 sure.
9    Q.  Sure.
10    A.  Not that I see on this.
11    Q.  Doctor, you can feel free to review and refer
12 to that version of your report as I ask you questions
13 about it. But I'm just going to mark it as an exhibit
14 to your deposition if that's okay with you.
15    A.  Sure. That is perfectly fine.
16    Q.  Thank you. Now, we can toss documents at one
17 another.
18         (Elliott Deposition Exhibit No. 30
19         was marked for identification.)
20 BY MS. GEIST:
21    Q.  And that will be, for the record, Exhibit 30,
22 which is Dr. Elliott's copy of his report for
23 Mrs. Alonso with some highlighting and handwritten
24 notes.
25    MS. GAYLE:  And, Counsel, I haven't seen that

Page 510

1 myself, so...
2    MS. GEIST:  You didn't? Now, let me just show it
3 to you, and I'm going to look through it quickly.
4 BY MS. GEIST:
5    Q.  You said, Doctor, that, on the last page of
6 your report, you had a typo on page 11. And that
7 sentence reads, Mrs. Alonso was unable to make a fully
8 informed decision about having the Cook device
9 implanted?
10    A.  Correct.
11    Q.  And you said that should read the Bard device?
12    A.  Correct.
13    Q.  What's the Cook device?
14    A.  Cook device is an SIS sling made of collagen,
15 porcine collagen.
16    Q.  And who manufactures that product?
17    A.  Cook.
18    MS. GAYLE:  Counsel, could we go off record just
19 for a second?
20    MS. GEIST:  Sure.
21    VIDEO TECHNICIAN:  We're off the record. The time
22 is 9:33 a.m.
23         (A recess was had.)
24    VIDEO TECHNICIAN:  We're back on the record. The
25 time is 9:42 a.m.

Page 511

1    MS. GEIST:  For the record, we just took a break
2 and counsel and I both agreed that Exhibit 30 appears to
3 be a draft of Dr. Elliott's report and was not the
4 doctor's version of the final report. So, for the
5 record, Exhibit 30 is being withdrawn and not being put
6 into evidence.
7    MS. GAYLE:  Thank you, Counsel.
8    MS. GEIST:  Thank you.
9 BY MS. GEIST:
10    Q.  Doctor, you have what we've marked as Exhibit
11 29, which is your final report, correct?
12    A.  That is correct.
13    Q.  And you've added some highlights to that
14 report for efficiency purposes and to help us move along
15 quickly with respect to dates and other information?
16    A.  Correct.
17    Q.  Okay. I had started to ask you about the
18 error, the typo you noted on page 11?
19    A.  Yes.
20    Q.  And you said that's the Cook device and SIS
21 sling?
22    A.  SIS mesh sling, that's correct.
23    Q.  Are you -- are you involved in litigation on
24 behalf of the plaintiffs against that company?
25    A.  Yes, I am.

Page 512

1    Q.  And have you provided any expert reports in
2 that litigation?
3    A.  Yeah. Yes.
4    Q.  Have you provided any deposition testimony in
5 that litigation?
6    A.  No.
7    Q.  Are you scheduled for deposition in that
8 litigation?
9    A.  Yes.
10    Q.  When is that going to take place?
11    A.  January 3rd.
12    Q.  January 3rd of 2015?
13    A.  Correct.
14    Q.  In this case, Doctor, Mrs. Alonso was also
15 implanted with the Align sling, correct?
16    A.  That is correct.
17    Q.  Okay.
18    A.  She had two surgeries at the same time.
19    Q.  And I understand, from your report and your
20 testimony yesterday, that you are not offering any
21 opinions with respect to the Bard Align sling; is that
22 correct?
23    A.  Well, unless I'm asked. I'm not here to talk
24 about the Align sling. This individual had the product
25 implanted. If you ask me about it, I will answer.

In Re: CR Bard 200                    Daniel Elliott M.D., Vol. II                    11/16/2014

Page 513

1    Q.  In your report, you're not providing any
2  opinions with respect to the Bard Align sling, correct?
3    MS. GAYLE:  Objection.  Form.
4  BY MS. GEIST:
5    Q.  Is there any -- well, let me fix it.
6      Is there any opinion in your report for
7  Mrs. Alonso with respect to the Bard Align sling
8  product?
9    A.  Not specifically.  The problem comes that
10  she's had two products that are placed in the same
11  region.  They're made out of the same type of mesh.  And
12  so there's going to be complications overlying that.  I
13  am here for the Avaulta product.  But she has two
14  products that were placed in her.
15    Q.  Understood.  But you haven't reached any
16  opinions, to a reasonable degree of medical certainty,
17  that Mrs. Alonso's Bard Align sling caused her any
18  complications; is that correct?
19    MS. GAYLE:  Object to form.  Mischaracterizes
20  testimony.
21  BY THE WITNESS:
22    A.  Well, no, that wouldn't necessarily be
23  correct, again, because we have a polypropylene mesh,
24  heavyweight that's put into the obturator foramen, this
25  exact same location as the Avaulta arms.  And so that

Page 514

1  makes it quite complicated.  I have two large pieces of
2  mesh going to the same region.  So I -- I can't state
3  that.  I can state what I've stated in my report.
4    Q.  Well, in your report, unless I'm missing it
5  somewhere, you attribute the complications and problems
6  that Mrs. Alonso describes to the Avaulta product, true?
7    A.  It is my opinion of going through the -- all
8  that's happened with her, look at the differential
9  diagnosis, looking at the literature out there,
10  statistics and my experience, that, in her situation, it
11  was the Avaulta mesh -- excuse me, the Avaulta POP mesh
12  which is creating her problem.
13    Q.  Okay.  So that's just what I want to
14  understand.
15    A.  Yeah.
16    Q.  You're not going to give an opinion, in
17  Mrs. Alonso's case, that it was the Bard Align sling
18  that has caused her any problems or complications; is
19  that true?
20    MS. GAYLE:  Object to form.
21  BY THE WITNESS:
22    A.  No.  I'm going off -- again, this is playing
23  the game of statistics of volume of mesh, what is more
24  likely.  And more likely than not with medical
25  certainty, it is the Avaulta POP that caused her

Page 515

1  problems.  However, the Align sling could be a
2  contributing factor to it.  Because if the Avaulta mesh
3  gets infected, the Avaulta POP mesh gets infected, she
4  also has the other mesh there which is going to get
5  infected.  So it becomes complicated.
6      My opinion, as I outline in here, that the
7  inciting event, the culprit which causes the problems,
8  was the Avaulta mesh.
9  BY MS. GEIST:
10    Q.  And not the Align sling?
11    MS. GAYLE:  Object to form.
12  BY MS. GEIST:
13    Q.  Is that correct?
14    A.  Based upon statistics and my experience and
15  review of the literature, more likely than not it is the
16  Avaulta mesh that caused the problem and not the Align
17  sling.
18    Q.  Thank you.  Okay.  So, Doctor, what I've tried
19  to do is summarize, as best I can, from looking at your
20  report, your opinions with respect to Mrs. Alonso.
21  Okay.  So if you look at beginning on page 5 of your
22  report and then continuing on to page 6 --
23    A.  Yes.
24    Q.  And just let me know, is this a fair summary
25  of your opinions, that Mrs. Alonso has experienced

Page 516

1  pelvic pain, dyspareunia, urge incontinence, as well as
2  some long-term potential impacts due to the loss of
3  physical intimacy and that all of these problems and
4  complications are caused by the Bard Avaulta product?
5    MS. GAYLE:  Object to form.
6  BY MS. GEIST:
7    Q.  Is that a fair summary?
8    MS. GAYLE:  Object to form.
9  BY THE WITNESS:
10    A.  Yeah.  Based upon my experience, my review of
11  the literature, attendance and giving lectures on the
12  international and national stage and review and the exam
13  of this patient and review of the records, as outlined
14  in my notes here, that is correct.
15    Q.  Okay.  So, at least the problems -- and I'm
16  trying to summarize so we can streamline a little bit.
17  The problems that we're talking about with respect to
18  Mrs. Alonso or the complications that you say are
19  attributed to the Bard Avaulta product are pelvic pain,
20  dyspareunia, urge incontinence, and then long-term
21  impact of lack of physical intimacy; is that correct?
22    MS. GAYLE:  Object to form.
23  BY MS. GEIST:
24    Q.  And then, Doctor, just so we're clear, on
25  pages 5 to 6, I'm looking at what you have numbered 1,

In Re: CR Bard 200                  Daniel Elliott M.D., Vol. II                  11/16/2014

Page 517

1  2, 3, and 4?
2      A.  Yeah.  Correct.  No.  I think that is, as I've
3  outlined here, I think that's a fair assessment.
4      Q.  Okay.  And you -- tell me how you went about
5  concluding that these four complications or problems
6  that Mrs. Alonso alleges she's experiencing were caused
7  by the Bard Avaulta product?
8      A.  That's a fairly drawn-out process entailing,
9  you know, 21 years of medical experience, review of the
10  literature, examination of patients -- not just this
11  one, but in my career -- then review of her medical
12  records, review of all of the potential -- the
13  differential diagnosis of other factors that could be
14  contributing to it or not, and then putting them all
15  together, all factors, and coming up with this
16  diagnosis.
17      Q.  So did you do a differential diagnosis?
18      A.  Yes.
19      Q.  Did you rule in any other medical problems or
20  conditions that may have caused the complaints that
21  Mrs. Alonso has and then rule them out?
22      A.  Well, I approach each individual.  Again, this
23  is because I work at a tertiary care center where we
24  have to keep an open mind of each individual coming in.
25  I do not disregard the outside doctor's opinions, but I

Page 518

1  always try and look at it with a critical eye.  Do I
2  agree or not?
3          So as I went through the list and looked at
4  her very carefully, looked at potential etiologies of
5  neurologic disorders, preexisting neurologic disorders,
6  which I'm not aware of any, any preexisting uterine or
7  GYN chronic pain syndromes, endometriosis, pelvic floor
8  myalgia, fibromyalgia, myositis, multiple sclerosis.
9  The list is -- sounds infinite, but we have to, again,
10  figure out all of the things that could be playing a
11  role and then looking at her and her data, her medical
12  records and her exam.  And so I might not list all of my
13  differential diagnoses, but those are all of the things
14  that go through my thought process.
15      Q.  Okay.  So would you agree with me that, when
16  we look at your report for Mrs. Alonso, it doesn't tell
17  us what you considered and ruled out in reaching your
18  differential diagnosis?
19      MS. GAYLE:  Object to form.  The report, he's
20  already testified, contains his opinions.  It's an
21  unfair characterization of the evidence.
22  BY MS. GEIST:
23      Q.  Well, does the report in any place, and you
24  can point me to it, Dr. Elliott, if I'm missing it, does
25  the report tell us what you ruled in or considered in

Page 519

1  reaching your differential diagnosis for Mrs. Alonso?
2      A.  Well, the list of potential differential
3  diagnoses in a female in this age group of pelvic
4  issues, you know, is probably a hundred different
5  things; MS, Parkinson's, myositis, endometriosis.  Did I
6  go through, as you say, and list out all of those?  I
7  did not.  But those would go through -- that goes
8  through my thought process, and I do that on every
9  single patient that I do every single day in my work.
10      Q.  Okay.  So just so I'm clear, there's
11  nowhere -- if we look at your report, there is nowhere
12  in your report that lists the other medical conditions
13  or problems that you considered specifically for
14  Mrs. Alonso and then ruled them out or concluded that
15  they were not causing her pelvic pain, dyspareunia, urge
16  incontinence?
17      MS. GAYLE:  Object to form.
18  BY THE WITNESS:
19      A.  I do not go through and list out the rare
20  issues of multiple sclerosis and endometriosis,
21  interstitial cystitis.  I look at -- I think about those
22  things.  I then look at the medical records to see if
23  there is any support for them.  If I find support for
24  that possibility, then I will include that in there.
25  But I'm not going to list every possible thing.

Page 520

1          Brain trauma, that can -- that can lead to it.
2  Spinal cord injury can lead to it.  I do not put that in
3  there.  But then, when I do my exam and I state
4  neurologically normal, then that, to me, my statement
5  neurologically normal, that rules out MS, Parkinson's,
6  spinal cord injury.
7      Q.  Understood, Doctor.  And I'm not trying to be
8  tricky about this.  I just want to see if you agree with
9  me that, if we look at your report, there is no place in
10  the report that provides us with a list of what medical
11  conditions or problems that you considered with respect
12  to Mrs. Alonso when reaching your differential
13  diagnosis.  If there is some -- if it's in the report
14  someplace and you can point it out to me, I would
15  appreciate it.
16      MS. GAYLE:  Objection.  Asked and answered.
17  BY THE WITNESS:
18      A.  The physical -- yeah, I mean, I've gone over
19  this several times now.  The differential diagnosis that
20  I go through when I encounter a patient, initially, that
21  differential diagnosis, as I'm trained, should be
22  infinite.  And then you very rapidly, through
23  experience, review of the medical literature, you can
24  narrow that differential diagnosis down rapidly.  But do
25  I go through and list every possible thing?  Again, MS,

Page 521

1 let's talk about that. To me, also, when I say
2 neurologic exam without gross deficit, that's going to
3 be excluding all of those things, and the same thing
4 with the abdominal exam, everything. So I don't go out
5 and list every possibility.
6     Q. Is there a list in the report or a note about
7 anything, any medical condition you considered with
8 respect to Mrs. Alonso and you ruled it out, in
9 concluding that the Bard Avaulta mesh was the cause of
10 her injuries and problems she's complaining about?
11     MS. GAYLE: Objection. Asked and answered.
12 BY THE WITNESS:
13     A. Yeah. I think we're -- I mean, each time we
14 ask this, it's going to be the exact same answer. I do
15 not go through and list out every possibility of
16 differential diagnosis. Again, that list is infinite.
17     But in my experience and training, as I'm
18 going through the medical records, we're knocking each
19 one of those out. But I don't go through and write
20 those all out for you in a list. Again, that list is
21 too long.
22 BY MS. GEIST:
23     Q. Okay. So there is no list. You can agree
24 with me on that, there is no list here in the report?
25     MS. GAYLE: Objection. Form.

Page 522

1 BY THE WITNESS:
2     A. As I've stated several times now, I go through
3 all of those lists of differential diagnoses in my head.
4 That includes every possible thing that can lead to
5 pelvic pain. I am a member of the International Pelvic
6 Pain Society. This is what I do for a living. But I'm
7 not going to go through and list out every possible
8 diagnosis that could lead to it that I have considered.
9 Because then you're talking about going back 25 years of
10 medical education, neurologic issues, pelvic floor, GYN,
11 endometriosis. So I considered those. I did not go out
12 and spell out each one of those separately, though.
13     Q. Okay. So the list is in your head, not in the
14 report?
15     MS. GAYLE: Object to form.
16 BY MS. GEIST:
17     Q. Is that correct?
18     MS. GAYLE: Mischaracterizes testimony.
19 BY THE WITNESS:
20     A. I've stated that over and over, and I'm going
21 to state the same thing again.
22     Q. I know. But, Doctor, here is my point, okay,
23 at the trial in this case, if Mrs. Alonso's case goes to
24 trial, the judge will ask you to say yes or no, is there
25 a list in your report. And all I'm asking you is to --

Page 523

1 all I'm asking for you is to answer my question, is
2 there a list in your report, yes or no? Can you answer
3 that question for me?
4     MS. GAYLE: Objection, counsel, argumentative.
5 BY MS. GEIST:
6     Q. Can you answer that question, Dr. Elliott?
7     MS. GAYLE: And object to form and asked and
8 answered.
9 BY THE WITNESS:
10     A. As I've said, when the judge asks me directly,
11 I can always answer him and I'll answer him in the exact
12 same way. A differential diagnosis is infinite to start
13 off with. To --
14     Q. Why won't you tell me that there is no list in
15 your report?
16     A. Okay.
17     Q. Why don't you just tell me there is no list in
18 your report, and then we can move on to the next
19 question?
20     A. Well, you can --
21     MS. GAYLE: Objection. Argumentative. Motion to
22 strike counsel's preface to the question.
23 BY THE WITNESS:
24     A. You can -- you can read what is in the report.
25 But I, as an expert, cannot include every possible

Page 524

1 diagnosis that I consider. I considered endometriosis.
2 I found no support for it. I considered interstitial
3 cystitis. I found no support for it. MS, neurologic,
4 spinal cord injuries, cervical injuries, lumbar injury,
5 lumbar disc disease, I considered all of those. I do
6 not then go and put down all of those in a form that you
7 want.
8     Q. Now, you won't answer my question, but let me
9 ask you this. You said a number of times you can't
10 possibly put down and list every possible alternative
11 cause for the problems Mrs. Alonso is complaining of.
12 Did you put in your report even one possible alternative
13 cause for the problems Mrs. Alonso is complaining of?
14     MS. GAYLE: Object to form.
15 BY MS. GEIST:
16     Q. That you considered and ruled out --
17     MS. GAYLE: Object.
18 BY MS. GEIST:
19     Q. -- in reaching your opinions? Did you include
20 even one medical condition or problem?
21     MS. GAYLE: Object to form. Asked and answered.
22 BY THE WITNESS:
23     A. Okay. In my opinion, I considered all
24 potential differential diagnoses. The report states
25 what the report states. I did not go through and list

Page 525

1 out all that I had considered.

2 Q. You didn't even list one though, correct?

3 MS. GAYLE: Objection. Asked and answered, and

4 mischaracterizes his testimony.

5 BY THE WITNESS:

6 **A. I considered all based upon my experience at a**

7 **tertiary medical center, a member of the International**

8 **Pelvic Pain Society, who deals with meshes, gain, et**

9 **cetera, on a daily basis. I considered all. I did not**

10 **go through and list out all of the possible**

11 **contributions that went through my head in coming up**

12 **with a diagnoses.**

13 Q. All right. In the interest of time, Doctor,

14 I'm going to move on. But can you tell me specifically

15 for Mrs. Alonso what specific medical conditions or

16 problems did you consider for her as a specific

17 plaintiff in reaching your differential diagnosis?

18 **A. I considered -- again, the list is large. I**

19 **considered dealing with central nervous system**

20 **conditions, Parkinson's, MS, brain trauma, radiation to**

21 **the brain, spinal cord injuries, cervical, thoracic,**

22 **lumbar, lumbar disc disease, endometriosis, interstitial**

23 **cystitis, ovarian etiologies, ovarian remnant, pelvic**

24 **congestion syndrome, primary bladder dysfunction,**

25 **neurologic injury, local diabetes, myositis.**

Page 526

1 Q. Did you see anything, when you reviewed

2 Mrs. Alonso's medical records, anything specific in

3 Mrs. Alonso's history that you considered and ruled out

4 as a potential cause of her problems in reaching your

5 differential diagnosis?

6 MS. GAYLE: Objection, form. And objection, asked

7 and answered.

8 BY THE WITNESS:

9 **A. Yeah. I mean, as far as when I reviewed her**

10 **medical records, I guess I'm confused on your question.**

11 Q. Yeah. Well, you just gave me a long list of

12 things that may or may not apply to Mrs. Alonso. Did

13 you -- did you -- when you reviewed her medical history

14 and her medical records, was there anything that you

15 considered about Mrs. Alonso's history that you ruled

16 out in reaching your differential diagnosis that the

17 Bard Avaulta product was the cause of her problems?

18 MS. GAYLE: Objection.

19 **THE WITNESS: I --**

20 MS. GAYLE: Asked and answered.

21 BY THE WITNESS:

22 **A. I ruled out that list I just went off of,**

23 **however many those were. I ruled those out as the**

24 **primary cause of her problem. Issues like myositis,**

25 **inflammation of the muscle, could be one of the**

Page 527

1 **diagnoses due to the inflammation of the product within**

2 **her body. I found no evidence of a central nervous**

3 **system defect in her.**

4 Q. In reaching your differential diagnosis for

5 Mrs. Alonso, did you consider her history with heavy

6 bleeding and clots as a possible alternative cause for

7 some of the pain and discomfort she's complaining about?

8 **A. Yes and no to that. She had heavy**

9 **periods, abnormalities of uterine issues. However, that**

10 **was prior to her surgery. Following her surgery and no**

11 **longer having a uterus, those issues are excluded.**

12 Q. Did you consider, in reaching your

13 differential diagnosis, the fact that Mrs. Alonso had

14 been diagnosed with diverticulitis?

15 **A. Yes. Diverticulitis, colon issues, are**

16 **considered in a differential diagnosis. However, in**

17 **dealing with being an expert in pelvic pain and a member**

18 **of the International Pelvic Pain Society, pelvic pain**

19 **due to diverticulitis, diverticulosis, or a perforated**

20 **diverticulum is different than this type of pain.**

21 Q. Diverticulitis, the primary presentation of

22 that medical condition is pelvic pain, true?

23 **A. It possibly can be pelvic pain if it ruptures.**

24 **It is also associated with fever, chills, systemic**

25 **defects, and usually located on the left-hand side where**

Page 528

1 the sigmoid is located.

2 Q. So did you consider diverticulitis --

3 diverticulitis as a possible cause for some of the

4 pelvic pain problems Mrs. Alonso is complaining of?

5 MS. GAYLE: Objection. Asked and answered.

6 BY THE WITNESS:

7 **A. As I mentioned, absolutely, but then I**

8 **analyzed and I have a fairly extensive -- because I'm a**

9 **reconstructive surgeon and a member of the International**

10 **Pelvic Pain Society, diverticulitis, she had no evidence**

11 **of active diverticulitis. Diverticulosis is not**

12 **commonly associated with pain. It's also a different**

13 **type of pain. She had no fever, no chills, no evidence**

14 **of an intraabdominal pelvic abscess.**

15 Q. How about internal hemorrhoids? Did

16 Mrs. Alonso have internal hemorrhoids?

17 **A. I don't recall.**

18 Q. Did you consider internal hemorrhoids as a

19 possible alternative cause for pelvic pain?

20 **A. Internal hemorrhoids are usually painless.**

21 **They may bleed per rectum with bright red blood. They**

22 **will not cause vaginal pain. So, in my experience, that**

23 **is theoretically a source of bleeding, but it is not a**

24 **source of vaginal pain or vaginal abscess following a**

25 **surgery.**

In Re: CR Bard 200     Daniel Elliott M.D., Vol. II     11/16/2014

Page 529

1   Q. One of the things you mentioned with respect
2 to Mrs. Alonso is urge incontinence?
3   **A. Correct.**
4   Q. Do you -- is it your opinion that the Bard
5 Avaulta product caused her to experience urge
6 incontinence?
7   **A. With, again, a review of the literature and**
8 **based upon my experience and where the Avaulta mesh is**
9 **placed in the vesicovaginal space and reviewing the**
10 **surgeon's records, which is consistent where he placed**
11 **it -- those are where the nerves for bladder function**
12 **occur -- if a mesh becomes infected or inflamed or**
13 **contracts, it will affect those nerves. So, yes, that**
14 **could be a source of her overreactive bladder.**
15   Q. Did you consider the fact that she was
16 diagnosed with overreactive bladder or urge
17 incontinence -- those are the same things, right,
18 Doctor? Don't we -- don't medical doctors use those
19 terms interchangeably? Urge incontinence means
20 overreactive bladder syndrome?
21   MS. GAYLE: Object to form.
22 BY THE WITNESS:
23   **A. Overreactive bladder is the entire**
24 **constellation of symptoms of urgency, frequency, urge**
25 **incontinence, where urge incontinence is a more specific**

Page 530

1 subset within that.
2   Q. Did you consider the fact that she was
3 diagnosed with an overreactive bladder and was on
4 Vesicare prior to the implant of the Bard product?
5   **A. Absolutely. And so my previous answer was**
6 **that the Avaulta, where it's located, is going to be**
7 **contributing to possibly worsening of that condition.**
8   Q. Can you say, with a reasonable degree of
9 medical certainty, that the Bard product changed, in any
10 way, the condition she already had prior to the implant?
11   **A. I would have to look at, and I'd have to go**
12 **back and look at her records here, the chronologic --**
13 **the chronology of the situation, the severity of her**
14 **overreactive bladder prior to and after and then**
15 **currently.**
16     **If the disease process has dramatically**
17 **increased following the implantation of it, the Avaulta**
18 **may not be the primary cause if she had a preexisting**
19 **condition, but it can worsen it. The same thing if an**
20 **individual has pelvic pain prior to surgery, but it**
21 **increases dramatically. The Avaulta may not have caused**
22 **the underlying problem, but then it worsens the**
23 **condition.**
24   Q. Did you consider the fact that Mrs. Alonso had
25 said she had no complaints of overreactive bladder

Page 531

1 syndrome at the end of 2013?
2   MS. GAYLE: Objection.
3 BY MS. GEIST:
4   Q. If she had said that, does that mean that the
5 Bard products could not have been increasing the
6 severity of the overreactive bladder syndrome?
7   MS. GAYLE: Objection. Objection. Form.
8 BY THE WITNESS:
9   **A. Absolutely not. Because, remember, the**
10 **vesicovaginal plexus, which are the nerves that control**
11 **bladder function, are located in the vesicovaginal plane**
12 **where the Avaulta mesh goes. So, if you have a mesh**
13 **that contracts, degrades, causes inflammation and traps**
14 **nerves, that can lead to progression of the disease just**
15 **like we see progression and increase of mesh extrusion.**
16   Q. Are you aware that Mrs. Alonso has a history
17 of extensive lumbar disc disease, joint swelling?
18   **A. Correct.**
19   Q. Back problems?
20   **A. Correct.**
21   Q. You're aware of all of that?
22   **A. Well, I would have to go back and look at the**
23 **records at exactly where all of the lumbar disc disease**
24 **is. But lumbar disc disease is in my differential**
25 **diagnosis, as I mentioned earlier, of neurologic**

Page 532

1 abnormalities.
2   Q. Did you consider those conditions as possibly
3 contributing to Mrs. Alonso's complaints of pain?
4   MS. GAYLE: Object.
5 BY MS. GEIST:
6   Q. And lack of physical intimacy?
7   MS. GAYLE: Objection. Asked and answered
8 previously.
9 BY THE WITNESS:
10   **A. Yes. Based upon my education and the fact**
11 **that I did a fellowship in what's called neurourology**
12 **and a member of the International Pelvic Pain Society,**
13 **I'm very well aware and one of the leaders in the field**
14 **as far as the understanding of neuroanatomy and its**
15 **effects upon the pelvis.**
16     **Lumbar disc disease can, no question, cause**
17 **pain. But leading to isolated pelvic pain where there**
18 **is a firm nodule in the vagina, lumbar disc disease does**
19 **not cause that. If you isolate it to causing foot pain,**
20 **leg pain, sciatic-type pain, then Avaulta does not cause**
21 **that. Disc disease causes that.**
22   Q. Does Mrs. Alonso have a handicapped sticker on
23 her car?
24   MS. GAYLE: Objection.
25 BY THE WITNESS:

In Re: CR Bard 200     Daniel Elliott M.D., Vol. II     11/16/2014

Page 533

1   A. I have no knowledge.
2   Q. You have no -- I thought you said you read her
3 deposition?
4   MS. GAYLE: Objection, Counsel. Mischaracterizes
5 his testimony.
6 BY MS. GEIST:
7   Q. Did you read her deposition?
8   A. Yes. I read her deposition. I do not
9 remember every word of her deposition, and I read many
10 people's depositions of hundreds and hundreds of pages.
11 I cannot recall every single word of it.
12   Q. Did you -- so you have no idea why she has
13 that handicapped sticker on her car --
14   MS. GAYLE: Objection.
15 BY MS. GEIST:
16   Q. -- what medical condition caused her to get
17 that handicapped sticker?
18   MS. GAYLE: Objection, Counsel.
19 BY THE WITNESS:
20   A. I've already answered the question. If I
21 didn't know she had a handicapped sticker, I don't know
22 why she would have a handicapped sticker.
23   Q. Did you read in her deposition how she
24 testified that it's hard for her to walk and she has
25 pain when she walks and that's the reason why she has

Page 534

1 the handicapped sticker due to a specific medical
2 condition?
3   MS. GAYLE: Object to form.
4 BY THE WITNESS:
5   A. Okay. I would like -- the important thing,
6 probably, let's pull out that deposition and read that
7 exactly because I would like to know what type of pain
8 she is describing. In my interaction with her, as I've
9 talked about it here, neurologic issues related to
10 lumbar disc disease can cause pain in the legs, can
11 cause difficulty ambulating. No question it can do it.
12   But when I'm then correlating that with
13 my exam and my interaction with her as far as what pain
14 happens when standing, sitting, lying down and then the
15 physical exam. As I mentioned, lumbar disc disease will
16 not cause pinpoint tenderness in the obturator foramen
17 and will not cause scarring in the vagina.
18   Q. Sitting here today, do you know why, what
19 specific medical condition Mrs. Alonso has that caused
20 her to go and get a handicapped sticker for her car?
21   MS. GAYLE: Object to form. Asked and answered.
22 BY THE WITNESS:
23   A. I've already stated I did not know she had a
24 handicapped sticker. The fact that she does tells me
25 that she's got some impairment. I do not -- I don't

Page 535

1 know what was in the deposition. I've asked to see this
2 deposition, to look at that in its entirety. Not that I
3 don't doubt you, but I would like to see the whole
4 comment.
5   Q. So you don't know the medical condition that
6 caused her to go and get the sticker?
7   MS. GAYLE: Objection.
8 BY MS. GEIST:
9   Q. Is that -- is that true?
10   MS. GAYLE: Objection to form. Objection, asked
11 and answered. Objection, mischaracterizes Mrs. Alonso's
12 testimony.
13 BY THE WITNESS:
14   A. I think the best thing, let's take a look at
15 that deposition and what she states. I would like to
16 see, in the entirety, those comments.
17   Q. So the answer to my question is, you don't
18 know the medical condition for which she got a
19 handicapped sticker on her car?
20   MS. GAYLE: Objection.
21 BY MS. GEIST:
22   Q. And which causes her pain with walking?
23   MS. GAYLE: Objection.
24 BY MS. GEIST:
25   Q. Is that true, Doctor?

Page 536

1   MS. GAYLE: Objection. Asked and answered.
2 BY THE WITNESS:
3   A. You are asking me to trust what you are
4 stating. And I would like to see that document and
5 let's look through it. I will be more than happy to
6 render an opinion based upon that deposition.
7   Q. Did -- after a woman has a pelvic floor
8 surgery like the type Mrs. Alonso had, the implant of a
9 transvaginal mesh product to repair a pelvic organ
10 prolapse, after a woman has such a procedure, are they
11 normally instructed by a physician to not engage in
12 sexual intercourse for a specific period of time?
13   A. I can't speak to what happens in every
14 practice. I know what my instructions are.
15   Q. What are your -- what are you instructions?
16   A. No sexual activity for six weeks.
17   Q. Why?
18   A. For concerns about breaking down the incision.
19   Q. So if a woman engages in sexual intercourse
20 during that six-week healing process, what could happen
21 to the incision?
22   A. Well, since I don't use any meshes, it will
23 just probably delay healing a bit because the incision
24 could break down. It's much more of an important issue
25 when meshes are in place.

Page 537

1  Q.  Is that because it could actually cause some
2  sort of mesh exposure and open the -- open the incision,
3  in other words?
4      A.  Possible --
5      MS. GAYLE:  Object to form.
6  BY THE WITNESS:
7      A.  Possibly.  I am unaware of any.  I would have
8  to look at the IFU, what Bard warns as far as how long
9  to avoid sexual activity.
10     Q.  Would you agree with me, if a woman engages in
11 sexual activity before being cleared by her doctor, that
12 that would not be a good thing and could possibly cause
13 complications?
14     A.  I disagree with that.
15     Q.  I thought you just told me that, if a woman
16 engages in sexual intercourse during the healing
17 process, that could cause some complications with
18 respect to healing and the suture?
19     A.  That -- I answered that.  That's correct.
20     Q.  Okay.
21     A.  But your other question was different.
22     Q.  Did you consider, in reaching your opinions
23 with respect to Mrs. Alonso and the complications she
24 had that you say resulted from the Bard Avaulta product,
25 did you consider the fact that she may have engaged in

Page 538

1  sexual intercourse prior to being cleared by her doctor?
2      MS. GAYLE:  Objection to form.  Objection,
3  mischaracterizes the testimony of the parties.
4  BY THE WITNESS:
5      A.  I don't know what she was instructed.  We
6  would have to go look back at the medical records of
7  what she was instructed.  Clearance by a medical doctor
8  does not necessarily have to be done if there is an
9  appropriate amount of waiting.
10         So, again, we would have to look at the
11 records and see what she was instructed and when sexual
12 activity began.  And we'd also have to look at the
13 medical literature to determine are there any studies
14 out there showing when it is appropriate to regain
15 sexual activity.
16     Q.  And certainly, Doctor, you would agree with me
17 that, if a woman engages in sexual activity too soon
18 after a vaginal surgery, complications could occur?
19     MS. GAYLE:  Objection.  Form.
20 BY THE WITNESS:
21     A.  There's -- there's too many variables there.
22 It depends upon the time of it, the health of the woman,
23 steroid status.  Multiple factors come into play.
24     Q.  Is it a possibility?
25     A.  Again, I would have to look at the medical

Page 539

1  records to see when she regained.  There is going to be
2  a lot of qualifiers.  Did she resume sexual activity two
3  days postop or four weeks, six weeks, eight weeks?
4      Q.  Do you know, from your review of the records
5  in Mrs. Alonso's case, when she began resuming sexual
6  activity and whether she, in fact, adhered to her
7  doctor's instructions; do you know that?
8      MS. GAYLE:  Object to form.
9  BY THE WITNESS:
10     A.  I would want to see the records.  I don't
11 recall.
12     Q.  You do not recall sitting here today?
13     A.  I do not recall the specifics of that.  That's
14 why I'd want to see the records, to refresh my memory.
15     Q.  Doctor, you talk in your report about the lack
16 of physical intimacy has already cost Mrs. Alonso a
17 major component to her quality of life.  And then you
18 state long-term impact on her quality of life is
19 difficult to accurately ascertain, however many studies
20 have shown long-term negative impact leads to feelings
21 of isolation, loneliness, depression, and suicide.  Did
22 I read that correctly?
23     A.  Correct.
24     Q.  And that is actually an identical opinion that
25 you provided in Mrs. Wheeler's and Mrs. Bolyard's case,

Page 540

1  true?
2      A.  That is correct, with medical literature to
3  support that.
4      Q.  Are you saying here, Doctor, that Mrs. Alonso
5  will necessarily experience depression and kill herself
6  because of the issues that she's complaining of in this
7  litigation?
8      MS. GAYLE:  Objection to form.  Mischaracterizes
9  his opinions.
10 BY THE WITNESS:
11     A.  In dealing with patients on a day-to-day
12 basis, review of the literature, being a member of the
13 International Pelvic Pain Society, one of the elite
14 societies on pelvic pain, isolation, depression due to
15 lack of physical intimacy, a guilt sensation to this can
16 possibly lead to depression, isolation, and suicide, as
17 I mentioned.
18     Q.  Did -- did you consider any other problems in
19 Mrs. Alonso's life that could contribute to the cause --
20 I'm sorry -- that could contribute to quality-of-life
21 issues, depression, issues relating to these things
22 you've raised in your report?
23     A.  Yes.  Yes, I did.
24     Q.  So did you consider her other problems such as
25 the husband being in jail who was cheating on her?  Did

Page 541

1  you consider those things?
2      MS. GAYLE:  Objection, form.
3  BY THE WITNESS:
4      **A.  Oh, well, by all means.  A husband being in**
5  **jail and those types of issues will definitely add**
6  **stress to her life.  Compounded by the fact that she has**
7  **pelvic pain, that is a major issue.  A husband that is**
8  **in jail will not cause extreme vaginal pain on my exam.**
9      Q.  But you would -- do you know how long her
10  husband was in jail?
11      MS. GAYLE:  Objection.  Form.
12  BY MS. GEIST:
13      Q.  Do you know how long the couple was separated
14  because her husband was incarcerated?
15      MS. GAYLE:  Objection.
16  BY THE WITNESS:
17      **A.  No.  How long?**
18      Q.  You don't know?
19      **A.  I just said I don't know.**
20      Q.  Okay.  Well, I thought you said you read her
21  deposition.
22      MS. GAYLE:  Objection, Counsel.  Mischaracterizes
23  his testimony.  He's reviewed thousands of pages.
24  BY THE WITNESS:
25      **A.  I am under the understanding a deposition like**

Page 542

1  **this is not a memory test.  So I've asked you let's see**
2  **the deposition and let's go over it.  If it's in there,**
3  **I'm very open and let's consider it.  But no matter,**
4  **let's say he's been in prison 30 years, that will not**
5  **cause vaginal pain on my exam.**
6      Q.  No.  But a husband with an extended history of
7  incarceration could certainly cause a woman depression
8  and quality-of-life issues?  Would you agree with me on
9  that?
10      MS. GAYLE:  Objection.  Are you talking about
11  generally for a random person, or are you talking about
12  in a specific case?
13  BY MS. GEIST:
14      Q.  No.  I'm talking about Ms. Alonso.  If
15  Mrs. Alonso was in a marriage where her husband was
16  incarcerated for five years, where she actually filed
17  for divorce, where he actually moved out, and she
18  testified he was cheating on her multiple times in the
19  marriage, could all of these things cause her to
20  experience quality-of-life issues such as depression?
21      MS. GAYLE:  Objection.  Mischaracterizes
22  Mrs. Alonso's testimony and her husband's testimony.
23  BY THE WITNESS:
24      **A.  In day-to-day interaction with women in my**
25  **clinic, day-to-day interaction with women in the public,**

Page 543

1  sometimes divorce actually improves quality of life.
2      Q.  So I don't think that answered my question,
3  though.
4      **A.  It absolutely answered it.**
5      Q.  Could the -- could the personal problems that
6  Mrs. Alonso has experienced in her marriage, including a
7  husband who is incarcerated for years who has cheated on
8  her, who has left her, could these issues have caused
9  her quality of life issues and depression issues
10  separate and apart from issues she says she has from the
11  Bard Avaulta product?  Could she have any of those
12  issues if she never even had the Bard Avaulta product
13  implanted?
14      **A.  I keep an open mind about this.  That's why I**
15  **mentioned, women undergoing stress of a husband who is**
16  **cheating, who is incarcerated, and he is taken out of**
17  **her life could improve quality of life.**
18      Q.  But could also result in a decline of quality
19  of life?  You're not going to disagree with me on that,
20  are you, Doctor?
21      MS. GAYLE:  Object to form.  Argumentative.
22  BY MS. GEIST:
23      Q.  You don't -- you don't think a woman can
24  experience depression and a decrease in quality of life
25  when she has a husband who is cheating on her and is

Page 544

1  tossed in jail for drug-related issues?
2      MS. GAYLE:  Objection.  Form and mischaracterizes
3  testimony.
4  BY THE WITNESS:
5      **A.  I could see a large number of women being**
6  **actually thrilled to get rid of a man in their life.**
7      Q.  Could you also see a large number of women
8  experiencing depression after a husband cheats on them?
9      MS. GAYLE:  Objection.  Form.
10  BY THE WITNESS:
11      **A.  That would be a possibly devastating part of**
12  **her life, and that's why she might be happy if he goes**
13  **off to prison.**
14      Q.  Do you -- do you know the status of
15  Mrs. Alonso's marriage at this point in time?  Do you
16  know whether she took him back or not?
17      MS. GAYLE:  Objection.  Form.
18  BY THE WITNESS:
19      **A.  I don't recall.**
20      Q.  If she took him back into the marital home
21  right before her deposition, would that change your
22  opinion on whether or not she was negatively impacted
23  when he was gone in jail for five years?
24      MS. GAYLE:  Objection.  Form.  Objection.
25  Mischaracterizes his testimony.

Page 545

1  BY THE WITNESS:
2      **A.  I could see that being a wonderful source of**
3  **joy, that they've reconciled themselves, and now they're**
4  **left with a painful vagina and they cannot engage in**
5  **intercourse and intimacy.**
6      Q.  The dyspareunia is one of these things you
7  note with respect to Mrs. Alonso, and you attribute that
8  as well to the Bard Avaulta product, correct?
9      **A.  Yes.  As we mentioned earlier, the Align**
10  **product also goes to the exact same location as the**
11  **Avaulta product.  It is my opinion, based upon my**
12  **experience, review of the literature and exam, that**
13  **statistically speaking with medical certainty it's going**
14  **to be the Avaulta product.**
15      Q.  Would you agree with me, Doctor, that
16  dyspareunia is what we call sort of a nonspecific
17  complaint?
18      MS. GAYLE:  Object to form.
19  BY THE WITNESS:
20      **A.  I think it's very, very specific.**
21      Q.  Are there --
22      **A.  It's painful with sex -- sexual -- it is pain**
23  **with sexual activity, so that's very specific.**
24      Q.  Are there a number of physical and
25  psychological reasons that a woman may experience

Page 546

1  dyspareunia?
2      MS. GAYLE:  Object to form.
3  BY THE WITNESS:
4      **A.  There are multiple different things that have**
5  **to be and should be considered when evaluating a woman**
6  **for dyspareunia.**
7      Q.  Many, many women experience dyspareunia who
8  have not had a transvaginal mesh implanted.  Would you
9  agree with me on that?
10      MS. GAYLE:  Object to form.
11  BY THE WITNESS:
12      **A.  But then we would have to look at the**
13  **severity, the location, the physical exam, the**
14  **chronology of that.**
15      Q.  Have you considered other causes for
16  Mrs. Alonso's complaints of dyspareunia?
17      **A.  Absolutely.  Every patient I see, on a**
18  **day-to-day basis, I keep an open mind to the**
19  **differential diagnosis of what caused it.  That's why we**
20  **have to look at the chronology, what surgeries were**
21  **done, familial factors, et cetera.**
22      Q.  I've seen in the literature and at least on
23  the Mayo Clinic site that dyspareunia can be caused in a
24  woman for psychological reasons.  Would you agree with
25  that?

Page 547

1      **A.  Psychological reasons can be one of the**
2  **considerations.  However, women with stressors will not**
3  **have pinpoint obturator foramen tenderness and scarring**
4  **of the vagina.**
5      Q.  Mrs. Alonso has certain stressors like what I
6  indicated to you earlier relating to a cheating husband,
7  a husband who is incarcerated.  Could those contribute
8  and cause dyspareunia?
9      **A.  They will not cause a scarred vagina and**
10  **pinpoint tenderness of the obturator foramen.**
11      Q.  That wasn't my question, though.  Could those
12  things cause dyspareunia?  If a woman has a husband
13  who's cheated on her, and she knows it, the woman has
14  stress in her marriage because the husband is
15  incarcerated for a number of years, could those things
16  have a psychological impact on that woman and cause her
17  to experience dyspareunia?
18      MS. GAYLE:  Objection.  Asked and answered.
19  BY THE WITNESS:
20      **A.  If the husband is her sole sexual partner and**
21  **he's in prison and not having sexual activity, they**
22  **won't have dyspareunia.**
23      Q.  I don't think you answered my question,
24  Doctor.  Can you answer my question?  And my question
25  was, could those facts, as I laid them out to you, cause

Page 548

1  a woman to experience dyspareunia?
2      MS. GAYLE:  Objection.  Asked and answered three
3  times now.
4  BY THE WITNESS:
5      **A.  The definition of dyspareunia is pain during**
6  **sexual activity.  If the woman is not having sexual**
7  **activity, there will not be pain during sexual activity**
8  **because it does not exist.  So the husband being**
9  **incarcerated, gone from the family, will not cause**
10  **dyspareunia.  Dyspareunia -- dyspareunia can only be**
11  **during sexual activity.  Pain during a physical exam,**
12  **pinpoint tenderness, scarring of the vagina exists**
13  **regardless of the husband's status.**
14      Q.  So I still think you're not answering my
15  question.  So let me try it a different way.  Let's
16  assume the husband is free from jail, he's back in the
17  marital home right before the deposition, conveniently,
18  and the couple is engaging in sexual intercourse.  Could
19  that history with that husband cheating, the other
20  stressors in the marriage, could that cause a woman such
21  as Mrs. Alonso to experience dyspareunia?
22      MS. GAYLE:  Objection.  Asked and answered four
23  times now.
24  BY THE WITNESS:
25      **A.  Yeah.  We keep going around and around with**

Page 549

1  this.
2      Q.  Well, we are, Doctor, because, you know, with
3  all due respect, you're not answering my question.
4  You're avoiding it like I've never seen.
5      A.  With all due respect, I am answering it very,
6  very well based upon my experience as a surgeon in a
7  tertiary care center who takes care of these patients on
8  a day-to-day basis.  A husband who comes back -- and I
9  take offense to the conveniently comes back.  That is a
10  pretty negative comment to put on the record for this
11  poor woman who is suffering, who I examined.  I'm the
12  only person in this room who has examined this woman.
13  I'm the only person who's talked to her and felt in the
14  vagina as far as where this pain is.  And, again, maybe
15  they've reconciled and her life is good and she's happy,
16  and now she cannot become sexually active and intimate
17  and loses that segment of her life.
18      Q.  You don't -- you don't consider the
19  possibility that Mr. -- that Mrs. Alonso's husband moved
20  back in with her two weeks before the deposition for the
21  purpose of the lawsuit and what they're pursuing in the
22  lawsuit?  You don't consider that as a possibility?
23      MS. GAYLE:  Object to form.
24  BY THE WITNESS:
25      A.  Number one, I am a surgeon here concerning her

Page 550

1  medical condition.  The motivations behind those
2  individuals you'll have to ask them.  That would be best
3  to have them answer that question.
4      Q.  You have some opinions in your report, Doctor,
5  that we talked about a little bit already with respect
6  to long-term outcome and prognosis.  Do you see that in
7  your report?
8      A.  Correct.
9      Q.  And your opinions, as I understand them, is
10  that for both Mrs. Alonso's reported pelvic pain and
11  dyspareunia, you say the prognosis is poor, and it is
12  highly unlikely that Mrs. Alonso will have a complete
13  resolution of her pelvic pain and her sexual
14  dysfunction.  Is that -- are those your opinions,
15  Doctor?
16      A.  Correct.  In my experience at a major tertiary
17  center, with highly subspecialized training, dealing
18  with the scarred -- the vaginal scarring that takes
19  place following mesh implantation, I have yet to see one
20  woman with this severe -- with this severe of a reaction
21  ever regaining normal sexual function.
22      Q.  The -- and you have the same identical opinion
23  for Mrs. Wheeler and Mrs. Bolyard as well, correct?
24  It's word for word in each of your three reports, this
25  section?

Page 551

1      A.  Yeah.  I would have to look at those exactly,
2  but I would not doubt they'd be similar.
3      Q.  Okay.  Well, they're actually exact.  We can
4  put them side by side if you want.  But it's your
5  opinion, in each of these three cases, that the pelvic
6  pain and dyspareunia are highly unlikely to be resolved
7  and that these women will have these conditions for the
8  rest of their lives, correct?
9      A.  Yeah.  In my experience at a tertiary medical
10  center, a member of the International Pain Society --
11  Pelvic Pain Society with women who have come which I see
12  on a daily basis, I have yet to see one recover normal
13  sexual functions.
14      Q.  Well, you're not a pelvic pain specialist or a
15  pain specialist; is that correct?
16      MS. GAYLE:  Object to form.
17  BY THE WITNESS:
18      A.  Absolutely, I'm a pelvic pain specialist.
19      Q.  You are?
20      A.  This is what I do on a daily basis, yes.
21  That's what female pelvic medicine and reconstructive
22  subspecialty approved by the boards of urogyn and
23  urology do.
24      Q.  Aren't there doctors who hold themselves out
25  as pain specialists in the medical community?

Page 552

1      MS. GAYLE:  Objection.
2  BY THE WITNESS:
3      A.  There are anesthesiologists, usually
4  anesthesiologists, who are pain specialists, but they're
5  also urologists.
6      Q.  No.  I mean doctors who actually treat people
7  experiencing chronic pain conditions, like fibromyalgia
8  and things of that nature?  Aren't there doctors who are
9  considered to be pain specialists who hold themselves
10  out as pain specialists in the medical community?
11      A.  Yes, and I'm one of them.
12      Q.  You are?
13      A.  Yes.
14      Q.  You hold yourself out as a pain specialist in
15  the medical community?
16      A.  Absolutely.
17      Q.  Do you treat any other type of pain condition
18  other than pelvic pain?
19      A.  I treat only pelvic pain.
20      Q.  Do you have any particularized education,
21  training, or background or advanced degree in the
22  treatment of pain generally?
23      A.  Yes.  Yes, I do.  And doing a fellowship in
24  neurourology, okay, which is pelvic neuroanatomy.
25  That's a one-year advanced training taking and passing

Page 553

1 the credentialing for female pelvic medicine and
2 reconstruction, which is dealing with pelvic pain, being
3 a member of the International Pelvic Pain Society,
4 reviewing literature, attending meetings, yeah, I have
5 an advanced level of understanding of this far more than
6 the average.
7     Q. So you don't refer your patients out -- your
8 patients out to a pain management specialist doctor, for
9 example?
10     A. At times I will, dependent upon my evaluation.
11 If I do not feel there is anything I can do surgically
12 for this woman, then I will -- it's a multispecialty
13 approach. I at times will get my urogynecology
14 colleagues involved. I will get colorectal involved. I
15 may get -- sometimes if they're going to do injections
16 into the spine. I don't do that. I'll get multiple
17 people involved because this is a multispecialty
18 approach to dealing with this problem.
19     Q. You don't perform trigger-point injections or
20 anything of that nature to address complaints of pain;
21 is that true?
22     A. No. I deal more with the surgical management
23 of the pelvic pain, medication management of the pelvic
24 pain. When it comes time to do injections, I have other
25 subspecialists who I feel can treat these individuals

Page 554

1 and have a better chance of it.
2     Q. So a pain management specialist would be a
3 doctor you would refer your patients to if they're going
4 to look into the option of trigger-point injections, for
5 example, to manage pain?
6     MS. GAYLE: Objection. Asked and answered.
7 BY THE WITNESS:
8     A. I need for you to define trigger-point
9 injections then.
10     Q. You don't know what I mean when I use that
11 term?
12     MS. GAYLE: Objection. Mischaracterizes his
13 testimony.
14 BY THE WITNESS:
15     A. Trigger points -- there are trigger points in
16 the spine. There's trigger points in the neck. There's
17 migraine trigger points. So you have to define what
18 you're talking about. I will not do a trigger-point
19 injection for migraines.
20     Q. In reaching your diagnosis, your opinions
21 about the long-term prognosis for Mrs. Alonso, did you
22 consider the availability of physical therapy for the
23 pain?
24     A. Absolutely. That is one of the other
25 individuals in my armamentarium. I have physical

Page 555

1 therapists within my department. I also have physical
2 medicine, rehab physical therapists that I deal with.
3     Q. Did -- when you met with Mrs. Alonso, did you
4 refer her to a physical therapist or a pain management
5 specialist?
6     A. I make no -- I was very clear with them. I am
7 here to evaluate you. I made no medical
8 recommendations. I gave her no diagnosis. I told her
9 upfront, I am here to evaluate you to come up with an
10 opinion on my own, but I did not talk to her about
11 diagnosis, prognosis, or treatment options.
12     Q. And, by the way, Doctor, can we agree that all
13 of these questions and answers you're providing me on
14 this issue of permanency of the pelvic pain and
15 dyspareunia, that they would also apply -- your same
16 responses would apply to Mrs. Wheeler and Mrs. Bolyard's
17 cases?
18     A. Yeah. I agree completely unless there is some
19 other nuance that pops up.
20     Q. Understood.
21     A. But you're right.
22     Q. Understood. Do you know whether Mrs. Alonso
23 has sought the assistance from a pain management
24 specialist?
25     A. I would have to go back and look at the

Page 556

1 records. Off the top of my head, I do not recall.
2     Q. How about Mrs. Wheeler and Mrs. Bolyard? Do
3 you know whether they have sought care and treatment
4 from a pain specialist, pain management specialist,
5 pardon me?
6     A. It's the same answer for all of those.
7     Q. You don't know whether any of those plaintiffs
8 are seeing a pain management doctor?
9     A. I don't recall.
10     Q. In Mrs. Alonso's case, did you consider, in
11 reaching your differential diagnosis, whether there were
12 any -- strike that.
13     In Mrs. Alonso's case, did you consider, in
14 reaching your differential diagnosis, the surgical
15 technique of the implanting doctor, Dr. Suarez?
16     A. Absolutely.
17     Q. The Avaulta -- the Bard Avaulta mesh is
18 supposed to be implanted tension-free. Do you
19 understand that?
20     A. Correct.
21     Q. And that's set forth in the IFU for the
22 product? Can we agree on that?
23     A. I would have to look because I'd have to
24 refresh my memory on the IFU; however, it is well-known
25 and established that it should be placed tension-free.

Page 557

1    Q.  Okay.

2    **A.  But the definition of tension-free is unknown.**

3    Q.  Understood.  But that's not something that you

4  think would be unknown to an implanting doctor.  It's

5  well-established that the mesh needs to be implanted

6  tension-free, and that's in order to allow for the

7  tissue ingrowth that is expected with the products; is

8  that true?

9    **A.  No.  It depends upon when the implantation**

10  **took place.  In the early years, when there was no**

11  **experience with meshes, no one knew what the right**

12  **amount of tension would be.**

13    Q.  How about --

14    **A.  In --**

15    Q.  I'm sorry.  Go ahead.

16    **A.  In 2014 -- well, it's not available.  Let's**

17  **say when it was last available on the market, it would**

18  **be a more -- there is a lot more data out there on what**

19  **tension-free would be.  Now, the reason for tension-free**

20  **is because of contraction of the mesh to account for it.**

21    Q.  There is a certain degree of contraction due

22  to the normal wound healing process after a transvaginal

23  mesh is implanted.  Is that correct?

24    **A.  Yes.  If we looked at various different data,**

25  **Letourzney was the one that comes to mind,**

Page 558

1  **L-E-T-O-U-R-Z-N-E-Y, et al., after six months, up to 80**

2  **percent contraction.**

3    Q.  Now, Dr. Suarez implanted Mrs. Alonso's

4  Avaulta product on July 19, 2010.  Do you understand

5  that?

6    **A.  July 19th, 2010, I agree.**

7    Q.  Okay.  So, at that point in time, was it

8  well-known in the medical community that the

9  transvaginal mesh product needed to be implanted

10  tension-free in your opinion?

11    **A.  I can't say as far as that date.  That's in**

12  **the middle years of this, so I can't say.**

13    Q.  Do you know if the IFU at the time instructed

14  the implanting doctor to implant the mesh tension-free?

15    **A.  I would have to look at that IFU and then also**

16  **have to know what IFU Dr. Suarez was looking at, too.**

17    Q.  Did you look at the operative note from

18  Dr. Suarez's surgery?

19    **A.  Yes.  I reviewed it closely.  I don't recall**

20  **it right now.  I would like to see it.  That would be**

21  **helpful.**

22    Q.  If the operative note describes that the mesh

23  was put in under tension without proper tacking to

24  prevent migration and curling, would that have been

25  proper surgical technique?

Page 559

1    **A.  Again, I would have to see that note because**

2  **I'd have to look at the note in its entirety.**

3    Q.  Understood.  But as -- and I'm asking you to

4  assume what is true as I've just stated to you, and then

5  we'll look at the note.  But if the note describes that

6  the mesh was put in under tension and without proper

7  tacking to prevent migration and curling, would that be

8  proper surgical technique?

9    MS. GAYLE:  Objection.  Form.

10  BY THE WITNESS:

11    **A.  I would like to look at that note and then**

12  **I'll decide whether I agree with you or not.**

13    MS. GAYLE:  Let's take a quick bathroom break,

14  Counsel, if you don't mind.

15    MS. GEIST:  Yeah.  Let's take a quick break.

16  That's a good idea.

17    VIDEO TECHNICIAN:  We're off the record.  The time

18  is 10:39 a.m.

19        (A recess was had.)

20    VIDEO TECHNICIAN:  We're back on the record.  The

21  time is 10:55 a.m.

22        (Elliott Deposition Exhibit Nos. 30 &

23          31 were marked for identification.)

24  BY MS. GEIST:

25    Q.  Dr. Elliott, let me hand you what I've marked

Page 560

1  during a break as Exhibit 30 and 31 to your deposition.

2  And, for the record, Exhibit 30 is the Avaulta Plus

3  Biosynthetic Support System IFU dated at the bottom

4  October of 2009.  And Exhibit 31 is the operative report

5  by Dr. Suarez for Mrs. Alonso for the surgical procedure

6  performed on July 19th, 2010.

7        Let me hand those to you and give a copy to

8  your counsel.  This is 30 and this is 31.

9    MS. GAYLE:  Thank you.

10  BY MS. GEIST:

11    Q.  Doctor, directing your attention to Exhibit

12  30, which is the IFU for the Avaulta Plus Biosynthetic

13  Support System?

14    **A.  Yes.**

15    Q.  You've reviewed this before the deposition,

16  correct?

17    **A.  Yes, I have.**

18    Q.  Okay.  And if you go with me to the fourth

19  page of the document --

20    **A.  I'm there.**

21    Q.  -- under Description, on the second paragraph,

22  it states, The monofilament polypropylene mesh used in

23  the Avaulta Plus Biosynthetic Support System has a soft

24  knit in the central section for compliant organ support

25  and host tissue ingrowth, and a strong knit in the

Page 561

1 lateral sides to provide improved strength for
2 tension-free fixation of the mesh.  Do you see that?
3    **A.  Oh, here we go.**
4    Q.  I'm sorry.  Were you --
5    **A.  I was -- no, no.  I list- --**
6    Q.  Were you not with me when I was reading?
7    **A.  No.  I was listening to you.**
8    Q.  Okay.
9    **A.  Okay.  Yes.  Yes.**
10    Q.  We were talking about whether or not the IFU
11 contained information and instructions for a physician
12 regarding the fact that the mesh should be placed
13 tension-free, correct?
14    **A.  I agree that's what you stated, but that's not**
15 **what this states.  It never states placed tension-free.**
16    Q.  Right.  Well, I haven't gotten -- I haven't
17 gotten through the IFU yet.
18    **A.  Okay.  Yes.**
19    Q.  I'm just noting this section for you.  Okay?
20    **A.  Okay.  I will agree with you that that's what**
21 **this states in this section, but it doesn't say anything**
22 **about placed.**
23    Q.  Okay.  And this IFU would have been in effect
24 for Mrs. Alonso's operation because that operation was
25 January 19th, 2010, correct?

Page 562

1    **A.  This IFU was in circulation.  I don't know**
2 **what IFU Dr. Suarez was using.**
3    Q.  Okay.  Fair enough.  But, as you look at the
4 document, it has a date at the bottom of October 2009 on
5 the first page, correct?
6    **A.  October of 2009 is when this came out, yes.**
7    Q.  You don't have any reason, sitting here today,
8 to believe that this was the version of the IFU that was
9 used by Dr. Suarez when he implanted the Avaulta mesh in
10 Mrs. Alonso about a year later?
11    MS. GAYLE:  Objection.  Asked and answered.
12 BY THE WITNESS:
13    **A.  I will agree that this was in circulation.  I**
14 **will not agree that that's the version that Dr. Suarez**
15 **used.  Because if the company came to his office, took**
16 **out all of his old IFUs, and replaced it with the new**
17 **ones, then I would agree, but I have no support of that.**
18    Q.  Do you know whether or not an IFU accompanies
19 each and every Bard Avaulta system that is sold and
20 provided to a medical doctor?
21    **A.  I cannot attest to that.  IFUs are usually**
22 **included, but I don't know what version of -- if he does**
23 **not do very many of these, perhaps, he's using a product**
24 **that was, you know, sitting on the shelves for a year**
25 **because these have long shelf lives.**

Page 563

1    Q.  I'm not asking you to agree that this is the
2 version used by Dr. Suarez.  We already talked to
3 Dr. Suarez about that.
4    **A.  Okay.**
5    Q.  I'm just saying you don't have any reason,
6 sitting here today, to disagree with me that this is
7 probably the version he used.  I'm not asking you to
8 agree with me.  Do you understand that?
9    **A.  Yeah.  I cannot attest to what version.  He**
10 **would know what version he read.  That's all I'm saying.**
11 **I just can't say it.**
12    Q.  That's fine.  That's fine.  And if you go with
13 me to -- we just finished looking at page 4.  If you
14 flip to page 5, in all bold, in caps, it says, Implant
15 procedures.  Do you see that?
16    **A.  Yes, I see that.**
17    Q.  And then there is a section regarding
18 preparation of Avaulta Plus mesh for implantation,
19 correct?
20    **A.  That is correct.**
21    Q.  And that provides information to the surgeon
22 regarding what should be done prior to implantation by
23 way of summary, true?
24    **A.  That is correct.**
25    Q.  And then -- and then it has a section in bold

Page 564

1 for implantation techniques for the Avaulta Plus
2 Biosynthetic Anterior Support System, correct?
3    **A.  Correct.  And I'm trying to correlate that.**
4 **For my understanding, Alonso had the Avaulta Solo put in**
5 **her or did she have the Avaulta Classic?  Because based**
6 **upon the operative note, I don't believe it actually**
7 **states it.  I would have to look at what the -- from the**
8 **records, what he actually -- because I don't recall**
9 **which one was placed in her.**
10    Q.  You don't recall which product Mrs. Alonso had
11 implanted in her by Dr. Suarez?
12    **A.  No.  That's what I'm saying.  I would want to**
13 **clarify to make sure we're all on the same page.**
14    Q.  Okay.  If you turn with me to page 6 of
15 Exhibit 30 that we're looking at together --
16    **A.  Yes.**
17    Q.  -- No. 5?
18    **A.  Yes.**
19    Q.  If you -- oh, I'm sorry.  I'm on the wrong
20 number, No. 6.  Number 6 says, Apply traction.  It says
21 a number of things, and then the second sentence in
22 No. 6 says, Be sure the graft is tension-free.  Do you
23 see that?
24    **A.  Yes.  I am reading over that sentence right**
25 **now.**

Page 565

1   Q.  Okay.  This is the second part in the IFU that
2  talks about the second part being tension-free?
3   **A.  Correct.  With no clarifier what tension-free**
4  **actually means.**
5   Q.  And then at No. 9, if you go with me to No. 9,
6  it has sort of a next step in the surgical procedure, if
7  you will.  And on the sixth line down, it says, ensure
8  the central graft is positioned under the bladder
9  without extensive -- excessive tension.  Do you see
10  that, Doctor?
11   **A.  Yes, I see that.**
12   Q.  So that's the third time the IFU is talking
13  about not implanting the graft with tension?
14   **A.  No.**
15   Q.  It should be tension-free?
16   **A.  I'm sorry.  I interrupted you.  That's my**
17  **fault.  No.  I disagree with you on the second.  Under**
18  **point No. 9 of the IFU, it says, without excessive**
19  **tension.  That means there is tension.  There's not**
20  **excessive tension.  That's different than tension-free.**
21  **I completely agree with you on Point No. 6.  It states**
22  **tension-free.  But point No. 9, it's very clear without**
23  **excessive tension.**
24   Q.  And then, if you go with me to No. 10 on the
25  next page, it says, The mesh should be sufficiently

Page 566

1  anchored to stabilize it during tissue ingrowth.  So
2  that indicates the anticipated and normal sequence of
3  tissue ingrowth in the mesh product, true?
4   MS. GAYLE:  Objection.  Form.
5  BY THE WITNESS:
6   **A.  To me that's telling me they're trying to**
7  **prevent a way to keep this thing from folding and**
8  **scarring up.**
9   Q.  And then the second sentence says, Additional
10  sutures may be used to secure the mesh tension-free.  Do
11  you see that?
12   **A.  Yes.  And then it goes down below.  It says,**
13  **Caution, excessive tension should be avoided.  Again, it**
14  **doesn't say tension-free.  It says excessive tension.**
15   Q.  Right.  So that was my next point to you.  And
16  then there's a caution underneath No. 10.  And, it
17  reads, as you've started to indicate, Caution, excessive
18  tension should be avoided on the mesh and suture
19  attachment points to account for wound shrinkage during
20  the healing process.  Did I read that correctly?
21   **A.  That is what they state.**
22   Q.  So the IFU for the Bard Avaulta product
23  indicates that it should be tension-free.  It should be
24  implanted tension-free and excessive tension should be
25  avoided?

Page 567

1   **A.  Well, I think statistically speaking twice**
2  **they say avoid excessive tension.  One time they say**
3  **tension-free.  So, again, those are -- they're ambiguous**
4  **terms.**
5   Q.  You think they're ambiguous?
6   **A.  Yeah.  I don't know what excessive tension, if**
7  **I -- I am someone, an individual putting these in,**
8  **excessive tension means I make it tight, but I just**
9  **don't make it really tight.  I don't know what that**
10  **means.**
11   Q.  You've never implanted one of these devices as
12  we've talked about yesterday, correct?
13   **A.  I have not implanted, in a live human being,**
14  **an Avaulta Plus.**
15   Q.  Do you know if Dr. Suarez thought these
16  instructions were vague or ambiguous in any way?
17   MS. GAYLE:  Objection.
18  BY THE WITNESS:
19   **A.  I would have -- I would have to look at his**
20  **deposition.  I don't recall what he said.**
21   Q.  Do you think if a doctor, a surgeon about to
22  use the product, thought that these instructions were
23  vague or ambiguous in any way, do you think that doctor
24  could ask for further information or clarification from
25  Bard?

Page 568

1   MS. GAYLE:  Objection.  Form.  Calls for
2  speculation.
3  BY THE WITNESS:
4   **A.  I think it leaves open the room for a surgeon**
5  **looking at this and says, who is doing their due**
6  **diligence and reading over this, says avoid excessive**
7  **tension.  Okay.  I'll avoid excessive tension.  But it**
8  **doesn't say what excessive tension is.  Does it say it**
9  **would be nice if they prevent the tissues from being**
10  **bent or pressure on the tissue?  But, again, it just**
11  **says excessive tension.**
12   Q.  Would you agree with me, Doctor, obviously, if
13  a surgeon about to implant this device has any sort of
14  ambiguity or it's unclear to that doctor what he or she
15  needs to do, that that doctor should ask the question
16  before implanting the device, that would be good medical
17  practice?
18   MS. GAYLE:  Objection.  Form.  Speculation.
19  BY THE WITNESS:
20   **A.  But if -- if the doctor has done their work,**
21  **they feel comfortable doing their procedure, then they**
22  **read this, without objective data, they won't**
23  **necessarily know what excessive tension is.**
24   Q.  Well, and if they don't, they should ask a
25  question of the device manufacturer, correct?

In Re: CR Bard 200                Daniel Elliott M.D., Vol. II                11/16/2014

Page 569

1    A.  No.  But excessive tension might be then they
2    might think about it and say, Okay, I see that.  Let's
3    make sure this is not cranked up really high so that the
4    bladder is elevated up significantly.  I will prevent
5    that.  I won't put excessive tension on it.
6        Q.  Would you agree with me that it's the
7    responsibility of a pelvic floor surgeon to understand
8    proper surgical technique when implanting a medical
9    device?
10       A.  I agree with you completely.  And what I'm
11   saying is, without objective data to go off of, this is
12   subjective.  And they may look at it.  They may think
13   about it.  They're doing the responsible thing.  They
14   say, okay, I'll avoid excessive tension.  That's
15   subjective.  It's not an objective term.
16       Q.  If you look with me to what we've marked as
17   Exhibit 31, that's the operative report for Dr. Suarez
18   for the surgical procedure on Mrs. Alonso on July 19th,
19   2010?
20       A.  Correct.
21       Q.  And have you looked at this document before,
22   Dr. Elliott?
23       A.  Yes.  When I did the original IME, I reviewed
24   this.
25       Q.  Okay.  Does this document indicate to you that

Page 570

1    Dr. Suarez implanted the mesh under tension and without
2    any proper tacking to prevent migration or curling of
3    the mesh?
4        A.  Let me read over it here.  Okay.  I've
5    finished reading it.  I had to determine what segment
6    was what because obviously he performed two different
7    procedures.  So the first paragraph of the description
8    of the procedure is the POP, the pelvic organ prolapse.
9    The second part appears to be the urethral sling.
10       Q.  And, after reading this, Doctor, does this
11   indicate to you that Dr. Suarez implanted the mesh under
12   tension and did not use any type of tacking as indicated
13   in the IFU to prevent any migration or curling of the
14   mesh?
15       MS. GAYLE:  Objection.  Form.
16       BY THE WITNESS:
17       A.  I do not see, in the dictation, that he states
18   that it was tacked down.  Regard- -- so that's point
19   number one.  Regarding the tension placed on it, he's
20   using the term vaginal tape, which I'm understanding
21   that is the Avaulta mesh, applied positive pressure
22   against the posterior bladder wall.  So I don't -- I
23   don't know what he means by that, applied positive
24   pressure against it.  So not to avoid you, I just don't
25   know what that means.  He would be the one who would

Page 571

1    have to answer what that means.
2        Q.  Is there any indication in the operative
3    report that he used any type of tacking or sutures to
4    prevent any migration or curling of the mesh?
5        A.  No.  That's why I stated.  I do not see, in
6    his note -- it does not appear that he recorded anything
7    about tacking it down.  He would be the best one to
8    answer that question, not me.  But I do not -- to answer
9    your question, I do not see it in the note.
10       Q.  And if the implanting surgeon, Dr. Suarez,
11   didn't use any sutures or other methods for tacking it
12   down, that may, in fact, have resulted in migration or
13   erosion or curling of the mesh, true?
14       MS. GAYLE:  Objection.  Form.
15       BY THE WITNESS:
16       A.  It would not affect the arms of the mesh.  The
17   proximal or distal portion of it, possibly.  But I don't
18   know.  I have not heard any data or seen any studies
19   whether or not tacking actually correlates to any
20   success.  All I can state is, in this note, it does not
21   appear he did any tacking stitches.
22       Q.  Would you agree with me that it's possible
23   that due to the lack of tacking of the mesh, that that's
24   why Mrs. Alonso experienced issues with exposure or
25   erosion?

Page 572

1        MS. GAYLE:  Objection.  Form.  Objection.
2    Mischaracterizes evidence.
3        BY THE WITNESS:
4        A.  I can't -- again, I would have to -- important
5    to go off of what the data is out there.  I don't know
6    of any data out there, objective studies, showing that
7    that makes a difference at all.  It does not correlate
8    to what the IFU states.  But does that correlate it to
9    real life?  I don't know that.
10       Q.  The surgical technique followed by Dr. Suarez
11   is not consistent with what the IFU instructs as you
12   just said, correct?
13       MS. GAYLE:  Objection.  Form.  Mischaracterizes his
14   testimony.
15       BY THE WITNESS:
16       A.  On that one aspect of not placing the tacking
17   stitches, that was not done as is stated in the IFU.
18   Whether or not that correlates to complications, I can't
19   answer that.
20       Q.  Did you -- so then you didn't consider that
21   issue, Dr. Suarez's surgical technique which is contrary
22   to the IFU, in reaching your opinions with respect to
23   Mrs. Alonso's complications?
24       MS. GAYLE:  Objection.  Form.  Objection,
25   mischaracterizes his testimony.  And objection,

Page 573

1  mischaracterizes the evidence.
2  BY THE WITNESS:
3      A.  No.  What I can state is, I cannot go off of
4  objective studies, papers looking at whether or not
5  tacking down correlates to any of those issues as
6  discussed in the IFU.
7      Q.  Can you tell me whether or not it's possible
8  it could have resulted in some of the complications
9  experienced by Mrs. Alonso?
10     MS. GAYLE:  Objection.  Form.  Objection.  As I've
11  stated before, mischaracterizes evidence.
12  Mischaracterizes testimony.  Mischaracterizes
13  Dr. Suarez's testimony.  And the witness would like
14  knowledge.  Just because this one page doesn't have it
15  on there does not mean that it's not in evidence
16  elsewhere.
17  BY THE WITNESS:
18     A.  To answer your question, I have no objective
19  data whether or not tacking actually plays a role in
20  folding, erosion, extrusion.
21     Q.  Well, Doctor, I'm not -- I'm not a doctor, and
22  I wouldn't pretend to be a medical doctor.  But tacking
23  is included as an instruction in the IFU.  And if one
24  doesn't tack down the mesh, even a layperson could
25  understand that it may move or fold or roll, aren't

Page 574

1  those possibilities, things that may occur, if a mesh is
2  not properly tacked down as instructed in the IFU?
3      MS. GAYLE:  Object to form.
4  BY THE WITNESS:
5      A.  I disagree completely because I am a surgeon
6  and I have read the IFUs and the studies on other
7  products like Prolift, Apogee, and they have nothing
8  about tacking down.  And their products have very high
9  incidence of erosion, scarring, and things.  So just
10  because this one says it, I don't know.
11     Also, I have a lot of data showing impaired
12  healing with the presence of any polypropylene,
13  especially if there is collagen.  So I have data for
14  that.  What I'm saying is, I have no data to go off of
15  that tacking down the mesh changes the erosion.  If you
16  have data, I would like to see it.  I will keep an open
17  mind.
18  BY MS. GEIST:
19     Q.  Let me -- let me move, Doctor, to page 8 of
20  your report, if you have your expert report in front of
21  you.
22     A.  I have it here.
23     Q.  And, again, Doctor, I'm going to try and
24  summarize, for purposes of efficiency, your opinions
25  which are contained in Mrs. Alonso's case-specific

Page 575

1  report beginning on the bottom of page 8 and going to
2  page 11?
3      A.  Correct.  Okay.
4      Q.  Okay.  So, just for the record, beginning on
5  page 8, on the entirety of page 9, the entirety of Page
6  10, and then maybe half of page 11, this is about two
7  and a half pages of all of the things you think that
8  Bard should have included in the IFU for the Avaulta
9  product.  Is that a fair summary?
10     A.  That's correct.
11     Q.  And that's your opinion, that all of the
12  things on two and a half pages here in your report,
13  should have been included in the IFU?
14     A.  That is correct.
15     Q.  And I think it's also your opinion that
16  Mrs. Alonso was not able to make an informed decision
17  about her use of transvaginal mesh because Bard failed
18  to disclose these risks?
19     A.  I say it's a combination of things that,
20  because Dr. Suarez was not fully informed, subsequently
21  he was not able to fully inform Mrs. Alonso.
22     Q.  Okay.  And it's your opinion that, if
23  Dr. Suarez was informed in the IFU of all of these
24  risks, then he would have been better able to inform
25  Mrs. Alonso; is that your opinion?

Page 576

1      A.  If he were fully aware of the frequency and
2  the severity and the permanence of these complications,
3  including, you know, all that's listed there, he would
4  have been able to better inform Mrs. Alonso who would
5  then have been able to better make a decision.
6      Q.  Now, you say, on page 8, at the bottom, that
7  all of the risks that you list on the next two and a
8  half pages were known, but Mrs. Alonso was not informed
9  of these risks on her informed consent.  Do you see
10  that?
11     A.  Okay.  I'm sorry.  You're on the bottom of
12  page 8.
13     Q.  I'm on the bottom of page 8.
14     A.  The paragraph starting with since Bard knew;
15  is that correct?
16     Q.  Correct.
17     A.  Okay.  I'm sorry.  Can you repeat the
18  question?
19     Q.  Sure.  So, in the last sentence of this
20  paragraph, you say, The following lists of risks that
21  were known, but Mrs. Alonso was not informed of on her
22  informed consent, correct?
23     A.  Correct.  That's what it states.
24     Q.  Did you look at the informed consent in
25  Mrs. Alonso's case as part of your review of her medical

In Re: CR Bard 200          Daniel Elliott M.D., Vol. II          11/16/2014

Page 577

1   records?
2      A.  Yes.  I was sent that.
3      Q.  And there was no information on an informed
4   consent about the risk of erosion or pain or dyspareunia
5   associated with the Avaulta product, true?
6      MS. GAYLE:  Objection.
7   BY THE WITNESS:
8      A.  I'd have to see that informed consent.  I
9   can't recall that one.
10     Q.  Whose responsibility is it to provide the
11  informed consent; Bard's, a medical device manufacturer,
12  or the doctor, Dr. Suarez, in this case?
13     A.  The informed consent is based upon -- the
14  informed consent is based upon the information that the
15  surgeon has gained from multiple different sources,
16  including the IFU.
17     Q.  Okay.  So it's not -- you would agree with me
18  it's not Bard's responsibility to put particular
19  language in an informed consent.  The doctor drafts the
20  informed consent for his or her patient, true?
21     A.  I disagree with that.  Bard has a
22  responsibility to provide to the doctors all known risks
23  regardless of severity and to list them for the doctor.
24  The doctor's then responsibility is to take that
25  information, to trust it being accurate, and then to

Page 578

1   properly inform the patient.
2      Q.  So the doctor's responsibility is to put
3   together the informed consent and provide the
4   risk-benefit analysis to the patient.  That's the
5   doctor's role, correct?  I mean, there's nothing
6   controversial about what I'm asking you here.  That's
7   the doctor's role?
8      A.  The doctor's role is just as I stated.  The
9   doctor has to take all available information on a
10  product and surgery and then to adequately inform and
11  thoroughly inform the patient.
12     Q.  All right.  So I think we're saying the same
13  thing.  You don't expect Bard to be sitting down with a
14  particular patient and talking about the particular
15  risks and benefits of the medical device.  The doctor's
16  role is to have that conversation with his or her
17  patient.  Do you agree with me on that?
18     A.  Yeah.  Bard's role is to provide all known
19  complications regardless of severity, and then the
20  doctor's role is to be in the room alone with the
21  patient and family.  Bard has no role inside that office
22  interaction.
23     Q.  Right.  It's the doctor's job to obtain the
24  informed consent from his or her patient for the
25  surgical procedure, correct?

Page 579

1      A.  Mentions the same thing, yes.  The doctor has
2   to take all of the available data that is provided to
3   him from the company and then inform the patient.
4      Q.  So let's assume that all of the information on
5   the two and a half pages that you have here in your
6   report was provided by Bard to Dr. Suarez.  Okay?
7      A.  I'm supposed to assume that?
8      Q.  Yeah.  Let's assume that.  Let's assume all of
9   the information that you say should have been put in the
10  IFU for the Avaulta product was provided by Bard to
11  Dr. Suarez?
12     A.  If all of those, however many --
13     MS. GAYLE:  I'm sorry.  There's --
14  BY MS. GEIST:
15     Q.  There is no question yet.
16     MS. GAYLE:  There is no question pending, Doctor.
17  BY MS. GEIST:
18     Q.  Just assume -- just assume with me all of that
19  information was given to Dr. Suarez, okay?
20     A.  Okay.
21     Q.  And all of this information on the two and a
22  half pages you say, Dr. Elliott, is information that
23  Bard knew about and Bard purposely didn't put it in the
24  IFU, didn't communicate it to doctors; is that a fair
25  summary?  Bard should have done this, Bard knew about

Page 580

1   these risks and didn't communicate it to doctors?
2      MS. GAYLE:  Objection.  Form.
3   BY THE WITNESS:
4      A.  Yeah.  You're asking me to assume something,
5   and then I'm kind of not following you because it's a
6   complicated question.  You're asking me to assume Bard
7   told everybody and I lost you.
8      Q.  Yeah.  Let me go back.  You're saying that
9   Bard knew about all of these risks and Bard should have
10  informed Dr. Suarez, or any other doctor, about all of
11  these risks, Bard failed to do this, Bard knew certain
12  information, and they failed to put it in the IFU?
13     A.  They failed to adequately put it in the IFU.
14  I'll agree with that.
15     Q.  Okay.  On that point, Doctor, did you ever
16  review any FDA regulations or rules on what needs to go
17  into an IFU before getting involved in this litigation?
18     MS. GAYLE:  Objection to that question.  That was
19  covered yesterday in his general testimony.
20  BY MS. GEIST:
21     Q.  That wasn't specifically.  The question was,
22  before you got involved in this litigation, did you ever
23  review any FDA rules or regulations relating to what
24  should or should not be put into a medical device
25  instructions for use?

In Re: CR Bard 200          Daniel Elliott M.D., Vol. II          11/16/2014

Page 581

1    MS. GAYLE: Objection. Again, I believe that was
2  covered yesterday.
3  BY THE WITNESS:
4    **A. Do I answer? I mean --**
5    Q. It's a different question, and I'm happy to
6  compare the transcripts. But the question was specific.
7  Before this litigation, had you ever read or acquainted
8  yourself with the FDA rules and regulations regarding
9  what information needs to be put or not included in an
10  IFU?
11    MS. GAYLE: You may answer that question subject to
12  my objection.
13  BY THE WITNESS:
14    **A. I guess I'm somewhat confused. I thought**
15  **yesterday was the -- all of this. Now we're going back**
16  **to the general report. I can't recall all of the**
17  **documents. I'm involved in reviewing 30 different IFUs.**
18  **I can pull up the notes as far as what IFUs I reviewed.**
19  **I can't recall when I first saw FDA guidelines. You**
20  **know, in 2008, when the first FDA warning came out, I**
21  **reviewed the things then. In 2011, I reviewed it.**
22    **So I can't recall when I first became aware of**
23  **various different FDA -- I'm sure, over the course of**
24  **this litigation, my understanding of the regulation**
25  **process has increased. I'm not going to deny that. I**

Page 582

1  **don't recall when I first saw what was required. I was**
2  **always under the impression everything had to be told to**
3  **the doctor on the IFU.**
4    Q. And I understand your impression, but my
5  question was, before you got involved as an expert for
6  plaintiffs in the pelvic mesh litigation, did you ever
7  go and review and research the FDA regulations, rules
8  and guidance documents, about what needs to go into a
9  label or not?
10    MS. GAYLE: My objection is reiterated. Again, I
11  think this goes to yesterday's testimony as well as
12  another objection because he's asked and answered the
13  question.
14  BY THE WITNESS:
15    **A. Okay. As of day one of medical school**
16  **residency staff, I was -- and I'll answer your question.**
17  **I was under the understanding the IFU had to tell me**
18  **everything about the product. That was my**
19  **understanding. Then, as I got involved in this**
20  **litigation and looking at various different things and**
21  **digging deeper, then I'm finding out that that**
22  **understanding was correct.**
23    **However, again, in 2008 and 2011, when the FDA**
24  **started coming out with these warnings, that's when I**
25  **started looking into this. So I can't tell you when I**

Page 583

1  **first looked at any, like the FDA Blue Book. I don't**
2  **know when that first was. I wouldn't be able to tell**
3  **you with any specific accuracy. That FDA Blue Book is**
4  **available online.**
5    Q. And you can't tell me whether or not you first
6  looked at that before you got involved as an expert in
7  the litigation?
8    MS. GAYLE: Objection. Asked and answered and
9  discussed yesterday. I'm going to instruct him not to
10  go over this territory, which was went over yesterday.
11  I think we're burning time on this issue and it's
12  duplicate. And, you know, Judge Goodwin does not like
13  duplicative testimony.
14  BY MS. GEIST:
15    Q. It's not. I never asked you yesterday about
16  did you review any FDA regulations, rules or guidance,
17  before you got involved as an expert in the litigation.
18  I did not ask that question yesterday. That's why I'm
19  asking it today.
20    MS. GAYLE: And it should have been answered,
21  Counsel, because that's a general question that went to
22  his general opinions yesterday. We covered the Blue
23  Book yesterday. He answered questions. If you failed
24  to ask a question yesterday, it's our position that it's
25  a question that's lost because it was a general

Page 584

1  question. You can't rehash general today when he's
2  sitting here on case specifics. You're not asking him
3  anything about the Blue Book in relation to these three
4  plaintiffs.
5    MS. GEIST: Well, I'm going to object. You should
6  make your objection to form. If you want to raise it in
7  a motion, that's fine. Speaking objections are not
8  allowed. We went through this yesterday with other
9  counsel.
10    And this is a specific point in Dr. Elliott's
11  case-specific report that goes on for four pages. And
12  it's specifically tied to Mrs. Alonso, because
13  Dr. Elliott opines, in his report, that all of these
14  risks should have been in the IFU and Mrs. Alonso was
15  not informed of these risks because Bard failed to
16  provide these risks to her surgeon, Dr. Suarez.
17    MS. GAYLE: And we'll just take it up in motion
18  practice.
19    MS. GEIST: That's fine.
20    MS. GAYLE: But, again, our objection is
21  reiterated. This is a general opinion. If you have
22  opinions to these people, ask a question to these
23  people.
24  BY MS. GEIST:
25    Q. And that's what this is all about,

Page 585

1 Mrs. Alonso. So can you answer my last question,
2 Doctor?
3      MS. GEIST: If the court reporter could read it
4 back for him.
5 BY THE WITNESS:
6      A. No. I recall the question. You're asking me
7 to speculate. If I had to give a time frame of first
8 looking into specific FDA regulations, that would be
9 when I was contacted by Dr. Michael Carome of Public
10 Citizen because he was getting involved as far as
11 drafting that copy to the F- -- yeah, to the FDA. And
12 that's probably when I first would have looked at that
13 document. And that was in -- it was signed in August.
14 That process started, probably, in June, June of 2011.
15      Q. Thank you. So, now, Doctor, getting back to
16 my original question, let's assume that all of the
17 information that you say Bard knew about and, therefore,
18 should have put in the IFU, this two and a half pages,
19 let's assume, for the purposes of this question, that
20 Dr. Suarez was informed by Bard of everything you lay
21 out here in your two and a half pages. Okay?
22      A. Okay.
23      Q. Can you assume that for me?
24      A. I can assume that, yes.
25      Q. Okay. Even if all of this information was

Page 586

1 provided to Dr. Suarez, how do you know, to a reasonable
2 degree of medical probability or certainty, that
3 Dr. Suarez would have provided any of that information
4 to Mrs. Alonso?
5      A. Well, you're asking me to theorize. You're
6 asking me, number one, to make a huge assumption that
7 Dr. Suarez would have provided -- been provided an
8 honest evaluation of risks, lifelong complications, and
9 a reasonable doctor would have then relayed that on to
10 patients. I cannot speak for him. I would have told
11 the patients all of that data because I wanted a fully
12 informed patient. I cannot speculate what Dr. Suarez
13 would do. That would be a best question for him.
14      Q. So, sitting here today, you can't say that had
15 Bard provided all of this information to Dr. Suarez,
16 Dr. Suarez would have provided it to Mrs. Alonso?
17      MS. GAYLE: Objection. Form.
18 BY THE WITNESS:
19      A. I can't speak to what Dr. Suarez would do. I
20 can speak to what I would do and what I feel a
21 reasonable surgeon would do.
22      Q. Can we agree, Dr. Elliott, that Dr. Suarez
23 likely would not have provided all of this information
24 to Mrs. Alonso?
25      MS. GAYLE: Objection. Form.

Page 587

1 BY THE WITNESS:
2      A. I cannot speculate what Dr. Suarez would do.
3 I can speculate -- I -- beyond speculate, I could tell
4 you what I would do and what a reasonable colleague of
5 mine would do. I can't speak for Dr. Suarez.
6 Dr. Suarez would be the best one to answer that
7 question.
8      Q. Well, you told me you read Ms. Alonso's
9 deposition testimony, right?
10      A. Correct.
11      Q. Do you recall her testimony that she was not
12 informed of any of the risks associated with
13 transvaginal mesh?
14      A. I do recall her saying that. In my
15 experience, sometimes individuals forget things over
16 time. I know what she stated.
17      Q. Well, would you agree with me that there is
18 nowhere in Dr. Suarez's records or the informed consent
19 to establish that he provided her with any of the risks
20 of the implantation of transvaginal mesh to Mrs. Alonso?
21      MS. GAYLE: Objection, form.
22 BY THE WITNESS:
23      A. That's why I stated earlier I would want to
24 see, again, the clinical notes and specifically the
25 informed consent. And then that also does not entail

Page 588

1 what actually went on in the office. And if he were
2 under the impression, after reading the IFU, that these
3 risks are minimal, he might have downplayed it.
4      Q. Did you see any evidence in the records that
5 Dr. Suarez talked to Mrs. Alonso about risks like
6 erosion, pelvic pain, and dyspareunia associated with
7 the implant of a transvaginal mesh product?
8      A. Yeah. I don't recall, and that's why I'm
9 asking to see those records again so we can go over
10 that, what was done on multiple clinic visits and at the
11 formal informed consent.
12      Q. So I just want to make sure I'm clear. There
13 is no -- you don't have any evidence, sitting here
14 today, Dr. Elliott, that Dr. Suarez would have passed on
15 any of this information that you say should have been
16 included in the IFU?
17      MS. GAYLE: Objection.
18 BY MS. GEIST:
19      Q. That he would have passed any of it on to
20 Mrs. Alonso?
21      MS. GAYLE: Object.
22 BY MS. GEIST:
23      Q. Would you agree with me?
24      MS. GAYLE: Objection, form. Objection,
25 mischaracterizes evidence.

Page 589

1 BY THE WITNESS:
2      A.  Well, all I can state -- again, I cannot speak
3 for Dr. Suarez.  He is the one who needs to address that
4 question.  A reasonable surgeon would relay on to a
5 patient, if he or she is fully knowledgeable of all of
6 the risks, you have to relay all of those risks to the
7 patient.
8      Q.  Well, would a reasonable surgeon relay to a
9 patient who is considering having a transvaginal mesh
10 device implanted in her body, would a reasonable surgeon
11 talk about risks such as erosion, pain, and dyspareunia?
12     A.  I can speak for myself.  I would.
13     Q.  And those are all risks that are in the Bard
14 Avaulta IFU, are they not?
15     A.  I would have to look at the IFU and see how
16 they state it.  Because if -- if a surgeon is looking at
17 his frame of reference being native procedures and he
18 sees pain, he's thinking and correlating that to native
19 procedures, which is short-term, pain, dyspareunia,
20 all of those things.  So, again, I can't speak to what
21 that surgeon's frame of reference is.  Again, he would
22 be the best one to answer that.
23     Q.  Well, referring back to the IFU that we marked
24 as Exhibit 30, Doctor, under Adverse Reactions, on page
25 5 of the IFU, the Adverse Reactions section of the IFU

Page 590

1 from Bard informs a surgeon that complications
2 associated even with the proper implantation of the
3 Avaulta Plus Biosynthetic Support System include, and
4 what's listed below are a number of different things.
5 And what's included is extrusion, erosion, inflammation,
6 pain, dyspareunia, scarification, among other things.
7 Those are all -- all included in the adverse reaction
8 section of the IFU, true?
9      A.  Yeah.  But, see, we're limited.  It talks
10 about extrusion, but it does not talk about lifelong
11 risk of extrusion.  It does not give you any qualifiers
12 of the extent and the severity of the problem.
13     Q.  Understood.  But there is no evidence in this
14 case, from the informed consent documents or the records
15 from Dr. Suarez, that Dr. Suarez even told Mrs. Alonso
16 about the potential risks of erosion, pain, or
17 dyspareunia?
18     MS. GAYLE:  Objection.
19 BY MS. GEIST:
20     Q.  Do you agree with me?
21     A.  Again, I would have to see that -- those
22 records.  I don't recall that specific terminology.  I
23 would have to look at the records.
24     Q.  Well, Doctor, we don't have time for you to go
25 through all of the records again here at your

Page 591

1 deposition.  You were prepared to come here and talk
2 about Mrs. Alonso's case, correct?
3      A.  Yes.  I had over a thousand pages of documents
4 to review, and I cannot remember every single word.  And
5 so that's why I would like to just see what was stated
6 on his informed consent.
7      Q.  So, sitting here now, you can't tell me
8 whether or not Dr. Suarez informed Mrs. Alonso of at
9 least some of the risks that are included here in the
10 adverse reaction section of the IFU?
11     A.  I have the understanding a deposition is not
12 memory test.  This is very detailed issues, and that's
13 why I would like to see the informed consent.  It seems
14 fairly basic.  I asked for the operative report and I
15 got that.  And so I would like to see the informed
16 consent and then we can logically go through it.  And
17 then I can disagree -- or, excuse me, agree or disagree
18 with you.
19     Q.  If -- if Dr. Suarez did not inform Mrs. Alonso
20 of some of the potential adverse events or complications
21 associated with transvaginal mesh, would that be acting
22 within the standard of care?
23     MS. GAYLE:  Objection.  Form.
24 BY THE WITNESS:
25     A.  I don't know as far as standard of care.  The

Page 592

1 purpose of an informed consent is to inform the patient
2 of risks and have them consent or not.
3      Q.  So -- all right.  So setting aside standard of
4 care, if Mrs. Alonso's testimony is true that Dr. Suarez
5 didn't tell her about any of the potential risks
6 associated with the implantation of Bard's Avaulta
7 product, that would be something you would be critical
8 of with respect to Dr. Suarez?
9      MS. GAYLE:  Object to form.  Objection,
10 mischaracterizes evidence and testimony.
11 BY MS. GEIST:
12     Q.  I mean, would that be proper medical care and
13 counseling to a patient if Dr. Suarez did not, in fact,
14 obtain informed consent from Mrs. Alonso prior to the
15 procedure?
16     A.  In discussion with patients on a daily basis
17 and providing informed consents to patients on a daily
18 basis, unfortunately, not everybody remembers all of the
19 issues that are discussed with them.  So, therefore,
20 that's why I'd have to go down to the -- what the notes
21 say and what Dr. Suarez says in his deposition.
22     MS. GEIST:  Can we go off the record one
23 minute?
24     VIDEO TECHNICIAN:  We're off the record.  The time
25 is 11:35 a.m.

Page 593

1    (A short recess was had.)

2    VIDEO TECHNICIAN:  We're back on the record.  The

3  time is 11:37 a.m.

4  BY MS. GEIST:

5    Q.  Dr. Elliott, had Mrs. Alonso had a native

6  tissue repair to resolve her pelvic organ prolapse or an

7  abdominal sacrocolpopexy procedure, would you agree with

8  me that she could have experienced the same issues with

9  pelvic pain and dyspareunia?

10   **A.  No.  I disagree.**

11   Q.  You disagree.  She didn't have -- she wouldn't

12 have had any risk of pelvic pain or dyspareunia after

13 having a native tissue repair; is that your testimony?

14   **A.  No.  My testimony is you have to put the**

15 **qualifiers on the location, the degree, the severity,**

16 **the inability to cure it.  And with a sacrocolpopexy, we**

17 **are talking about -- excuse me, with a mesh repair,**

18 **we're talking about midvault scarring of the obturator**

19 **foramen.  The sacrocolpopexy is not even in that region.**

20 **The same thing with the native tissue repair.  So I**

21 **would -- you would have to put the qualifiers on it.**

22   Q.  Okay.  Well, let me try and put the qualifiers

23 on it.  If Mrs. Alonso had had a native tissue repair,

24 would you agree with me that she still could have

25 experienced pelvic pain and dyspareunia?

Page 594

1    **A.  In my experience, in a high-volume tertiary**

2  **center, a member of the International Pelvic Pain**

3  **Society, she has the chance of having mild and usually**

4  **correctible -- and, in my experience, I have never had**

5  **one of permanent -- dyspareunia.  That is comparing to**

6  **mesh, which is permanent, progressive, and severe.**

7    Q.  So she could have still experienced pelvic

8  pain and dyspareunia, but it's your opinion that the

9  pelvic pain and dyspareunia she's complaining of now is

10 more severe and permanent in nature; is that right?

11   **A.  It is more severe.  Based upon the data and my**

12 **experience, it's progressive.  There is no ability to**

13 **cure it.  So with those qualifiers on there, then I**

14 **agree with you.**

15   Q.  And you're certainly not going to give an

16 opinion that had Mrs. Alonso had a native tissue or an

17 ASC procedure, that she would have had no risk of

18 experiencing pelvic pain or dyspareunia?  You would

19 never give that opinion, would you?

20   **A.  I would give the opinion that, in my**

21 **experience, I've never once had an individual with this**

22 **severe of pain in this location and in a progressive**

23 **nature.  And in our review of sacrocolpopexies, we've**

24 **had zero incidence of pelvic pain.**

25   Q.  So the answer to my question is, yes, had she

Page 595

1  had a native tissue repair or an ASC, an abdominal

2  sacrocolpopexy, she could have still experienced some

3  degree of pelvic pain and dyspareunia, true?

4    MS. GAYLE:  Objection.  Form.  Mischaracterizes his

5  testimony.

6  BY THE WITNESS:

7    **A.  To a minor and, in my experience, correctible**

8  **extent and short-lived and, as far as impact upon**

9  **quality of life, minimal, she could have had some**

10 **discomfort.**

11   Q.  Is it your opinion, Doctor, that every woman

12 who has had a native tissue repair or an ASC and who has

13 experienced pelvic pain and dyspareunia as a result of

14 those surgeries has always had short-term and

15 correctible pelvic pain and dyspareunia?

16   MS. GAYLE:  Objection.  Form.

17 BY MS. GEIST:

18   Q.  There is no risk of long-term pelvic pain or

19 dyspareunia in either of those surgical procedures?

20   MS. GAYLE:  Objection.  Form.  Mischaracterizes his

21 testimony and asked and answered yesterday as well as

22 today.

23 BY THE WITNESS:

24   **A.  I can state, in my practice now, at a**

25 **high-volume tertiary center with highly subspecialized**

Page 596

1  care that I have never once seen an individual with a

2  **native tissue or sacro- -- or sacrocolpopexy procedure**

3  **present with severe, debilitating, progressive pain like**

4  **I see with the transvaginal mesh kits.**

5    Q.  But you're aware, from the literature, if not

6  your own personal experience, that women who have had

7  native tissue and ASC repairs experience pelvic pain and

8  dyspareunia years after those procedures are done?

9  You're aware of that, correct?

10   MS. GAYLE:  Continuing objection.  Can I have that

11 so I don't have to keep interrupting you on this line of

12 questioning?  I believe you asked and answered this

13 yesterday, Counsel.

14 BY MS. GEIST:

15   Q.  Well, I'm focusing on Mrs. Alonso.

16   **A.  My statement stands as from yesterday and**

17 **today.  And what I've reiterated is you have to put the**

18 **qualifiers on there of the severity, the progressive**

19 **nature of it, the life-changing disability.  I have**

20 **never once, at a high-volume tertiary care center, seen**

21 **that.  Especially important when you look at the various**

22 **different papers out there from Karram, Zimmerman,**

23 **Blandon, that we discussed, where they're saying that**

24 **these mesh complications require tertiary care.**

25    **So I am not seeing the need for these -- for**

Page 597

1 tertiary, advanced-level care with these women who
2 received those other types of native repair or
3 sacrocolpopexy.
4    Q.  So Mrs. Alonso is complaining of pelvic pain
5 and dyspareunia a few years after her mesh implant
6 procedure, correct?
7    A.  That is correct.
8    Q.  And is it not established in the literature
9 that women who had a native tissue or ASC repair
10 complain of pelvic pain and dyspareunia years after
11 those procedures as well?
12    A.  Again, we keep leaving off those qualifiers.
13 If you give me those qualifiers on there, severe,
14 progressive, debilitating, without a source of cure,
15 then I will agree with you.
16    Q.  Had Mrs. Alonso had a transvaginal mesh device
17 implanted by another manufacturer, would you agree with
18 me, Dr. Elliot, that she could have experienced pelvic
19 pain and dyspareunia as a result of that procedure?
20    MS. GAYLE:  Objection.  Form.
21 BY THE WITNESS:
22
23
24
25

Page 598

1    A.  And that is theoretical; however, if you look
2 at the data out there, Prolift, Apogee, Perigee,
3 Pinnacle, SIS, severe debilitating pain occurs with
4 those other mesh devices as well as Avaulta.
5    Q.  Okay.  So, sitting here today, you can't say
6 that Mrs. Alonso's outcome would have been any different
7 had she been implanted with another transvaginal mesh
8 device?
9    MS. GAYLE:  Objection.
10 BY MS. GEIST:
11    Q.  Is that true?
12    MS. GAYLE:  Objection.  Form and objection calls
13 for speculation and --
14 BY THE WITNESS:
15    A.  That's not necessarily true because remember I
16 just cannot recall, from the literature -- or not,
17 excuse me, not the literature, the medical records which
18 specific Avaulta product she had placed.  If she had the
19 Plus, then she has collagen on there so there could be a
20 higher rate of complications with it.  The arms are
21 heavier weight with the Avaulta product regardless of
22 which one it is.
23       So I cannot say she would not -- it gets
24 confusing.  There is a very good risk she still would
25 have had complications with another mesh kit.  In my

Page 599

1 opinion, if she had the Avaulta Plus, she's at the
2 highest risk possible of complication with the
3 transvaginal mesh kit.
4    Q.  Understood.  But we agree that had she used
5 another medical device company's mesh kit, she still
6 could have had the same complications?
7    MS. GAYLE:  Objection.
8 BY MS. GEIST:
9    Q.  Are we in agreement on that?
10    MS. GAYLE:  Objection, form.  And objection, calls
11 for speculation.
12 BY THE WITNESS:
13    A.  I mean, I think I answered it very well the
14 last time.  And, actually, I would like to know.  I
15 would like to see in the records, because we must have
16 it somewhere -- I just don't have it off the top of my
17 head -- which product she had put in there.  So if she
18 had the Plus or not, because that would help us out.
19 Because if she had the Plus, I will then state that she
20 is at a higher risk for complications.
21    Q.  Understood.  But she still would have been at
22 risk for the same complications if she had been
23 implanted with another medical device's -- another
24 medical device company's pelvic mesh kit product, true?
25    MS. GAYLE:  Objection.  Form.  Counsel, are you

Page 600

1 talking about the same exact complications
2 percentagewise, different?  What?
3 BY MS. GEIST:
4    Q.  Could Mrs. Alonso still have experienced
5 pelvic pain and dyspareunia if she had been implanted
6 with another medical device company's transvaginal mesh?
7 That's my question.
8    A.  My opinion is transvaginal polypropylene mesh
9 for pelvic organ prolapse is bad across the board.  Had
10 she had another product in there like Prolift, which
11 there's hundreds and hundreds of papers out on Prolift,
12 perhaps, even more than that, clearly shows devastation
13 in women.  Apogee, Perigee, the same thing.  Pinnacle,
14 the same thing.  And, again, there is another product
15 out there.  I can't recall off the top of my head.
16       So, yes, she could have had devastating
17 complications with that.  My argument is, is that the
18 Avaulta mesh, the arms are heavyweight, small pore,
19 which data shows that Klosterhalfen and Cobb, et al.,
20 higher rates of complications with those.  And, if she
21 had collagen, there's data that show those have impaired
22 healing.  So I am -- I am partly agreeing with you,
23 again, with the clarifications in this as I answered
24 here.
25    Q.  If -- if Mrs. Alonso's transvaginal mesh was

Page 601

1  made from a different grade of polypropylene other than
2  the Marlex polypropylene used in the Avaulta products,
3  can you state, to a reasonable degree of medical
4  certainty, that she would not have experienced pelvic
5  pain and dyspareunia?
6      MS. GAYLE: Objection, form. Objection, calls for
7  speculation and assumes facts not in evidence.
8  BY THE WITNESS:
9      **A. Yeah. I'm sorry. Like, as far as a different**
10     **grade, you'd have to tell me the weight of it, the pore**
11     **size, all of those different factors. Right now, as far**
12     **as I know, the Marlex that is used has heavyweight arms.**
13     **And so, again, polypropylene, in my -- my opinion, based**
14     **upon my evidence and my experience and what we had**
15     **mentioned over and over and over, should not be placed**
16     **in the vagina on women for pelvic organ prolapse.**
17     Q. But it's okay for the midurethral sling,
18  correct?
19     MS. GAYLE: Objection.
20  BY MS. GEIST:
21     Q. As we talked about yesterday?
22     MS. GAYLE: Objection. Form. Objection.
23  Mischaracterizes testimony and goes into general
24  opinions from yesterday.
25  BY THE WITNESS:

Page 602

1      **A. No. What I just said, I had the qualifiers on**
2  **there on purpose. The Align sling is heavyweight, small**
3  **pore, which we have data from Cobb, Klosterhalfen, are**
4  **the two I can remember off the top of my head. My**
5  **report has many more. There are known, very clear**
6  **complications from that with degradation, contraction,**
7  **pain, et cetera. So I personally, in my practice, do**
8  **not implant any transvaginal mesh.**
9      Q. But you understand, and I don't want to replow
10  yesterday at all, but you understand that other pelvic
11  floor surgeons continue to believe in and implant the
12  midurethral polypropylene sling like the Align product,
13  and you haven't come out and sent a separate letter to
14  the FDA seeking the removal of that type of product from
15  the market like you did with the POP products, true?
16     MS. GAYLE: Objection. I'm going to instruct him
17  not to answer that as that is exactly replowing
18  yesterday.
19     MS. GEIST: Well, the doctor brought it up. I
20  think it's legitimate. If he's going to raise it, then
21  I can ask a question in response. So I would like to
22  have an answer subject to your objection.
23     MS. GAYLE: But you, yourself, admitted that was
24  replowing yesterday and it was a general question. And
25  so I think his answer or his question, and he can

Page 603

1  clarify, was in response to this specific patient. And
2  so we're not replowing general opinions from yesterday.
3      MS. GEIST: Right. We're talking about this
4  specific patient.
5      MS. GAYLE: It's your question. We're doing
6  specifics.
7  BY MS. GEIST:
8      Q. In this specific patient, we already talked
9  about the fact that she has the Align sling implanted at
10  the same time that she had the Avaulta Plus or Solo
11  product implanted, and we don't know which one it is,
12  right?
13     **A. Correct. I know what the Align sling was. We**
14     **know that. That's very clear.**
15     Q. But not which Bard POP product?
16     **A. No. I do not recall what that one is, and the**
17     **operative note does not state it.**
18     Q. And --
19     **A. And those were done at the same procedure,**
20     **July 19th, 2010.**
21     Q. And the Align sling that Mrs. Alonso had
22  implanted was implanted for the purpose of correcting
23  her stress urinary incontinence, correct?
24     **A. Correct.**
25     Q. That's the indication for that medical device?

Page 604

1      **A. Correct.**
2      Q. And there is no evidence, in Mrs. Alonso's
3  medical records, that she's had any recurrence of stress
4  urinary incontinence, true?
5      MS. GAYLE: Objection. Form.
6  BY THE WITNESS:
7      **A. On my discussion with the patient, and I**
8  **believe I go over that here. I have to find it as I say**
9  **currently. Yeah. Under my exam, as I recall -- here we**
10  **go -- she had mild urethral hypermobility with no SUI**
11  **noted. However, her bladder was empty at the time of**
12  **the examination. So on my exam, on that day, I did not**
13  **elicit any urinary incontinence.**
14     Q. And there is nothing in her records reflecting
15  any stress urinary incontinence either, true, since --
16     **A. I --**
17     Q. -- since the implant of the Bard Align product
18  product?
19     **A. I do not recall that being a problem that she**
20  **had mentioned, no.**
21     Q. So, in other words, the Bard Align sling
22  product is doing exactly what it was intended to do,
23  treat and resolve the stress urinary incontinence
24  problems Mrs. Alonso is experiencing?
25     MS. GAYLE: Objection. Form.

Page 605

1  BY THE WITNESS:
2      A.  Yeah, I don't -- I do not recall any mention
3  regarding stress urinary incontinence.
4      Q.  So, in other words, the product worked?  It's
5  doing what it was intended to do, correct?
6      MS. GAYLE:  Objection.  Form.
7  BY THE WITNESS:
8      A.  I don't believe anybody is going to challenge
9  whether or not a product, a given sling product, can
10  treat stress incontinence.  It's the complications from
11  that sling product which are the issue.
12      Q.  But in her case, Mrs. Alonso's case, we've
13  already talked about this extensively, you're
14  attributing all of her complications to the Bard Avaulta
15  product, the POP product and not the sling product,
16  true?
17      A.  No.
18      MS. GAYLE:  Objection.  Form.
19  BY THE WITNESS:
20      A.  No.  What I've stated, and we'd need to go
21  back to exactly what I stated, I'll paraphrase it.  The
22  Avaulta Align -- excuse me, the Align transobturator
23  sling, which is heavyweight, small pore, goes through
24  the obturator foramen in essentially the exact location
25  as the Avaulta mesh.

Page 606

1      So, on my exam, she has severe pain in that
2  region and scarring.  Statistically speaking, due to the
3  larger volume of mesh with meaning, you know, the arms
4  of the Avaulta, statistically speaking, it is more
5  likely than not to be due to the Avaulta than the Align,
6  period.
7      Q.  Okay.  Doctor, I want to move on to
8  Mrs. Wheeler now.  Do you want to take a break?
9      A.  No.
10      Q.  And how about the court reporter?
11      A.  She's fine.  She's happy.  She's happy to be
12  here.  Do you need a break?
13      Q.  I think we're all happy to be here, Doctor,
14  but I need to just go to the court reporter because she
15  has the hardest job of all of us.
16      A.  She's nodding.  She's fine.
17      Q.  She is?
18      A.  Yes, she went like that.  (Indicating.)
19      Q.  I can't tell.
20      MS. GAYLE:  Lunch?
21      THE WITNESS:  Do you need a break?
22      MS. GAYLE:  Can we take a short, like maybe ten
23  minutes lunch break.
24      MS. GEIST:  Yes.
25      MS. GAYLE:  Madame Court Reporter, I know you said

Page 607

1  you had to eat, so --
2      THE WITNESS:  And I have a flight at 5:15, which
3  will take me 25 minutes to get there.
4      MS. GAYLE:  Well, she said that these will be
5  shorter, so...
6      THE REPORTER:  Can we go off?
7      MS. GEIST:  Yeah.  Let's go off the record.
8      VIDEO TECHNICIAN:  We're off the record.  The time
9  is 11:53 a.m.
10      (A recess was had.)
11      VIDEO TECHNICIAN:  We're back on the record.  The
12  time is 12:15 p.m.
13  BY MS. GEIST:
14      Q.  So, Dr. Elliott, we just had a very quick
15  lunch break and let's continue on with your opinions in
16  the case of Martina Wheeler.  Okay?
17      A.  Okay.
18      Q.  And, Doctor, we've previously marked your
19  notice of deposition, and that actually applies to the
20  three cases in which you've given a specific report,
21  Mrs. Alonso, Mrs. Wheeler, and Mrs. Bolyard.  And that's
22  Exhibit 28, correct?
23      A.  Yes.  Correct.  That is correct.
24
25

Page 608

1      (Elliott Deposition Exhibit No. 33
2          was marked for identification.)
3  BY MS. GEIST:
4      Q.  And I've marked as Exhibit 33 your
5  case-specific report in Mrs. Wheeler's case.  And, as
6  I -- I'm sorry.  As I indicated to you earlier, Doctor,
7  I'm not going to ask you the same generally applicable
8  questions that we just went through with respect to
9  Mrs. Alonso's case.  Okay.
10      And, with respect to your opinions in
11  Mrs. Wheeler's case, is it fair to say that you formed
12  your opinions in that case using the same methodology
13  that you used in Mrs. Alonso's case?
14      A.  Correct.  As I outlined earlier, it would be
15  the same process.
16      Q.  Okay?
17      MS. GAYLE:  Counsel, just for the record, you
18  handed me what's Exhibit 33, and that does not have his
19  exhibit attachments to that.  I just wanted to note that
20  for the record.
21      MS. GEIST:  Thank you.  And I was -- I was actually
22  going to get to that.
23  BY MS. GEIST:
24      Q.  And your attachments to Mrs. Wheeler's report
25  I didn't bring with me separately because they're the

Page 609

1  same.  They have your CV and your materials relied list.
2  The only difference would be case-specific materials and
3  records relating to Mrs. Wheeler, correct?
4      **A.  Correct, yes.**
5      Q.  And you have that in the version that you're
6  looking at now?
7      **A.  Yeah.  This is my copy highlighted with one**
8  **set of notes, but I can just rely off yours.  That was**
9  **just for efficiency's sake.**
10     Q.  Okay.  And let's just make sure we're all
11  clear that that is a final copy of the report.
12     **A.  Oh.**
13     MS. GAYLE:  He's not going to rely -- he's not
14  going to look at it.
15     **THE WITNESS:  Yes.**
16     MS. GAYLE:  Because I have not taken the time to --
17  this one is the final copy that you handed me, your
18  Exhibit 33, but I took away from him his earlier copies
19  because, honestly, I only did a line-by-line comparison
20  of one and found that it's a draft.  But for
21  efficiency's sake, I just took everything away from him.
22  He was just asking if he should highlight for efficiency
23  purposes like you allowed him to do earlier, but we're
24  good.
25     **THE WITNESS:  And I don't need to.  We -- yeah.**

Page 610

1  We're good with that.
2  BY MS. GEIST:
3      Q.  Okay.  So with Mrs. Wheeler, in forming your
4  opinions with respect to her case, Doctor, did you do a
5  differential diagnosis?
6      **A.  Yes.  As outlined previously in the Alonso**
7  **case, I used the same process, same differential**
8  **diagnosis, same consideration, keeping an open mind of**
9  **all possibilities.**
10     Q.  Okay.  And the alternative possibilities or
11  medical conditions or causes of the issues complained of
12  by Mrs. Wheeler are not specifically set forth in any
13  list that I can read in your report in Mrs. Wheeler's
14  case, true?
15     **A.  No.  It is exactly as outlined in my testimony**
16  **on Alonso.  The same process, the same options were**
17  **considered and ruled out with the exception of with**
18  **Wheeler of the Osler-Weber-Rendu syndrome as indicated**
19  **in my report on page 2.  That would be a unique**
20  **diagnosis that Ms. Alonso obviously did not have.**
21     Q.  And you considered that in reaching your
22  opinion that that did not contribute in any way to
23  Mrs. Wheeler's complaints; is that correct?
24     **A.  Correct.  I have no logical evidence that that**
25  **was playing a role in her outcome.**

Page 611

1      Q.  And, just as I did with you, Doctor, with
2  Mrs. Alonso, I just want to summarize the opinions you
3  have in Mrs. Wheeler's case, okay?
4      **A.  Okay.**
5      Q.  So in terms of her symptomatology, in your
6  opinion, she experiences pelvic pain, pelvic floor
7  myalgia, urge incontinence, dyspareunia, and similarly
8  loss of quality of life, which may have a long-term
9  impact.  Is that a fair summary?
10     **A.  That is correct.**
11     Q.  Okay.  And, in Mrs. Wheeler's case, she was
12  implanted with the Avaulta Solo products to treat both
13  an anterior and a posterior defect, correct?
14     **A.  And, yes, she had Avaulta Solo posterior**
15  **Avaulta Solo anterior, and an Align TOT for**
16  **incontinence.**
17     Q.  Similarly, Doctor, in your opinions with
18  respect to Mrs. Alonso, you don't have any opinions that
19  the Align sling was the predominant cause or substantial
20  cause of the complaints that Mrs. Wheeler has; is that
21  correct?
22     MS. GAYLE:  Objection.  Form.
23  BY THE WITNESS:
24     **A.  Same as my testimony with Alonso, that, based**
25  **upon my experience, statistics, data, available**

Page 612

1  **manuscripts, and internal documentation, statistically**
2  **speaking, the Avaulta Solo anterior would be responsible**
3  **for what I found on my exam, much more so than the**
4  **Align.**
5      Q.  Okay.  And just so we're clear, there's no
6  opinions with respect to the Bard Align sling product in
7  your report for Mrs. Wheeler, correct?
8      MS. GAYLE:  Objection.  Form.
9  BY THE WITNESS:
10     **A.  I do not -- I do not state anything along**
11  **those lines in my report.**
12     Q.  Okay.  And she was implanted with the Avaulta
13  and Align products by Dr. Sprock on July 7th, 2008,
14  correct?
15     **A.  That is what my records reflect, yes.**
16     Q.  And we already discussed that she was
17  implanted with the Avaulta Solo products, correct?
18     **A.  Correct.  Solo anterior and posterior.**
19     Q.  So your opinions with respect to the Avaulta
20  Plus products, which are a collagen/polypropylene
21  combination product, any of those opinions would not
22  apply in Mrs. Wheeler's case; is that fair to say?
23     **A.  With the exception that the arms of the Solo**
24  **are the same, high-density, small pore.  The issues**
25  **pertaining to collagen and the hypersensitivity, et**

Page 613

1  cetera, do not apply to Mrs. Wheeler.
2      Q.  On -- okay.  So, Doctor, let me start by
3  asking you whether you considered a number of different
4  things with respect to Mrs. Wheeler in reaching your
5  differential.  Okay?
6      A.  Okay.
7      Q.  In concluding or opining that the Bard Avaulta
8  products were the cause for her dyspareunia and pelvic
9  pain, did you consider the fact that Mrs. Wheeler is in
10  her mid-50s and menopausal?
11      A.  Yes.  That is always a consideration.  The
12  hormonal status at age 50 -- actually, the hormonal
13  status is going to be still fairly decent.
14      Q.  Isn't it true, Doctor, that there could be
15  significant pain or dyspareunia associated with
16  intercourse in a woman whose vagina is atrophic --
17  atrophic?  Pardon me.
18      MS. GAYLE:  Objection.  Form.
19  BY THE WITNESS:
20      A.  Again, we have to put the qualifiers on there.
21  Atrophic vaginal perimenopausal, post-menopausal can
22  contribute to vaginal dryness that is usually amenable
23  to a vaginal lubricant.  So it's a different type,
24  quality, severity of pain.
25      Q.  Well, vaginal atrophy or vaginal thinning due

Page 614

1  to a woman going through menopause and the correlating
2  reduction in estrogen can cause dyspareunia.  Do you
3  agree with that?
4      MS. GAYLE:  Objection.  Form.
5  BY THE WITNESS:
6      A.  That's just what I stated.  There would have
7  to be qualifiers on that.  That's usually why we use the
8  Visual Analog Pain Scale to determine the severity and
9  the relative severity.  She can have dryness.  She can
10  have discomfort that is mild and usually treatable with
11  vaginal lubricants.
12      Q.  Did you read and consider Dr. Sprock's, who is
13  the implanting physician in the case, her deposition
14  where she testified that Mrs. Wheeler has very thin
15  tissue and, in fact, an atrophic -- atrophic
16  endometrium?  Did you consider that in reaching your
17  conclusion that the Avaulta products were the cause of
18  the dyspareunia?
19      A.  I would have to look at that specific record
20  with that.  However, you said thinned endometrium.  I
21  would expect that.  She's a perimenopausal,
22  postmenopausal woman.  You would expect the uterus to
23  be -- have a thinned endometrium.  I can correlate it to
24  my exam on October 4th where I said the vagina was
25  well-estrogenized.  So, in my experience, at a

Page 615

1  high-volume tertiary center, subspecialized in female
2  pelvic medicine, fully board-certified in that, my
3  opinion was she was well-estrogenized.
4      Q.  Excuse me.  Are you aware of whether
5  Mrs. Wheeler has been taking estrogen therapy for a
6  number of years to treat the vaginal atrophy?
7      A.  I can't recall specifically.  Most women have
8  been treated with estrogen from time to time for
9  extrusion.  So I would have to see with that.
10      Q.  In reaching your opinion that she experiences
11  now severe dyspareunia, did you take into consideration
12  her medical records where she reports that her
13  dyspareunia is mild?
14      MS. GAYLE:  Objection.  Form.
15  BY MS. GEIST:
16      Q.  Did you see that in any of the medical records
17  for Mrs. Wheeler?
18      A.  Yeah.  I've seen various medical records and
19  documentation.  All I can speak to specifically is my
20  interaction with her on October 4th where I then used
21  the Visual Analog Pain Scale to be able to compare
22  a rel-- -- you can do comparisons that way on severity.
23      Q.  So she -- when she saw you, she told you she
24  was experiencing severe dyspareunia; is that right?
25      A.  She graded her pain using the Visual Analog

Page 616

1  Pain Scale, which is a validated study for patients to
2  be able to compare pain, on a scale of 1 to 10, with 1
3  being essentially nothing, 10 being the most severe pain
4  in life.  She graded it at 8 during intercourse.
5      Q.  And did you consider the reliability of that
6  grading by Mrs. Wheeler when looking at her medical
7  records where she has reported only mild dyspareunia?
8      A.  Yeah.  I am familiar with the records.  We
9  probably want to talk -- go look specifically at those
10  notes, when that was, when was it relative to an
11  extrusion and a treatment of extrusion -- extrusion.  Is
12  it possibly immediately after the extrusion?  The pain
13  might have gone away and then comes back.  And,
14  remember, this is also a progressive process.
15  Klosterhalfen, et al., talks about 15 years'
16  progression.  So what happened in the past is important,
17  but has to be looked at as the progression of the
18  disease process.
19      Q.  How about Mrs. Wheeler's preimplant complaints
20  of trouble with sexual intercourse, specifically burning
21  with sexual intercourse.  Did you consider those reports
22  she made to her doctors in reaching your opinion that it
23  was the Bard's product only that has caused her problems
24  with sexual intercourse?
25      MS. GAYLE:  Objection.  Form.

Page 617

1  BY THE WITNESS:
2      A.  Yeah.  Number one, yes, I did consider those.
3  Number two, as I stated earlier, as far as the quality
4  and severity of the pain.  Burning with sexual activity,
5  I'm just trying to see if I have a Visual Analog Scale.
6  I know I have here somewhere what it was before surgery
7  and after surgery.  It will be in my note somewhere.
8      MS. GAYLE:  Take your time, Doctor, and look for
9  it.
10 BY THE WITNESS:
11     A.  Yeah.  I only see in my notes, on quick
12 review, a current Visual Analog Scale of 10 with sexual
13 activity and a baseline of 6 to 7 constantly.  I do not
14 see where I state a preoperative Visual Analog Scale.  I
15 can go off of just what she said as far as advancement
16 of the severity.
17     Q.  That's what she told you, correct?
18     A.  That's what she told me, yes.
19     Q.  Did you consider, Doctor, the reasons why
20 Mrs. Wheeler's reports of the severity of dyspareunia
21 may be different to you compared to her treating doctors
22 as reflected in the records?
23     MS. GAYLE:  Objection.  Form.
24 BY THE WITNESS:
25     A.  Every time I interact with an individual I am

Page 618

1  always cognizant that people don't always tell the
2  truth.  You, as lawyers, know that, too.  Anybody in the
3  legal field knows it, the police force or otherwise.  So
4  that is always something I consider.  All I can go off
5  of is my personal interaction.  I ask a question, I get
6  a response, and then I correlate it to the physical
7  exam.
8          And when I do a physical exam, being aware of
9  what we call malingering, I will try and do an exam,
10 distract the patient, touch certain areas that I know
11 would not be involved with meshes, ask them, Do you have
12 pain here?  If a patient is telling me they had pain
13 everywhere I touch, inside the thigh, outside the thigh,
14 I know that's not due to mesh.  So all I can state is my
15 questions and my physical exam correlate.
16     Q.  When you have a case like in any of these
17 cases where you have medical records that reflect a much
18 lesser degree of dyspareunia, do you consider that at
19 all in reaching your opinions that the plaintiff
20 experienced severe dyspareunia?
21         If the medical record contradicts what she's
22 telling you during your exam, do you consider that in
23 reaching your conclusion with respect to severe
24 dyspareunia?
25     MS. GAYLE:  Objection.  Form.

Page 619

1  BY THE WITNESS:
2      A.  Absolutely I consider it, and that is a very
3  important one.  And I have to correlate it to my
4  experience, my understanding of the medical literature,
5  which, again, I have 509 papers that I've reviewed
6  regarding this, including documentation on pain.  I do
7  know that from, again, Klosterhalfen, et al., mesh
8  contraction is a progressive process.
9          So if an individual has -- does not have pain,
10 we have to look at exactly what's going on with that and
11 if it progresses.  Remember we had the paper yesterday
12 where at one year they had 8 percent extrusion and at
13 three years they had something like 19 percent, roughly.
14 So things change.
15     Q.  You've mentioned Dr. Klosterhalfen quite a few
16 times.  Who is he?
17     A.  Klosterhalfen is a pathologist, Ph.D.,
18 specializing in biomaterials.  He is considered by some
19 to be the king of meshes as far as understanding of
20 meshes.  And if you look at his CV, he has dozens and
21 dozens of papers of looking at animal studies and human
22 studies and mesh interaction from the vagina and also
23 abdominal wall hernias.
24     Q.  Do you consider him to be a biomaterials
25 expert?

Page 620

1      A.  I consider him to be an advanced level
2  individual who understands polymers and their
3  interaction with the body.
4      Q.  So do you consider him to be a biomaterials
5  expert?
6      MS. GAYLE:  Objection.  Asked and answered.
7  BY THE WITNESS:
8      A.  Well, I just stated.  He has -- he has extreme
9  advanced knowledge arguably, the best in the world, in
10 understanding meshes and their complications in animal
11 and human, vaginal and transabdominal meshes.
12     Q.  Have you ever met with Dr. Klosterhalfen?
13     A.  No.
14     Q.  You read his report in this litigation?
15     A.  I've read --
16     MS. GAYLE:  Objection.
17 BY THE WITNESS:
18     A.  Yes.  I've read his reports, but I've read
19 more so his papers.
20     Q.  You understand he's an expert for the
21 plaintiffs in this litigation as you are, correct?
22     MS. GAYLE:  Objection.  Form.
23 BY THE WITNESS:
24     A.  Yes.  I do understand that, and I also put it
25 in the mindset that I read his papers going back to the

In Re: CR Bard 200                Daniel Elliott M.D., Vol. II                11/16/2014

Page 621

1  early '80s, which predate any of this.  And what he
2  stated then and I correlate to what he states now to see
3  if it's changed.
4      Q.  In reaching your opinions in Mrs. Wheeler's
5  case about long-term quality-of-life issues and
6  inability to engage in sexual intercourse, did you
7  consider Mrs. Wheeler's attitudes or desires to have
8  sexual intercourse?
9      A.  I can't recall exactly what I spoke to her
10  about and her motivations as far as sexual activity.  I
11  stated, you know, based upon my exam and what she stated
12  to me, that it's so severe she cannot have sexual
13  activity and it's a tremendous impact upon her quality
14  of life.  So, yes, to answer your question, I did do
15  that.
16      Q.  Well, did you review or see, in any of the
17  medical records, Mrs. Wheeler's reports, that she
18  couldn't be bothered with sex because they were
19  experiencing marital problems?
20      MS. GAYLE:  Objection.
21  BY MS. GEIST:
22      Q.  Did you see any of that?
23      MS. GAYLE:  Objection.  Form.
24  BY THE WITNESS:
25      A.  I would like to look at those records.  The

Page 622

1  fact that she might not want to be bothered by sexual
2  activity is understandable.  But then if she were to
3  change her mind and not be able to, that is an important
4  issue.
5      Q.  Well --
6      A.  She should have the right to be able to have
7  sexual activity if she chooses to.
8      Q.  If she has marital problems and she doesn't
9  want to be bothered with sex, obviously, she wouldn't
10  have any long-term quality-of-life impact, true?
11      MS. GAYLE:  Object to form.  Mischaracterizes
12  Ms. Wheeler's testimony and her husband's testimony.
13  BY THE WITNESS:
14      A.  I'm of the opinion the woman should have the
15  right to choose what she wants to do with her body.  If
16  she is having marital discourse or whatever type of
17  discourse and does not want to partake in sex, that's
18  fine.  But if she were to change her mind, she has the
19  right to be able to do that.
20      Q.  And I don't disagree with you.  But my
21  question only is this, if she's indicated in her medical
22  records, maybe not to you, that she couldn't be bothered
23  with sex, then obviously she doesn't have any long-term,
24  quality-of-life issue if she's not interested in
25  engaging in sex?  Would you agree with me on that?

Page 623

1      MS. GAYLE:  Objection, form.  Mischaracterizes
2  evidence and testimony in this case.
3  BY THE WITNESS:
4      A.  You're taking a certain -- I would like to see
5  those records, which would probably be important.  Let's
6  see what the context and when it is occurring.  However,
7  on my interaction with her on October 4th, 2014, what
8  she stated to me, which correlates to my physical exam,
9  is the impact upon her quality of life has been
10  tremendous and cannot engage in any -- cannot.  Not that
11  she doesn't choose.  She cannot engage in significant --
12  excuse me, engage in any meaningful -- cannot engage in
13  any meaningful sexual activity and has lost that
14  intimacy.
15      Q.  Well, I understand that's what she told you,
16  Dr. Elliott.  Would Mrs. Wheeler, as a plaintiff in this
17  litigation, tell you anything other than that in order
18  to move her case forward?
19      MS. GAYLE:  Objection.  Move to strike.  Also,
20  objection.  It mischaracterizes testimony and
21  argumentative.
22  BY THE WITNESS:
23      A.  I cannot state what -- what Mrs. Wheeler and
24  her various different motivations are.  All I can do is
25  I ask questions keeping an open mind, keeping the

Page 624

1  concept of malingering very well present, correlate it
2  to what my physical exam is.  And my physical exam
3  demonstrated a severely scarred and painful vagina,
4  which is not consistent remotely with meaningful sexual
5  activity.
6      Q.  Well, I guess what I'm asking you, Doctor, is
7  this, when Mrs. Wheeler reported to you that she's
8  experiencing severe dyspareunia, did you go back and
9  look at her records and see if that report correlated to
10  what she was telling her treating doctors over the
11  years?
12      A.  Well, by all means.  I mean, I've read the
13  records.  But, again, what happened then versus now was
14  that, you know, was it when she was having mesh
15  extrusion and she wants nothing to do with sexual
16  activity?  We have to figure out what is exactly going
17  on.  You're taking one -- one line from somewhere and
18  I'm taking, when I examined her and when I personally
19  spoke with her, what she said.
20      Q.  Now, moving to the paragraph regarding the
21  lack of physical intimacy and the long-term outcome of
22  impact on quality-of-life issues leading to the
23  possibility of depression and the suicide, that's the
24  same paragraph you have for Mrs. Alonso and Mrs. Wheeler
25  and Mrs. Bolyard, correct?

In Re: CR Bard 200                Daniel Elliott M.D., Vol. II                11/16/2014

Page 625

1    **A. That is correct.**
2    Q. Okay. So are you giving an opinion in this
3    case that Mrs. Wheeler will experience depression or
4    commit suicide as a result of the problems that she
5    contends she is experiencing?
6    **A. I stated the same statement as in my previous**
7    **testimony with Alonso, that, based upon the data out**
8    **there in multiple different manuscripts, my review of**
9    **the literature, my daily interaction with female**
10   **patients, that the loss of intimacy, the isolation, the**
11   **embarrassment, the guilt, the perception of inability**
12   **to, for lack of a better phrase, satisfy their partner,**
13   **that can lead to depression and all of the emotions we**
14   **discuss -- discussed.**
15   Q. It's fair to say it would be speculation to
16   opine, in any of these three cases, that any of these
17   women will experience depression as a result of the
18   complications they say they've had from the mesh?
19   MS. GAYLE: Objection. Form.
20   BY MS. GEIST:
21   Q. It would be speculation to say Mrs. Alonso or
22   Mrs. Wheeler or Mrs. Bolyard will experience depression
23   based on the complications that they say they've had
24   from the Bard mesh?
25   MS. GAYLE: Objection. Form. Mischaracterizes

Page 626

1    testimony and his report. The report speaks for itself.
2    BY THE WITNESS:
3    **A. Yeah. My report, the words that I wrote down**
4    **here, I chose very carefully. I did not state it will**
5    **lead to. The symptoms that she is experiencing, based**
6    **upon my experience, review of the literature, can lead**
7    **to these feelings of isolation, loneliness, depression,**
8    **and, unfortunately, suicide.**
9    Q. Well, would you agree with me, Doctor, that
10   the use of the term suicide is a pretty highly charged
11   term? It's a pretty serious term to throw in there in
12   this report?
13   **A. The data backs it up, though. Look, I had two**
14   **quotes there, two papers. And so, yeah, chronic pain,**
15   **loss of intimacy, loneliness, depression, I don't think**
16   **there is anybody going to challenge that depression and**
17   **suicide correlate. I'm not saying they will have it.**
18   **I'm saying that these are things that can, in the very**
19   **severe situations, lead to that.**
20   Q. How about in Mrs. Wheeler's specific case?
21   Did you consider, in reaching your opinions, that the
22   quality of life issues that you say were caused by the
23   Bard Avaulta products may cause her depression? Did you
24   consider, in reaching those opinions, that she had been
25   using antidepressants for a number of years prior to the

Page 627

1    Bard implant surgery?
2    **A. Absolutely. And that's all the more worrisome**
3    **in an individual with underlying baseline depression.**
4    **Now you have added on another stressor like chronic pain**
5    **and then more isolation and more loneliness. So, yes,**
6    **that is further evidence or worrisome that, you know,**
7    **this is a major, serious tragic problem for these**
8    **individuals.**
9    Q. Would you agree with me that Mrs. Wheeler
10   could have still experienced depression and would still
11   be a user of antidepressants if she never even had the
12   Bard implant surgery?
13   **A. Depression is, unfortunately, frequently not a**
14   **curable problem; and, if you add in more stressors, it**
15   **makes it worse. So, yes, by all means, depression was**
16   **there. That means, again, the more importance of the**
17   **added stress of the pain.**
18   Q. Well, you would agree with me, Doctor, that
19   you can't say in this circumstance that, if Mrs. Wheeler
20   continues to experience depression, that it's all due to
21   the problems she says she's had from the Bard surgery --
22   from the Bard implant surgery? Pardon me.
23   **A. That's -- well, again, my report states what**
24   **it states. I am not stating that Bard product caused**
25   **her original depression. I am saying that -- and I**

Page 628

1    **don't think there is anybody who is going to be**
2    **questioning this -- that added stress, pain, loneliness,**
3    **lack of intimacy can worsen the condition.**
4    Q. I assume you would agree with me, Doctor, that
5    you're not an expert in psychiatry or psychology, true?
6    **A. I am not trained in psychology or psychiatry.**
7    Q. So you're not an expert in either of those
8    fields, correct? You wouldn't hold yourself out as an
9    expert in the fields of psychiatry or psychology or
10   mental health, in general?
11   **A. No. Those, I think every physician deals with**
12   **individuals dealing with major issues. To a certain**
13   **extent, every physician, especially if they deal with**
14   **pain, has to be aware and recognize these and also aware**
15   **and recognize their limitations to ask certain questions**
16   **and get the individual to somebody with advanced**
17   **training.**
18   Q. Doctor, I'm asking if you recognize your
19   limitations. Are you putting yourself out there as an
20   expert in psychiatry, psychology, and mental health
21   disorders?
22   MS. GAYLE: Object to form.
23   BY THE WITNESS:
24   **A. Well, no. I think I answered that. No, I am**
25   **not a psychiatrist or a psychologist, but I deal with a**

Page 629

1 large number of women who suffer from depression and
2 things, but I do not hold myself out as being an expert
3 in psychology or psychiatry. I do not hold an advanced
4 degree in that area.
5      Q. Okay. Thank you. Did you see, in your review
6 of Mrs. Wheeler's records, that she experienced a
7 dehiscence in weeks postop?
8      A. Yeah. Her surgery was on July 7th, 2008. And
9 on August 26th -- August 26th is when it was clear.
10 But, though, if you go back to July 22nd, I think we
11 start to see the beginnings of the dehiscence, that it
12 manifested itself on August 26th.
13      Q. And just so the jury understands, a dehiscence
14 is what?
15      A. It's a separation of a wound, poor healing.
16      Q. It's sort of a wound rupture at the suture
17 site; is that correct?
18      A. Yeah. Well, dehiscence technically just means
19 a separation. In a surgical setting, it is implied that
20 that is the incision that opens.
21      Q. And, in this case, the separation we're
22 talking about is the vaginal wall, correct?
23      A. The -- correct. The anterior, 4-millimeter
24 mesh extrusion on August 26th. So it is just the
25 anterior component. According to Dr. Sprock's note,

Page 630

1 there was -- well, actually, I have nothing down here
2 pertaining to posterior. So it was just anterior.
3      Q. The dehiscence or the separation of the
4 vaginal wall would cause the exposure of the mesh,
5 correct?
6      A. Yes.
7      Q. And what are some of the known causes of
8 dehiscence in the first instance?
9      A. Implantation of mesh, surgery, wound
10 infection. You know, those are probably the top things
11 that come to my mind.
12      Q. Is surgical error one of the known causes for
13 wound dehiscence?
14      A. Not eight weeks out, ten weeks out.
15 Immediately after surgery, if a wound breaks open, and
16 I'd be willing to go on -- obviously, I am on the
17 record. If a wound breaks open a day or two after
18 surgery, unless you have a hematoma, that would probably
19 be poor surgical technique.
20      Q. Well --
21      A. Closing at ten weeks afterwards, then you
22 start talking about poor healing.
23      Q. Well, you actually corrected me and you said
24 the dehiscence started earlier, that it started in July
25 of 2008?

Page 631

1      A. No. The surgery was July 7th. July 22nd she
2 was examined. The tissue was turned a little yellowish.
3 Now, Dr. Sprock says it's part of the healing process.
4 What I'm saying is, in hindsight -- I don't disagree
5 with Dr. Sprock at that moment; but, in hindsight, that
6 was probably the start of impaired healing.
7      Q. So two weeks out from the surgery, the
8 dehiscence had started, correct?
9      A. No. I'm saying, if we want to go purely off
10 of the record, Dr. Sprock states it's part of the
11 healing process. So she was there. She laid eyes on
12 the individual. I did not. So if we go off of her
13 record, she's saying this is normal healing. So then
14 the 26th, clear-cut that there is impaired healing and
15 the dehiscence.
16      Q. Now, Dr. Sprock did not repair the dehiscence
17 when she made that diagnosis in her patient,
18 Mrs. Wheeler, correct?
19      A. No. It says, on the August 26th office visit,
20 she noticed an anterior 4-millimeter mesh extrusion.
21 Mesh is our word we put in there. Dr. Sprock trimmed
22 the extrusion and sutured the site closed. So she did
23 repair it.
24      Q. Did you review the record for Mrs. Wheeler on
25 September 23rd, 2008, when wound dehiscence was noted as

Page 632

1 well as the extrusion and it was also noted that the
2 patient does not desire surgical suturing?
3      A. Yeah. Again, I have that note down here from
4 the 23rd. I would have to review the exact records.
5 But, according to my note -- oh, excuse me. You're
6 correct. You said September 23rd, patient aware of
7 dehiscence, not bothered with intercourse, and left it.
8 But then it was then repaired on October 10th. But you
9 are correct, on the September 23rd, no repair was done.
10      Q. So you think the October which date now?
11      A. September 23rd, 2008, eight-week visit,
12 Dr. Sprock again noticed vaginal mesh extrusion.
13 According to my notes, and we can correlate that with
14 the records, at that point in time, no treatment was
15 done. However, on October 10th, so, roughly, what,
16 two -- two and a half weeks later, Ms. Wheeler returned,
17 the mesh extrusion was, again, noted and then it was cut
18 and they continued conservative therapy from then.
19      Q. Now, the October 10th, 2008 record notes the
20 extrusion, as you've just said, and that the extrusion
21 was cut or there was an excision done?
22      A. Correct.
23      Q. Is there any record that notes that the
24 dehiscence was repaired?
25      A. Well, no. They -- you wouldn't necessarily be

Page 633

1  suturing that up at that point in time.
2      Q.  Why not?
3      A.  Because it won't heal.  It's infected.  It's
4  contaminated tissue.  If you close it over, you're more
5  likely to create an abscess.  So the standard treatment
6  that far out would be just to excise the mesh.  Get rid
7  of the foreign body back as far as you can with the hope
8  the tissue is going to granulate in.
9      Q.  So is it your opinion that it was within the
10 standard of care not to repair the wound dehiscence?
11     A.  I -- on which day are we talking about,
12 October 10th?
13     Q.  Right.
14     A.  Okay.
15     Q.  Is that the ten-week follow-up postop visit?
16     A.  That is ten-and-a-half-week follow-up, yes.
17 The ten and a half weeks out I would not have closed a
18 mesh extrusion.  I would have trimmed the mesh either in
19 the clinic setting or in the operating room, but I would
20 not have closed the wound.
21     Q.  If Mrs. Wheeler had engaged in sexual activity
22 after that time, could that have led to some
23 complications relating to the mesh due to the wound
24 dehiscence?
25     MS. GAYLE:  Objection.  Form.

Page 634

1  BY THE WITNESS:
2      A.  After October 10th?
3      Q.  Yes.
4      A.  Well, I don't know.  I would have to see the
5  record as far as if there are warnings about not
6  becoming sexually active, but I can't speak to that.
7      Q.  Well, if there's no warnings in the records
8  for Mrs. Wheeler about not becoming sexually active, is
9  it your opinion that she should have been told not to
10 become sexually active with a wound dehiscence?
11     MS. GAYLE:  Objection.  Form.
12 BY THE WITNESS:
13     A.  Well, I would have to look at -- I just say,
14 in my notes, going off Dr. Sprock's note, it says a mesh
15 extrusion was noted.  I don't have the dimensions of
16 that extrusion.  If the extrusion were large
17 centimeters, then I think abstaining from sexual
18 activity is appropriate.
19         If it's just the prongs poking through and
20 it's a minimal deal, then there's probably minimal
21 warning that needs to be given to the patient.  So,
22 again, I don't know -- or, unfortunately, our notes are
23 not clear as far as the degree of extrusion.
24     Q.  Well, what about the wound dehiscence,
25 specifically?  Isn't it standard of care to instruct or

Page 635

1  advise a woman to refrain from engaging in sexual
2  intercourse when she has a vaginal wound dehiscence?
3      A.  Well, at 26 -- August 26th, it's a
4  4-millimeter mesh extrusion, okay, which is, what, not
5  even a quarter of an inch.  Maybe less than that.  Let
6  me just find out what that would be at.  4 millimeters
7  is, at the most, a quarter of an inch.  Dr. Sprock did
8  the appropriate thing.  She closed it, trimmed the mesh,
9  and then closed it.  And I don't know when she started
10 sexual activity.  But -- again, there's certain gaps
11 here.  I think we have to look at the deposition and
12 talk to Dr. Sprock and the patient.
13     Q.  Sitting here today, you can't tell me one way
14 or the other whether it would be within the standard of
15 care to instruct a woman experiencing vaginal wound
16 dehiscence to avoid sexual intercourse?
17     MS. GAYLE:  Objection.  Form.
18 BY THE WITNESS:
19     A.  Well, I think that's actually a very good
20 thing for the IFU to help out the physician.  I don't
21 know of a standard out there with meshes of what to do.
22 I don't know of any paper out there.  If a company has
23 information that, if there is a wound dehiscence and
24 delayed healing, completely avoid anything per vagina
25 would actually be very helpful.  That would be an

Page 636

1  instruction that probably could have helped Dr. Sprock
2  if you feel that she did something inappropriate.  I
3  don't -- again, I don't know.  I can't say.  I can't
4  throw fault here.
5      Q.  You don't have an opinion one way or the
6  other; is that fair to say?
7      MS. GAYLE:  Objection, form.
8  BY THE WITNESS:
9      A.  Well, no.  I did say.  I said that she,
10 Dr. Sprock, is the one who we say laid eyes on the
11 patient, did the exam.  I don't know what warnings she
12 gave.  So there is nothing clear in the literature.
13 There is nothing in the IFU to say, Hey, if you've got a
14 complication, be careful with this.
15     Q.  Did -- in reaching your opinions in
16 Mrs. Wheeler's case that the mesh was the cause or is
17 the cause of her reported symptoms, did you consider
18 surgical technique?
19     A.  Oh, I -- I'm sorry.  Absolutely.  Every time I
20 review a patient, as I've stated previously with Alonso,
21 we're looking at the totality of that patient, their
22 medical records, their past medical history, all of the
23 diagnoses, the surgical implementation, the management
24 of this patient after surgery.
25     Q.  Did you consider whether Dr. Sprock implanted

Page 637

1  the mesh too tight and not tension-free on July 7th,
2  2008?
3      MS. GAYLE: Objection. Form.
4  BY THE WITNESS:
5      A.  I would have to go back to the operative note
6  to go over that specifically, which I don't have.  In
7  reading the notes, on all of the individuals today, I
8  cannot point to something that I could say would be a
9  medical error or malpractice.  It would all have been
10 within acceptable surgical standards.
11     Q.  Did you read the testimony from Dr. Zipper in
12 Mrs. Wheeler's case?
13     A.  Yeah. Dr. Zipper?  Yes.  Yes.  Dr. Zipper is
14 in her -- I believe in Dr. Sprock's group, former group.
15 And according to my recollection -- and I could be
16 wrong.  We could pull out that actual deposition -- he
17 stated that she did not do anything surgically
18 incorrect.
19     Q.  Do you recall Dr. Zipper testifying that, when
20 he examined Mrs. Wheeler, that the mesh arms were too
21 tight and that this was possibly contributing to her
22 dyspareunia?
23     A.  I do not recall that specific deposition.  We
24 can look at it.  However, I would agree completely with
25 that diagnosis.  These mesh arms, as I've stated, are

Page 638

1  high-density, small pore.  They contract over time.  So,
2  by all means, they're tight.  Based upon my exam on
3  October 4th, I felt that knot -- I forget which side --
4  extremely painful in the obturator foramen.  So I agree.
5  They are too tight.
6      Q.  But did you consider the possibility that the
7  arms of the mesh were too tight because Dr. Sprock's
8  surgical technique was not according to the IFU as we
9  looked at earlier together?
10     A.  We would have to pull out the actual operative
11 note.  From my recollection, from all individuals, that
12 this is put in loose with avoiding excessive tension as
13 what the IFU specifically states.  I do not recall
14 anything, from this operative note, stating anything
15 about it being excessively tight.
16     MS. GAYLE:  And, just for the record, Elliott 30 is
17 the Avaulta Plus IFU, and this is an Avaulta Solo
18 product, and your question referenced the IFU that we
19 looked at earlier, which is the Plus.
20 BY MS. GEIST:
21     Q.  Point well taken by counsel.  But, Doctor, you
22 looked at the IFUs for the Plus product and the Solo
23 product, correct --
24     A.  That is correct.
25     Q.  -- on your reliance list?

Page 639

1      A.  That is correct.
2      Q.  The language that I pointed you to earlier on
3  the IFU for the Avaulta Plus product where it says that
4  the mesh should be implanted tension-free, that's the
5  same language in the Avaulta Solo IFU; is it not?
6      A.  My recollection, we'd have to compare them
7  side by side, as they are essentially the same document.
8  But I would not agree with you as far as it being
9  tension-free.  They mentioned twice avoid excessive
10 tension, without excessive tension.
11     Q.  Now, we looked at the operative note in
12 Mrs. Alonso's case, correct?
13     A.  That is correct.
14     Q.  And you would agree with me that, when we
15 looked at that operative note, that medical record,
16 nowhere in it did it indicate that the mesh was placed
17 tension-free?
18     A.  No.  But I would say it is stated it avoided
19 excessive pressure.  He said apply positive pressure
20 against the posterior bladder.  That, to me, is not
21 excessive tension.
22     Q.  But it doesn't say, I avoided excess tension
23 or I placed the mesh tension-free?  It doesn't say that
24 in the operative report for Mrs. Alonso, does it?
25     MS. GAYLE:  Objection.  Form.  He's asked and

Page 640

1  answered that question previously, and I thought we were
2  on to Wheeler.
3  BY THE WITNESS:
4      A.  He does not use those exact words; however, I
5  do feel he is following the specific words of the IFU
6  saying avoid excessive tension.  He is avoiding
7  excessive tension, so he is following the IFU.
8      Q.  That's your interpretation of the report in
9  Mrs. Alonso's case?
10     A.  As a surgeon who takes care of these with a
11 large amount of experience, yes.  He is following --
12 this is not just an opinion.  He is following the
13 avoiding excessive tension, which is mentioned twice in
14 the IFU.
15     Q.  And what about Dr. Sprock?  Did Dr. Sprock
16 similarly avoid implanting the Avaulta Solo products in
17 Mrs. Wheeler?
18     A.  I would have to see that operative note.
19     Q.  You don't remember one way or the other
20 sitting here today?
21     A.  I read a lot of operative notes and I'd want
22 to -- because this is very important to know the tension
23 of this.  I would want to see the exact operative note.
24     MS. GEIST:  Can we go off the record one minute?
25     VIDEO TECHNICIAN:  We're off the record.  The time

Page 641

1  is 12:59 p.m.
2       (A short recess was had.)
3       VIDEO TECHNICIAN:  We're back on the record.  The
4  time is 1:01 p.m.
5  BY MS. GEIST:
6       Q.  Dr. Elliott, as you requested, you wanted to
7  see the operative note for Mrs. Wheeler, Mrs. Wheeler's
8  procedure?
9       A.  Correct.
10      Q.  So that was in the materials you had reviewed
11  in forming your opinions about Mrs. Wheeler's case,
12  correct?
13      A.  Yes.
14      MS. GEIST:  I think I'm up to Exhibit 32.
15      THE REPORTER:  34.
16           (Elliott Deposition Exhibit No. 34
17             was marked for identification.)
18  BY MS. GEIST:
19      Q.  34, thank you.  Doctor, let me hand you what
20  we've marked as Exhibit 34.  I apologize for the fact
21  that it doesn't have staples.
22      MS. GAYLE:  I'm going to take care of that for you,
23  Counsel.
24      MS. GEIST:  Thank you, ma'am.
25      MS. GAYLE:  I travel with a stapler.

Page 642

1       MS. GEIST:  Thank you, ma'am.  I used to.  I should
2  bring that again.
3  BY MS. GEIST:
4       Q.  I should have just marked the records in the
5  entirety, but let's just isolate the operative report
6  for Mrs. Wheeler.  And this is dated July 7, 2008.  Do
7  you see that, Doctor?
8       A.  Correct.
9       Q.  And this is the operative report from
10  Dr. Sprock.  And you looked at this in the past, I
11  assume, in order to inform your opinions in the case?
12      A.  That is correct.
13      Q.  Okay.  Could you tell, from reviewing the
14  operative report, whether the implanting surgeon did, in
15  fact, place the mesh tension-free?
16      MS. GAYLE:  Objection.  Give him just one moment,
17  Counsel, to review this three-page document.
18  BY MS. GEIST:
19      Q.  There's actually nothing on the third page.
20  But, Doctor, you can take as much time as you want.
21      MS. GAYLE:  Sorry.
22  BY THE WITNESS:
23      A.  Okay.  I'm done -- I'm done with it.  What was
24  your question again?
25      MS. GEIST:  Can you read back my question, please?

Page 643

1       (Record read as requested.)
2  BY THE WITNESS:
3       A.  It states here, tensed with an 8 Hegar
4  dilator.  So that means an 8 Hegar dilator was able to
5  be inserted between the mesh.  So that means it was
6  placed loosely.
7       Q.  And you are referring to page 2 of the
8  operative report, which we just marked as Exhibit 34?
9       A.  That's correct, on Ms. Wheeler.
10      Q.  And this is the second paragraph,
11  second-to-the-last sentence of that paragraph?
12      A.  Correct.
13      Q.  And that's the basis for your opinion that
14  Dr. Sprock implanted the mesh tension-free, that
15  sentence that says tensed with an 8 --
16      A.  Hegar dilator.
17      Q.  -- Hegar dilator?
18      MS. GAYLE:  Objection.  Form.
19  BY THE WITNESS:
20      A.  Well, that's --
21      Q.  That's my question.
22      A.  That's what that means.  That means you can
23  fit an 8 Hegar dilator between the mesh and the tissues.
24      Q.  So that's the basis of your opinion, that the
25  mesh was implanted tension-free by Dr. Sprock?

Page 644

1       MS. GAYLE:  Objection.  Form.
2  BY THE WITNESS:
3       A.  Well, that's what - that's what Dr. Sprock
4  states right here.
5       Q.  I understand that.  But is that the basis for
6  your opinion that Dr. Sprock implanted the mesh
7  tension-free, that sentence?
8       MS. GAYLE:  Same objection.
9  BY THE WITNESS:
10      A.  Yes.  That's the basis for my opinion.
11      Q.  Okay.  Thank you.  You can set that aside,
12  Doctor.
13           Do you recall, from your review of the records
14  in this case, that Dr. Zipper described the mesh as
15  being rolled up when that doctor performed an excision
16  about four years after the implant?
17      A.  Yeah.  I recall that terminology.  And it also
18  should be noted that Dr. Sprock tacked the mesh anterior
19  and posterior, so following the IFU instructions.
20      Q.  If the mesh had been implanted flat and
21  without tension at the time of the initial surgery,
22  would it have been possible to see rolling four years
23  later due to tissue, due to tissue ingrowth?
24      MS. GAYLE:  Object to form.
25  BY THE WITNESS:

Page 645

1  A. Absolutely. That's mesh contraction. That's
2  what I see on a daily basis.
3  Q. But, Doctor, would you agree with me that,
4  once tissue ingrowth occurs, you are less likely to see
5  erosion for the logical reason that the mesh has ingrown
6  or combined with the woman's tissue; isn't that true?
7  MS. GAYLE: Objection to form.
8  BY THE WITNESS:
9  A. No, it's absolutely wrong.
10  Q. Why?
11  A. That's why we see mesh extrusion years after
12  the implantation and it's a progressive process. As the
13  mesh contracts up to 80 percent, based upon certain
14  studies, there is rolling, folding, uneven pressure on
15  the tissues, especially with the arms. There's uneven
16  pulling on the vagina and extrusion happens because of
17  pressure, poor healing, degradation of the product.
18  Q. What -- what's the basis for your opinion that
19  we see 80 percent of mesh contraction?
20  MS. GAYLE: Objection. Form. I'm sorry. I
21  believe that was a yesterday opinion, but I may have
22  missed it. Did he just mention 80 percent? Madam Court
23  Reporter, can you read back his answer? I'm so sorry,
24  Madam Court Reporter.
25

Page 646

1  (Record read as requested.)
2  MS. GAYLE: Excuse me, Counsel. My apologies.
3  Thank you.
4  MS. GEIST: No problem.
5  MS. GAYLE: Please, continue.
6  BY THE WITNESS:
7  A. Okay. Now, what was your question then?
8  Q. I just want to know what studies are you
9  relying on in support of your opinion that we see mesh
10  contraction up to 80 percent?
11  A. I'm relying upon -- I'm going to have to pull
12  out my expert report from yesterday, the general
13  specific. And the section on mesh contraction, I can go
14  through the studies and list them for you.
15  Q. I just want to know the 80 percent one,
16  Doctor?
17  A. Okay. Letouzey, this is on page 19 of my
18  expert report, Letouzey, L-E-T-O-U-Z-E-Y, which I
19  mentioned earlier today, reviewed the long-term
20  placement of mesh, pelvic mesh volumes over time using
21  three-dimensional, translabial ultrasound and found
22  contraction of 30 percent, 65 percent, 85 percent at a
23  follow-up duration of three, six, and eight years.
24  Correlating this with Bard's own internal documents that
25  showed a substantial risk of up to 50 percent. But my

Page 647

1  80 percent, I was -- I actually underestimated. It says
2  85 percent here.
3  Q. And was that study an animal study or a study
4  of -- looking at mesh in women?
5  A. Pelvic mesh volumes using translabial
6  ultrasonography that's in females, humans.
7  Q. And we talked yesterday -- and I don't want to
8  repeat it, but just to confirm -- you had not considered
9  the Dietz study in reaching your opinions about mesh
10  contraction, correct?
11  MS. GAYLE: Objection to form. And that is exactly
12  correct, Counsel. It was discussed yesterday. So I'm
13  going to instruct him not to answer that.
14  MS. GEIST: That's fine. He answered it yesterday.
15  BY MS. GEIST:
16  Q. Okay. Doctor, with respect to the opinions in
17  your report, excuse me, from Mrs. Wheeler that go to the
18  risks that you contend Bard should have included in the
19  IFU and did not?
20  A. Correct.
21  Q. That's -- I just want to make sure that we're
22  clear on the record. That's the same list,
23  two-and-a-half page list, that you had in Mrs. Alonso's
24  report, correct?
25  A. It should be the same, yes.

Page 648

1  Q. And it's the same list that you have in
2  Mrs. Bolyard's report?
3  A. That is correct.
4  Q. And would you agree with me, Dr. Elliott, that
5  you can't state, to a reasonable degree of medical
6  certainty or probability, that had all of this
7  information been included by Bard in the IFU for the
8  Avaulta Solo product, that this information would have
9  been conveyed to Mrs. Wheeler by her implanting doctor?
10  MS. GAYLE: Objection. Form.
11  BY THE WITNESS:
12  A. You're forcing me to speculate what another
13  individual would have done.
14  Q. No, no, no. I'm not. I'm asking you not to.
15  I'm asking you to agree with me that you can't say,
16  sitting here today, that had Bard put all of this
17  information in the IFU that you say Bard should have
18  done because Bard knew about all of these risks and
19  didn't communicate them to doctors, if Bard had done
20  what you say Bard should have done, that that
21  information would have been relayed to Mrs. Wheeler?
22  MS. GAYLE: Objection. Form.
23  BY THE WITNESS:
24  A. It should be the decision and moral obligation
25  of the implanting surgeon to have all information

Page 649

1  available.  A reasonable surgeon and doctor would relay
2  that information on to the patient.  I cannot speculate
3  what this hypothetical individual would have done had
4  they had this information.
5      Q.  Well, we're not talking about a hypothetical
6  individual.  We're talking about Dr. Sprock in
7  Mrs. Wheeler's case.  So that's my question.  You
8  can't -- you're not going to sit here and say that your
9  opinion is had Bard provided all of this information to
10  Dr. Sprock in the IFU for the Avaulta Solo product, that
11  that information would have been relayed by the doctor
12  to his patient, Mrs. Wheeler.  You can't say that,
13  correct?
14      MS. GAYLE: Objection. Form.
15  BY THE WITNESS:
16      A.  I can state exactly how I stated with Alonso
17  and exactly what I'll state with Bolyard, and that I can
18  state that a reasonable surgeon would relay that
19  information on.  I would do it and do it in my practice
20  of all known potential complications.
21      Q.  And you have no way of saying, because it
22  would be pure speculation, to use your own words, what
23  would have happened in the case of Mrs. Alonso,
24  Mrs. Wheeler, and Mrs. Bolyard, correct?
25      A.  Well, you're asking me to speculate.  I can't

Page 650

1  speculate.  I would -- I am of the opinion a patient has
2  the right to have that information available to her for
3  her own body to make her own choice.
4      Q.  Had Mrs. Wheeler had a native tissue repair or
5  an abdominal sacrocolpopexy procedure, would you agree
6  with me that she could have experienced the same issues
7  and complications she's complaining about now in her
8  complaint?
9      MS. GAYLE: Objection. Form. Assumes -- also,
10  objection, assumes facts not in evidence.
11  BY THE WITNESS:
12      A.  I disagree.
13      Q.  You disagree?
14      A.  (No verbal response.)
15      Q.  So let me explore that.  So if Mrs. Wheeler
16  had a native tissue repair for her anterior and
17  posterior defects, you don't agree that she could have
18  experienced pelvic pain and dyspareunia after that
19  procedure?
20      A.  Same answers that we went down before with the
21  first one, Alonso, applies here.  Number one,
22  Ms. Wheeler would never have had a mesh extrusion.  If
23  you had a native repair, it's impossible.  It's not
24  going to happen.
25      Q.  Right.  That's why I didn't ask you about it.

Page 651

1      A.  Yeah, you did.  You said native repair and
2  anterior sacrocolpopexy.
3      Q.  No.  I asked you about -- well, I don't want
4  to argue it.
5      A.  You said same complications.
6      Q.  No.  I said pain and dyspareunia.  So let me
7  make sure you understand my question, because that's
8  always important in these depositions.
9          I'm asking you about her complaints of pain
10  and dyspareunia.  And my question is this, had she had a
11  native tissue repair or an abdominal sacrocolpopexy,
12  instead of a transvaginal mesh procedure, could she
13  still have experienced pain and dyspareunia after either
14  one of those other procedures?
15      MS. GAYLE: Objection. Form.
16  BY THE WITNESS:
17      A.  Not in my practice, my experience, at a
18  high-volume tertiary care center, taking care of
19  patients on a daily basis.  I have never seen a native
20  repair or an abdominal sacrocolpopexy or robotic
21  sacrocolpopexy with the severity of pain and the
22  location of the pain and the delayed onset of pain like
23  I've seen with pelvic meshes.  The same answer I gave
24  with Alonso and the same one I'll give with Bolyard.
25      Q.  All right.  So just so I understand your

Page 652

1  answer, so Mrs. Wheeler still could have experienced
2  pelvic pain and dyspareunia.  But, in your opinion, it
3  would not have been to the same degree as she's
4  experiencing per her testimony today, correct?
5      MS. GAYLE: Object -- objection to form and
6  objection, mischaracterizes his testimony.
7  BY THE WITNESS:
8      A.  It's not just my opinion.  The literature
9  supports it.  And I forget what the second part is after
10  the objection.  I'll be quiet then because I can't
11  recall what the last part of it was.
12      Q.  So let me ask my question again.  You don't
13  disagree with me, do you, Dr. Elliott, that Mrs. Wheeler
14  could have experienced pelvic pain and dyspareunia after
15  having a native tissue or an ASC procedure?
16      MS. GAYLE: Objection. Asked and answered.
17  BY THE WITNESS:
18      A.  Again, with the qualifiers of the severity,
19  the frequency, the location, and the delayed onset and
20  the permanency and the inability to fix it, then I agree
21  with you.  If you take away those qualifiers, then I
22  disagree with you.
23      Q.  Understood.  Similar question to what I asked
24  you for Mrs. Alonso.  Had Mrs. Wheeler had a
25  transvaginal mesh implanted by another medical device

Page 653

1  company, would you agree with me that she could still
2  have experienced the same exact problems that she's
3  complaining about today as a result of the implant of
4  the Bard Avaulta products?
5      **A.   And I'll have to give the similar answer and**
6  **refer to my previous testimony on Alonso, but it's going**
7  **to be the same apply here because the Avaulta Solo**
8  **has -- is heavyweight, small pore arms compared to the**
9  **other products out there that I am familiar with, then**
10 **we can reasonably say, based upon the literature like**
11 **Clobb -- Cobb, Klosterhalfen, and others, that the**
12 **potential for complications will be greater with the**
13 **Avaulta Solo than the other mesh products.  However, the**
14 **mesh -- other mesh products have a high degree of**
15 **complications with it.  And it is my opinion no**
16 **transvaginal pelvic organ prolapse mesh, polypropylene,**
17 **with arms is safe.**
18     Q.   Okay.  So, in this case, Mrs. Wheeler's case,
19 you can't say that her outcome would have been any
20 different had she been implanted with another type of
21 pelvic organ prolapse device?
22     MS. GAYLE: Objection.  Form.
23 BY MS. GEIST:
24     Q.   Correct?
25     **A.   That's what I just stated.**

Page 654

1      Q.   Okay.
2      **A.   I said that there is, regardless of which**
3  **company's device is placed, there is still the**
4  **possibility of devastating, irreversible complications.**
5  **The Avaulta Solo has a higher chance because of the**
6  **heavyweight, small pore arms.**
7      Q.   And before you told me earlier that you're
8  distinguishing the Avaulta Solo from the Avaulta Plus;
9  is that right?
10     MS. GAYLE: Objection.  Form.
11 BY THE WITNESS:
12     **A.   That is correct on this one because it was**
13 **Avaulta Solo, which was implanted in Ms. Wheeler, did**
14 **not have the collagen implant.**
15     Q.   And, in your opinion, the
16 collagen/polypropylene combination puts a woman at a
17 greater risk for adverse events because of the collagen
18 addition?
19     **A.   Correct.  Based upon the literature that is**
20 **available, the collagen content on the mesh, which is**
21 **backed up by internal documents from Bard, has an**
22 **increased risk for delayed healing, impaired healing.**
23     Q.   Did -- in reaching that opinion, did you
24 consider any literature that concluded that the addition
25 of the collagen actually helped and decreased

Page 655

1  inflammation and decreased the risk of erosion?
2      **A.   Number one, I do not recall ever seeing any**
3  **literature that supports that.  I would like to see it.**
4  **That would be very interesting to read.  But I did**
5  **review the other ones, roughly, 15 or 20 other articles,**
6  **talking about collagen placed in the woman's vagina**
7  **increases the immune system, increases hypersensitivity,**
8  **graft versus host disease, et cetera.**
9      Q.   So you didn't -- in reaching this opinion, you
10 didn't review any literature or any article that
11 concluded that a collagen coating decreases an
12 inflammatory response during healing, which should, as a
13 result, decrease the risk of erosion?
14     MS. GAYLE: Objection.  Form.
15 BY THE WITNESS:
16     **A.   I would like to see that information.  In my**
17 **review of the Bard internal documents, Bard depositions,**
18 **review of the available medical literature, I have not**
19 **found that.  I have seen claims on Bard documentations,**
20 **but I have not seen any data to support that.  However,**
21 **I keep an open mind.  I would like to see that data.**
22     Q.   Dr. Elliott, I want to move on now to the
23 third case in which you provided an expert opinion,
24 Mrs. Bolyard's case.  Does anybody need a break?
25     **A.   No.  They're fine.**

Page 656

1      Q.   You keep answering for everyone, Dr. Elliott.
2      **A.   That's okay.  That's okay to use this?**
3      MS. GAYLE: You can look at it real quick.
4  BY MS. GEIST:
5      Q.   Sorry.  I'm making a lot of noise.
6      MS. GAYLE: What's our time on the record?
7      VIDEO TECHNICIAN: 3:39.
8      MS. GEIST: 3:39.  What was my goal?  Two hours per
9  case.  I'm doing a lot better than I could have even
10 hoped.
11         Madame Court Reporter, please tell me what
12 number I'm up to.
13     THE REPORTER: 35.
14         (Elliott Deposition Exhibit No. 35
15          was marked for identification.)
16     **THE WITNESS: I don't see 32 on that list.  Do you**
17 **have one?**
18     THE REPORTER: I think she skipped it.
19     **THE WITNESS: That's fine.  God is in the details.**
20 BY MS. GEIST:
21     Q.   Okay.  Dr. Elliott, we're going to shift now
22 and talk about your opinions in the case of Patricia
23 Bolyard.  And so I've marked, as Exhibit 35, a copy of
24 your expert report in that case.  Do you need a copy,
25 Counsel?

Page 657

1    MS. GAYLE:  Sure.
2    MS. GEIST:  This will be 35.
3    MS. GAYLE:  Thank you.
4  BY MS. GEIST:
5    Q.  And, Doctor, just by way of summary, can we
6  agree for any issues that we've already discussed with
7  respect to Mrs. Alonso and Mrs. Wheeler, those apply,
8  also, to Mrs. Bolyard's case to the extent they're
9  consistent?
10   **A.  Correct.  Correct, they are.**
11   Q.  And can I also assume, Doctor, that your
12  methodology that you employed in reaching your expert
13  opinions in Mrs. Bolyard's case are the same as we
14  already talked about extensively when we discussed
15  Mrs. Alonso's case?
16   **A.  Yes.  My previous testimony of the evaluation,**
17  **the differential diagnosis, will all be the same with**
18  **these.  And, also, for the record, on page 2 of the**
19  **report, it's under the Subsection 2, and it's**
20  **case-specific, it says, at the time of her 2008 Avaulta**
21  **placement.  It's actually July 2nd of 2010.**
22   Q.  Correct.
23   **A.  There is a typographical error there.**
24   Q.  Okay.
25   **A.  Just for clarification, so...**

Page 658

1    Q.  Thank you for that clarification.  I should
2  have asked you this for Mrs. Wheeler's report.  So let
3  me ask you for both cases, Mrs. Bolyard and
4  Mrs. Wheeler's.  These are both true and accurate copies
5  of your report, and that's your electronic signature on
6  both, correct?
7    **A.  Correct.**
8    Q.  Any other changes or revisions or typos needed
9  to be corrected in either report?
10   **A.  I believe, in Ms. Wheeler, also, on page 12,**
11  **the last paragraph, it also mentions incorrectly having**
12  **the Cook device implanted.  It should be Bard device.**
13   Q.  And that typo is in both of those
14  case-specific reports, correct?
15   **A.  Correct.  Yeah, there is a typographical**
16  **error.**
17   Q.  Okay.  So you've made that change on the
18  record.  And in Mrs. Wheeler's report, the copy that I
19  marked doesn't have a copy of your CV or reliance list
20  included in that copy.  And I think, by agreement of
21  counsel, we can just supplement that and include that to
22  make the record complete and accurate?
23   MS. GAYLE:  That's fine with me.
24  BY MS. GEIST:
25   Q.  Thank you.  And so shifting back, again, in

Page 659

1  Mrs. Bolyard's case, the last page of your report there,
2  that's the list of medical records specific to
3  Mrs. Bolyard that you reviewed to inform your opinions
4  in her case, correct?
5    **A.  Yes.  On page 12, I assume you're referring**
6  **to, that is the records I reviewed.**
7    Q.  Okay.  You know what?  My version, Doctor,
8  actually doesn't have a page 12.  It's actually on
9  page 2.
10   **A.  Okay.  It just says, Exhibits for patient of**
11  **Bolyard.  It says documents reviewed, and it has a list**
12  **of medical documents.**
13   Q.  Okay.
14   **A.  Actually mine is incomplete.**
15   Q.  Did -- in your review of Mrs. Bolyard's case,
16  did you read any depositions taken in her case other
17  than the deposition of the plaintiff herself?
18   **A.  Let me go to my reliance list.  All I have**
19  **listed -- is listed the deposition of Patricia**
20  **Bolyard.  I don't recall someone else's deposition, I**
21  **mean.**
22   Q.  If you had read the depositions of any of the
23  treaters in Mrs. Bolyard's case, we would see that on
24  this list of documents reviewed?
25   **A.  That's correct.  It should list that.  And it**

Page 660

1  **also does not list the depositions of Dr. Ross and**
2  **Dr. -- Mr. Orr either.  So it's somewhat incomplete.**
3  **But specific to Bolyard, it just has deposition --**
4  **Patricia Bolyard's deposition.**
5    Q.  Well, that -- the depositions of Dr. Ross and
6  Orr are listed in the list of materials you reviewed
7  provided with your generic report, correct?
8    **A.  That is correct, yes.**
9    Q.  For each of these reports, you have a separate
10  list of materials reviewed that are specific to that
11  individual plaintiff; fair to say?
12   **A.  That is correct, yes.**
13   Q.  And here for Mrs. Bolyard we don't see any
14  indication that you reviewed any of the deposition
15  testimony provided by any treating physicians in the
16  case, correct?
17   **A.  Yeah.  There is nothing listed here.  I don't**
18  **recall if I reviewed something of the surgeon or not,**
19  **but there is nothing listed here.**
20   Q.  Would that have been important information for
21  you to review in order to inform your opinions in the
22  case?
23   **A.  I think it would be --**
24   MS. GAYLE:  Objection.  Form.
25  BY THE WITNESS:

Page 661

1 **A. I think it would be additive to the fund of**
2 **knowledge.**
3 Q. But you didn't do that in this case?
4 **A. I'm saying I don't recall if I did or not.**
5 Q. Do you know if any of the information in those
6 depositions would have changed your opinions in
7 Mrs. Bolyard's case?
8 MS. GAYLE: Objection. Form.
9 BY THE WITNESS:
10 **A. I would have to see those depositions.**
11 Q. So, sitting here today, you don't know one way
12 or another if your opinions would have been changed by
13 reviewing what the treaters had to say?
14 **A. I've been able to review their medical**
15 **documents. I've been able to review the medical**
16 **literature. I've been able to examine the patient**
17 **specifically. So the possibility of them altering my**
18 **opinion would be very small to none.**
19 Q. Okay. With respect to Mrs. Bolyard, she had
20 implanted, back on July 2nd, 2010, by Dr. Prouty the
21 Avaulta Solo anterior and posterior products, correct?
22 **A. That is correct.**
23 Q. No Align sling in this case, correct?
24 **A. There was no documentation of that in the**
25 **records.**

Page 662

1 Q. Okay. You would have seen that somewhere in
2 the records if she had an Align sling implanted to
3 relieve stress urinary incontinence symptoms, correct?
4 **A. It should be in there, and it was not noted.**
5 Q. Okay. So same question that I asked you in
6 Mrs. Wheeler's case. Any of your opinions relating to
7 the Bard Avaulta Plus product and your opinions relating
8 to the collagen-polypropylene combination product would
9 not apply to Mrs. Bolyard's case, true?
10 **A. That -- that is correct. Anything pertaining**
11 **specifically to the collagen implantation do not apply**
12 **to Ms. Bolyard.**
13 Q. And, in Mrs. Bolyard's case, like I did with
14 your other cases, I'm going to just try and summarize
15 your opinions. And in her case, your opinions are that,
16 due to the Bard Avaulta product, she is experiencing
17 pelvic pain dyspareunia, urge incontinence, pelvic floor
18 myalgia, and then we have that same paragraph regarding
19 the impact on loss of physical intimacy and potential
20 for long-term depression, correct?
21 **A. Correct. She also -- she -- her current**
22 **diagnosis also is pelvic skin pain secondary to lichen**
23 **sclerosus, which has nothing -- that is not caused by**
24 **the Avaulta product. That is a preexisting condition.**
25 **Again, it states, in number one, pelvic pain secondary**

Page 663

1 to lichen sclerosis. It should be pelvic skin pain.
2 MS. GAYLE: Hold on one moment, Doctor. Can you
3 spell that for Madame Court Reporter.
4 **THE WITNESS: Oh, lichen sclerosis? L-I-C-H-E-N,**
5 **and the next word is, sclerosis, S-C-L-E-R-O-S-I-S.**
6 (Sic.)
7 BY MS. GEIST:
8 Q. So let's go to page 2 of your report in
9 Mrs. Bolyard's case, Doctor.
10 **A. Okay. I'm there.**
11 Q. This is a list of your opinions, correct?
12 **A. On page 2?**
13 Q. I'm on page 5.
14 **A. Oh, yes.**
15 Q. Okay. And what -- tell me, again, what
16 exactly you need to change or amend in your report with
17 respect to the -- is it lichen or lichen?
18 **A. Lichen sclerosis.**
19 Q. Lichen sclerosis?
20 **A. Yes. Number one, I say pelvic pain secondary**
21 **to lichen sclerosis. It's pelvic skin pain. Lichen**
22 **sclerosis is a superficial disorder of the skin. I left**
23 **out skin there. And that has -- that has not been**
24 **caused by Avaulta. It's not been provoked by Avaulta.**
25 **It's a preexisting condition.**

Page 664

1 Q. And lichen sclerosis is a fairly rare
2 condition, would you agree with me on that?
3 **A. Yes, it is a rare condition.**
4 Q. And the symptomatology associated with lichen
5 sclerosis is burning and cutting pain in the vaginal
6 region?
7 **A. In the skin, yes. It's a skin disorder.**
8 Q. That causes burning and cutting pain, correct?
9 **A. On the skin, yes.**
10 Q. Well, it can also result in painful sexual
11 intercourse or dyspareunia, correct?
12 **A. It can result in insertional pain at the skin**
13 **level.**
14 Q. Well, that's well established by the medical
15 literature; is it not?
16 **A. Yes. But the clarifier on there, it does not**
17 **cause pelvic floor myalgia. It does not cause deep**
18 **insertional pain. It's superficial skin pain at the**
19 **level of the introitus.**
20 Q. But you would agree with me, as set forth here
21 in your expert report in Mrs. Bolyard's case, that this
22 is a separate and independent reason for Mrs. Bolyard's
23 pelvic pain that has nothing to do with the Bard Avaulta
24 products; is that true?
25 **A. Bard is not responsible for causing lichen**

In Re: CR Bard 200                 Daniel Elliott M.D., Vol. II                    11/16/2014

1  sclerosis, not cause for flare-up of the lichen
2  sclerosis. This is a skin disorder on the outside of
3  the vagina, which, again, has not been caused by Bard
4  products.
5      Q.  And this is a condition that Mrs. Bolyard will
6  unfortunately have for the remainder of her life, true?
7      A.  To date there is no known cure for this
8  process.
9      Q.  And I assume you saw in the medical records
10  that, prior to her implant of the Bard products, she had
11  rated her dyspareunia pain as a 7 out of 10, and that is
12  caused by the lichen sclerosis, correct?
13      A.  Correct. And that is insertional pain, a 7 on
14  the Visual Analog Scale at the level of the skin. I
15  agree with you.
16      Q.  And I believe she told you, when you saw her
17  and conducted your independent medical evaluation, that
18  her dyspareunia could be rated as an 8 out of 10; is
19  that correct?
20      A.  Where the -- we have to be careful, as far as
21  what we're defining, I'm being very clear that Avaulta
22  and Bard products are not responsible for lichen
23  sclerosis. They are responsible for the deep pain
24  inside of Ms. Bolyard's vagina.
25      Q.  Well, we can agree, from the medical records,

1  that Mrs. Bolyard's lichen sclerosis was causing her, as
2  reflected in her records, painful intercourse or
3  dyspareunia and she rated it as a 7 out of 10
4  preimplant, correct?
5      A.  Correct, at the level of the skin.
6      Q.  Well, she --
7      A.  The introitus.
8      Q.  -- doesn't say anywhere in her records -- she
9  doesn't distinguish dyspareunia, as you are now, by
10  saying, well, it's only at the level of the skin, does
11  she?
12      MS. GAYLE:  Object to form and move to strike.
13  BY THE WITNESS:
14      A.  Lichen sclerosis is not a disorder on the
15  inside of the vagina. It will not distort the vagina.
16  It will distort the introitus, the opening of the
17  vagina.
18      Q.  Understood. But in Mrs. Bolyard's own
19  records, she has told her treating doctors, prior to
20  ever being implanted with the Bard product, that her
21  dyspareunia pain could be rated on a scale of 0 to 10.
22  She rated it as a 7 out of 10. That's what the records
23  show, correct?
24      A.  Yes. The records state that and with the
25  understanding we have to define where the location of

1  that pain is.
2      Q.  Is there any distinguishing information in her
3  medical records that talk about the location of the
4  pain, or does she just say, I have had pain -- painful
5  sexual intercourse before ever being implanted with the
6  Bard product that I rate on a scale of 7 out of 10?
7      MS. GAYLE:  Object to form.
8  BY THE WITNESS:
9      A.  Well, lichen sclerosis is a disease of the
10  skin. It's not a disease of the vagina. So it is in
11  the medical records. There is no reason for her to have
12  deep vaginal pain or obturator foramen pain, but she
13  would have skin pain.
14      Q.  And she complains of this in terms of painful
15  sexual intercourse preimplant? That's in the records,
16  correct?
17      A.  Correct.
18      Q.  And then, after the surgery in July of 2010
19  where Mrs. Bolyard was implanted with the Bard products,
20  we see that she is now complaining of dyspareunia pain
21  and she rates it as an 8, 8 out of 10, postimplant,
22  correct?
23      A.  That is what I state, yes.
24      Q.  Okay. So we've moved from 7 out of 10
25  preimplant to 8 out of 10 postimplant?

1      MS. GAYLE:  Object to form.
2  BY MS. GEIST:
3      Q.  Fair summary?
4      A.  But there is a location difference, but the
5  overall pain level has increased.
6      Q.  Can you point me to any medical record that
7  supports what you just told me, that there is a
8  difference in where she's experiencing the pain?
9      A.  Well, it's based upon my exam of her.
10      Q.  Well, her medical records, prior to her
11  implant, just say, I have pain with sexual intercourse.
12  I rate it as a 7 out of 10; isn't that true?
13      MS. GAYLE:  Object to form.
14  BY THE WITNESS:
15      A.  Well, prior to the surgery, and the surg- --
16  the doctor is just documenting that she has painful
17  intercourse.
18      Q.  Right.
19      A.  They have not delineated where that pain is.
20      Q.  Okay. Let's shift and talk about
21  Mrs. Bolyard's smoking history. I noted, when you
22  provided us with your updated literature list and
23  bibliography, you had some articles on there relating to
24  smoking and the potential injury or impact smoking could
25  have on the human body?

Page 669

1    **A.  Correct.**

2    Q.  Did you do a little bit more reading about

3  smoking and the potential negative impact smoking could

4  have on the human body in preparation for your

5  deposition?

6    MS. GAYLE:  Objection.  Form.  His opinions

7  regarding smoking were discussed yesterday.  If you have

8  a specific question in relation to this patient, go

9  ahead.

10    MS. GEIST:  I am --

11    MS. GAYLE:  But it sounded in general to me.

12    MS. GEIST:  I think I'm entitled to get an answer

13  here.  So I hope you're not instructing Dr. Elliott to

14  not answer my question.

15    MS. GAYLE:  I believe that's a general opinion, but

16  I didn't hear anything case specific with her.  I think

17  you started off and then tailed off.  But if you want to

18  read back the question, you can, but I believe it to be

19  a general question.

20    MS. GEIST:  Can you read back my question?

21    MS. GAYLE:  And the one before, Madam Court

22  Reporter.

23    THE REPORTER:  I'm sorry.

24    MS. GAYLE:  And the one before it.

25        (Record read as requested.)

Page 670

1    MS. GAYLE:  My objection stands.

2  BY MS. GEIST:

3    Q.  All right.  So let me just add, in preparation

4  for your deposition in this case, in Mrs. Bolyard's

5  case, where we have a plaintiff who has a very

6  significant and extensive history of smoking?

7    MS. GAYLE:  Thank you, Counsel.

8    MS. GEIST:  You're welcome.

9  BY THE WITNESS:

10    **A.  I did not update my reliance or look at**

11  **documents in preparation for a deposition because I also**

12  **do sacrocolpopexies.  Smoking is associated with an**

13  **increased risk of mesh extrusion, that I know of no data**

14  **that states that smoking is involved in impaired healing**

15  **with nonmeshes.  So I have a natural interest in that.**

16    Q.  Okay.  So let me just make sure I understand

17  that.  Mrs. Bolyard, because of her long-term and

18  extensive history of smoking, was at a greater risk for

19  mesh expulsion -- pardon me -- mesh exposure or erosion

20  as a result of her smoking history; is that fair to say?

21    MS. GAYLE:  Objection, form.

22  BY THE WITNESS:

23    **A.  There is data in the sacrocolpopexy that**

24  **smoking can increase the risk of extrusion.  I have**

25  **heard conflicting reports as far as with the**

Page 671

1  transvaginal cases with meshes.  There is no data that I

2  am aware of that smoking increases any wound healing in

3  nonsmoker's transvaginal repairs.

4    Q.  So if Mrs. Bolyard had had an abdominal

5  sacrocolpopexy instead of a transvaginal mesh procedure

6  to treat her anterior and posterior defects, she would

7  have been at an even greater risk of mesh extrusion as

8  demonstrated by the literature, correct?

9    MS. GAYLE:  Objection.  Form.

10  BY THE WITNESS:

11    **A.  Incorrect.  The literature is current smokers.**

12  **There is no data out there that I am aware of on former**

13  **smokers.**

14    Q.  So --

15    **A.  But current and active smokers are at**

16  **increased risk.**

17    Q.  So a woman who is an active smoker at the time

18  of her procedure is at an increased risk?

19    MS. GAYLE:  Object to form.

20  BY THE WITNESS:

21    **A.  For transvaginal repairs, but there is also**

22  **good data out there that stopping up to ten days prior**

23  **reduces that risk tremendously.  So, again, in former**

24  **smokers, I know of no good data that says they're at an**

25  **increased risk.**

Page 672

1    Q.  Well, Doctor, is Mrs. Bolyard a former smoker?

2    **A.  It states in here former smoker.  And that**

3  **actually raises a good point.  I would have to look at**

4  **the IFU to see if they warn.  If there is data out**

5  **there, I would like to see it.  Because if there is good**

6  **data out there that smoking increases risk of extrusion**

7  **or complications with meshes, then it should be in the**

8  **IFU.  And to the best of my knowledge, and correct me if**

9  **I'm wrong, I have not read any deposition.  There is**

10  **nothing in here about smoking.  So I would like to know,**

11  **is there information out there.**

12    Q.  But just so I'm clear, it's your opinion that

13  somebody who is a current smoker is at a higher risk or

14  at an increased risk of mesh extrusion based on the

15  smoking, correct?

16    MS. GAYLE:  Objection.  Form.  Mischaracterizes his

17  testimony.

18  BY THE WITNESS:

19    **A.  The data that I am familiar with is in**

20  **abdominal sacrocolpopexies current smokers there is**

21  **increased risk.  I am not aware of consistent or**

22  **consistent -- consistent on transvaginal mesh repairs.**

23    Q.  Any reason to think the data would be any

24  different or better with the transvaginal repair?

25    **A.  Yes, because they're a different procedure.**

Page 673

1  Q.  Well, smoking, it has a negative impact and
2  damages the vasculature, correct?
3  **A.  Correct.  I think that that's a fair**
4  **assessment.**
5  Q.  And somebody who has a pack-a-day habit is at
6  a greater risk of damage to the vascular -- vasculature
7  than somebody who has a half pack a day compared to
8  somebody who smokes a cigarette or two a day?
9  MS. GAYLE:  Objection.  Form.
10  BY MS. GEIST:
11  Q.  The more cigarettes you smoke, the more damage
12  you're causing to your body?  Isn't that something
13  that's noncontroversial, Doctor?
14  MS. GAYLE:  Objection.  Form.
15  BY THE WITNESS:
16  **A.  I don't know if there is any data that says at**
17  **what point in time you cross that threshold of their**
18  **being dangerous.  And, again, I am reviewing the IFU**
19  **right now, and I see nowhere in here a warning on**
20  **smokers.**
21  Q.  Well, Doctor, come on.  Do you need a warning
22  in the IFU about smoking?  Doesn't every medical doctor
23  who has gone through medical school and gone on to treat
24  patients know that smoking is dangerous and damages
25  your -- damages your system, your vasculature?  You

Page 674

1  don't need to be told that in the IFU, do you?
2  MS. GAYLE:  Move to strike the preface to questions
3  by counsel.  Also, objection.  Argumentative.
4  BY THE WITNESS:
5  **A.  According to the FDA Blue Book, the warning**
6  **sections, if a company is aware, they have to warn the**
7  **patients of all known issues.  If smoking -- if they**
8  **know smoking is increasing the risk of complications**
9  **with the procedure, they have to warn it.  They do warn**
10  **with their trocars of the possibility of organ**
11  **perforation.  If I hold up a trocar and you look at it,**
12  **that will perforate organs.  You don't need any degree**
13  **with that, but they warn it.  So, subsequently, smoking,**
14  **I don't know.  So, again, it's not in here.**
15  Q.  Since you raised the point, there is no
16  evidence that there was any trocar perforation or any
17  damage caused to Mrs. Alonso or Mrs. Wheeler or
18  Mrs. Bolyard based on the trocars used in any of those
19  cases, correct?
20  MS. GAYLE:  Object to form.
21  BY THE WITNESS:
22  **A.  There is no evidence of organ perforation with**
23  **all three of those that you mentioned from the trocars.**
24  Q.  All right.  So let's go back to smoking.  Is
25  it your opinion that the IFU should have contained

Page 675

1  information about smoking and that that would have been
2  information a doctor would need to read about in order
3  to be informed about the risk of smoking?
4  **A.  I think it's not just my opinion.  It's the**
5  **FDA's opinion, and a patient needs to be aware that, if**
6  **they are smoking, they are at an increased risk.**
7  Q.  You've never worked with the FDA or been a
8  consultant to the FDA with respect to what needs to go
9  into an IFU or not go into an IFU, correct?
10  MS. GAYLE:  Objection.  Form.  This was ground that
11  we plowed yesterday.
12  BY MS. GEIST:
13  Q.  Is that correct, Doctor?  You've never been a
14  consultant for the FDA or worked with the FDA on what
15  should go into an IFU?
16  MS. GAYLE:  Same objection.  I'm going to instruct
17  you not to answer that because you asked it yesterday.
18  MS. GEIST:  I didn't ask him that question
19  yesterday.  We didn't talk about FDA consulting.  And he
20  just raised FDA regulations and an opinion about what
21  the FDA would require.  So my question is new.
22  BY MS. GEIST:
23  Q.  Have you ever been a consultant or worked for
24  the FDA in -- on issues relating to what should be on a
25  label or an IFU?

Page 676

1  **A.  I've --**
2  MS. GAYLE:  Same objection.
3  BY THE WITNESS:
4  **A.  I have never been an employee of the FDA.**
5  Q.  Or a consultant with respect to the IFU or
6  what information needs to go into a label?
7  **A.  I have never been an employee nor a consultant**
8  **of the FDA.**
9  Q.  Now, back to smoking, would you agree with me
10  that the duration or the length of time that somebody
11  smokes would have an increase on the damage to the
12  vasculature; in other words, if somebody -- if somebody
13  who smokes for five years compared to somebody who
14  smokes for ten years or, in Mrs. Bolyard's case,
15  somebody who smokes for 50 years a pack a day, are they
16  not at a greater increased risk for damaging their own
17  vasculature system?
18  **A.  I think the data supports not necessarily the**
19  **duration of smoking, but the fact that an individual**
20  **stops smoking.**
21  Q.  Now, you keep saying that, Doctor.
22  **A.  Because --**
23  Q.  Is your -- I'm sorry.  Were you not done?
24  **A.  No.  I'm sorry.**
25  Q.  Is it your opinion that Mrs. Bolyard had

Page 677

1  stopped smoking before she was implanted with the Bard
2  Avaulta products?
3      A.  I would have to go back and look at the
4  literature.  I don't recall.  I'm going off of my notes
5  here, and it states she was a former smoker.
6      Q.  Well, what makes you think she was a former
7  smoker?
8      A.  I would have to look at the notes.  At some
9  point in time, I must have saw that she had stopped
10  smoking.
11     Q.  If she was a current smoker at the time of her
12  implant surgery back in July of 2010, would that change
13  your opinions in the case?
14     A.  If -- if the consensus is that that's going to
15  impair healing, then it would change it because that's
16  all the more evidence it should have been on the IFU.
17     Q.  Isn't it well-known by the medical community
18  that smokers have a greater challenge with healing,
19  their healing is impaired because of their smoking,
20  current smokers?
21     MS. GAYLE:  Objection.  Form.
22  BY THE WITNESS:
23     A.  Not with transvaginal work without meshes.
24  There is no data to support that.
25     Q.  There is no data to support that?

Page 678

1      A.  Zero data with transvaginal native repairs
2  that impairs healing.
3      Q.  But you don't think you can extrapolate the
4  general, well-established body of literature out there
5  that says smoking is bad and damages your vasculature
6  and causes challenges and delayed healing?  You can't
7  take that literature and say, well, of course, those
8  same problems and challenges would apply to somebody
9  undergoing a transvaginal mesh surgery?  You can't do
10  that?
11     MS. GAYLE:  Objection.  Form.
12  BY THE WITNESS:
13     A.  Studies have been done and they don't see an
14  independent variable study analysis on transvaginal work
15  to show that smoking increases the risk of poor wound
16  healing in transvaginal work without meshes.
17     Q.  Are there some studies -- are there some
18  studies that talk about the fact that smoking may
19  increase a problem with healing or result in delayed
20  healing in somebody who has had a transvaginal mesh
21  implanted?
22     A.  With meshes, I have seen some state -- some
23  data -- I have seen some data stating that it can
24  increase the risk and other data showing it does not
25  have any impact upon it.

Page 679

1      Q.  All right.
2      A.  But we're -- but we're not --
3      Q.  So, at least, there is some -- I'm sorry.  Go
4  ahead?
5      A.  We are talking about native, non-mesh repairs.
6  I know of zero data that smoking increases the problems
7  of wound healing.
8      Q.  But you have seen that data in the context of
9  the abdominal sacrocolpopexy, which is a mesh procedure
10  done via the abdominal approach, correct?
11     A.  Which we have discussed the other day as a
12  completely separate procedure and it's transabdominal.
13     Q.  But you have seen that data, correct?
14     A.  Correct, for the transabdominal repair, but
15  not the transvaginal repair.
16     Q.  So can we agree that Mrs. Bolyard, had she had
17  the trans- -- sorry -- had she had the abdominal
18  sacrocolpopexy instead of the transvaginal mesh, she
19  would have been at an increased risk of erosion after
20  that operation?
21     MS. GAYLE:  Object to form.
22  BY THE WITNESS:
23     A.  Well, you used the word erosion.  It's
24  extrusion.
25     Q.  Sorry.  Extrusion.

Page 680

1      A.  The data that -- there is data out there.  If
2  she would have had a different procedure and had the
3  abdominal sacrocolpopexy, that there would have been an
4  increased risk for extrusion in that procedure, which
5  she did not have.
6      Q.  And sitting here today, after reviewing
7  Mrs. Bolyard's medical records, it's your opinion that
8  she was not a current smoker at the time she had her
9  Bard Avaulta mesh implanted or any time thereafter?
10     MS. GAYLE:  Objection.  Form and asked and
11  answered.
12  BY THE WITNESS:
13     A.  I would have to go back and look at the
14  records.  You know, according to my notes, I wrote down
15  here, it says that she was a former smoker.
16     Q.  Well, if the records show -- if you go back
17  again and you take a look and you see that the records
18  show that Mrs. Bolyard was a current smoker at the time
19  of her Bard -- at the time of her implant surgery and
20  continued to smoke thereafter, would that change your
21  opinions in this case concerning the causes of the
22  problems that she experienced after the implant?
23     MS. GAYLE:  Objection to form.
24  BY THE WITNESS:
25     A.  Well, as I mentioned, according to my

1  knowledge, there is conflicting data smoking does
2  anything as far as transvaginal mesh work. And if she
3  were an active smoker and there is knowledge out there
4  by the company that that is going to impair healing,
5  that's got to be on the IFU and she's got to be warned
6  for that.
7   Q. So if you -- if you go back and you take
8  another look at the records, Doctor, and you conclude
9  that Mrs. Bolyard was a current smoker at the time of
10  the implant, that wouldn't have any impact or change
11  your opinions in this case, whatsoever; is that what
12  you're telling me?
13   MS. GAYLE: Objection. Objection. Form.
14  BY THE WITNESS:
15   A. Well, I thought I just answered it. Because
16  in the precautions section of the IFU, they list things
17  about compromised immune system, prior abdominal pelvic
18  surgeries, they list quite a few issues here, but
19  nowhere in there is, again, smoking. So from Bard's
20  perspective, it must not have played a role.
21   Q. If you go back and look at Mrs. Bolyard's
22  records and conclude that she was a current smoker at
23  the time of her surgery, would you consider that fact in
24  reaching your opinions regarding why she experienced the
25  complications that she's testified about?

1   MS. GAYLE: Objection. Asked and answered.
2  BY THE WITNESS:
3   A. I believe I've answered. I guess I'm confused
4  because I've been answering this multiple times. I
5  would have to look --
6   Q. I wouldn't be asking it again, Dr. Elliott, if
7  you would answer my questions. And this has been going
8  on all day today and all day yesterday. If you would
9  answer my questions, we could move on. I just want to
10  know. I just want to know, did you consider the fact
11  that Mrs. Bolyard was a current smoker at the time of
12  the implant and had a 50-year, pack-a-day history, did
13  you consider that as an alternative cause of some of the
14  problems and complications she experienced after her
15  implant surgery?
16   MS. GAYLE: Objection. Asked and answered.
17  BY THE WITNESS:
18   A. I have in my notes here she is a former
19  smoker. I have no evidence of her being an active
20  smoker at the time of the implantation. So if you show
21  me data that she was an active smoker at the surgery,
22  then we can proceed. Otherwise, I'm going off of what
23  my notes are.
24   Q. How about chronic obstructive pulmonary
25  disease or COPD?

1   A. CO --
2   Q. Would you consider Mrs. Bolyard's COPD and
3  chronic cough in reaching your opinions in this case
4  that the Bard Avaulta products were the cause of her
5  complications?
6   A. COPD, in and of itself, is a lung condition
7  which would have no bearing upon vaginal extrusion,
8  vaginal pain. It may increase the risk of recurrence of
9  a prolapse, but it's not going to cause the other
10  issues.
11   Q. How about --
12   MS. GAYLE: Before your next question, do you
13  mind if we take a short break? I think it would do
14  us all good because everybody is stuttering and so
15  forth.
16   MS. GEIST: No, not at all. I'm happy to take a
17  break.
18   VIDEO TECHNICIAN: We're off the record. The time
19  is 1:55 p.m.
20   (A recess was had.)
21   VIDEO TECHNICIAN: We're back on the record. The
22  time is 2:03 p.m.
23   MS. GEIST: May I have my last question read back,
24  please, Madam Court Reporter.
25   (Record read as requested.)

1  BY MS. GEIST:
2   Q. Doctor, would somebody such as Mrs. Bolyard
3  who has a chronic cough as a result of her COPD be at a
4  greater risk for erosion or extrusion of the vaginal
5  mesh?
6   A. I'm not aware of any data that would show for
7  extrusion of mesh, it increased risk of recurrence of
8  her prolapse.
9   Q. Would you agree with me if she had had, for
10  example, a native tissue repair, because the native
11  tissue repair is not augmented with a synthetic mesh,
12  that she would have had a greater recurrence of prolapse
13  had she undergone that procedure based on her chronic
14  cough?
15   A. Chronic cough is associated with a greater
16  recurrence of pelvic organ prolapse. I'm not aware of
17  any study comparing COPD and native and mesh repairs.
18  So I can't say if she would have a greater recurrence.
19   Q. If she had had a native tissue, you can't say,
20  due to her chronic cough, that she would have had a
21  recurrence of the prolapse repaired by the native tissue
22  procedure?
23   A. She -- she would have a higher chance of
24  recurrence of a pelvic organ prolapse regardless of what
25  type of repair she had because it's a chronic,

Page 685

1 repetitive process.
2     Q.  How about diabetes?  Does somebody diagnosed
3 with diabetes have greater challenges with respect to
4 healing after a surgical procedure?
5     A.  I'm not aware of anything transvaginal as far
6 as increasing wound healing.  Definitely transabdominal
7 and obesity can increase the risk of wound healing, but
8 that's on the abdomen and the skin.
9     Q.  Did you consider, in reaching your
10 differential, whether Mrs. Bolyard's diagnosis of
11 diabetes could have had an impact on her wound healing?
12     A.  Yes.
13     Q.  And did you eliminate that as a cause after
14 you considered it?
15     A.  Well, diabetes -- I am unaware of any study
16 demonstrating that diabetes, in the transvaginal mesh
17 group, increases the risk of extrusion.  In my review of
18 the literature and my experience, I have not seen
19 anything like that.  If there is data, I would like to
20 see it.  So, yes, I did review that.  I did consider it.
21 I did not find it being, based upon data, a causal
22 factor.
23     Q.  Only because you couldn't find any data
24 specific to a transvaginal -- strike that.
25         Only because you couldn't find any data that

Page 686

1 specifically looked at the impact of diabetes on wound
2 healing after a transvaginal surgery?
3     MS. GAYLE:  Objection.  Form.
4 BY THE WITNESS:
5     A.  No.  There are many studies out there,
6 multivariate analysis studies, looking at diabetes, age,
7 obesity, transvaginal repairs, and also mesh repairs.  I
8 have yet to see anything on a good quality, multivariate
9 study to demonstrate diabetes increases the risk of
10 vaginal extrusion.
11     Q.  But you agree that diabetes increases the risk
12 or increases problems associated with wound healing,
13 correct?
14     A.  In the setting of the abdomen.
15     Q.  Why wouldn't that apply to the vaginal
16 setting?
17     A.  Because there is no fat in the vagina.  Fat is
18 the problem.  Fat does not heal.  There is no fat, no
19 adipose, in the vagina.
20     Q.  How about degenerative disc disease?  Did you
21 consider Mrs. Bolyard's degenerative disc disease --
22     A.  Absolutely.
23     Q.  -- in reaching your opinions with respect to
24 her chronic pain?
25     A.  Absolutely.  And that is a very important one

Page 687

1 to realize and that's why you need to have a very good
2 understanding of neuroanatomy, which is exactly why, in
3 my fellowship on bladder and neuroanatomy and a member
4 of the International Pelvic Pain Society, you have to
5 look at the distribution of the nerves, where the nerves
6 go.
7         Pain down the legs, the back of the leg, the
8 bottom of the foot, that type of pain is consistent with
9 degenerative disc disease that is not caused by an
10 Avaulta product.  Pain inside the vagina at the
11 obturator foramen is not due to degenerative disc
12 disease.
13     Q.  So you don't think any of the pain complaints
14 that Mrs. Bolyard has can be attributed to the
15 degenerative disc disease?  Is that your opinion?
16     A.  We have to be specific which pain we're
17 talking about.  If we're talking about dyspareunia pain
18 on pelvic exam, that is not due to a degenerative disc
19 disease.
20     Q.  How about her generalized complaints of pelvic
21 pain?
22     MS. GAYLE:  Objection.
23 BY MS. GEIST:
24     Q.  Could that be attributable to her degenerative
25 disc disease?

Page 688

1     A.  Degenerative disc disease usually is L2 --
2 excuse me, L3, 4, 5.  The nerve roots of that extend
3 down to the sciatic, which then extend down the back of
4 the leg, front of the thigh, and the bottom of the foot.
5 And that is not the type of pain that she is
6 experiencing in the pelvis.  The nerves have to be
7 involved going to the pelvis and they are not.  Because
8 then we're talking about the pudendal nerve, and we have
9 no evidence of that being involved.
10     Q.  It's your opinion, Dr. Elliott, from your
11 expert report, that her pelvic pain is caused, at least,
12 in some degree, by her lichen sclerosis, correct?
13     MS. GAYLE:  Objection.  Form.  I believe he
14 corrected that on the report earlier.
15 BY THE WITNESS:
16     A.  Pelvic skin pain, peroneum pain on the skin is
17 definitely due to lichen sclerosis.  Avaulta, to the
18 best of my knowledge based upon neuroanatomy, study of
19 pelvic nerve neuroanatomy, the Avaulta product will not
20 be affecting the skin of the peroneum.
21     Q.  So explain to me this difference you've been
22 talking about, the pelvic skin pain versus pelvic pain
23 generally.  If I understand your report, you say that
24 the -- and this is based on your revision that we did
25 earlier, Mrs. Bolyard's pelvic skin complaint is

Page 689

1  secondary or caused by the lich- --
2  **A. Lichen sclerosis.**
3  Q. -- lichen sclerosis, correct?
4  **A. That is correct.**
5  Q. And her pelvic pain is caused by or secondary
6  to the Avaulta mesh in your opinion, correct?
7  **A. Correct.**
8  Q. So explain to me just so I understand the
9  difference in the two types of pain you're talking
10  about?
11  **A. You have to understand neuroanatomy.**
12  **Neuroanatomy is very logical. Nerves that are**
13  **irritated, you can follow them back to wherever they**
14  **are. Different nerves carry different stimuli, pain,**
15  **temperature differences. On the skin they are carried**
16  **by the dermatomes, which exit the back and wrap around,**
17  **okay. That is not evolved by Avaulta product. The**
18  **Avaulta product does not hit the skin dermatomes.**
19  **Avaulta will hit the deep nerves, the nerves**
20  **that are involved in the function of the bladder, a**
21  **sensation deep within the vagina. So based upon my**
22  **understanding of neuroanatomy and my education, they are**
23  **completely separate entities.**
24  Q. And do you have any studies or scientific
25  literature that you can cite to me in support of what

Page 690

1  you just said?
2  **A. Grey's Anatomy.**
3  Q. Anything else?
4  MS. GAYLE: Objection. Form.
5  BY THE WITNESS:
6  **A. Clemente's Anatomy.**
7  Q. Did you consider the fact that Mrs. Bolyard
8  was diagnosed with lymphoma shortly after her mesh
9  implant surgery and underwent radiation therapy? Could
10  the radiation therapy be a potential cause for her
11  problems or challenges with wound healing?
12  **A. It depends where she got her -- it depends the**
13  **timing of the radiation and the location of the**
14  **radiation. I don't recall, off the top of my head,**
15  **where she received radiation.**
16  Q. And did you look at that when you reviewed the
17  medical records in the case to see whether or not it
18  would potentially have an impact on her delayed healing?
19  **A. Yes, I did, and I just don't recall from the**
20  **records, so we'd need to look at that. Lymphoma, if**
21  **it's treated with radiation, usually is a pinpoint.**
22  **They are radiating a certain location of the body. So,**
23  **again, I would have to look, review the records to**
24  **refresh my memory.**
25  Q. Could radiation therapy have an impact on the

Page 691

1  vaginal tissues?
2  **A. If the vagina were radiated during the healing**
3  **period, the first six-or-so weeks afterwards, that**
4  **possibly could play a role. If radiation is done**
5  **afterwards, there is no data to support impaired**
6  **healing.**
7  Q. She has -- Mrs. Bolyard has vaginal atrophy as
8  well, correct? Did you see that in your review of her
9  records?
10  **A. I say moderately atrophic.**
11  Q. She's been on Premarin and Estrace for that
12  condition, correct?
13  **A. She's on Estrace. I don't know about vaginal**
14  **Premarin. I don't recall. I would have to, again, look**
15  **at the records to be specific. They're both vaginal**
16  **estrogens regardless.**
17  Q. Okay. This isn't really surprising seeing as
18  Mrs. Bolyard was a 70-year-old woman at the time of the
19  procedure?
20  MS. GAYLE: Objection. Form.
21  BY MS. GEIST:
22  Q. It wouldn't be unusual or atypical for a
23  70-year-old woman to have vaginal atrophy?
24  **A. It's not beyond -- it would be consistent.**
25  **It's not uncommon. I should put it that way.**

Page 692

1  Q. You note, in your report, Doctor, that
2  Mrs. Bolyard was experiencing urge incontinence,
3  correct?
4  **A. Yes.**
5  Q. Are you attributing her urge incontinence to
6  the Bard products?
7  **A. I cannot blame Bard fully for that condition.**
8  **That condition can occur de novo. It could be**
9  **exacerbated by the presence of the Bard product.**
10  Q. So I'm just trying to understand your opinion
11  with respect to urge incontinence. You understand, from
12  a review of the records, that that was a condition she
13  had prior to the implant of the Bard products, correct?
14  **A. Correct.**
15  Q. Do you have an opinion in this case that the
16  Bard products had any impact, whatsoever, on
17  Mrs. Bolyard's urge incontinence?
18  **A. I would have to go back and look at my records**
19  **here as far as the severity. If she had preexisting**
20  **urge incontinence and the severity of that urge**
21  **incontinence did not change afterwards; however, if it**
22  **increased dramatically, then the blame could be placed**
23  **upon the Avaulta product because the dissection of the**
24  **vesicovaginal place -- space where the vesicovaginal**
25  **plexus is, which is responsible for bladder function.**

Page 693

1  Q.  Sitting here today, do you have an opinion, to
2  a reasonable degree of medical certainty or probability,
3  that the Bard products played any role in Mrs. Bolyard's
4  development of urge incontinence?
5      MS. GAYLE:  Objection.  Form.
6  BY THE WITNESS:
7      **A.  I'm looking at my records to see if I**
8  **documented severity change.  I don't -- I don't see that**
9  **in there.  Overreactive bladder, urge incontinence is a**
10 **very, very common condition, especially in this age**
11 **group.  Again, I do not see a comparison of before and**
12 **afterwards.  We would have to look at the records and**
13 **talk to the patient to find out if there has been a**
14 **change.  If there has been only a minimal change, I am**
15 **agreeable with stating that the Bard product had minimal**
16 **impact upon that.**
17     Q.  How about no impact?  If there is no change
18 reflected in the records, how about agreeing with me
19 that the Bard product had no impact on her development
20 of urge incontinence?
21     MS. GAYLE:  Objection.  Form.
22 BY THE WITNESS:
23     **A.  If there has been no change or only minimal**
24 **change, I am acceptable with saying that the Bard had no**
25 **impact upon it right now.  I don't know what happened on**

Page 694

1  **down the road.  But right now there's been no impact.**
2      Q.  With respect to your opinion that the lack of
3  physical intimacy has already cost Mrs. Bolyard a major
4  component of her quality of life and similar to your
5  opinions in the other cases, you state that the
6  long-term impact on her quality of life is difficult to
7  accurately ascertain, but many studies have shown that
8  long-term negative impact leads to issues relating to
9  depression.  And you hold that opinion with respect to
10 Mrs. Bolyard?
11     **A.  Yes.  And, hopefully, we can avoid the**
12 **discussion we've had on the previous two, because it's**
13 **going to be the exact same.**
14     Q.  Yeah.  I don't want to go over prior
15 discussion.  So my only question on that point is, did
16 you consider the status of Mrs. Bolyard and her
17 husband's sexual activity in reaching that opinion prior
18 to the implant?
19     **A.  You mean her degree of sexual activity prior**
20 **to?**
21     Q.  Yeah.  When you talk about the fact that she's
22 experiencing dyspareunia and that she can't have
23 physical intimacy and this is going to impact her
24 quality of life, correct?
25     **A.  Yeah.  And I state that, that she's not**

Page 695

1  **currently.  I don't recall, off the top of my head, how**
2  **sexually active she was before.  It is a potential**
3  **significant impact upon her quality of life.**
4      Q.  Well, it's only significantly -- it's only a
5  potential significant impact if she was actually
6  engaging in sexual intercourse prior to the implant of
7  the Bard products, correct?
8      MS. GAYLE:  Object to form.
9  BY THE WITNESS:
10     **A.  Again, I would have to refresh my memory and**
11 **look at the records as far as if she was sexually active**
12 **before.  I don't recall.**
13     Q.  Do you remember, from your review of the
14 records or review of the deposition testimony, that
15 Mrs. Bolyard's husband had erectile dysfunction
16 diagnosed years before the implant surgery?
17     MS. GAYLE:  Objection.  Form.  Mischaracterizes
18 testimony.
19 BY THE WITNESS:
20     **A.  Okay.  Again, I'd have to look at that.  I**
21 **have no reason to doubt it, but I would have to look at**
22 **the record and see what that says.**
23     Q.  Well, if her husband was already having
24 problems engaging in sexual intercourse, this would have
25 an effect, would it not, on your opinion about her

Page 696

1  quality of life after the implant?
2      MS. GAYLE:  Objection.  Form.
3  BY MS. GEIST:
4      Q.  Wouldn't you need to know to what extent the
5  couple was engaging in sexual intercourse as a married
6  couple?
7      **A.  That's why I stated I would need to see what**
8  **the records state as far as her preop sexual activity**
9  **level.**
10     Q.  Well, you've already rendered the opinion in
11 this case this lack of physical intimacy has cost her a
12 major component, she's unlikely to ever regain the
13 benefit of physical intimacy again, and that this impact
14 may have a long-term negative impact and potentially
15 depression, correct?
16         Don't you have to -- in order to render such
17 an opinion, Doctor, don't you need to know what the
18 status of her sexual relations with her husband was
19 prior to the implant surgery?
20     MS. GAYLE:  Objection.  Form.
21 BY THE WITNESS:
22     **A.  Well, I state it on page 3.  It says, prior to**
23 **her surgery, Ms. Bolyard was sexually active.  However,**
24 **because of her diagnosis of lichen sclerosis, she did**
25 **describe pain with intercourse at introitus with**

Page 697

1 insertion, and we have a reference number there.
2    Q.  So what's your -- what's the support for your
3 opinion that she was sexually active?  Did you know that
4 her husband had erectile dysfunction that was diagnosed
5 prior to the implant?
6    MS. GAYLE:  Objection.  Form.
7 BY THE WITNESS:
8    A.  Yes.  But, also, as a urologist, I'm also
9 aware people have different types of sex.  So I'm just
10 going off of what I've been told in my questioning of
11 Mrs. Bolyard and comparing it, again, with her physical
12 exam.  The same thing we've gone down before in the
13 other individuals.
14    Q.  Do you understand, from your review of
15 Mrs. Bolyard's records, that she had depression prior to
16 her surgery in 2010?
17    A.  I would have to refresh my memory off of the
18 medical records.
19    Q.  Well, did you consider her preexisting
20 condition of depression in reaching your opinions in
21 this case?
22    A.  Yes.  And those individuals who all have
23 preexisting depression are probably at increased risk
24 with further stressors of worsening that depression,
25 more susceptible.

Page 698

1    Q.  In Mrs. Bolyard's case, Dr. Elliott, would you
2 agree with me that, if she had had a native tissue or an
3 ASC procedure, she could have experienced the same
4 issues that she's complaining of today?
5    A.  Okay.  My testimony is going to be identical
6 to the previous ones, which is much more detailed than
7 I'll be able to do now.
8    Q.  And you know what?  If just want to stick with
9 your prior statements.  And as long as you're telling me
10 that your opinions here would be the same as you gave me
11 for Mrs. Alonso and Mrs. Wheeler, I can agree to that
12 and we can shortcut it.
13    A.  Okay.
14    MS. GAYLE:  And my objections would also be the
15 same.
16    MS. GEIST:  That's fine.
17 BY THE WITNESS:
18    A.  No.  That would be -- I think I stated my
19 opinion well on the previous testimony, and it will be
20 the same as your line of questioning now.  So I'm
21 agreeable to that.
22    Q.  Okay.  And then my other question that I asked
23 you, with respect to Mrs. Alonso and Mrs. Wheeler, is
24 the same for Mrs. Bolyard.  Had she had a transvaginal
25 mesh implanted from another manufacturer, you can't say

Page 699

1 that her outcome would have been any different than it
2 is here.  And I assume your answer would be the same
3 answer you gave me for Mrs. Alonso and Mrs. Wheeler; is
4 that also fair?
5    A.  That -- I'm sorry.  Yeah.  My testimony would
6 be consistent with -- consistent with the previous two.
7    Q.  In any of those three cases we just went over
8 together -- Mrs. Alonso, Mrs. Wheeler, and
9 Mrs. Bolyard -- did you review and observe any of the
10 mesh that had been excised from any of these three
11 plaintiffs?
12    A.  On one of the individuals, there is a Dr.
13 Ickelov report who has photos, and I cannot recall which
14 individual has those.
15    Q.  You didn't actually observe and do any
16 analysis of the excised mesh in Mrs. --
17    A.  Wheeler.
18    Q.  -- Alonso, Wheeler or Bolyard's case; is that
19 correct?
20    A.  I personally did not.  I reviewed the slides
21 and the photos on Ms. Wheeler that were provided by
22 Dr. Ickelov.
23    Q.  So you didn't look at the actual mesh explants
24 or the mesh incised from any of the three plaintiffs; is
25 that correct?

Page 700

1    A.  I did not personally hold that mesh or
2 personally do studies on that mesh.  I did read the
3 report on Mrs. Wheeler by Dr. Ickelov and looked at the
4 photos of that mesh.
5    Q.  Okay.  And I assume -- are you deferring to
6 any of the conclusions reached by Dr. Ickelov with
7 respect to Mrs. Wheeler's pathology?
8    A.  Yes.  He has had a very thorough, detailed
9 write-up.  I would defer to him on those issues.
10    Q.  Okay.  He is a pathologist; is that right?
11    A.  Actually, his credentials I don't -- off the
12 top of my head, I can't recall.  He's involved in
13 pathology.  But, again, I -- I'd have to plead a little
14 ignorance.  I can't recall.
15    Q.  Okay.  So you're deferring to whatever he has
16 to say about the excised mesh of Mrs. Wheeler, correct?
17    A.  He has done microscopic evaluations on those.
18 I will defer to his opinions on that specific patient.
19    Q.  And you haven't reviewed any of the excised
20 mesh taken from Mrs. Alonso, Mrs. Wheeler, or
21 Mrs. Bolyard to reach any conclusion with respect to
22 degradation; is that correct?
23    MS. GAYLE:  Objection.  Form.
24 BY THE WITNESS:
25    A.  No.  That is incorrect.  Specifically, on

Page 701

1 Mrs. Wheeler, where there is documentation of
2 degradation, contraction, inflammatory process, I have
3 reviewed it and it is consistent with my physical exam
4 findings and my understanding of the available data out
5 there in manuscripts.
6      Q. You don't have any opinion with respect to
7 degradation for Mrs. Bolyard and Mrs. Alonso; is that
8 correct?
9      A. That is incorrect.
10      Q. Well, you didn't review any of the slides or
11 anything like that for the excised mesh in those two
12 cases, correct?
13      A. I did not personally examine those. However,
14 my physical exam, based upon my experience and knowledge
15 of the literature states that, when you have a firm,
16 gran- -- excuse me, not granulated -- nodule at the
17 level of the obturator foramen that is exquisitely
18 tender on exam, that is consistent with mesh degradation
19 caused by inflammation, inflammation causing pain.
20      Q. And do you hold that opinion in each one of
21 these three cases we just talked about?
22      A. Correct. My opinion would be consistent with
23 all three.
24      Q. And your opinion is based on the physical
25 exam; is that correct?

Page 702

1      A. Not just the physical exam. That's a very
2 good question. Not just the physical exam. I have to
3 correlate it with the available data that is out there,
4 Cobb, Klosterhalfen, others. There are many others
5 describing degradation of the tissues. Then correlating
6 that with my own surgical experience, even as of last
7 week of taking these things out, pulling them out,
8 they're brittle, they break, they're sharp, they're
9 painful, then correlating that with my physical exam I
10 do daily in my practice and correlating that with the
11 exams that I did on these three individuals.
12      Q. And when you're talking about degradation,
13 you're talking about that from a clinician's perspective
14 and not a biomaterials expert perspective; is that fair
15 to say?
16      MS. GAYLE: Objection. Form.
17 BY THE WITNESS:
18
19
20
21
22
23
24
25

Page 703

1      A. I am describing that from when I take out
2 these tissue, these meshes, I hold them in my hands, I
3 have our pathologist review them, but they are --
4 they're brittle, they crack, they're sharp, they can
5 poke you through the glove. You have to use very large
6 scissors, heavy-duty scissors to cut them out. To me,
7 that is clinical manifestations of degradation and the
8 cascade that happens from that.
9      Q. So I think we're just -- I don't want to have
10 the record be confused. You didn't actually hold any of
11 the excised mesh from any of these three plaintiffs
12 which we've just talked about, correct?
13      A. That is correct.
14      Q. Okay. So I want to focus on the three
15 plaintiffs, okay?
16      A. Okay.
17      Q. You didn't look at any of the mesh removed
18 from any of these women under a microscope or look at
19 them at any point in time, correct?
20      A. I -- well, with Ms. Wheeler, I looked at the
21 photographs and Dr. Ickelov's report. So, yes, I looked
22 at it. I did not personally look under a microscope at
23 them. Okay.
24      Q. Including for Mrs. Wheeler, correct?
25      A. Wheeler, only Wheeler.

Page 704

1      Q. Wait. Hold on. This is not -- this is not
2 clear to me at all, Doctor. So let's go one step at a
3 time so we have a clear record.
4      For Mrs. Alonso and Mrs. Wheeler and
5 Mrs. Bolyard, in any of those three cases, did you
6 actually visibly look at any of the excised mesh from
7 those three plaintiffs?
8      MS. GAYLE: Objection. Form.
9 BY THE WITNESS:
10      A. Again, just so we're clear, on Ms. Wheeler, I
11 have reviewed Dr. Ickelov's report, which includes in
12 there photographs of the specimens that have been taken
13 out of her.
14      Q. So you looked at photographs that were
15 included in Dr. Ickelov's report?
16      A. That is correct.
17      Q. For Mrs. Wheeler?
18      A. For just Mrs. Wheeler.
19      Q. Okay. You didn't look at photographs with
20 respect to the mesh excised from Mrs. Bolyard or
21 Mrs. Alonso, correct?
22      A. Correct.
23      Q. You didn't look at pathology slides for any of
24 the three plaintiffs, correct?
25      A. No. That's incorrect. I looked at the

Page 705

1  **pathology slides on Mrs. Wheeler that were included in**
2  **Dr. Ickelov's report.**
3     Q.  The photographs?
4     **A.  The photographs of the pathologic specimen.**
5     Q.  Understood.  But you didn't actually look at
6  the slides.  You didn't have the slide in your hand and
7  look at the mesh under a microscope for Mrs. Wheeler,
8  correct?
9     **A.  No.  I only looked at a photograph of the -- a**
10  **representative photograph of the specimen.  I did not**
11  **personally sit at a microscope with a glass side and**
12  **look at it.**
13     Q.  Okay.  Thank you.  Have you ever done that?
14  Have you ever looked at excised mesh under a microscope?
15     **A.  Yes.**
16     Q.  Did you ever do that before you got involved
17  as an expert in the pelvic mesh litigation?
18     **A.  Yes.  In 2004, 2003, 2004, and then 2005 or**
19  **so, in my animal studies on the rabbits that we reviewed**
20  **yesterday.**
21     Q.  Yes, and I remember those studies.  So my
22  question was poor.  Before you became involved in this
23  litigation as an expert for the plaintiffs, did you ever
24  look at excised mesh that had come from a woman's body
25  under a microscope?

Page 706

1     **A.  I have looked at the photograph of specimens**
2  **that my pathologists at my institution have provided for**
3  **the medical records on the ones that I have excised.**
4     Q.  Okay.  So the answer to my question is, no,
5  you, personally, Dr. Elliott, have not looked at excised
6  mesh under a microscope that came from a woman's body,
7  correct?
8     MS. GAYLE:  Objection.  Form.
9  BY THE WITNESS:
10     **A.  I have personally examined mesh excised from**
11  **our animal studies on the rabbit, which are documented**
12  **in two different publications.  I have not sat down with**
13  **a microscope and looked at the slide specimens of the**
14  **individuals I have taken out.  I have looked at the**
15  **photographs, representative photographs my pathologists**
16  **have given me, on individuals I've excised.**
17     Q.  Okay.  So I think we're talk -- I think we're
18  saying the same thing.  You never actually looked at
19  slides under a microscope of excised mesh that came from
20  women, correct?
21     MS. GAYLE:  Objection.  Form.
22  BY THE WITNESS:
23     **A.  Yeah.  I answered that, and I answered it**
24  **very, very carefully because you're limiting what --**
25  **what I just said.**

Page 707

1     Q.  No.  I'm not trying to.  I'm just trying to
2  understand and I want to make sure the record is clear.
3  You've looked at photographs of slides that have been
4  reviewed by a pathologist or a biomaterials expert,
5  correct?
6     MS. GAYLE:  Objection.  Asked and answered.
7  BY THE WITNESS:
8     **A.  Yes.  Of my own personal patients that I have**
9  **excised mesh and mesh complications, as part of my**
10  **routine, I review the pathologic specimens provided to**
11  **me by my pathology team.  So I review those as part of**
12  **our routine.**
13     Q.  So when you say the pathological specimens,
14  are you talking about slides or are you talking about
15  photographs?
16     **A.  Photographs of the pathologic specimen.**
17     Q.  Got it.  So you've never looked at actual
18  pathology slides?
19     **A.  I have --**
20     MS. GAYLE:  Objection.  Form.
21  BY THE WITNESS:
22     **A.  I have not sat down with a glass specimen**
23  **looking under a microscope on the individuals I**
24  **reviewed.  I look at the photographic representative the**
25  **pathologist provides me.**

Page 708

1     Q.  Okay.  And the pathologist also, I assume,
2  provides you with a pathology report?
3     **A.  Usually, yes.  Yes, he does.**
4     Q.  That's what a pathologist does?  That's their
5  job?
6     **A.  That is correct.**
7     Q.  Okay.  Back to Mrs. Bolyard's report,
8  specifically, Doctor, for a moment, on page 8 of this
9  report, the second paragraph --
10     **A.  Yes.**
11     Q.  -- this is the same paragraph that I referred
12  to you when we started your deposition today.  Do you
13  remember that?
14     **A.  I don't.**
15     Q.  I realize it was some time ago.
16     **A.  I don't remember that now.**
17     Q.  Okay.  This -- this paragraph, on page 8 of
18  Mrs. Bolyard's report, starts out by saying, Set out in
19  my general causation expert report, several
20  characteristics of the Marlex polypropylene mesh
21  rendering inherently unsafe for use in Ms. Bolyard.  And
22  then you provide five specific reasons why you opine
23  that the characteristics of the Marlex polypropylene
24  mesh render it unsafe for use in Mrs. Bolyard?
25     **A.  Correct.**

In Re: CR Bard 200                Daniel Elliott M.D., Vol. II                11/16/2014

Page 709

1    Q.  And this is the same paragraph that's in
2  Mrs. Alonso's report and Mrs. Wheeler's report, correct?
3    A.  Yes.
4    Q.  And then, in the pages that we went over with
5  some frequency earlier, pages 8 to 11, these are all of
6  the things that you say should have gone into the IFU
7  for the Avaulta products, correct?
8    A.  That is correct, and my previous testimony
9  correlates with this as well.
10    Q.  And, in this section, you're basing your
11  opinion on what you think Bard knew and understood about
12  these risks based on the Bard internal documents that
13  you've included in your reliance materials?
14    A.  Not just the internal documents, but also the
15  medical literature that was readily available.
16    Q.  And you think -- well, let me ask you.  Do you
17  believe that Bard intended to omit this information from
18  the medical community?  Is that your opinion based on
19  your review of the internal Bard documents?
20    MS. GAYLE:  Objection.  Mischaracterizes his
21  opinions.
22  BY THE WITNESS:
23    A.  I cannot -- I can only speculate what the
24  company was doing with this data in withholding it.  I
25  can only have a theory.

Page 710

1    Q.  Are you inferring Bard's intent from your
2  review of the records that you were provided in this
3  litigation?
4    MS. GAYLE:  Objection.  Question calls for a legal
5  conclusion.
6  BY THE WITNESS:
7    A.  Yeah.  I could only provide a theory of why
8  this was not provided in the form that I feel is
9  acceptable.  That question would be best answered by the
10  Bard personnel.
11    Q.  In the context of our discussion about all of
12  these risks that you think should be in the IFU, you
13  believe that a medical device company should include all
14  risks of which it is aware in the IFU; is that a fair
15  summary?
16    MS. GAYLE:  Objection.  Form.
17  BY THE WITNESS:
18    A.  I believe that the requirements established
19  are that the company is required to provide all known
20  risks regardless of the severity.
21    Q.  All right.  So would you agree with me that,
22  if a medical device company is not aware of a risk, a
23  risk to an individual patient's health and well-being,
24  that they would not need to include that information in
25  the IFU?

Page 711

1    MS. GAYLE:  Objection.  Form.
2  BY THE WITNESS:
3    A.  It would depend upon what risk we're talking
4  about or what complication we're talking about.
5  Ignorance of risks and ignorance of literature is not an
6  excuse.  So I can't give a carte blanche acceptance of
7  your statement.  We'd have to go point by point.
8    Q.  Well if a medical device company such as Bard
9  believed that there was no health consequence or risk,
10  it would be misleading to put that information on a
11  label.  Would you agree with me on that?
12    MS. GAYLE:  Objection.  Form.
13  BY THE WITNESS:
14    A.  I would want to see what that risk is and see
15  if I agree with the company that it is truly not a risk.
16    Q.  Well, you have, in all of these expert reports
17  relating to the Marlex polypropylene mesh, you state, in
18  all of your reports, that Bard utilizes nonmedical grade
19  polypropylene, the supplier of which has forbidden its
20  use in humans because of its known degradation
21  characteristics.  And then you say, in your IFU section,
22  that Bard should have included this information in the
23  IFU and told physicians about this.
24    Are those -- is that your opinion in this
25  case?

Page 712

1    A.  Yes, as stated.
2    Q.  And my question to you is, if Bard believed
3  that this was a hypothetical and not a real risk
4  relating to the Marlex polypropylene, should it have
5  included that information in the IFU?
6    MS. GAYLE:  Objection.  Calls for speculation.
7  BY THE WITNESS:
8    A.  I think they owed -- they had a right.  Excuse
9  me.  The doctors and the patients, the doctor, who is
10  the implanter, and the woman that this is going to go in
11  the body, they are the ones who should be choosing that,
12  not the company.  And if they had -- if they felt there
13  was no risk to this, then they should have done the
14  studies to show there was no risk.
15    Q.  Well, you read the testimony from individuals
16  at Bard on this issue, the use of the Marlex
17  polypropylene, did you not?
18    A.  I've read many depositions, yes.
19    Q.  And so you read Bard's testimony that the
20  company did not believe that there was any medical or
21  scientific reason for the medical application caution in
22  the MSDS sheet for the Marlex polypropylene.  Did you
23  read that?
24    MS. GAYLE:  Objection.  Form.  I believe you all
25  discussed the MSDS yesterday.

In Re: CR Bard 200                Daniel Elliott M.D., Vol. II                11/16/2014

Page 713

1    MS. GEIST: We did not.
2  BY THE WITNESS:
3    **A. I have to go back. The actual manufacturer,**
4  **Phillips Sumika, came out with that warning. I would**
5  **assume that they are going to be the authority on this**
6  **product. They are the manufacturer of the product.**
7  **They issued the warning for a reason.**
8    Q. You say Phillips Sumika is the manufacturer of
9  the product?
10   **A. Of the -- the Marlex substrate or the**
11 **polypropylene substrate.**
12   Q. You understand that that MSDS sheet that
13 you're referring to is not an MSDS sheet for the final
14 Bard Avaulta product, don't you?
15   MS. GAYLE: Objection. Form.
16 BY THE WITNESS:
17   **A. It is a warning for the basic fundamental**
18 **building blocks of the mesh that's going to go into**
19 **women.**
20   Q. It -- it relates to the raw material, the
21 polypropylene pellet; is that a fair summary?
22   MS. GAYLE: Continuing objection.
23 BY THE WITNESS:
24
25

Page 714

1    **A. That is just what I stated. It's the**
2  **substrate, yes.**
3    Q. And did you read the testimony from Bard
4  concerning why they believed that that was not a risk
5  that needed to be included in the IFU and communicated to
6  doctors? Did you review that testimony as I believe I
7  saw in your reliance list?
8    **A. Yes. No. I've read it. I can't recall all**
9  **of the details off the top of my head. I also read the**
10 **deposition by the Phillips -- or Zumika (sic), whatever**
11 **his name is, it starts with a Z. I've read his warning**
12 **on it. And he says this is a warning.**
13   Q. You're referring to the testimony of Frank
14 Zakrzewski -- and we can check the spelling after your
15 deposition -- the representatives from the Phillips
16 Sumika company?
17   **A. The salesperson that was test- -- that**
18 **testified, yes.**
19   Q. And you were provided with that testimony,
20 correct?
21   **A. Correct.**
22   Q. And you just said to me he is a salesperson.
23 Did you understand, when you read it, that he was what
24 we call a 30(b)(6) witness or a corporate representative
25 on that issue?

Page 715

1    **A. Yeah. He was representing the company. The**
2  **30(b)(6), I've never heard of that specific designation.**
3  **I have no reason to disagree with that.**
4    Q. Did anybody ever tell you what that means to
5  be a 30(b)(6) witness?
6    MS. GAYLE: Objection. Form.
7  BY THE WITNESS:
8    **A. I don't -- I don't recall being told that.**
9    Q. Well, assume with me, Doctor, and I'll make
10 this representation to you, that that means that that
11 person is charged with speaking for the company on a
12 particular topic and they need to be informed about that
13 particular topic.
14   **A. Okay.**
15   Q. Okay. So assuming -- strike that.
16   Assuming that the Phillips Marlex -- I'm
17 sorry, the Phillips Sumika representative was a 30(b)(6)
18 witness, somebody charged with speaking about that
19 issue, why the medical application caution language was
20 in the MSDS, assuming all of that, didn't that
21 individual testify that he was not aware of any medical
22 or scientific reason for the inclusion of that language
23 in the MSDS sheet?
24   MS. GAYLE: Continuing objection as to the form and
25 to this entire line of questioning. You had your chance

Page 716

1  yesterday. Y'all talked about an MSDS yesterday and
2  this Marlex, and I think that this is going over ground
3  that you already should have covered yesterday.
4    MS. GEIST: Well, and I appreciate that objection,
5  but we didn't talk about the MSDS at all yesterday. And
6  it is contained in each one of these case-specific
7  reports and as part of Dr. Elliott's opinions as to what
8  should have been included and provided in the three
9  implanting physicians in these three cases. So I'm
10 entitled to explore it.
11 BY THE WITNESS:
12   **A. I'll make the statement that, again, I'd have**
13 **to -- I'm going off of memory, that he made the**
14 **statement that he was not aware of studies or whatever.**
15 **That does not mean that he was condoning it. And then**
16 **he came back on deposition, page 205, lines 7 through 8,**
17 **I view it as a warning that should be taken seriously.**
18   Q. Do you have the entirety of the testimony
19 there?
20   **A. I don't have the entirety of the testimony**
21 **here.**
22   Q. I think I saw, in your reliance list in these
23 cases, that you also reviewed prior versions of the
24 Phillips Sumika MSDS sheet, earlier versions?
25   **A. I'm -- I guess I'm not following. I've**

In Re: CR Bard 200          Daniel Elliott M.D., Vol. II          11/16/2014

Page 717

1 reviewed multiple different records, an earlier record.
2     Q.  I thought I saw in your reliance list, Doctor,
3 that you had reviewed a number of different versions of
4 the MSDS sheet; am I right about that?
5     A.  I've reviewed thousands of pages of documents.
6 I can't -- I can't recall.
7     Q.  Okay.  And I don't mean to be tricky.  I'll
8 just show them to you so we all are on the same page.
9     MS. GEIST:  Madame Court Reporter, what number am I
10 up to?
11     THE REPORTER:  36.
12     (Elliott Exhibit Nos. 36, 37 & 38
13          were marked for identification.)
14     MS. GEIST:  Counsel, would you like copies of
15 these?
16 BY MS. GEIST:
17     Q.  Doctor, I'm handing you what I've marked to
18 your deposition as Exhibits 36, 37, and 38.  And, for
19 the record, these are copies of the Phillips Sumika
20 Materials Safety Data Sheet, or MSDS.  Exhibit 36 is the
21 2007 version, Exhibit 37 is the 1993 version, and
22 Exhibit 38 is the 1997 -- I'm sorry, 1997 version.  And,
23 Counsel, I'll give you copies in just a second.  Do
24 these look familiar to you?
25     MS. GAYLE:  Hold on, Counsel.  I'm not letting him

Page 718

1 look at them yet until I look at them.
2     MS. GEIST:  Sure.  No.  I have your copies here.
3 Sorry, I'm a little slow.  It's the end of the day.
4     MS. GAYLE:  I'm ready for my copies.
5 BY MS. GEIST:
6     Q.  Do you -- do you have those three MSDS sheets
7 in front of you?
8     A.  Yes, I do.
9     Q.  Dr. Elliott?
10     A.  Yes, I do.
11     Q.  Okay.  Now, the one that you discussed, in
12 each of your case-specific reports of Ms. Alonso,
13 Mrs. Wheeler, and Mrs. Bolyard is the first one that
14 I've marked as an exhibit to your deposition.  This is
15 the one that contains the medical application caution
16 language, correct, the 2007 version?
17     A.  I don't see the language I'm familiar with.
18     Q.  Doctor, if you have the -- yeah, that's the
19 right exhibit in front of you, the 2007 version.  The
20 language that you're talking about in your expert report
21 is the medical application caution language, is it not?
22 And, it says, on this exhibit, Do not use this Chevron
23 Phillips Chemical Company material in medical
24 applications involving permanent implantation in the
25 human body or permanent contact with human body fluids

Page 719

1 or tissue?
2     MS. GAYLE:  Counsel, would you point him to
3 where --
4 BY THE WITNESS:
5     A.  That's what I'm trying to find.  That's all.
6     Q.  Yeah.  I'm trying to help you, Doctor.  If you
7 want to look at me down here, do you see it says Medical
8 Application Caution, right here?  (Indicating.)
9     A.  Oh, here it is.
10     Q.  There you go.
11     A.  Okay.  Yes.  Yes.
12     Q.  That's what you're talking about in your
13 expert reports, right?
14     A.  Correct.
15     Q.  And you're saying -- well, you tell me.  Are
16 you saying, based on this, that Bard was told that this
17 material should not be used in a permanent -- in a
18 permanent implantation in a human body; and because Bard
19 knew about this, they should have told doctors about
20 this information.  Is that your opinion?
21     A.  That's my opinion.  I can't speak for Bard,
22 but I can state that Phillips Sumika warned Bard of
23 this.
24     Q.  And my question to you is, if Bard believed
25 that there was no medical or scientific reason for that

Page 720

1 medical application caution language and it was included
2 there for another reason that had nothing to do with
3 patient safety, would Bard have any obligation to put
4 that information in the IFU?
5     MS. GAYLE:  Object to form.
6 BY THE WITNESS:
7     A.  I don't believe that is Bard's call to make.
8 If this warning is here, the doctor and the patient need
9 to be warned.  And if Bard felt there was no problems
10 with this, then I don't see why they were trying to hide
11 it up on those series of e-mails.  It's very
12 well-documented where they're trying to hide it.  That
13 does not seem like what an upfront company would do.
14     Q.  Well, let's look at it.  We just looked at the
15 2007 version together, correct?  That medical
16 application caution, I just read it to you, right?
17     A.  Correct.
18     Q.  And underneath it, it says, Do not use this
19 Chevron Phillips Chemical Company material medical
20 applications -- and I'm going to skip a little bit --
21 and then, it says, Unless the material has been provided
22 directly from Chevron Phillips Chemical Company under an
23 agreement which expressly acknowledges the contemplated
24 use?
25     MS. GAYLE:  Objection.  Form.

Page 721

1  BY MS. GEIST:
2      Q.  Do you see that information there, Doctor?
3      **A.  Yes.  That's what it states.**
4      Q.  Did you review any materials or any
5  information relating to Chevron Phillips entering into
6  contracts with other medical device companies
7  specifically for the use of this material in
8  transvaginal mesh products?
9      MS. GAYLE:  Objection.  Form.  And objection,
10 assumes facts not in evidence.
11 BY THE WITNESS:
12     **A.  I've heard of it with Boston Scientific.**
13     Q.  So you're aware that Boston Scientific
14 actually entered into a contract with the Phillips
15 Sumika Company for this very same grade of Marlex
16 polypropylene to use in their transvaginal products,
17 transvaginal mesh products?
18     MS. GAYLE:  Objection.  Form.
19 BY THE WITNESS:
20
21
22
23
24
25

Page 722

1      **A.  I cannot -- I cannot testify to that.  I have**
2  **not seen those records.  I would like to see those**
3  **records and correlate to that.  But that still does not**
4  **correlate.  Just because Boston Scientific doesn't do**
5  **it, doesn't mean Bard should do it.  And they had this**
6  **language here, and this does not excuse it.**
7      Q.  Well, I'll show it to you in a minute.  But my
8  question is, do you think that, if the Phillips Sumika
9  Company really believed that there was any safety issue
10 relating to the implant of the Marlex polypropylene in
11 the human body, that they would be providing it to
12 Boston Scientific knowing full well what Boston
13 Scientific intended to do with the material?
14     MS. GAYLE:  Objection, form and calls for
15 speculation.
16 BY THE WITNESS:
17     **A.  I cannot speak for the interaction with Boston**
18 **Scientific.  We'd have to review all of those records.**
19 **All I can state is what Frank Zakrzewski said.  I view**
20 **it as a warning.  It should be taken seriously.**
21     Q.  He also said, did he not, that he was unaware
22 of any medical or scientific reason for the inclusion of
23 this new language -- and this is what I want you to
24 focus on -- the inclusion of this new language in the
25 MSDS sheet?  Didn't he also say that?

Page 723

1      MS. GAYLE:  Objection.  Form.
2  BY THE WITNESS:
3      **A.  He stated he was unaware, but that does not**
4  **mean there is no data out there proving -- or there is**
5  **data out there proving it's not an issue.  He was**
6  **unaware of anything.**
7      Q.  Now, there is no citation to any medical study
8  or literature supporting this application in the MSDS
9  sheet itself, correct?
10     MS. GAYLE:  Objection.
11 BY THE WITNESS:
12     **A.  No.  That would be best answered by a Phillips**
13 **Sumika representative, which we have.  He says, I view**
14 **it as a warning.  It should be taken seriously.**
15     Q.  Have you ever seen any study looking
16 specifically at the Phillips Sumika Marlex polypropylene
17 and concluding that there was a medical or scientific
18 reason that it should not be implanted in the human
19 body?  Have you ever seen any such study?
20     MS. GAYLE:  Objection.
21 BY THE WITNESS:
22     **A.  I don't recall with this specific grade of**
23 **polypropylene Marlex.  I don't recall ever seeing a**
24 **study showing that it was safe.**
25     Q.  Well, did you wonder why the Phillips Sumika

Page 724

1  Company added this medical application caution language
2  to the MSDS sheet?
3      MS. GAYLE:  Objection.  Form and argumentative.
4  Move to strike.
5  BY THE WITNESS:
6      **A.  The company, an oil company, issued this**
7  **warning that their representative, who you've said is**
8  **their official representative, he said, I view it as a**
9  **warning.  It should be taken seriously.  So who do you**
10 **want me to believe?  You want me to strike Zakrzewski's**
11 **statements.  I mean, he states it.  It's in here.**
12 **Patients need to know that.  Doctors need to know it.**
13     Q.  Now, look with me, if you would, at the
14 earlier versions of the MSDS sheets for the same
15 material.  And as we look at this, let me ask you this
16 question.  Were you aware of how many years Bard had
17 been using this same polypropylene grade, the Marlex
18 polypropylene grade, in its mesh products?
19     MS. GAYLE:  Objection.  Form.
20 BY THE WITNESS:
21     **A.  First of all, I have no evidence that this is**
22 **the same grade.  There are multiple different grades, I**
23 **believe, in the 30s, different grades.  All I know is**
24 **HG6030-01 is the one referenced here.  So I would want**
25 **to see studies specifically with that grade stating it**

Page 725

1 is safe coming from the company, and I don't see it. I
2 never saw that.
3     Q. Now, if you look at the 1993 version of the
4 MSDS sheet, do you have that in front of you, Doctor?
5     A. Yes, I do.
6     Q. There is no medical application caution
7 language in that MSDS sheet?
8     A. Okay. I would have to review through the
9 whole record. And, again, I have no idea if this is
10 pertaining to this specific grade.
11     Q. I thought you looked at these materials
12 because they were on your reliance sheet. Have you not
13 seen these before?
14     MS. GAYLE: Objection. Form. Argumentative. Move
15 to strike statement of counsel.
16 BY THE WITNESS:
17     A. No. I reviewed these, and I just stated that
18 I saw nothing in here to say that that is the exact same
19 grade that is discussed in the 2007 document.
20     Q. Are you disputing that it's the same grade or
21 you just don't know?
22     MS. GAYLE: Objection.
23     THE WITNESS: I'm stating --
24     MS. GAYLE: Move to strike.
25 BY THE WITNESS:

Page 726

1     A. I'm stating I'd want to see the data that
2 HGX030-01 has been proven safe and accepted by the
3 company for Bard to use in implantation of women.
4     Q. If you flip through the 1993 version of the
5 MSDS sheet, can you agree with me there is no medical
6 application caution language anywhere in the document?
7     A. Well, I see they have other health effects,
8 long-term exposure. The dust concentration can cause
9 non-debilitating lung changes.
10     Q. Right. Do you understand -- let me back up
11 for a second, Dr. Elliott. Do you understand what an
12 MSDS -- MSDS sheet is?
13     A. Yes. Yeah. It's the, you know, medical
14 device or Medical Safety Data Sheet, and this is your --
15 you're showing me something from 1993, a long time ago,
16 and then you show me 2007 where they're making a
17 warning. Warnings change.
18     Q. Well, it's not -- this has nothing to do with
19 a medical device, does it? This has to do with a
20 polypropylene pellet, a raw material that undergoes a
21 number of manufacturing processes before it is woven
22 into what ultimately becomes the Bard Avaulta mesh; do
23 you understand that?
24     MS. GAYLE: Move to strike. Objection. Form.
25 Subject to that, you can answer, if you can.

Page 727

1 BY THE WITNESS:
2     A. No. I fully understand. And I fully
3 understand. And look at this, and, perhaps, this should
4 be addressed to the jury. Let them read this and ask
5 the women would your want to know this. I see 2007 the
6 specific grade that's implanted in women with warnings.
7 You then show me a document from 1993. I don't know
8 what the laws are. I don't know what the grade of this
9 is. I don't know if it's the same grades we're talking
10 about now. There is too much data that I don't know.
11     Q. Does it -- on each of these three versions of
12 the MSDS sheet, doesn't it say, Marlex polypropylene,
13 all grades?
14     MS. GAYLE: Object. Form.
15 BY THE WITNESS:
16     A. Yes. All grades in 1993 does not mean all
17 grades in 2007.
18     Q. Why not? It says all grades on this sheet?
19     A. In 1993, if we say all Ford cars and in 1997
20 there are different types of cars around, so that does
21 not correlate. All grades, new warning. Perhaps, the
22 company has come up and found there are problems with
23 this.
24     Q. Perhaps, or perhaps the company wanted to
25 limit its own liability and ensure that they were not

Page 728

1 getting embroiled in a product liability, personal
2 injury lawsuit; isn't that a possibility?
3     MS. GAYLE: Object. Move to strike. Object,
4 argumentative.
5 BY THE WITNESS:
6     A. That sounds like a responsible company. And
7 that's when it gets scary, if an oil company of all
8 places is being more responsible on a product that goes
9 in a human body.
10     Q. Do you think their own concern about their
11 liability equates with responsibility? Is that what
12 you're telling me?
13     MS. GAYLE: Move to strike. Objection. Form.
14 Argumentative.
15 BY MS. GEIST:
16     Q. And then how are they responsible if they sold
17 this product, the Marlex polypropylene product, to
18 another medical device company, Boston Scientific,
19 knowing that Boston Scientific was going to use it in
20 their pelvic mesh product to treat prolapse?
21     MS. GAYLE: Move to strike. Objection,
22 argumentative.
23 BY MS. GEIST:
24     Q. Isn't that inconsistent? I mean, if Phillips
25 Sumika sold the same grade of polypropylene to Boston

Page 729

1  Scientific, isn't that inconsistent with their not
2  selling it to Bard?
3      MS. GAYLE: Objection, form. Objection,
4  argumentative, and move to strike.
5  BY THE WITNESS:
6      **A. I have seen no records from Boston Scientific**
7  **to correlate that this is the same grade. That would be**
8  **helpful. I have seen no records from any deposition to**
9  **say -- saying it's safe. All I have is records saying**
10 **it's dangerous. I'm saying that the woman has the right**
11 **to know this is going in her body and a company is**
12 **warning her about it.**
13     Q. All right. I'll show you one more document,
14 Doctor, and then I think that will end our discussion on
15 the MSDS topic. And I'm up to exhibit what?
16     THE REPORTER: 39.
17     MS. GEIST: 39.
18         (Elliott Deposition Exhibit No. 39
19         was marked for identification.)
20 BY MS. GEIST:
21     Q. Doctor, here is Exhibit 39. You've asked me a
22 couple of times to see this information. So my question
23 to you is, have you ever seen the information I've just
24 handed you for - which is marked as Exhibit 39?
25     **A. I don't recall if this is what I reviewed**

Page 730

1  **before Pinnacle. And how is this not on the general**
2  **liability? I don't understand this. We went over this**
3  **yesterday. You wasted time yesterday. Now we're**
4  **talking about this. So let's get into it.**
5      MS. GAYLE: No, Doctor. I believe that this is
6  general liability. You guys talked about this stuff
7  yesterday. You went over this.
8      MS. GEIST: No, we did not. We did not talk about
9  MSDS, whatsoever.
10     MS. GAYLE: Counsel, it's in his general report.
11 And, Doctor, will you step out of the room, please?
12         (Exit the witness.)
13     MS. GAYLE: Counsel, it's our position that this is
14 in his general report and you were given the opportunity
15 yesterday to answer questions and ask questions related
16 to his general report. And the fact that you're
17 rehashing these general statements today we think is
18 beyond the scope of what he's here for today.
19     Today he's here about case specifics. You're
20 not asking questions specific to those three individuals
21 and how it relates to his opinion. You're showing him a
22 document now, Exhibit 39, that even has to do with
23 Boston Scientific. Again, this is general matter, and
24 I'm -- I'm hesitant to do it, but I'm nearing the point
25 that I think I'm going to have to instruct him not to

Page 731

1  answer.
2      MS. GEIST: Well, this is the last document I'm
3  going to show him on the issue. We did not talk about
4  the MSDS issue at all during his deposition yesterday.
5  He puts front and center this issue, the nonmedical
6  grade polypropylene, in each and every one of his
7  case-specific reports. And he also discusses it in
8  terms of what he expected Bard to put in the IFU. And
9  it is not my fault that this is included in each and
10 every one of his specific causation reports.
11     MS. GAYLE: It's incorporated --
12     MS. GEIST: Now, I am -- and I am entitled to
13 explore whatever information he puts in his
14 case-specific reports.
15     MS. GAYLE: It is incorporated into the
16 case-specific reports from his general report, and it's
17 gone over ad nauseam in his general report. And so we
18 have our two different positions on it. And I'll let
19 you go a little bit on this Exhibit 39, but not -- not
20 long. And then if you go too much further, I'm going to
21 instruct him not to answer.
22     MS. GEIST: Well, that's fine. I already told you
23 I only plan on showing him one exhibit. I don't really
24 think either one of us believes that Dr. Elliott's
25 opinions are going to be changed by what I have to show

Page 732

1  him, but we're going to explore the issue. I think it's
2  only fair that he gets this full picture.
3      MS. GAYLE: Okay. Can you go off the record for a
4  moment so I can go get him?
5      VIDEO TECHNICIAN: We're off the record. The time
6  is 3:03 p.m.
7          (A recess was had.)
8          (Enter the witness.)
9      VIDEO TECHNICIAN: We are back on the record. The
10 time is 3:09 p.m.
11 BY MS. GEIST:
12     Q. Doctor, you have Exhibit 39 in front of you?
13     **A. Correct.**
14     Q. Were you provided with this previously?
15     **A. I don't recall seeing this before.**
16     Q. Okay. If you go with me to look at the actual
17 third page of the document, it actually says, page 5, on
18 the top left corner. Do you see that?
19     **A. I'm on the third page. I'm on the third page.**
20 **I don't see a page 5 anywhere, but I'm on the third page**
21 **of it.**
22     Q. Okay. Well, do you -- please take a look at
23 the front page of the document before we get to page 5.
24 I just want you to see that, in June of 2008, FDA asked
25 Boston Scientific about the MSDS they used for Marlex

In Re: CR Bard 200          Daniel Elliott M.D., Vol. II                11/16/2014

Page 733

1  polypropylene resin purchased from Phillips Sumika.
2     **A. Okay. I've never seen it. It's a 23-page**
3  **document, which I've never seen before, which,**
4  **obviously, this is a very important document. And so, I**
5  **mean, to be fair, I need to be able to review this.**
6     Q. Understood. And I'll give you as much time as
7  you want after I direct you to certain portions of the
8  document, and then you can take a look at it. Okay?
9     **A. Okay.**
10    Q. Is that fair?
11    **A. Potentially.**
12    Q. Okay.
13    **A. It's a 23-page document.**
14    Q. I understand. Some of it has topics in here
15  that don't really concern us and others do not, but
16  you're welcome to review the whole document. If you
17  look at the first page, or, you know, go towards the
18  last page, whatever makes sense to you, it's a document
19  that is coming from the Food & Drug Administration or
20  FDA, correct?
21    **A. Correct.**
22    Q. To Boston Scientific, correct?
23    MS. GAYLE: Objection. Form. He's already asked
24  to review the whole document.
25

Page 734

1  BY MS. GEIST:
2     Q. Well, I'm just looking at the address. It's
3  addressed to Boston Scientific?
4     MS. GAYLE: It's a compilation of multiple
5  documents.
6  BY THE WITNESS:
7     **A. Yeah. I don't feel -- I mean, this is a**
8  **complicated -- it's a very important, complicated**
9  **document that is just now presented to me after we could**
10 **have reviewed this yesterday, and so -- and this is not**
11 **just one, and there's letters back and forth.**
12    Q. Doctor, I want to give you as much time as you
13  need to review it, but let me point you to certain
14  sections. And then, if you need more time, feel free.
15  If you go to -- do you see at the bottom there is what
16  we call Bates numbers?
17    **A. Yes, I see those.**
18    Q. Do you see they begin with DX?
19    **A. Yes.**
20    Q. If you go to the page that has DX0046-005?
21    **A. Yes, I see. I'm there.**
22    Q. Okay. Do you see at No. 8, paragraph 8?
23    **A. Yes.**
24    Q. And this is from FDA. And you can look at the
25  document to make yourself comfortable with my

Page 735

1  representation. But this is from FDA to Boston
2  Scientific. And the FDA states, on No. 8, The Material
3  Safety Data Sheet provided for the Marlex material
4  states that the product used is for coatings. In this
5  MSDS, there is a medical application caution that states
6  do not use this Chevron Phillips Chemical Company
7  material in medical applications involving permanent
8  implantation in the human body or permanent contact with
9  internal body fluids or tissues. Did I read that
10  correctly?
11    **A. I see it.**
12    Q. That's the same language we just looked at
13  together, correct, for the Marlex polypropylene
14  material?
15    **A. It appears to be similar.**
16    Q. It's actually identical, but you can compare
17  the language in both. And the FDA says to Boston
18  Scientific, Please provide a rationale why your mesh
19  material is safe for use as a permanent implant device
20  contrary to what is stated in the MSDS provided for the
21  Marlex material. Do you see that?
22    MS. GAYLE: Object to form.
23  BY THE WITNESS:
24    **A. I see that.**
25    Q. So the FDA is asking Boston Scientific, Hey,

Page 736

1  we see this medical application caution language. We
2  want to understand why you think the mesh is safe to use
3  in the human body. Is that a fair summary?
4     MS. GAYLE: Object to form.
5  BY THE WITNESS:
6     **A. I see what they're stating in this one number**
7  **here, yes.**
8     Q. And then, if you flip with me a couple more
9  pages to the document at the bottom that has 009 --
10    **A. Okay.**
11    Q. -- and do you see, at the top, it says,
12  Response to FDA questions?
13    **A. Yes.**
14    Q. And it has FDA Question No. 8 below there, do
15  you see that?
16    **A. I see it.**
17    Q. And that's the same question that FDA had that
18  we just read previously, correct?
19    **A. I see it.**
20    Q. And, at the bottom, underneath that, it says,
21  BSC response, or Boston Scientific company response?
22    **A. I see it.**
23    Q. And with respect to the Marlex polypropylene
24  MSDS sheet, at the second paragraph, Boston Scientific
25  states that, in 2002, Boston Scientific was informed

In Re: CR Bard 200          Daniel Elliott M.D., Vol. II          11/16/2014

Page 737

1  that Phillips Sumika no longer would supply this resin
2  for any application involving implantation in the human
3  body due to the company's unwillingness to accept any
4  liability for the use of their resin for medical
5  purposes, particularly permanent implants.  They
6  subsequently revised the MSDS for Marlex to this effect.
7  Do you see that?
8      **A.  Yes.**
9          MS. GAYLE:  Object to form.
10 BY MS. GEIST:
11     Q.  So do you see there Boston Scientific is
12 reporting to FDA that Phillips Sumika told them they
13 would not supply the polypropylene resin due to their
14 own concern for liability?  And then underneath that, it
15 says, However, in 2004, Boston Scientific entered into a
16 one-year contract with Phillips Sumika to enable Boston
17 Scientific Corporation to purchase the resin with the
18 understanding that Boston Scientific would use this
19 material in the manufacture of medical devices which may
20 be implanted in the human body.  The agreement required
21 Boston Scientific to be ultimately responsible for
22 ensuring that the material was suited to the specific
23 application and assume all product liability.  Do you
24 see that?
25     **A.  Yeah.**

Page 738

1      Q.  And then, ultimately, as I think you already
2  know, Doctor, from your own experience, FDA cleared,
3  through the 510 clearance process, the Pinnacle device,
4  which is the subject of this correspondence between FDA
5  and Boston Scientific?
6          MS. GAYLE:  Object to form.
7  BY MS. GEIST:
8      Q.  Are you aware of that?
9      **A.  I have no data to support that.  I have not**
10 **seen those documents.**
11     Q.  Well, it's part of this overall package, the
12 FDA's approval of the Pinnacle product.  It's part of
13 this, Doctor.  And I'm happy to have you read it cover
14 to cover.
15         MS. GAYLE:  And he's asked to review the document.
16 And so my objection continues with asking him questions
17 when he's not even reviewed the document.
18 BY MS. GEIST:
19     Q.  And, Doctor, I guess my question to you is
20 this, after being informed of the reasons why the
21 Phillips Sumika Company added that medical application
22 caution language to the MSDS sheet, does that change
23 your opinion at all that Bard should have included that
24 information in the IFU for the Avaulta products knowing
25 that the only reason it was included was to insulate the

Page 739

1  polypropylene manufacturer from product liability?
2  Knowing that, should they have communicated that to
3  doctors?
4          MS. GAYLE:  Object to form.  Object to the
5  characterization of the Phillip Sumika's intent or
6  reasoning for putting that in there, and object to
7  counsel testifying on behalf of the company, and object
8  to the use of this document.  We weren't provided this
9  previously.  I don't even believe it's on his reliance
10 list, Counsel.
11         MS. GEIST:  Well, I understand that you all --
12         MS. GAYLE:  He's asked for the opportunity to
13 review it.
14         MS. GEIST:  -- didn't give your own expert this
15 information.  That would have been helpful for a doctor
16 to know the full story.
17         MS. GAYLE:  That's an unfair characterization,
18 Counsel.  In addition, he's asked to review the document
19 that you're trying to ask him questions for, and then
20 you're saying that the company -- you're testifying for
21 the company.  They're trying to keep this out.  It's
22 ridiculous.  So my objection stands.
23 BY THE WITNESS:
24     **A.  I have yet to see a document which has Bard's**
25 **name on it saying it's okay to use in the implantation**

Page 740

1  of humans.  I see Boston Scientific everywhere.
2      Q.  Now, that is the same Marlex polypropylene
3  that we just looked at which is set forth in the MSDS
4  sheet for the Avaulta products, true?
5          MS. GAYLE:  Object to form.
6  BY MS. GEIST:
7      Q.  If you compare -- if you look at the document
8  I just gave you, Doctor, and the MSDS sheet, it is the
9  same Marlex polypropylene?  It is the very same, from
10 the very same company?  Do you see that?
11     **A.  I see that.**
12     Q.  So does it matter whether or not there is
13 Bard's name on it, that Boston Scientific is telling FDA
14 exactly why Phillips Sumika added that language to the
15 MSDS sheet?
16         MS. GAYLE:  Object to form.
17 BY THE WITNESS:
18     **A.  I don't know of all of the manufacturing**
19 **processes that go on after the product is delivered to**
20 **Boston Scientific versus Bard.  All I see here is Boston**
21 **Scientific.  Boston Scientific gained permission.  I**
22 **don't see Bard ever gaining permission, and they're**
23 **actually trying to hide that fact.**
24     Q.  Does this document at all relieve your concern
25 that there was any scientific or medical reason for the

Page 741

1  inclusion of the medical application caution language in
2  the MSDS sheet to begin with?
3      MS. GAYLE:  Object to form.
4  BY MS. GEIST:
5      Q.  I mean, you haven't seen a single document, an
6  article or a study, that caused the Phillips Sumika
7  company to put that language in the MSDS sheet, have
8  you?
9      MS. GAYLE:  Object to form.
10 BY THE WITNESS:
11     **A.  I've seen the opposite.  I've seen the**
12 **representative of that company saying it should be taken**
13 **seriously.**
14     Q.  So you're sticking with that opinion
15 regardless of what I just showed you; is that correct?
16     MS. GAYLE:  Objection.  Mischaracterizes his
17 testimony.  And moved to strike counsel's preface before
18 the question.
19 BY MS. GEIST:
20     Q.  Do you want to at least review the materials
21 I've provided to you, Dr. Elliott, and see if that has
22 any impact on the opinions you've given in this
23 litigation to a reasonable degree of medical certainty?
24     **A.  Yeah.  It's 23 pages.  For me to read that**
25 **will take at least two to three minutes per page, and I**

Page 742

1  **may -- I may have to correlate that.  So that will be,**
2  **roughly, 45 minutes or longer, and I will do that.**
3      Q.  I'm just saying.  You don't have to do it now.
4  But my question to you is, would you want to review the
5  information I provided to you to see if it changes your
6  opinions at all?
7      **A.  Absolutely.**
8      Q.  Doctor, before your deposition today in the
9  three cases -- Mrs. Alonso's case, Mrs. Wheeler's case,
10 and Mrs. Bolyard's case -- can you just tell me briefly
11 what you did to prepare for your testimony?
12     **A.  I reviewed medical literature, combining that**
13 **with my 20-some odd years of medical experience.  I**
14 **reviewed depositions.  I had an hour-and-12-minute**
15 **conversation with Mr. Cartmell in one day.  I had an**
16 **hour-and-21-minute conversation the other day.  I**
17 **reviewed my expert report, those things.**
18     Q.  Those two conversations with Mr. Cartmell that
19 you just described to me, did you have any other
20 conversations or meetings with plaintiff's counsel to
21 prepare for your testimony today or yesterday?
22     **A.  On Saturday morning, I met with Mr. Cartmell**
23 **for, roughly, 15 minutes.**
24     Q.  And was that here at the Wexler Wallace's
25 offices, Wexler Wallace office in Chicago?

Page 743

1      **A.  No.  That was at the Palmer Hotel where I'm**
2  **staying.  And then last night I met with Ms. Gayle for,**
3  **roughly, 15, 20 minutes at the Palmer Hotel, again,**
4  **going over just discussion for today, and that's it.**
5      Q.  Any other meetings with any other plaintiffs
6  to prepare for your deposition today?
7      **A.  No.**
8      Q.  Or yesterday?
9      **A.  No.  Just those two telephone calls that I can**
10 **recall.  I believe that was all there was for, again,**
11 **roughly, whatever times I told you.**
12     Q.  And, in terms of the total number of hours
13 you've spent reviewing information and preparing for
14 your deposition, that would be reflected in your
15 invoices to counsel, I assume?
16     **A.  That's correct.  That would be -- that would**
17 **be the accurate representation of the time that I spent**
18 **in totality on this project.**
19     Q.  And would that provide a narrative that would
20 be helpful to somebody like me that actually say things
21 like preparation for deposition or similar language?
22     **A.  Yes.  It would have prepare -- preparation for**
23 **deposition and then review of pertinent manuscripts**
24 **could be the same thing.  So it's not going to be just**
25 **specific just "deposition."**

Page 744

1      Q.  Got it.  And we've already asked for that
2  information, which has not yet been provided to us.
3  You're aware of that, correct?
4      **A.  I'm not aware of that, no.  I know you've**
5  **requested it.  I've heard that, but I don't know what**
6  **you've received.**
7      Q.  Okay.  Sitting here today, I assume you can't
8  give me your best approximation or estimate of how much
9  time you actually spent preparing to give testimony
10 today and yesterday?
11     MS. GAYLE:  Objection.  Form.
12 BY THE WITNESS:
13     **A.  Well, in reality, preparation for today began**
14 **20-something years ago.  So you can't exclude that**
15 **experience, but then it also began in June or July,**
16 **whenever I began on this project, too.**
17     Q.  Well, but you're not going to bill for time 20
18 years ago, though, right, Doctor?
19     **A.  No.  I'm not going to bill.**
20     Q.  That would be a pretty big bill?
21     **A.  So billing began in June, but preparation**
22 **began during fellowship, residency, medical school even.**
23 **So I know what you're saying, and I'm not trying -- but**
24 **I'm trying to also say this is not just preparation for**
25 **this.  There has been a vast amount of preparation.**

In Re: CR Bard 200          Daniel Elliott M.D., Vol. II          11/16/2014

Page 745

1    Q.  No.  I understand that.  I just didn't know if
2  you could tell me there was a specific day, for example,
3  where you said to yourself, Okay, I need to start
4  preparing for my deposition.  Let me hunker down and go
5  through my reports and look at literature and things of
6  that nature?
7    **A.  In reality, that probably would be -- sorry.**
8  **In reality, that began probably the first day I reviewed**
9  **medical records.  Because having going through this**
10 **process before, when I start looking at those things,**
11 **that is preparation.**
12       **I am -- the only time I'm preparing**
13 **specifically for my own deposition is probably when I'm**
14 **reviewing another person's deposition.  But that's also**
15 **not necessarily true because I'm correlating that to**
16 **medical records, so it gets complicated.**
17   Q.  And, in terms of prior testimony, do you
18 remember yesterday we talked a little bit about whether
19 or not you were a biomaterials expert.  And you said to
20 me, I would want to see that testimony, and I didn't
21 have it for you?
22   **A.  Yes.**
23   Q.  Do you still want to see it?
24   **A.  If we want to continue that line of**
25 **questioning.**

Page 746

1    Q.  Well, I just want to know from you.  I had
2  asked you yesterday if you were holding yourself out as
3  a biomaterials expert.  And I had stated to you, with
4  all intention -- intentions of being accurate, that I
5  had read your prior testimony where you appeared as an
6  expert in the Ethicon Pelvic Mesh Litigation where you
7  had said, I'm not a biomaterials expert and you didn't
8  hold yourself out as a polymer chemist and things of
9  that nature.  So I just want to make sure you're giving
10 the same testimony in this litigation as you did in that
11 litigation?
12       MS. GAYLE:  Object to form.  His testimony from
13 yesterday is what it is.
14 BY THE WITNESS:
15   **A.  I put qualifiers on what I stated yesterday.**
16 **I do not recall the Ethicon testimony word for word.  I**
17 **don't know if Mr. Snell had put qualifiers on his**
18 **question.  But I answered that, and I'll stand by my**
19 **answer as far as what the various different qualifiers I**
20 **put on there.**
21   Q.  If you said, yeah, I'm not a biomaterials
22 expert, you have no reason to change that testimony and
23 say something different in this litigation, true?
24       MS. GAYLE:  Object to form.
25 BY THE WITNESS:

Page 747

1    **A.  Well, again, it depends upon what we're**
2  **talking about as far as biomaterials expert.  I do have**
3  **expertise, the papers I've written, both in animals and**
4  **in humans, studying them under the microscope, as we've**
5  **already mentioned today, so the mesh complications,**
6  **other medical devices and which are all biomaterials.**
7         **So I do have a certain expertise in that**
8  **subject.  Do I hold an advanced degree of Ph.D. in**
9  **biomaterials?  The answer to that is, no.  So, again,**
10 **it's not that the testimony is inconsistent.  I'm**
11 **putting -- I'm describing it better.**
12   Q.  Okay.  And that is a better description.  So
13 your testimony is from a clinician's perspective rather
14 than an advanced degree, biomaterials scientist; is that
15 a fair summary?
16   **A.  I would agree with you with that,**
17 **yes.**
18       MS. GEIST:  Okay.  Dr. Elliott, I want to thank
19 you very much for your time and your patience.  And I
20 don't have any further questions for you at this
21 time.
22   **THE WITNESS:  Okay.**
23             CROSS-EXAMINATION
24 BY MS. GAYLE:
25   Q.  Good afternoon, Dr. Elliott.  I have some

Page 748

1  follow-up questions.  I'll try to make it as fast as we
2  can.
3    **A.  Okay.**
4    Q.  I know that we all have flights this evening.
5  If you'll turn back to meet with me to Exhibit 39 --
6    **A.  Okay.**
7    Q.  -- Bates number ending, I believe, with
8  DX0046-009?
9    **A.  Yes.**
10   Q.  009 is the last three digits on the page,
11 Doctor?
12   **A.  Okay.  I'm there.**
13   Q.  And, Doctor, do you remember your line of
14 questioning where counsel asked you various questions
15 over this packet of documents?  Do you remember that
16 just moments ago?
17   **A.  I remember well.**
18   Q.  Okay.  And I'm going to refer you to -- to a
19 statement.  She referred you to BSC's response on this
20 particular page.  Under the heading, Background, Doctor,
21 if you go three paragraphs down, okay?
22   **A.  Okay.  I'm there.**
23   Q.  The paragraph starting in, However?
24   **A.  Yes.**
25   Q.  The last sentence of that paragraph, will you

In Re: CR Bard 200          Daniel Elliott M.D., Vol. II          11/16/2014

Page 749

1  read that last sentence into the record, please?
2      A.  The agreement required Boston Scientific to be
3  ultimately responsible for ensuring that the material is
4  suited to the specific application and assume all
5  product liability.
6      Q.  Doctor, with regard to Bard and the use of
7  Marlex in its Avaulta Plus and Avaulta Solo products,
8  have you ever seen where Bard has assumed responsibility
9  for any product liability?
10     MS. GEIST:  Objection to form.
11 BY THE WITNESS:
12     A.  In the documents I've reviewed, I have not
13 read that, no.
14     Q.  In fact, Doctor, in the documents that you've
15 reviewed, I believe that you testified that you actually
16 had seen where Bard tried to hide the use of this
17 Marlex; is that correct?
18     MS. GEIST:  Objection to form.
19 BY THE WITNESS:
20     A.  I reviewed a series of e-mails where there was
21 active attempts to hide how Bard was using the product,
22 yes.
23     Q.  And let me just fix my question, Doctor, so I
24 don't have any objections.  Did Bard try to hide the use
25 of Marlex in its Avaulta Plus product?

Page 750

1      MS. GEIST:  Objection to form, inferring Bard's
2  intent from company documents.
3  BY THE WITNESS:
4      A.  The e-mails that I reviewed stated, and we can
5  pull those out and state them if you'd like, but,
6  ultimately, multiple times do not let the company -- do
7  not let Phillips Sumika -- Sumika know that we are doing
8  this.  Do not -- do not -- make sure they do not have
9  that information.
10     Q.  So they weren't forthcoming with that
11 information, correct, Doctor?
12     MS. GEIST:  Objection to form, infers Bard's intent
13 from company documents.
14 BY THE WITNESS:
15     A.  All I can go off is that series of e-mails
16 where it does not take an M.D. or a Ph.D.  It is very
17 clear to anybody what their intent was.
18     Q.  Let's go down to Ms. Bolyard's report now,
19 Doctor, Exhibit 35.  And I'm just going to kind of go
20 back, backwards, if you don't mind.
21     A.  Okay.
22     Q.  Doctor, if you turn to the first page of
23 Exhibit 35, the first paragraph, can you read into the
24 record the first sentence -- the last sentence of that
25 first paragraph, Doctor, starting with, I reserve?

Page 751

1      A.  I reserve the right to supplement this report
2  if new or supplemental information is provided at any
3  point and as I review other related documents.
4      Q.  And, Doctor, I believe that you were asked a
5  series of questions about whether or not you had
6  reviewed the transcripts of treating physicians at the
7  time that you had executed your report.  Do you remember
8  that line of questioning?
9      A.  I vaguely remember that, yes.
10     Q.  And should available information or
11 transcripts become available to you, would you be
12 willing to review those, Doctor?
13     A.  I would want --
14     MS. GEIST:  Objection.  Form.  You can answer,
15 Doctor.
16 BY THE WITNESS:
17     A.  Okay.  No.  I would want to review -- if
18 documents become available, whether they be medical
19 transcripts, depositions, any new information that shed
20 light on this subject, I would be very willing to read
21 those.
22     Q.  And if your opinions change, Doctor, then
23 would you issue an amended report?
24     A.  Well, I keep an open mind.  And if an amended
25 report is required or needed or helpful, then we would

Page 752

1  do that.
2      Q.  And do you know, at the time of your report,
3  Doctor, whether or not the transcripts for those
4  treaters were available to you?
5      A.  I don't know that.
6      MS. GEIST:  Objection to form.
7  BY MS. GAYLE:
8      Q.  And, Doctor, I think on Ms. Bolyard you were
9  also asked a series of questions with regard to her
10 sexual status.  Do you remember that line of
11 questioning?
12     A.  In general, yes.
13     Q.  Do you remember the questions about her
14 husband who suffered from erectile dysfunction?
15     A.  Yes.
16     Q.  Doctor, in your experience and practice, is it
17 possible that a woman be engaging in physical intimacy
18 with her husband if he has erectile dysfunction?
19     MS. GEIST:  Objection to form.
20 BY THE WITNESS:
21     A.  Oh, it's possible, yes.
22     Q.  And, in fact, that condition would not keep --
23 prohibit him completely from having intimate -- intimacy
24 with his wife, would it?
25     MS. GEIST:  Objection to form.

In Re: CR Bard 200                Daniel Elliott M.D., Vol. II                11/16/2014

Page 753

1  BY THE WITNESS:
2      A.  By no means.  I'm a urologist.  As compared to
3  a gynecologist who only sees women, I also see men.
4  25 -- 25 percent of my practice is male.  So we are
5  treating impotence.  Impotence in and of itself does not
6  inhibit sexual activity.  It may make it a little more
7  difficult, but there are treatments available.
8      Q.  And, likewise, Doctor, if, for some reason, as
9  counsel had inferred that his erectile dysfunction was
10  completely inhibiting him from having sex, then that
11  doesn't mean that the couple could not be having sex
12  through other methods, including, perhaps, the use of a
13  dildo, correct?
14      MS. GEIST:  Objection to form.
15  BY THE WITNESS:
16      A.  As a urologist dealing with pelvic floor,
17  there are a lot of different ways to have intercourse.
18      MS. GEIST:  I'm going to object to this whole line
19  of questioning.
20      MS. GAYLE:  You brought it up, Counsel.  You
21  inferred they weren't having sex.  And so I apologize I
22  have to go through for everybody in the room.
23      MS. GEIST:  I did not say anything about a dildo.
24  Lord knows I did not.
25

Page 754

1  BY MS. GAYLE:
2      Q.  Doctor, there's other ways that couples can
3  engage in sexual relations; isn't that correct, other
4  than penetration?
5      A.  There is a lot of different ways that sexual
6  activity can take place.
7      Q.  Thank you, Doctor.  And, Doctor, with regard
8  to all three of the questions and in the interest of
9  time, you performed differential -- differential
10  diagnosis for all three ladies as we've -- as you've
11  discussed today, correct?
12      A.  Correct.
13      MS. GEIST:  Objection.  Asked and answered.
14  BY MS. GAYLE:
15      Q.  And, Doctor, I'm going to skip over to
16  Ms. Wheeler now.  You can grab hers, and I don't exactly
17  have which number that was.
18      A.  I have Wheeler's, No. 33.
19      Q.  Yes.  Thank you.  You were asked a series of
20  questions about her degree of dyspareunia.  I believe
21  counsel quoted to you that it was a lesser degree of
22  dyspareunia in the records than the more severe degree
23  that Ms. Wheeler discussed with you.  Do you remember
24  that line of questioning earlier today?
25      A.  Actually, I do not remember it.  There's been

Page 755

1  a lot of questions over two days, so I don't remember.
2  I mean, I remember in generality.
3      Q.  Sure.  So let's just break it down for you,
4  Doctor.  When you spoke with Ms. Wheeler, did you
5  measure her dyspareunia on the VAS scale?
6      MS. GEIST:  Objection to form.
7  BY THE WITNESS:
8      A.  Yes.  I used the Visual Analog Pain Scale and
9  current situation.  If sexual activity were to take
10  place -- she graded it, not I -- she graded it as an 8.
11      Q.  And, Doctor, have you found that that VAS
12  scale is a reliable instrument of measure?
13      A.  Yes.
14      Q.  Measurement?
15      MS. GEIST:  Objection to form.
16  BY THE WITNESS:
17      A.  There have been multiple studies that the
18  Visual Analog Scale is highly reproducible for an
19  individual.
20      Q.  And, Doctor, I believe, if you also turn to
21  the first page -- just one moment.  Let me make sure I'm
22  on Wheeler.  Doctor, turn to page 3 of Ms. Wheeler's
23  report, if you would.
24      A.  I'm there.
25      Q.  And I believe there was discussion going back

Page 756

1  and forth, and it could have been Ms. Alonso.  But just
2  for the record to clarify, first paragraph, Ms. Wheeler
3  had the Solo posterior and Solo anterior, correct?
4      A.  Correct.
5      Q.  And Ms. Alonso, can you turn to hers?  And it
6  might be around exhibit -- do you have it?
7      A.  Yes, I do.
8      Q.  And, similarly, can you tell me what product
9  she had, Doctor?
10      A.  According to my records, she had an Avaulta
11  anterior and the Align transobturator sling.
12      Q.  And, Doctor, if it were the product that had
13  the Avaulta Plus, then I think you testified earlier or
14  at some point today that a patient would be at a higher
15  risk than if it would have been the Avaulta Solo,
16  correct?
17      MS. GEIST:  Objection to form.  Higher risk of
18  what?
19      MS. GAYLE:  Higher risk of complications.
20      MS. GEIST:  Objection to form.
21  BY THE WITNESS:
22      A.  There is data available demonstrating, from
23  internal documents, external reviews, manuscripts, that,
24  when the collagen is implanted, then there's increased
25  hypersensitivity and decreased healing with the Avaulta

Page 757

1 Plus.

2     Q. And, Doctor, with regard to each of the three

3 ladies, you were asked a series of questions about the

4 implantation methods. So I'm going to break it down.

5     With regard to Ms. Alonso, did you see

6 anything that was outside the standard of care in her

7 implantation of mesh?

8     MS. GEIST: Objection to form.

9 BY THE WITNESS:

10     A. No.

11     Q. And the same question for Ms. Wheeler.

12 Doctor, did you see anything outside the standard of

13 care for the implantation of her Avaulta devices or

14 Align device?

15     A. In review of the --

16     MS. GEIST: Objection to form. Asked and answered.

17 You can go ahead, Doctor.

18 BY THE WITNESS:

19     A. In the review of the operative note, I did not

20 see anything that stated it was outside the standard of

21 care.

22     Q. And the same question for Ms. Bolyard?

23     A. Same answer, review of the surgical operative

24 note, I saw nothing outside the standard of care.

25     Q. And, Doctor, again, let's go back to each one

Page 758

1 of these three questions or three cases with regard to

2 particular activities of the lady.

3     With regard to Ms. Alonso, did you say that

4 she engaged in sexual activity in a way that would have

5 caused her complications? In other words, prematurely

6 engaged in sexual activity?

7     MS. GEIST: Objection to form.

8 BY THE WITNESS:

9     A. I saw nothing in the records that she

10 was engaged in sexual activity too early or anything

11 that would predispose her to failure or

12 complications.

13     Q. And did you see anything in the records or

14 learn anything regarding Ms. Wheeler that would

15 indicate that she engaged in sexual activities

16 prematurely?

17     A. Same answer. I saw nothing in the records to

18 support that.

19     Q. And same questions for Ms. Bolyard?

20     A. And same answer. I saw nothing in the

21 records.

22     Q. Did you see anything in the records that would

23 predispose any of these women to have caused their own

24 complications from these products?

25     MS. GEIST: Objection to form. Asked and answered.

Page 759

1 BY THE WITNESS:

2     A. No.

3     Q. That includes smoking on behalf of Ms. Bolyard

4 as well, Doctor?

5     MS. GEIST: Same objection.

6 BY THE WITNESS:

7     A. Yeah. We went over that earlier. I saw

8 nothing in there that her history of smoking led to her

9 product complication.

10     Q. And, Doctor, I think that you, early in

11 this day, were asked a series of questions and

12 counsel had inferred that you had gotten rid of your

13 notes.

14     Is your process, as I understood it, is your

15 process an evolution where you go from a notepad to a

16 Word document and that Word document evolves into your

17 eventual final product?

18     MS. GEIST: Objection to form. Asked and answered.

19 We went over this a long time. And objection to any

20 statement about what I was inferring.

21 BY THE WITNESS:

22     A. Correct. I agree with you.

23     MS. GAYLE: Okay. Okay. All right. We're done.

24 Thank you, Doctor.

25     MS. GEIST: Thank you, Doctor.

Page 760

1     VIDEO TECHNICIAN: This concludes today's

2 deposition of Dr. Daniel Elliot. We're off the record.

3 The time is 3:41 p.m.

4     (Witness excused.)

In Re: CR Bard 200              Daniel Elliott M.D., Vol. II              11/16/2014

Page 761

```
 1    UNITED STATES OF AMERICA       )
      NORTHERN DISTRICT OF ILLINOIS  )
 2    EASTERN DIVISION               )   SS.
      STATE OF ILLINOIS              )
 3    COUNTY OF COOK                 )

 4

 5         I, Jennifer L. Bernier, Certified Shorthand
 6    Reporter, Registered Professional Reporter, and Notary
 7    Public, do hereby certify that DANIEL S. ELLIOT, M.D.,
 8    was first duly sworn by me to testify to the whole truth
 9    and that the above deposition was reported
10    stenographically by me and reduced to typewriting under
11    my personal direction.
12         I further certify that the said deposition was
13    taken at the time and place specified and that the
14    taking of said deposition commenced on November 15 and
15    16th, 2014.
16         I further certify that I am not a relative or
17    employee or attorney or counsel of any of the parties,
18    nor a relative or employee of such attorney or counsel,
19    nor financially interested directly or indirectly in
20    this action.
21
22
23
24
25
```

Page 762

```
 1         In witness whereof, I have hereunto set my
 2    hand and affixed my seal of office at Chicago, Illinois,
 3    this 5th day of November, A.D., 2014.
 4
 5
 6
 7
 8         JENNIFER L. BERNIER, CSR, RPR, CLR
           CSR No.  084-004190
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 763

```
 1    TO: Daniel Elliott M.D., Vol. II
 2    Re: Reading and Signing Your Deposition Transcript
 3    Date Errata due back at our offices:  12/20/2014
 4
 5    Greetings:
 6    You have reserved the right to read and sign your
      deposition transcript. Please review the attached
 7    PDF transcript, noting any changes or corrections
      on the attached PDF Errata.  You may fill out the
 8    Errata electronically or print and fill out manually.
 9
      The PDF files open with Adobe Reader. If you need help
10    opening these files, please see the instructions in the
      cover letter of this email.
11
      Once you have completed your Errata, please print it, sign
12    it, and have the document notarized in the place provided.

      When the signed Errata is returned to us, we will seal
14    and forward to the taking attorney to file with the
      original transcript.  We will also send copies of the
15    Errata to all ordering parties.
16
      If the signed Errata is not returned within the time
17    below, the original transcript may be filed with the
      court without your signature.
18
19
20    Please send completed Errata to:
21    Tiffany Alley Global Reporting & Video
22    730 Peachtree St. NE, Ste 470
23    Atlanta, GA 30308
24    (770) 343-9696
25
```

Page 764

```
 1    ERRATA
 2    I, the undersigned, do hereby certify that I have read the
      transcript of my testimony, and that
 3
 4    ___ There are no changes noted.
 5    ___ The following changes are noted:
 6
      Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
 7    Procedure and/or OCGA 9-11-30(e), any changes in form or
      substance which you desire to make to your testimony shall
 8    be entered upon the deposition with a statement of the
      reasons given for making them.  To assist you in making any
 9    such corrections, please use the form below.  If additional
      pages are necessary, please furnish same and attach.
10
11    Page _____ Line _____ Change _____
12    _____
13    Reason for change _____
14    Page _____ Line _____ Change _____
15    _____
16    Reason for change _____
17    Page _____ Line _____ Change _____
18    _____
19    Reason for change _____
20    Page _____ Line _____ Change _____
21    _____
22    Reason for change _____
23    Page _____ Line _____ Change _____
24    _____
25    Reason for change _____
```

In Re: CR Bard 200                  Daniel Elliott M.D., Vol. II                    11/16/2014

Page 765

1    Page _____ Line _____ Change _____
2    _____
3    Reason for change _____
4    Page _____ Line _____ Change _____
5    _____
6    Reason for change _____
7    Page _____ Line _____ Change _____
8    _____
9    Reason for change _____
10   Page _____ Line _____ Change _____
11   _____
12   Reason for change _____
13   Page _____ Line _____ Change _____
14   _____
15   Reason for change _____
16   Page _____ Line _____ Change _____
17   _____
18   Reason for change _____
19
20        _____

              DEPONENT'S SIGNATURE

21
     Sworn to and subscribed before me this ___ day of
22   _____, _____.
23
     _____
24   NOTARY PUBLIC
25   My Commission Expires:_____

**$**

**$700** 489:3,9

**0**

**0** 666:21

**009** 736:9 748:10

**1**

**1** 475:3 516:25 616:2

**10** 565:24 566:16 575:6 616:2,3 617:12 665:11, 18 666:3,21,22 667:6,21,24,25 668:12

**10:39** 559:18

**10:55** 559:21

**10th** 632:8,15,19 633:12 634:2

**11** 478:24 479:3 508:25 510:6 511:18 575:2,6 709:5

**11,000** 506:11

**1100** 506:11

**11:35** 592:25

**11:37** 593:3

**11:53** 607:9

**12** 658:10 659:5, 8

**12:15** 607:12

**12:59** 641:1

**14th** 492:25 493:2,11

**15** 616:15 655:5 742:23 743:3

**19** 558:4 619:13 646:17

**1900** 506:12

**1925** 486:22

**1993** 717:21 725:3 726:4,15 727:7,16,19

**1997** 717:22 727:19

**19th** 560:6 561:25 569:18 603:20

**1:01** 641:4

**1:55** 683:19

**2**

**2** 475:3 485:21 486:19 517:1 610:19 643:7 657:18,19 659:9 663:8,12

**20** 655:5 743:3 744:17

**20-some** 742:13

**20-something** 744:14

**200** 490:23

**2002** 736:25

**2003** 705:18

**2004** 705:18 737:15

**2005** 705:18

**2007** 717:21 718:16,19 720:15 725:19 726:16 727:5,17

**2008** 581:20 582:23 612:13 629:8 631:25 632:11,19 637:2 642:6 657:20 732:24

**2009** 562:4,6

**2010** 558:4, 560:6 561:25 569:19 603:20 657:21 661:20 667:18 677:12 697:16

**2011** 581:21 582:23 585:14

**2013** 531:1

**2014** 488:7 492:25 493:19 501:12 557:16 623:7

**2015** 512:12

**205** 716:16

**21** 517:9

**22nd** 629:10 631:1

**23** 741:24

**23-page** 733:2, 13

**23rd** 631:25 632:4,6,9,11

**25** 522:9 607:3 753:4

**26** 635:3

**26th** 629:9,12,24 631:14,19 635:3

**28** 607:22

**29** 477:16,20 483:23 511:11

**2:03** 683:22

**2nd** 657:21 661:20

**3**

**3** 485:21 486:19 517:1 755:22

**30** 509:18,21 511:2,5 542:4 559:22 560:1,2, 8,12 564:15 581:17 589:24 638:16 646:22

**30(b)(6)** 714:24 715:2,5,17

**30s** 724:23

**31** 559:23 560:1, 4,8 569:17

**32** 641:14 656:16

**33** 608:1,4, 754:18

**34** 641:15,16,19, 20 643:8

**35** 656:13,14,23 657:2 750:19,23

**36** 717:11,12,18, 20

**37** 717:12,18,21

**38** 717:12,18,22

**39** 729:16,17,18, 21,24 730:22 731:19 732:12 748:5

**3:03** 732:6

**3:09** 732:10

**3:39** 656:7,8

**3:41** 760:3

**3rd** 512:11,12

---

**4**

**4** 493:8 501:11 503:10 517:1 563:13 635:6 688:2

**4-millimeter** 629:23 631:20 635:4

**45** 489:19,22,25 742:2

**4th** 488:7 493:1, 3,6,8,9,13 501:11 503:14 614:24 615:20 623:7 638:3

---

**5**

**5** 515:21 516:25 563:14 564:17 589:25 663:13 688:2 732:17, 20,23

**50** 613:12 646:25 676:15

**50-year** 682:12

**509** 619:5

**510** 738:3

**5:15** 607:2

---

**6**

**6** 508:14,18 515:22 516:25 564:14,20,22 565:21 617:13

**65** 646:22

---

**7**

**7** 508:18 617:13 642:6 665:11,13 666:3,22 667:6, 24 668:12 716:16

**70-year-old** 691:18,23

**700-dollar-an-hour** 489:8

**700-hundred-dollar-an-hour** 489:12

**7th** 612:13 629:8 637:1

---

**8**

**8** 477:23 478:24 479:3 574:19 575:1,5 576:6, 12,13 616:4 619:12 643:3,4, 15,23 665:18 667:21,25

708:8,17 709:5 716:16 734:22 735:2 736:14 755:10

**80** 558:1 645:13, 19,22 646:10,15 647:1

**80s** 621:1

**85** 646:22 647:2

**8:51** 475:2

---

**9**

**9** 565:5,18,22 575:5

**9:33** 510:22

**9:42** 510:25

**9th** 493:18

---

**A**

**A-b-d-u-c-t-o-r-s** 494:10

**a.m.** 475:2 510:22,25 559:18,21 592:25 593:3 607:9

**abdomen** 685:8 686:14

**abdominal** 521:4 593:7 595:1 619:23 650:5 651:11,20 671:4 672:20 679:9, 10,17 680:3 681:17

**abductor** 494:9

**ability** 594:12

**able** 491:16 500:1 507:11 575:16,21,24 576:4,5 583:2 615:21 616:2 622:3,6,19 643:4 661:14, 15,16 698:7 733:5

**abnormalities** 527:9 532:1

**about** 478:7,14, 22 479:3,21,24 482:18 483:14, 21 485:15,17 486:25 487:18 494:19 497:16 502:1,14 507:20,24 509:13 510:8 511:17 512:24, 25 516:17 517:4 519:21 520:8 521:1,6,10 522:9 526:15 527:7 528:15 534:9 536:18 539:15 542:10, 11, 543:14 550:5 554:18,21 555:10 556:2 557:13 561:10, 22 562:10 563:3 565:2,13 567:12,21 568:13 569:2,13 571:7 574:8

575:6,17 577:4 578:6,14 579:23,25 580:9,10 582:8, 18 583:15 584:3,25 585:17 588:5 589:11 590:10,16 591:2 592:5 593:17,18 600:1 601:21 603:3,9 605:13 606:10 616:15, 19 621:5,10 626:20 630:22 633:11 634:5,8, 24 640:15 641:11 644:16 647:9 648:18 649:5,6 650:7, 25 651:3,9 653:3 655:6 656:22 657:14 667:3 668:20 669:2 672:10 673:22 675:1,2, 3,19,20 678:18 679:5 681:17,25 682:24 683:11 685:2 686:20 687:17,20 688:8,22 689:10 691:13 693:17, 18 694:21 695:25 700:16 701:21 702:12, 13 703:12 707:14 710:11 711:4,23 715:12,18 716:1,5 717:4

718:20 719:12, 19 728:10 729:12 730:4,6, 8,19 731:3 732:25 745:18 747:2 751:5 752:13 753:23 754:20 757:3 759:20

**abscess** 528:14, 24 633:5

**absolutely** 478:19 528:7 530:5 531:9 543:4 546:17 551:18 552:16 554:24 556:16 627:2 636:19 645:1,9 686:22, 25 742:7

**abstaining** 634:17

**accept** 737:3

**acceptable** 637:10 693:24 710:9

**acceptance** 711:6

**accepted** 726:2

**access** 500:22 507:11

**accessible** 507:9

**accidental** 508:14

**accidentally** 509:1

**accompanies**

562:18

**according** 629:25 632:5,13 637:15 638:8 674:5 680:14,25 756:10

**account** 507:8 557:20 566:19

**accuracy** 583:3

**accurate** 489:24 491:22,23 577:25 658:4,22 743:17 746:4

**accurately** 539:19 694:7

**acknowledges** 720:23

**acquainted** 581:7

**across** 600:9

**act** 495:23

**acting** 591:21

**active** 503:12 528:11 549:16 634:6,8,10 671:15,17 681:3 682:19,21 695:2,11 696:23 697:3 749:21

**activities** 758:2, 15

**activity** 536:16 537:9,11 538:12,15,17 539:2,6 545:23 547:21 548:6,7, 11 617:4,13

621:10,13 622:2,7 623:13 624:5,16 633:21 634:18 635:10 694:17,19 696:8 754:6 755:9 758:4,6,10

**actual** 497:1 499:4 637:16 638:10 699:23 707:17 713:3 732:16

**actually** 482:15 486:16 488:25 491:18 499:6 502:24 503:13 504:25 537:1 539:24 542:16, 17 543:1 544:6 551:3 564:6,8 565:4 573:19 588:1 599:14 607:19 608:21 613:12 630:1,23 635:19,25 642:19 647:1 654:25 657:21 659:8,14 672:3 695:5 699:15 700:11 703:10 704:6 705:5 706:18 721:14 732:17 735:16 740:23 743:20 744:9 749:15 754:25

**ad** 731:17

**add** 476:20 541:5 627:14

670:3

**added** 511:13
627:4,17 628:2
724:1 738:21
740:14

**addition** 654:18,
24 739:18

**additional**
486:10 566:9

**additive** 661:1

**address** 488:19
553:20 589:3
734:2

**addressed** 727:4
734:3

**adductor** 494:9

**adequately**
578:10 580:13

**adhered** 539:6

**adipose** 686:19

**Administration**
733:19

**admitted** 602:23

**advanced**
552:21,25 553:5
620:1,9 628:16
629:3 747:8,14

**advanced-level**
597:1

**advancement**
617:15

**adverse** 589:24,
25 590:7
591:10,20
654:17

**advise** 635:1

**affect** 529:13
571:16

**affecting** 688:20

**after** 483:19
494:3,20 498:6,
7 499:10 500:19
502:5 530:14
536:7,10 538:18
544:8 557:22
558:1 570:10
588:2 593:12
596:8 597:5,10
616:12 617:7
630:15,17
633:22 634:2
636:24 644:16
645:11 650:18
651:13 652:9,14
667:18 679:19
680:6,22 682:14
685:4,13 686:2
690:8 696:1
714:14 733:7
734:9 738:20
740:19

**afternoon**
747:25

**afterwards**
630:21 691:3,5
692:21 693:12

**again** 479:9
491:1 494:13,14
504:7 506:11
513:23 517:22
518:9 520:25
521:16,20
522:21 525:18
529:7 538:10,25
549:14 559:1

566:13 567:3
568:10 572:4
574:23 581:1
582:10,23
584:20 587:24
588:9 589:2,20,
590:21,25
597:12 600:14,
23 601:13
613:20 619:5,7
624:13 627:16,
23 632:3,12,17
634:22 635:10
636:3 642:2,24
652:12,18
662:25 663:15
665:3 671:23
673:18 674:14
680:17 681:19
682:6 690:23
691:14 693:11
695:10,20
696:13 697:11
700:13 704:10
716:12 725:9
730:23 743:3,10
747:1,9 757:25

**against** 497:14
511:24 570:22,
24 639:20

**age** 519:3 613:12
686:6 693:10

**ago** 726:15
744:14,18
748:16

**agree** 476:14
477:11 479:12
480:6,9,10
491:5 495:16

518:2,15 520:8
521:23 537:10
538:16 542:8
545:15 546:9,24
555:12,18
556:22 558:6
559:12 561:14,
20 562:13,14,17
563:1,8 565:21
568:12 569:6,10
571:22 578:17
580:14 586:22
587:17 588:23
590:20 591:17
593:7,24 594:14
597:15,17 599:4
614:3 622:25
627:9,18 628:4
637:24 638:4
639:8,14 645:3
648:4,15 650:5,
17 652:20 653:1
657:6 664:2,20
665:15,25 676:9
679:16 684:9
686:11 698:2,11
710:21 711:11,
15 726:5 747:16
759:22

**agreeable**
476:25 693:15
698:21

**agreed** 511:2

**agreeing** 600:22
693:18

**agreement**
476:21 478:10
599:9 658:20
720:23 737:20

749:2

**agrees** 492:23

**ahead** 487:6
557:15 669:9
679:4 757:17

**Align** 512:15,21,
24 513:2,7,
514:17 515:1,
10,16 545:9
602:2,12 603:9,
13,21 604:17,21
605:22 606:5
611:15,19
612:4,6,13
661:23 662:2
756:11 757:14

**all** 476:23
479:19 482:6
483:9,17 485:22
486:1,18 487:4,
10 488:2,6
491:10 494:13
495:22 496:24
497:4 499:24
500:8,15,18,24
501:1,7 502:6
503:5,20 504:3
506:1,10 514:7
516:3 517:12,
14,15 518:10,
12,13 519:6
521:3,20 522:3,
25 523:1 524:5,
6,23 525:1,6,9,
10,13 531:21,23
541:4 542:19
549:3,5 555:12
556:6 562:16
563:10,14

564:13 571:20
575:7,11,23
576:3,7 577:22
578:9,12,18
579:2,4,8,12,18,
21 580:9,10
581:15,16
584:13,25
585:16,25
586:11,15,23
589:2,5,6,13,20
590:7,25 592:3,
18 601:11
602:10 605:14
606:13,15
609:10 610:9
615:19 618:4,
14,19 623:24
624:12 625:13
627:2,15,20
636:22 637:7,9
638:2,11 648:6,
16,18,25 649:9,
20 651:25
657:17 659:18
670:3 674:7,23,
24 677:16 679:1
682:8 683:14,16
697:22 701:23
704:2 709:5
710:11,13,19,21
711:16,18
712:24 714:8
715:20 716:5
717:8 719:5
722:18,19
724:21,23
727:13,16,18,
19,21 728:7
729:9,13 731:4

738:23 739:11
740:18,20,24
742:6 743:10
746:4 747:6
749:4 750:15
754:8,10 759:23

**alleges** 517:6

**allotted** 482:12

**allow** 495:2
496:15 557:6

**allowed** 584:8
609:23

**alone** 496:25
578:20

**along** 511:14
612:10

**Alonso** 475:8
477:21 478:2,4,
14,24 482:7,11,
21 483:15,24
485:4,24
486:12,16,21
487:19 489:17
490:7,18 491:7
493:8 494:3
501:13 502:22,
24 503:11
504:1,10 505:8,
19 506:12,23
507:7,15,20
508:3 509:23
510:7 512:14
513:7 514:6
515:20,25
516:18 517:6,21
518:16 519:1,14
520:12 521:8
524:11,13

525:15 526:12
527:5,13 528:4,
16 529:2 530:24
531:16 532:22
534:19 536:8
537:23 539:16
540:4 542:14,15
543:6 545:7
547:5 548:21
550:12 554:21
555:3,22 560:5
562:10 564:4,10
569:18 571:24
573:9 575:16,
21,25 576:4,8,
21 584:12,14
585:1 586:4,16,
24 587:20
588:5,20 590:15
591:8,19 592:14
593:5,23 594:16
596:15 597:4,16
600:4 603:21
604:24 607:21
610:6,16,20
611:2,18,
624:24 625:7,21
636:20 639:24
649:16,23
650:21 652:24
653:6 657:7
674:17 698:11,
23 699:3,8,18
700:20 701:7
704:4,21 718:12
756:1, 757:5
758:3

**Alonso's** 479:10
481:8 483:4
484:24 485:3

486:11 487:10
491:13 493:18
494:17 501:10
514:17 522:23
526:2,3,15
532:3 535:11
539:5 540:19
542:22 544:15
546:16 549:19
556:10,13 558:3
561:24 572:23
576:25 587:8
591:2 592:4
598:6 600:25
604:2 605:12
608:9,13 639:12
640:9 647:23
657:15 709:2
742:9

**already** 477:20
487:17 518:20
530:10 533:20
534:23 539:16
550:5 563:2
603:8 605:13
612:16 657:6,14
694:3 695:23
696:10 716:3
731:22 733:23
744:1 747:5

**also** 478:6
479:16 481:6
483:20 484:8
485:7 487:21
491:19 505:17
512:14 515:4
521:1 527:24
538:12 543:18
544:7 545:10
552:5 555:1,

558:15 574:11
575:15 587:25
616:14 619:22
620:24 623:19
628:14 632:1
644:17 650:9
657:8,11,18
658:10,11 660:1
662:21,22
664:10 670:11
671:21 674:3
686:7 697:8
698:14 699:4
708:1 709:14
714:9 716:23
722:21,25 731:7
744:15,24
745:14 752:9
753:3 755:20

**altering** 661:17
**alternative**
524:10,12 527:6
528:19 610:10
682:13

**always** 492:8
518:1 523:11
582:2 595:14
613:11 618:1,4
651:8

**am** 479:22 482:8
511:25 513:13
522:5 537:7
541:25 549:5,25
555:6,9 564:24
567:7 574:5
596:25 600:22
616:8 617:25
627:24,25
628:6,24 630:16

650:1 653:9
669:10 671:2,12
672:19,21
673:18 685:15
693:14,24 703:1
717:4,9 745:12

**ambiguity**
568:14

**ambiguous**
567:3,5,16,23

**ambulating**
534:11

**amenable**
613:22

**amend** 494:18
663:16

**amended**
751:23,24

**among** 590:6

**amount** 482:12
538:9 557:12
640:11 744:25

**Analog** 503:15
614:8 615:21,25
617:5,12,
665:14 755:8,18

**analysis** 487:15
492:17 578:4
678:14 686:6
699:16

**analyzed** 528:8

**Anatomy** 690:2,
6

**anchored** 566:1

**Anderson**
481:15

**Anderson's**
481:12 482:25
483:9

**anesthesiologists**
552:3,4

**animal** 619:21
620:10 647:3
705:19 706:11

**animals** 747:3

**Ann** 475:7

**another** 476:8
496:19 509:17
582:12 597:17
598:7,25 599:5,
23 600:6,10,14
627:4 648:12
652:25 653:20
661:12 681:8
698:25 720:2
728:18 745:14

**answer** 479:13
481:17 491:2
497:16,20
512:25 521:14
523:1,2,6,11
524:8 530:5
535:17 547:24
550:3 556:6
571:1,8 572:19
573:18 581:4,11
582:16 585:1
587:6 589:22
594:25 602:17,
22,25 621:14
645:23 647:13
651:23 652:1
653:5 669:12,14
675:17 682:7,9
699:2,3 706:4

726:25 730:15
731:1,21 746:19
747:9 751:14
757:23 758:17,
20

**answered** 492:18
520:16 521:11
523:8 524:21
525:3 526:7,20
528:5 532:7
533:20 534:21
535:11 536:1
537:19 543:2,4
547:18,23
548:2,22 554:6
562:11 582:12
583:8,20,23
595:21 596:12
599:13 600:23
620:6 628:24
640:1 647:14
652:16 680:11
681:15 682:1,3,
16 706:23 707:6
710:9 723:12
746:18 754:13
757:16 758:25
759:18

**answering**
548:14 549:3,5
656:1 682:4

**answers** 478:15
487:7 555:13
650:20

**anterior** 564:2
611:13,15
612:2,18
629:23,25 630:2
631:20 644:18

650:16 651:2
661:21 671:6
756:3,11

**anticipated**
566:2

**antidepressants**
626:25 627:11

**any** 476:21
480:17,18 481:1
483:17 486:10
490:9 491:24
494:2,21
496:12,13,22
497:2,8,12,17
498:2,5,13,16
500:4 504:8
505:12,17
507:23 508:11
509:4 512:1,4,
20 513:1,5,6,15,
17 514:18
517:19 518:6,
519:23 521:7
530:9 536:22
537:7 538:13
540:18 543:11
552:17,20
556:7,12 562:7
563:5 567:16,23
568:13 570:2,
12,13 571:2,3,4,
11,18,19,21
572:6 573:5
574:12 580:10,
16,23 583:1,3,
16 586:3
587:12,19
588:4,13,15,19
590:11 592:5

593:12 598:6
602:8 604:3,13,
15 605:2
610:12,22
611:18 612:21
618:16 621:1,
16,22 622:10,23
623:10,12,13
625:16 632:23
635:22 653:19
654:24 655:2,
10,20 657:6
658:8 659:16,22
660:13,14,15
661:5 662:6
667:2 668:6
671:2 672:9,23
673:16 674:12,
16,18 678:25
680:9 681:10
684:6,17
685:15,23,25
687:13 689:24
692:16 693:3
699:1,7,9,10,15,
24 700:6,19,21
701:6, 703:10,
11,17,18,19
704:5,6,23
712:20 715:21
720:3 721:4
722:9,22 723:7,
15,19 729:8
737:2,3 740:25
741:22 742:19
743:5 747:20
749:9,24 751:2,
19 758:23
759:19

**anybody** 495:2,4
496:15,20 500:9
605:8 618:2
626:16 628:1
655:24 715:4
750:17

**anyone** 496:16
500:1 507:19

**anything** 476:8
478:13 501:22
504:3,8 505:1
521:7 526:1,2,
14 553:11,20
561:21 571:6
584:3 612:10
623:17 635:24
637:17 638:14
662:10 669:16
681:2 685:5,19
686:8 690:3
701:11 723:6
753:23 757:6,
12,20 758:10,
13,14,22

**anyway** 480:4

**anywhere**
503:17 666:8
726:6 732:20

**apart** 543:10

**Apogee** 574:7
598:2 600:13

**apologies** 646:2

**apologize** 495:10
496:9 641:20
753:21

**appear** 571:6,21

**appeared** 746:5

**appearing** 475:7

**appears** 485:3
508:24 511:2
570:9 735:15

**applicable** 608:7

**application**
712:21 715:19
718:15,21 719:8
720:1,16 723:8
724:1 726:6
735:5 736:1
737:2,23 738:21
741:1 749:4

**applications**
718:24 720:20
735:7

**applied** 570:21,
23

**applies** 607:19
650:21

**apply** 478:14
479:24 480:7
526:12 555:15,
16 564:20
612:22 613:1
639:19 657:7
662:9,11 678:8
686:15

**appreciate**
520:15 716:4

**approach** 517:22
553:13,18
679:10

**appropriate**
538:9,14 634:18
635:8

**approval** 738:12

**approved** 551:22

**approximately**
475:2

**approximation**
483:3 744:8

**area** 629:4

**areas** 618:10

**aren't** 551:24
552:8 573:25

**arguably** 620:9

**argue** 651:4

**argument**
600:17

**argumentative**
523:4, 623:21
724:3 725:14
728:4,14,22
729:4

**armamentarium**
554:25

**arms** 494:9
513:25 571:16
598:20 600:18
601:12 606:3
612:23 637:20,
25 638:7 645:15
653:8,17 654:6

**around** 500:18
548:25 689:16
727:20 756:6

**arranged** 488:14

**arrived** 484:20

**arrows** 499:14
500:18

**article** 655:10
741:6

**articles** 655:5
668:23

**as** 475:23,24
476:22,23
477:20 478:18
479:15,23
483:4,10,23
484:9,14 485:7
487:5,9,14
491:10 494:1,5
495:13,23
500:17 501:8
503:7,14 504:6,
10,18,21 506:14
508:12,18
509:12,13
511:10 513:25
515:6,19 516:1,
13 517:2 518:3
519:6 520:21
521:17 522:2
523:10,25
525:16 526:4,9,
23 527:6 528:3,
7,18 531:25
532:2,14 534:8,
13,15 537:8
540:16,24
542:20 545:8,9,
10 547:25
548:21 549:6,
14,22 550:9,23
551:25 552:10,
14 558:11
559:3,4 560:1
562:3 566:17
567:11 569:16
570:12 572:11,
17 573:5,10,23
574:2 576:25

578:8 581:18
582:5,11,15,19
583:6,17 585:10
589:11,24
591:25 595:8,
13,21 596:16
597:11,19 598:4
600:23 601:9,
11,12,21 602:17
604:8,9 605:25
608:4,5,6,14
610:6,15,18
611:1,24 616:17
617:3,15,22
618:2 619:19
620:21 621:10
623:16 625:4,6,
17 628:8,19
629:2 631:25
632:1,20 633:7
634:5,23 636:20
637:25 638:8,12
639:7,8 640:10
641:6, 642:20
643:1,8 644:14
645:12 646:1
653:3 655:12
656:23 657:13
664:20 665:11,
18,20 666:1,3,9,
22 667:21
668:12 669:25
670:20,25 671:7
679:11 680:25
681:2 682:13
683:25 684:2,3
685:5,6,13
691:7,17 692:19
695:11 696:5,
697:8 698:9,10,

20 702:6
705:17,23
707:9,11 709:9
711:8 712:1
714:6 715:24
716:7,17 717:18
718:14 722:20
723:14 724:8,15
729:24 733:6
734:12 735:19
738:1 746:2,5,8,
10,19 747:2,4
748:1 751:3
753:2,8,16
755:10 759:4,14

**ASC** 594:17
595:1,12 596:7
597:9 652:15
698:3

**ascertain** 539:19
694:7

**aside** 592:3
644:11

**ask** 476:8 478:13
479:11 480:6
487:18 497:15
509:12 511:17
512:25 521:14
522:24 524:9
550:2 567:24
568:15,24
583:18,24
584:22 602:21
608:7 618:5,11
623:25 628:15
650:25 652:12
658:3 675:18
709:16 724:15
727:4 730:15

739:19

**asked** 480:14
486:2,10 492:18
495:15 512:23
520:16 521:11
523:7 524:21
525:3 526:6,20
528:5 532:7
534:21 535:1,10
542:1 547:18
548:2,22 554:6
562:11 582:12
583:8,15 591:14
595:21 596:12
620:6 639:25
651:3 652:16,23
658:2 662:5
675:17 680:10
682:1,16 698:22
707:6 729:21
732:24 733:23
738:15 739:12,
18 744:1 746:2
748:14 751:4
752:9 754:13,19
757:3,16 758:25
759:11,18

**asking** 476:24
502:11 522:25
523:1 559:3
563:1,7 578:6
580:4,6 583:19
584:2 585:6
586:5,6 588:9
609:22 613:3
624:6 628:18
648:14,15
649:25 651:9
682:6 730:20
735:25 738:16

**asks** 523:10

**aspect** 572:16

**assessment**
517:3 673:4

**assistance**
555:23

**assistant** 495:4

**associated**
527:24 528:12
577:5 587:12
588:6 590:2
591:21 592:6
613:15 664:4
670:12 684:15
686:12

**assume** 476:6
480:21 484:23
485:9 548:16
579:4,7,8,18
580:4,6 585:16,
19,23,24 628:4
657:11 659:5
665:9 699:2
700:5 708:1
713:5 715:9
737:23 743:15
744:7 749:4

**assumed** 749:8

**assumes** 601:7
650:9, 721:10

**assuming**
715:15,16,20

**assumption**
586:6

**at** 477:19,23
479:18 485:1,14
488:16 489:3,8,
9,11,15 490:11

492:7 496:12,24
497:4,9 498:16
499:2 501:10
502:11 503:10
504:7,16 508:2
509:16 512:18
514:8,9 515:19,
21 516:15,25
517:23 518:1,3,
4,11,16 519:11,
21,22 520:9
522:23 525:6
530:11,12
531:1,22,23
535:2,14 537:8
538:6,10,12,25
544:15 546:12,
20,22 550:16
551:1,9 553:10,
13 555:25
557:24 558:7,
13,15,16,17
559:2,5,11
562:3,4 563:13
564:7,15 565:5
567:19 568:5
569:12,21 572:7
573:4 576:6,24
582:20 583:1,6
585:12 588:10
589:15,16
590:23,25 591:8
595:24 596:20,
21 598:2 599:1,
20,21 602:10
603:9,19 604:11
607:2 609:6,14
613:12 614:19,
25 616:4,6,9,17
618:18 619:10,

12,20,21 621:25
624:9 629:16
630:21 631:5
632:14 633:1
634:13 635:3,6,
7,11 636:21
637:24 638:9,
19,22 639:11,15
642:10 644:21
646:22 647:4
651:17 654:16
656:3 657:20
664:12,18
665:14 666:5,
670:10,18
671:7,15,17,18,
24 672:3,13,14
673:5,16 674:11
675:6 676:16
677:3,8,11
679:3,19 680:8,
13,18,19 681:8,
9,21,22 682:11,
20,21 683:16
684:3 686:1,6
687:5,10 688:11
690:16,20
691:15, 692:18
693:7,12
695:11,20,21
696:25 699:23
700:3 701:16
703:17,18,19,
20,22 704:2,6,
14,19,23,25
705:5,7,9,11,12,
14,24 706:1,2,5,
13,14,18 707:3,
17,24 712:16
716:5 718:1

719:7 720:14
723:16 724:13,
15 725:3,11
727:3 731:4
732:22 733:8,17
734:2,15,22,24
735:2,12 736:9,
11,20,24 738:23
740:3,7,24
741:20,25
742:6,24 743:1,
3 745:5,10
747:20 751:2,6
752:2 756:14

**atrophic** 613:16,
17,21 614:15
691:10

**atrophy** 613:25
615:6 691:7,23

**attachment**
566:19

**attachments**
484:1 608:19,24

**attempts** 749:21

**attendance**
516:11

**attending** 553:4

**attention** 560:11

**attest** 562:21
563:9

**attitudes** 621:7

**attorney** 481:15

**attributable**
687:24

**attribute** 514:5
545:7

**attributed**
516:19 687:14

**attributing**
605:14 692:5

**atypical** 691:22

**augmented**
494:15 684:11

**August** 585:13
629:9,12,24
631:19 635:3

**authority** 713:5

**availability**
554:22

**available**
506:17,19
507:10 557:16,
17 578:9 579:2
583:4 611:25
649:1 650:2
654:20 655:18
701:4 702:3
709:15 751:10,
11,18 752:4
753:7 756:22

**Avaulta** 513:13,
25 514:6,11,25
515:2,3,8,16
516:4,19 517:7
521:9 526:17
529:5,8 530:6,
17,21 531:12
532:20 537:24
543:11,12
545:8,11,14
556:17 558:4
560:2,12,23
562:9,19 563:18
564:1,4,5

566:22 567:14
570:21 575:8
577:5 579:10
589:14 590:3
592:6 598:4,18,
21 599:1 600:18
601:2 603:10
605:14,22,25
606:4,5 611:12,
14,15 612:2,12,
17,19 613:7
614:17 626:23
638:17 639:3,5
640:16 648:8
649:10 653:4,7,
13 654:5,8,13
657:20 661:21
662:7,16,
663:24 664:23
665:21 677:2
680:9 683:4
687:10 688:17,
19 689:6,17,18,
19 692:23 709:7
713:14 726:22
738:24 740:4
749:7,25
756:10,13,15,25
757:13

**average** 553:6

**avoid** 537:9
567:2 568:6,7
569:14 570:24
635:16,24 639:9
640:6,16 694:11

**avoided** 566:13,
18,25 639:18,22

**avoiding** 549:4
638:12 640:6,13

**aware** 518:6
531:16,21
532:13 576:1
581:22 596:5,9
615:4 618:8
628:14 632:6
671:2,12 672:21
674:6 675:5
684:6,16 685:5
697:9 710:14,22
715:21 716:14
721:13 724:16
738:8 744:3,4

**away** 609:18,21
616:13 652:21

**Aylstock** 475:9,
12

---

## B

**B-o-l-y-a-r-d**
478:13

**back** 479:16
480:21 485:13
496:3,5,17
505:14 506:15
510:24 522:9
530:12 531:19,
22 538:6
544:16,20
548:16 549:8,9,
20 555:25
559:20 580:8
581:15 585:4,15
589:23 593:2
605:21 607:11
616:13 620:25
624:8 629:10
633:7 637:5

641:3 642:25
645:23 658:25
661:20 669:18,
20 674:24 676:9
677:3,12
680:13,16
681:7, 683:21,
23 687:7 688:3
689:13,16
692:18 708:7
713:3 716:16
726:10 732:9
734:11 748:5
750:20 757:25

**backed** 654:21

**background**
552:21 748:20

**backs** 626:13

**backwards**
750:20

**bad** 600:9 678:5

**Bard** 475:14
478:22 497:14
509:2 510:11
512:21 513:2,7,
514:17 516:4,19
517:7 521:9
526:17 530:4,9
531:5 537:8,24
543:11,12 545:8
556:17 562:19
566:22 567:25
575:8,17 576:14
577:21 578:13,
21 579:6,10,23,
25 580:6,9,11
584:15 585:17,
20 586:15
589:13 590:1

603:15 604:17,
21 605:14 612:6
613:7 625:24
626:23 627:1,
12,21,22,24
647:18 648:7,
16,17,18,19,20
649:9 653:4
654:21 655:17,
19 658:12
662:7,16
664:23,25
665:3,10,22
666:20 667:6,19
677:1 680:9,19
683:4 692:6,7,9,
13,16 693:3,15,
19,24 695:7
709:11,12,17,19
710:10 711:8,
18,22 712:2,16
713:14 714:3
719:16,18,21,
22,24 720:3,9
722:5 724:16
726:3,22 729:2
731:8 738:23
740:20,22
749:6,8,16,21,
24

**Bard's** 577:11,
578:18 592:6
616:23 646:24
681:19 710:1
712:19 720:7
739:24 740:13
750:1,12

**based** 492:21
515:14 516:10
525:6 529:8

532:10 536:6
545:11 549:6
564:5 577:13,14
594:11 601:13
611:24 621:11
625:7,23 626:5
638:2 645:13
653:10 654:19
668:9 672:14
674:18 684:13
685:21 688:18,
24 689:21
701:14,24
709:12,18
719:16

**baseline** 617:13
627:3

**basic** 591:14
713:17

**basing** 709:10

**basis** 491:9
494:5 525:9
540:12 546:18
549:8 551:12,20
592:16,18
643:13,24
644:5,10 645:2,
18 651:19

**batches** 486:4

**Bates** 734:16
748:7

**bathroom**
559:13

**bearing** 683:7

**became** 705:22

**because** 479:19
482:11,14,23
492:6 493:8

494:5, 499:13
501:5, 502:6
503:13 505:11
513:23 515:2
517:23 522:9
528:8 531:9
534:7 536:23
537:1 540:6
547:14 548:8
549:2 553:17
556:23 557:20
559:1 561:24
562:15,25
564:5,8 570:6
573:14 574:5,10
575:17,20 580:5
582:12 583:21,
25 584:12,15
585:10 586:11
589:16 599:15,
18,19 606:14
608:25 609:16,
19 621:18 633:3
638:7 640:22
645:16 648:18
649:21 651:7
652:10 653:7
654:5,12,17
670:11,17
672:5,25 675:17
676:22 677:15,
19 681:15 682:4
683:14 684:10,
25 685:23,25
686:17 688:7
692:23 694:12
706:24 711:20
719:18 722:4
725:12 745:9,15

**become** 549:16
634:10 751:11,
18

**becomes** 515:5
529:12 726:22

**becoming** 634:6,
8

**before** 476:16
479:13 484:17
493:15 494:7
496:2 537:11
544:21 548:17
549:20 560:15
568:16 569:21
573:11 580:17,
22 581:7 582:5
583:6,17 617:6
650:20 654:7
667:5 669:21,24
677:1 683:12
693:11 695:2,
12,16 697:12
705:16,22
725:13 726:21
730:1 732:15,23
733:3 741:17
742:8 745:10

**began** 480:13
538:12 539:5
744:13,15,16,
21,22 745:8

**begin** 734:18
741:2

**beginning** 475:3
501:11 515:21
575:1,4

**beginnings**
629:11

**begins** 501:11

**behalf** 511:24
739:7 759:3

**behind** 550:1

**being** 488:14
511:5 527:17
537:11 538:1
540:12,25 541:4
544:5 545:2
548:8 565:2
567:13 568:9
577:25 589:17
604:19 616:3
618:8 629:2
638:15 639:8
644:15 665:21
666:20 667:5
673:18 682:19
685:21 688:9
728:8 738:20
746:4

**believe** 486:21
562:8 564:6
581:1 596:12
602:11 605:8
637:14 645:21
658:10 665:16
669:15,18 682:3
688:13 709:17
710:13,18
712:20,24 714:6
720:7 724:10,23
730:5 739:9
743:10 748:7
749:15 751:4
755:20,25

**believed** 711:9
712:2 714:4
719:24 722:9

**believes** 731:24

**below** 566:12
590:4 736:14

**benefit** 696:13

**benefits** 578:15

**bent** 568:10

**best** 476:22
501:25 504:2
515:19 535:14
550:2 571:7
586:13 587:6
589:22 620:9
672:8 688:18
710:9 723:12
744:8

**better** 554:1
575:24 576:4,5
625:12 656:9
672:24 747:11,
12

**between** 491:2
643:5,23 738:4

**beyond** 587:3
691:24 730:18

**bibliography**
484:19,24
668:23

**big** 744:20

**bill** 489:2,5
744:17,19,20

**billing** 744:21

**biomaterials**
619:18,24 620:4
702:14 707:4
745:19 746:3,7,
21 747:2,6,9,14

**Biosynthetic**
560:3,12,23
564:2 590:3

**bit** 490:1 516:16
536:23 550:5
669:2 720:20
731:19 745:18

**bladder** 525:24
529:11,14,16,
20,23 530:3,14,
25 531:6,11
565:8 569:4
570:22 604:11
639:20 687:3
689:20 692:25
693:9

**blame** 692:7,22

**blanche** 711:6

**Blandon** 596:23

**bleed** 528:21

**bleeding** 527:6
528:23

**blocks** 713:18

**blood** 491:17
528:21

**Blue** 583:1,3,22
584:3 674:5

**board** 600:9

**board-certified**
615:2

**boards** 551:22

**body** 527:2
589:10 620:3
622:15 633:7
650:3 668:25
669:4 673:12
678:4 690:22

705:24 706:6
712:11 718:25
719:18 722:11
723:19 728:9
729:11 735:8,9
737:3,20

**bold** 563:14,25

**Bolyard** 475:8
478:13 479:7
487:5,23,24
489:23 490:8,16
491:6 497:13
506:6,24 507:7,
16,21 550:23
556:2 607:21
624:25 625:22
649:17, 651:24
656:23 659:3,
11,20 660:3,13
661:19 662:12
665:5 667:19
670:17 671:4
672:1 674:18
676:25 679:16
680:18 681:9
682:11 684:2
687:14 691:7,18
692:2 694:3,10,
16 696:23
697:11 698:24
699:9 700:21
701:7 704:5,20
708:21,24
718:13 752:8
757:22 758:19
759:3

**Bolyard's**
491:14 494:18
539:25 555:16

648:2 655:24
657:8,13 659:1,
15,23 660:4
661:7 662:9,13
663:9 664:21,22
665:24 666:1,18
668:21 670:4
676:14 680:7
681:21 683:2
685:10 686:21
688:25 692:17
693:3 697:15
698:1 699:18
708:7,18 742:10
750:18

**Book** 583:1,3,23
584:3 674:5

**Boston** 721:12,
13 722:4,12,17
728:18,19,25
729:6 730:23
732:25 733:22
734:3 735:1,17,
25 736:21,24,25
737:11,15,16,
18,21 738:5
740:1,13,20,21
749:2

**both** 502:13
511:2 550:10
611:12 658:3,4,
6,13 691:15
735:17 747:3

**bothered** 621:18
622:1,9,22
632:7

**bottom** 496:20
560:3 562:4
575:1 576:6,11,

13 687:8 688:4
734:15 736:9,20

**brain** 520:1
525:20,21

**Brandon** 475:11

**break** 511:1
536:24 559:13,
15 560:1 606:8,
12,21,23 607:15
655:24 683:13,
17 702:8 755:3
757:4

**breaking** 536:18

**breaks** 630:15,
17

**briefly** 742:10

**bright** 528:21

**bring** 608:25
642:2

**brittle** 702:8
703:4

**broke** 481:7

**broken** 481:24
482:3

**brought** 499:1
602:19 753:20

**BSC** 736:21

**BSC'S** 748:19

**building** 713:18

**burning** 583:11
616:20 617:4
664:5,8

**buttock** 494:8

**C**

**C.R.** 475:14

**call** 485:4 545:16
618:9 714:24
720:7 734:16

**called** 475:23
532:11

**calls** 568:1
598:12 599:10
601:6 710:4
712:6 722:14
743:9

**came** 486:21
495:22 497:5
501:16 562:6,15
581:20 706:6,19
713:4 716:16

**can** 476:11 477:1
478:14 479:9
480:7 482:21
487:6 491:17
492:3 502:19
503:22 508:23
509:11,16 514:3
515:19 516:16
518:24 520:1,2,
14, 521:23
522:4 523:2,6,
11,18,20,24
525:14 527:23
530:8,19 531:14
532:16 534:10,
11 540:15
546:23 547:1,24
548:10 551:3
553:11,25
555:12 556:22

571:20 573:3,7
576:17 581:18
585:1,23,24
586:20,22 587:3
588:9 589:2,12
591:16,17
592:22 595:24
596:10 601:3
602:4,21,25
605:9 606:22
607:6 609:8
610:13 613:21
614:2,9,23
615:19,22
617:15 618:4,14
623:24 625:13
626:6,18 628:3
632:13 633:7
640:24 642:20,
25 643:22
644:11 645:23
646:13 649:16,
17 653:10 656:3
657:5,11 658:21
663:2 664:10,12
665:25 668:6
669:18,20
670:24 678:3,23
679:16 682:22
685:7 687:14
689:13,25 692:8
698:11,12 703:4
709:23,25
714:14 719:22
722:19 726:5,8,
25 732:3,4
733:8 734:24
735:16 742:10
743:9 748:2
750:4,15,23

751:14 754:2,6,
16 756:5,8
757:17

**can't** 482:23
485:14 486:4,12
489:25 490:21
491:2,22
506:10,12 514:2
524:9 536:13
558:11,12
563:11 572:4,18
577:9 581:16,
19,22 582:25
583:5 584:1
586:14,19 587:5
589:20 591:7
598:5 600:15
606:19 615:7
621:9 627:19
634:6 635:13
636:3 648:5,15
649:8,12,25
652:10 653:19
678:6,9 684:18,
19 694:22
698:25 700:12,
14 711:6 714:8
717:6 719:21
744:7,14

**cannot** 486:16
496:14 523:25
533:11 545:4
549:16 562:21
563:9 573:3
586:10,12 589:2
591:4 598:16,23
621:12 623:10,
11,12,23 637:8
649:2 692:7
699:13 709:23

722:1,17

**caps** 563:14

**car** 532:23
533:13 534:20
535:19

**care** 483:18
485:6,18 504:7
517:23 549:7
556:3 591:22,25
592:4,12 596:1,
20,24 597:1
633:10 634:25
635:15 640:10
641:22 651:18
757:6,13,21,24

**career** 517:11

**careful** 476:7
636:14 665:20

**carefully** 626:4
706:24

**Carlos** 485:17,
18

**Carome** 585:9

**carried** 689:15

**carry** 689:14

**cars** 727:19,20

**carte** 711:6

**Cartmel** 742:18,
22

**Cartmell** 742:15

**cascade** 703:8

**case** 476:18
479:10,20,25
481:8,23
482:18,22
483:4,21 484:24

486:3,11
487:10,15
491:13,14
493:24 494:17,
18 512:14
514:17 522:23
539:5,25 542:12
556:10,13
576:25 577:12
584:2 590:14
591:2 605:12
607:16 608:5,9,
11,12,13 610:4,
7,14 611:3,11
612:22 614:13
618:16 621:5
623:2,18 625:3
626:20 629:21
636:16 639:12
640:9 642:11
644:14 649:7,23
653:18 655:23,
24 656:9,22,24
657:8,13,15
659:1,4,15,16,
23 660:16,22
661:3,7,23
662:6,9,13,15
663:9 664:21
669:16 670:4,5
676:14 677:13
680:21 681:11
683:3 690:17
692:15 696:11
697:21 698:1
699:18 711:25
730:19 742:9,10

**case-specific**
478:21 485:4,22
502:12 574:25

584:11 608:5
609:2 657:20
658:14 716:6
718:12 731:7,
14,16

**cases** 476:19
478:11,15
479:12 480:6,8,
15,19 483:11
487:9 488:5
489:10 491:24
493:16 494:20
551:5 555:17
607:20 618:17
625:16 658:3
662:14 671:1
674:19 694:5
699:7 701:12,21
704:5 716:9,23
742:9 758:1

**catch** 476:23

**causal** 685:21

**causation** 477:25
708:19 731:10

**cause** 521:9
524:11,13
526:4,17,24
527:6 528:3,19,
22 530:18
532:16,19,20
534:10,11,16,17
537:1,12,17
540:19 541:8
542:5,7,19
547:8,9,12,16,
25 548:9,20
611:19,20 613:8
614:2,17 626:23
630:4 636:16,

664:17 665:1
682:13 683:4,9
685:13 690:10
726:8

**caused** 513:17
514:18,25
515:16 516:4
517:6,20 529:5
530:21 533:16
534:19 535:6
543:8 546:19,
616:23 626:22
627:24 662:23
663:24 665:3,12
674:17 687:9
688:11 689:1,5
701:19 741:6
758:5,23

**causes** 515:7
531:13 532:21
535:22 546:15
610:11 630:7,12
664:8 678:6
680:21

**causing** 519:15
532:19 664:25
666:1 673:12
701:19

**caution** 566:13,
16,17 712:21
715:19 718:15,
21 719:8 720:1,
16 724:1 726:6
735:5 736:1
738:22 741:1

**center** 492:8
517:23 549:7
550:17 551:10
594:2 595:25

596:20 615:1
651:18 731:5

**centimeters**
634:17

**central** 525:19
527:2 560:24
565:8

**certain** 477:13,
14 482:12 486:7
502:11,20 547:5
557:21 580:11
618:10 623:4
628:12,15
635:10 645:13
690:22 733:7
734:13 747:7

**certainly** 538:16
542:7 594:15

**certainty** 513:16
514:25 530:9
545:13 586:2
601:4 648:6
693:2 741:23

**cervical** 524:4
525:21

**cetera** 480:7
525:9 546:21
602:7 613:1
655:8

**chagrin** 491:19

**challenge** 605:8
626:16 677:18

**challenges**
678:6,8 685:3
690:11

**chance** 554:1
594:3 654:5
684:23 715:25

change 494:3,19
509:5 544:21
619:14 622:3,18
658:17 663:16
677:12,15
680:20 681:10
692:21 693:8,
14,17,23,24
726:17 751:22

changed 530:9
621:3 661:6,12
731:25

changes 574:15
658:8 726:9
742:5

chaperone
495:24

characteristics
477:25 708:20,
23 711:21

characterization
518:21 739:5,17

charged 626:10
715:11,18

cheated 543:7
547:13

cheating 540:25
542:18 543:16,
25 547:6 548:19

cheats 544:8

check 714:14

Chemical 718:23
720:19,22 735:6

chemist 746:8

Chevron 718:22
720:19,22 721:5
735:6

Chicago 742:25

chills 527:24
528:13

choice 650:3

choose 622:15
623:11

chooses 622:7

choosing 712:11

chose 626:4

chronic 552:7
626:14 627:4
682:24 684:3,
13,15,20,25
686:24

chronologic
505:12 507:3,5
530:12

chronology
530:13 546:14,
20

cigarette 673:8

cigarettes
673:11

circled 508:23

circulation
562:1,13

circumstance
627:19

citation 723:7

cite 689:25

Citizen 585:10

claims 655:19

clarification
503:9 504:4
567:24 657:25
658:1

clarifications
600:23

clarifier 565:3
664:16

clarify 564:13
603:1 756:2

Classic 564:5

clear 502:10
516:24 519:10
555:6 565:22
588:12 602:5
603:14 609:11
612:5 629:9
634:23 636:12
647:22 665:21
672:12 704:2,3,
10 707:2 750:17

clear-cut 631:14

clearance 538:7
738:3

cleared 537:11
538:1 738:2

clearly 600:12

Clemente's
690:6

clinic 486:14
496:1 542:25
546:23 588:10
633:19

clinical 587:24
703:7

clinician's
747:13

Clobb 653:11

close 633:4

closed 631:22
633:17,20

635:8,9

closely 558:19

Closing 630:21

clots 527:6

CO 683:1

coating 655:11

coatings 735:4

Cobb 600:19
602:3 653:11
702:4

cognizant 618:1

collagen 510:14,
15 574:13
598:19 600:21
612:25 654:14,
17,20,25 655:6,
662:11 756:24

collagen-
polypropylene
662:8

collagen/
polypropylene
612:20 654:16

colleague 587:4

colleagues
553:14

colon 527:15

colorectal
553:14

combination
575:19 612:21
654:16 662:8

combined 645:6

combining
742:12

**come** 483:20 495:25 496:3,5, 17 505:12 506:15 538:23 551:11 555:9 591:1 602:13 630:11 673:21 705:24 727:22

**comes** 513:9 549:8,9 553:24 557:25 616:13

**comfortable** 568:21 734:25

**coming** 492:14 500:19 517:15, 24 525:11 582:24 725:1 733:19

**comment** 535:4 549:10

**comments** 504:22 505:1 535:16

**commit** 625:4

**common** 693:10

**commonly** 528:12

**communicate** 579:24 580:1 648:19

**communicated** 714:5 739:2

**communications** 507:18

**community** 551:25 552:10, 15 558:8 677:17

709:18

**companies** 721:6

**company** 511:24 562:15 579:3 635:22 653:1 674:6 681:4 709:24 710:13, 19,22 711:8,15 712:12,20 714:16 715:1,11 718:23 720:13, 19,22 721:15 722:9 724:1,6 725:1 726:3 727:22,24 728:6,7,18 729:11 735:6 738:21 739:7, 20,21 740:10 741:7,12 750:2, 6,13

**company's** 599:5,24 600:6 737:3

**compare** 581:6 615:21 616:2 639:6 735:16 740:7

**compared** 490:7 617:21 653:8 673:7 676:13 753:2

**comparing** 594:5 684:17 697:11

**comparison** 609:19 693:11

**comparisons**

615:22

**compilation** 734:4

**complain** 597:10

**complained** 610:11

**complaining** 521:10 524:11, 13 527:7 528:4 540:6 594:9 597:4 650:7 653:3 667:20 698:4

**complains** 667:14

**complaint** 545:17 650:8 688:25

**complaints** 517:20 530:25 532:3 546:16 553:20 610:23 611:20 616:19 651:9 687:13,20

**complete** 485:22 487:15 550:12 658:22

**completely** 555:18 565:21 569:10 574:5 637:24 679:12 752:23 753:10

**complex** 491:6

**complexity** 490:22

**compliant** 560:24

**complicated** 490:17 491:9, 10,11 514:1 515:5 580:6 734:8 745:16

**complication** 599:2 636:14 711:4 759:9

**complications** 485:19 513:12, 18 514:5,18 516:4,18 517:5 537:13,17,23 572:18,23 573:8 576:2 578:19 586:8 590:1 591:20 596:24 598:20,25 599:6,20,22 600:1,17,20 602:6 605:10,14 620:10 625:18, 633:23 649:20 650:7 651:5 653:12,15 654:4 672:7 674:8 681:25 682:14 683:5 707:9 747:5 756:19 758:5,12,24

**component** 539:17 629:25 694:4 696:12

**Compounded** 541:6

**compromised** 681:17

**concentration** 726:8

concept 624:1

concepts 492:21

concern 728:10 733:15 737:14 740:24

concerning 549:25 680:21 714:4

concerns 536:18

conclude 681:8, 22

concluded 519:14 654:24 655:11

concludes 760:1

concluding 517:5 521:9 613:7 723:17

conclusion 492:14, 614:17 618:23 700:21 710:5

conclusions 700:6

condition 521:7 524:20 527:22 530:7,10,19,23 533:16 534:2,19 535:5,18 550:1 552:17 628:3 662:24 663:25 664:2,3 665:5 683:6 691:12 692:7,8,12 693:10 697:20 752:22

conditions

517:20 519:12 520:11 525:15, 20 532:2 552:7 610:11

condoning 716:15

conduct 491:12

conducted 494:20 665:17

conducting 491:25

confidentiality 499:25

confirm 647:8

confirmation 495:12

conflicting 670:25 681:1

confused 502:14, 16 526:10 581:14 682:3 703:10

confusing 501:6 598:24

congestion 525:24

consensus 677:14

consent 576:9, 22,24 577:4,8, 11,13,14,19,20 578:3,24 587:18,25 588:11 590:14 591:6,13,16 592:1,2,14

consents 592:17

consequence 711:9

conservative 632:18

consider 524:1 525:16 527:5,12 528:2,18 529:15 530:2,24 532:2 537:22,25 540:18,24 541:1 542:3 549:18, 554:22 556:10, 13 572:20 613:9 614:12,16 616:5,21 617:2, 19 618:4,18,22 619:2,24 620:1, 4 621:7 626:21, 24 636:17,25 638:6 654:24 681:23 682:10, 13 683:2 685:9, 20 686:21 690:7 694:16 697:19

considerable 476:4

considerably 490:11,12

consideration 610:8 615:11

considerations 547:2

considered 518:17,25 519:13 520:11 521:7 522:8,11 524:1,2,5,16,23

525:1,6,9,18,19 526:3,15 527:16 546:5,15 552:9 610:17,21 613:3 619:18 647:8 685:14

considering 589:9

consistent 529:10 572:11 624:4 657:9 672:21,22 687:8 691:24 699:6 701:3,18,22

constantly 617:13

constellation 529:24

consultant 675:8,14,23 676:5,7

consulting 675:19

contact 718:25 735:8

contacted 585:9

contained 500:4 501:24 503:25 561:11 674:25 716:6

contains 518:20 718:15

contaminated 633:4

contemplated 720:23

contend 647:18

**contends** 625:5

**content** 654:20

**context** 623:6 679:8 710:11

**continue** 602:11 607:15 646:5 745:24

**continued** 475:25 632:18 680:20

**continues** 627:20 738:16

**continuing** 515:22 596:10 713:22 715:24

**contract** 638:1 721:14 737:16

**contraction** 557:20,21 558:2 602:6 619:8 645:1,19 646:10,13,22 647:10 701:2

**contracts** 645:13 721:6

**contradicts** 618:21

**contrary** 572:21 735:20

**contribute** 540:19,20 547:7 613:22

**contributing** 515:2 517:14 530:7 532:3 637:21

**contributions** 525:11

**control** 531:10

**controversial** 578:6

**conveniently** 548:17 549:9

**conversation** 498:10 578:16 742:15,16

**conversations** 742:18,20

**convert** 505:10, 16

**converted** 506:1

**conveyed** 648:9

**Cook** 509:1 510:8,13,14,17 511:20 658:12

**COPD** 682:25 683:2,6 684:3, 17

**copies** 609:18 658:4 717:14, 19,23 718:2,4

**copy** 493:23 499:18 500:8 508:7,8,11 509:22 560:7 585:11 609:7, 11,17 656:23,24 658:18,19,20

**cord** 520:2,6 524:4 525:21

**corner** 732:18

**corporate** 714:24

**Corporation** 737:17

**correct** 477:5,6, 9,22 478:7,8 479:7 480:2,3, 19,20,25 482:9, 20 483:24,25 484:2,3,6,7,10, 14,15,19,25 485:8,9,25 487:16 488:7, 11,21 489:4,7,9, 13,16 490:15 492:17,25 493:13,17,19, 20,24,25 496:23 498:12 499:8,9, 12,25 501:14,21 502:22,23,25 503:2,4 508:22 510:10,12 511:11,12,16,22 512:13,15,16,22 513:2,18,23 515:13 516:14, 21 517:2 522:17 525:2 529:3 531:18,20 537:19 539:23 540:2 550:8,16, 23 551:8,15 556:20 557:23 560:16 561:13, 25 562:5 563:19,20,24 564:2, 565:3 567:12 568:25 569:20 572:12 575:3,10,14 576:15,16,22,23

578:5,25 582:22 587:10 591:2 596:9 597:6,7 601:18 603:13, 23,24 604:1 605:5 607:22,23 608:14 609:3,4 610:23,24 611:10,13,21 612:7,14,17,18 617:17 620:21 624:25 625:1 628:8 629:17, 22,23 630:5 631:8,18 632:6, 9,22 638:23,24 639:1,12,13 641:9,12 642:8, 12 643:9,12 647:10,12,20,24 648:3 649:13,24 652:4 653:24 654:12,19 657:10,22 658:6,7,14,15 659:4,25 660:7, 8,12,16 661:21, 22,23 662:3,10, 20,21 663:11 664:8,11 665:12,13,19 666:4,5,23 667:16,17,22 669:1 672:8,15 673:2,3 674:19 675:9,13 679:10,13,14 686:13 688:12 689:3,4,6,7 691:8,12 692:3,

13,14 694:24
695:7 696:15
699:19,25
700:16,22
701:8,12,22,25
703:12,13,19,24
704:16,21,22,24
705:8 706:7,20
707:5 708:6,25
709:2,7,8
714:20,21
718:16 719:14
720:15,17 723:9
732:13 733:20,
21,22 735:13
736:18 741:15
743:16 744:3
749:17 750:11
753:13 754:3,
11,12 756:3,4,
16 759:22

**corrected** 630:23
658:9 688:14

**correctible**
594:4 595:7,15

**correcting**
603:22

**correctly** 481:6
539:22 566:20
735:10

**correlate** 480:10
482:13,15
490:22 495:15
564:3 572:7,8
614:23 618:6,15
619:3 621:2
624:1 626:17
632:13 722:3,4
727:21 729:7

742:1

**correlated** 624:9

**correlates**
571:19 572:18
573:5 623:8
709:9

**correlating**
534:12 589:18
614:1 646:24
702:5,9,10
745:15

**correlation**
491:1

**correspondence**
481:2 738:4

**cost** 539:16
694:3 696:11

**cough** 684:3,14,
15,20

**could** 480:14,22
488:19 490:11
494:9,14 496:19
499:14 510:18
515:1 517:13
518:10 522:8
526:25 529:14
531:5 536:20,24
537:1,12,17
538:18 540:19,
20 542:7,19
543:5,8,11,17,
18 544:5,7
545:2 547:7,11,
15,25 548:18,20
567:24 573:8,24
587:3 593:8,24
594:7 595:2,9
597:18 598:19

599:6 600:4,16
613:14 627:10
633:22 636:1
637:8,15,16
642:13 650:6,17
651:12 652:1,14
653:1 656:9
665:18 666:21
668:24 669:3
682:9 685:11
687:24 690:9,25
691:4 692:8,22
698:3 710:7
734:9 743:24
745:2 753:11
756:1

**couldn't** 491:23
621:18 622:22
685:23,25

**counsel** 475:5
476:16 479:14
483:7 497:22
502:10 507:19
509:25 510:18
511:2,7 533:4,
18 541:22
559:14 560:8
583:21 584:9
596:13 599:25
608:17 638:21
641:23 642:17
646:2 647:12
656:25 658:21
670:7 674:3
717:14,23,25
719:2 725:15
730:10,13
739:7,10,18
742:20 743:15
748:14 753:9,20

754:21 759:12

**counsel's** 523:22
741:17

**counseling**
592:13

**counting** 489:19

**couple** 476:25
484:5 487:17
541:13 548:18
696:5,6 729:22
736:8 753:11

**couples** 754:2

**course** 581:23
678:7

**court** 475:15
495:9 585:3
606:10,14,25
645:22,24
656:11 663:3
669:21 683:24
717:9

**cover** 738:13,14

**covered** 580:19
581:2 583:22
716:3

**crack** 703:4

**cranked** 569:3

**create** 506:21
633:5

**creating** 514:12

**credentialing**
553:1

**credentials**
700:11

**critical** 518:1
592:7

cross 673:17

**CROSS-EXAMINATIO**
**N** 747:23

**culprit** 515:7

**curable** 627:14

**cure** 593:16
594:13 597:14
665:7

**curling** 558:24
559:7 570:2,13
571:4,13

**current** 617:12
662:21 671:11,
15 672:13,20
677:11,20
680:8,18 681:9,
22 682:11 755:9

**currently**
503:11,13
530:15 604:9
695:1

**cut** 632:17,21
703:6

**cutting** 664:5,8

**CV** 484:2,5
609:1 619:20
658:19

**cystitis** 519:21
524:3 525:23

––––––––––

**D**

**daily** 492:9
494:5 525:9
551:12,20
592:16,17 625:9
645:2 651:19

702:10

**damage** 673:6,
11 674:17
676:11

**damages** 673:2,
24,25 678:5

**damaging**
676:16

**dangerous**
673:18,24
729:10

**Daniel** 475:4,22
760:2

**data** 518:11
557:18,24
568:22 569:11
571:18 572:5,6
573:19 574:11,
13,14,16 579:2
594:11 598:2
600:19,21 602:3
611:25 625:7
626:13 655:20,
21 670:13,23
671:1,12,22,24
672:4,6,19,23
673:16 676:18
677:24,25
678:1,23,24
679:6,8,13
681:1 682:21
684:6 685:19,
21,23,25 691:5
701:4 702:3
709:24 717:20
723:4,5 726:1,
14 727:10 735:3
738:9 756:22

**date** 493:7,13
503:14 504:21
558:11 562:4
632:10 665:7

**dated** 493:18
560:3 642:6

**dates** 503:9
508:23 511:15

**day** 484:17
488:2,6 493:5
497:9,12 519:9
582:15 604:12
630:17 633:11
673:7,8 676:15
679:11 682:8
718:3 742:15,16
745:2,8 759:11

**day-to-day**
540:11 542:24,
25 546:18 549:8

**days** 539:3
671:22 755:1

**de** 692:8

**deal** 478:22
491:9 553:22
555:2 628:13,25
634:20

**dealing** 494:6
525:19 527:17
540:11 550:17
553:2,18 628:12
753:16

**deals** 525:8
628:11

**debilitating**
596:3 597:14
598:3

**decent** 613:13

**decide** 559:12

**decision** 510:8
575:16 576:5
648:24

**decline** 543:18

**decrease** 543:24
655:13

**decreased**
654:25 655:1
756:25

**decreases** 655:11

**deep** 664:17
665:23 667:12
689:19,21

**deeper** 582:21

**defect** 527:3
611:13

**defects** 527:25
650:17 671:6

**defendant**
475:14

**defer** 700:9,18

**deferring** 700:5,
15

**deficit** 521:2

**define** 554:8,17
666:25

**defining** 665:21

**definitely** 541:5
685:6 688:17

**definition** 548:5
557:2

**degenerative**
686:20,21
687:9,11,15,18,

24 688:1

**degradation**
602:6 645:17
700:22 701:2,7,
18 702:5,12
703:7 711:20

**degrades** 531:13

**degree** 513:16
530:8 557:21
586:2 593:15
601:3 618:18
629:4 634:23
648:5 652:3
653:14 688:12
693:2 694:19
741:23 747:8,14
754:20,21,22

**dehiscence**
629:7,11,13,18
630:3,8,13,24
631:8,15,16,25
632:7,24
633:10,24
634:10,24
635:2,16,23

**delay** 536:23

**delayed** 635:24
651:22 652:19
654:22 678:6,19
690:18

**delete** 504:3

**deleted** 502:4

**delineated**
668:19

**delivered** 740:19

**demand** 507:12

**demonstrate**

686:9

**demonstrated**
624:3 671:8

**demonstrating**
685:16 756:22

**deny** 581:25

**department**
555:1

**depend** 711:3

**dependent**
553:10

**depending**
490:12

**depends** 538:22
557:9 690:12
747:1

**deposition** 475:4
476:6 477:16,20
480:13 484:17
486:25 509:14,
18 512:4,7
533:3,7,8,9,23
534:6 535:1,2,
15 536:6
541:21,25 542:2
544:21 548:17
549:20 559:22
560:1,15 567:20
587:9 591:1,11
592:21 607:19
608:1 614:13
635:11 637:16,
23 641:16
656:14 659:17,
19,20 660:3,4,
14 669:5 670:4,
11 672:9 695:14
708:12 714:10,

15 716:16
717:18 718:14
729:8,18 731:4
742:8 743:6,14,
21,23,25 745:4,
13,14 760:2

**depositions**
485:7,10,11
487:2 533:10
651:8 655:17
659:16,22
660:1,5 661:6,
10 712:18
742:14 751:19

**depression**
539:21 540:5,
14,16,21 542:7,
20 543:9,24
544:8 624:23
625:3,13,17,22
626:7,15,16,23
627:3,10,13,15,
20,25 629:1
662:20 694:9
697:15,20,23,24

**dermatomes**
689:16,18

**describe** 478:2
696:25

**described**
644:14 742:19

**describes** 514:6
558:22 559:5

**describing**
499:20 534:8
702:5 703:1
747:11

**description**

560:21 570:7
747:12

**designation**
715:2

**desire** 632:2

**desires** 621:7

**destroy** 505:17

**detailed** 591:12
698:6 700:8

**details** 656:19
714:9

**determine**
492:22 538:13
570:5 614:8

**devastating**
544:11 600:16
654:4

**devastation**
600:12

**development**
693:4,19

**device** 509:1,2
510:8,11,13,14
511:20 568:13,
16,25 569:9
577:11 578:15
580:24 589:10
597:16 598:8
599:5,24 600:6
652:25 653:21
654:3 658:12
710:13,22 711:8
721:6 726:14,19
728:18 735:19
738:3 757:14

**device's** 599:23

**devices** 567:11

598:4 737:19 747:6 757:13

**diabetes** 525:25 685:2,3,11,15, 16 686:1,6,9,11

**diagnosed** 527:14 529:16 530:3 685:2 690:8 695:16 697:4

**diagnoses** 503:19 518:13 522:3 524:24 525:12 527:1 636:23

**diagnosis** 491:22,23 492:21 494:14 503:20 514:9 517:13,16,17 518:18 519:1 520:13,19,21,24 521:16 522:8 523:12 524:1 525:17 526:5,16 527:4,13,16 531:25 546:19 554:20 555:8, 556:11,14 610:5,8,20 631:17 637:25 657:17 662:22 685:10 696:24 754:10

**dictation** 570:17

**didn't** 480:21 486:15 496:20 506:13 525:2 533:21 571:11

572:20 579:23, 24 580:1 592:5 593:11 608:25 648:19 650:25 655:9,10 661:3 669:16 675:18, 19 699:15,23 703:10,17 704:19,23 705:5,6 715:20 716:5 722:25 739:14 745:1,20 746:7

**Dietz** 647:9

**difference** 572:7 609:2 668:4,8 688:21 689:9

**differences** 689:15

**different** 482:3 490:14 519:4 527:20 528:12 537:21 546:4 548:15 557:24 565:20 570:6 577:15 581:5, 17,23 582:20 590:4 596:22 598:6 600:2 601:1,9,11 613:3,23 617:21 623:24 625:8 653:20 672:24, 25 680:2 689:14 697:9 699:1 706:12 717:1,3 724:22,23 727:20 731:18 746:19,23

753:17 754:5

**differential** 492:21 503:20 514:8 517:13,17 518:13,18 519:1,2 520:12, 19,21,24 521:16 522:3 523:12 524:24 525:17 526:5,16 527:4, 13,16 531:24 546:19 556:11, 14 610:5,7 613:5 657:17 685:10 754:9

**difficult** 505:13 539:19 694:6 753:7

**difficulty** 534:11

**digging** 582:21

**digital** 500:8 506:2

**digits** 748:10

**dilator** 643:4,16, 17,23

**dildo** 753:13,23

**diligence** 568:6

**dimensions** 634:15

**direct** 475:25 733:7

**directing** 560:11

**directly** 523:10 720:22

**disability** 596:19

**disagree** 537:14 543:19 563:6

565:17 574:5 577:21 591:17 593:10,11 622:20 631:4 650:12, 652:13, 22 715:3

**disagrees** 492:23

**disc** 475:3 524:5 525:22 531:17, 23,24 532:16, 18,21 534:10,15 686:20,21 687:9,11,15,18, 25 688:1

**disclose** 575:18

**discomfort** 527:7 614:10

**discourse** 622:16,17

**discuss** 625:14

**discussed** 484:6 507:13 573:6 583:9 592:19 596:23 612:16 625:14 647:12 657:6,14 669:7 679:11 712:25 718:11 725:19 754:11,23

**discusses** 731:7

**discussing** 483:12

**discussion** 592:16 604:7 694:12,15 710:11 729:14 743:4 755:25

**disease** 524:5
525:22 530:16
531:14,17,23,24
532:16,18,21
534:10,15
616:18 655:8
667:9,10 682:25
686:20,21
687:9,12,15,19,
25 688:1

**disorder** 663:22
664:7 665:2
666:14

**disorders** 518:5
628:21

**disputing** 725:20

**disregard**
517:25

**dissection**
692:23

**distal** 571:17

**distinguish**
666:9

**distinguishing**
654:8 667:2

**distort** 666:15,
16

**distract** 618:10

**distribution**
687:5

**diverticulitis**
527:14,15,19,21
528:2,3,10,11

**diverticulosis**
527:19 528:11

**diverticulum**
527:20

**divorce** 542:17
543:1

**doctor** 476:24
477:11 478:25
480:2,12 482:8
483:24 487:11
488:4 503:22
509:11 510:5
511:10 512:14
515:18 516:24
520:7 522:22
525:13 529:18
535:25 537:11
538:1,7,16
539:15 540:4
543:20 545:15
547:24 549:2
550:4,15 553:8
554:3 555:12
556:8,15 557:4
558:14 560:11
562:20 565:10
567:21,23
568:12,14,15,20
570:10 573:21,
22 574:19,23
577:12,19,23
578:9 579:1,16
580:10,15 582:3
585:2,15 586:9
590:24 595:11
602:19 606:7,13
607:18 608:6
610:4 611:1,17
613:2,14 617:8,
19 624:6 626:9
627:18 628:4,18
638:21 641:19
642:7,20
644:12,15 645:3

647:16 648:9
649:1,11 657:5,
11 659:7 663:2,
9 668:16 672:1
673:13,21,22
675:2,13 676:21
681:8 684:2
692:1 696:17
704:2 708:8
715:9 717:2,17
718:18 719:6
720:8 721:2
725:4 729:14,21
730:5,11 734:12
738:2,13,19
739:15 742:8
744:18 748:11,
13,20 749:6,14,
23 750:11,19,
22,25 751:4,12,
15,22 752:3,8,
16 753:8 754:2,
7,15 755:4,11,
20,22 756:9,12
757:2,12,17,25
759:4,10,24,25

**doctor's** 488:20
500:16 504:22
511:4 517:25
539:7 577:24
578:2,5,7,8,15,
20,23

**doctors** 486:13
507:23 529:18
551:24 552:6,8
577:22 579:24
580:1 616:22
617:21 624:10
666:19 712:9
714:6 719:19

724:12 739:3

**document**
499:12,16,19,21
500:6,21,22
501:3,6,9,16,23
502:5,8,22
503:1,25 504:4,
19 536:4 560:19
562:4 569:21,25
585:13 639:7
642:17 725:19
726:6 727:7
729:13 730:22
731:2 732:17,23
733:3,4,8,13,16,
18,24 734:9,25
736:9 738:15,17
739:8,18,24
740:7,24 741:5
759:16

**documentation**
481:25 612:1
615:19 619:6
661:24 701:1

**documentations**
655:19

**documented**
693:8 706:11

**documenting**
668:16

**documents**
480:18 482:1
498:13 500:24
501:5,8 502:7
506:21 509:16
581:17 582:8
590:14 591:3
646:24 654:21
655:17 659:11,

12,24 661:15
670:11 709:12,
14,19 734:5
738:10 748:15
749:12,14
750:2,13 751:3,
18 756:23

**doing** 489:11
494:21 552:23
568:5,21 569:13
603:5 604:22
605:5 656:9
709:24 750:7

**done** 483:10
495:21 498:7
538:8 546:21
563:22 568:20
572:17 579:25
588:10 596:8
603:19 632:9,
15,21 642:23
648:13,18,19,20
649:3 676:23
678:13 679:10
691:4 700:17
712:13 759:23

**doubt** 535:3
551:2 695:21

**down** 481:24
488:3 493:5,
499:6 503:23
509:1 520:24
524:6,10 534:14
536:18,24 565:7
566:12 570:18
571:7,12 573:5,
24 574:2,8,15
578:13 592:20
626:3 630:1

632:3 650:20
680:14 687:7
688:3 694:1
706:12 707:22
719:7 745:4
748:21 750:18
755:3 757:4

**downplayed**
588:3

**dozens** 619:20,
21

**Dr** 475:4 476:2
477:3 483:8
485:15,17
486:15 493:21
498:9 502:19
507:14 508:2
509:22 511:3
518:24 523:6
556:15 558:3,
16,18 559:25
560:5 562:2,9,
14 563:2,3
564:11 567:15
569:17,22
570:1,11
572:10,21
573:13 575:20,
23 577:12
579:6,11,19,22
584:10,13,16
585:9,20 586:1,
3,7,12,15,16,19,
22 587:2,5,6,18
588:5,14 589:3
590:15 591:8,19
592:4,8,13,21
593:5 597:18
607:14 612:13

614:12 619:15
620:12 623:16
629:25 631:3,5,
10,16,21 632:12
634:14 635:7,12
636:1,10,25
637:11,13,14,19
638:7 640:15
641:6 642:10
643:14,25
644:3,6,14,18
648:4 649:6,10
652:13 655:22
656:1,21 660:1,
2,5 661:20
669:13 682:6
688:10 698:1
699:12,22
700:3,6 703:21
704:11,15 705:2
706:5 716:7
718:9 726:11
731:24 741:21
747:18,25 760:2

**draft** 511:3
609:20

**drafting** 585:11

**drafts** 577:19

**dramatically**
530:16,21
692:22

**drawn-out** 517:8

**dressed** 496:5

**Dropbox** 499:21
507:8

**Drug** 733:19

**drug-related**
544:1

**dryness** 613:22
614:9

**due** 503:12
516:2 527:1,19
534:1 540:14
549:3,5 557:21
568:5 571:23
606:2,5 613:25
618:14 627:20
644:23 662:16
684:20 687:11,
18 688:17
737:3,13

**duly** 475:23

**duplicate** 583:12

**duplicated**
508:14

**duplication**
508:14,21

**duplicative**
583:13

**duration** 646:23
676:10,19

**during** 482:5
494:23 496:13,
21 497:1 498:17
503:6,24 504:9
536:20 537:16
548:5,7,11
566:1,19 616:4
618:22 655:12
691:2 731:4
744:22

**dust** 726:8

**DX** 734:18

**DX0046-005**
734:20

**DX0046-009**
    748:8

**dysfunction**
    525:24 550:14
    695:15 697:4
    752:14,18 753:9

**dyspareunia**
    516:1,20 519:15
    545:6,16 546:1,
    6,7,16,23 547:8,
    12,17,22 548:1,
    5,10,21 550:11
    551:6 555:15
    577:4 588:6
    589:11,19
    590:6,17 593:9,
    12,25 594:5,8,9,
    18 595:3,13,15,
    19 596:8 597:5,
    10,19 601:5
    611:7 613:8,15
    614:2,18
    615:11,13,24
    616:7 617:20
    618:18,20,24
    624:8 637:22
    650:18 651:6,
    10,13 652:2,14
    662:17 665:11,
    18 666:3,9,21
    667:20 687:17
    694:22 754:20,
    22 755:5

_____

E

**e-mails** 720:11
    749:20 750:4,15

**each** 476:18

478:21 479:24
481:12,22
489:18,25
490:13 493:15
494:19,24 495:7
496:13 498:10,
20 499:7 501:4
506:12 517:22,
24 521:13,18
522:12 550:24
551:5 562:19
660:9 701:20
716:6 718:12
727:11 731:6,9
757:2,25

**earlier** 531:25
545:9 547:6
587:23 608:6,14
609:18,23 617:3
630:24 638:9,19
639:2 646:19
654:7 688:14,25
709:5 716:24
717:1 724:14
754:24 756:13
759:7

**early** 557:10
621:1 759:10

**easier** 505:15
508:24

**eat** 607:1

**education**
532:10 552:20
689:22

**effect** 561:23
695:25 737:6

**effects** 532:15
726:7

**efficiency** 511:14
574:24 609:22

**efficiency's**
609:9,21

**efficient** 476:23
477:1 478:18

**eight** 539:3
630:14 646:23

**eight-week**
632:11

**either** 494:21
506:18, 595:19
604:15 628:7
633:18 651:13
658:9 660:2
731:24

**electronic**
483:17 493:22
505:5,10,16
506:2,22 507:14
658:5

**elevated** 569:4

**elicit** 604:13

**eliminate** 685:13

**elite** 540:13

**Elliot** 475:4
476:2 597:18
638:16 760:2

**elliott** 475:22
477:3,16 483:8
493:21 498:9
502:19 508:2
509:18 518:24
523:6 559:22,25
579:22 584:13
586:22 588:14
593:5 607:14

608:1 623:16
641:6,16 648:4
652:13 655:22
656:1,14,21
669:13 682:6
688:10 698:1
706:5 717:12
718:9 726:11
729:18 741:21
747:18,25

**Elliott's** 507:14
509:22 511:3
584:10 716:7
731:24

**else** 487:5 495:1
503:17 507:20
690:3

**else's** 659:20

**elsewhere**
573:16

**embarrassment**
625:11

**embroiled** 728:1

**emotions** 625:13

**employed**
657:12

**employee** 496:1
676:4,7

**empty** 604:11

**enable** 737:16

**encounter**
520:20

**end** 531:1 718:3
729:14

**ending** 748:7

**endometriosis**
518:7 519:5,20

522:11 524:1
525:22

**endometrium**
614:16,20,23

**engage** 536:11
545:4 621:6
623:10,11,12
754:3

**engaged** 537:25
633:21 758:4,6,
10,15

**engages** 536:19
537:10,16
538:17

**engaging** 548:18
622:25 635:1
695:6,24 696:5
752:17

**enough** 562:3

**ensure** 565:7
727:25

**ensuring** 737:22
749:3

**entail** 587:25

**entailing** 517:8

**enter** 732:8

**entered** 721:14
737:15

**entering** 721:5

**entire** 502:15
529:23 715:25

**entirety** 486:18
487:2,4 535:2,
16 559:2 642:5
716:18,20

**entities** 689:23

**entitled** 479:22
669:12 716:10
731:12

**equates** 728:11

**erectile** 695:15
697:4 752:14,18
753:9

**erosion** 571:13,
25 573:20
574:9,15 577:4
588:6 589:11
590:5,16 645:5
655:1,13
679:19,23 684:4

**error** 508:25
509:3 511:18
630:12 637:9
657:23 658:16

**errors** 509:4

**especially**
574:13 596:21
628:13 645:15
693:10

**essential** 491:15,
21

**essentially** 500:7
605:24 616:3
639:7

**establish** 587:19

**established**
556:25 597:8
664:14 710:18

**estimate** 483:2
489:24,25 744:8

**Estrace** 691:11,
13

**estrogen** 614:2

615:5,8

**estrogens** 691:16

**et** 480:7 503:9
525:8 546:21
602:7 612:25
655:8

**et al** 558:1
600:19 616:15
619:7

**Ethicon** 746:6,
16

**etiologies** 518:4
525:23

**evaluate** 555:7,9

**evaluating** 546:5

**evaluation**
553:10 586:8
657:16 665:17

**evaluations**
700:17

**even** 524:12,20
525:2 543:12
573:24 585:25
590:2,15 593:19
600:12 627:11
635:5 656:9
671:7 702:6
730:22 738:17
739:9 744:22

**evening** 748:4

**event** 515:7

**events** 591:20
654:17

**eventual** 759:17

**ever** 500:9
550:21 580:15,
22 581:7 582:6

620:12 655:2
666:20 667:5
675:23 696:12
705:13,14,16,23
715:4 723:15,
19, 729:23
740:22 749:8

**every** 503:23
519:8,9, 520:25
521:5,15 522:4,
7 523:25 524:10
533:9,11 536:13
546:17 562:19
591:4 595:11
617:25 628:11,
13 636:19
673:22 731:6,10

**everybody** 487:5
580:7 592:18
683:14 753:22

**everyone** 656:1

**everything**
482:15 489:9
492:15 500:7
505:10 521:4
582:2,18 585:20
609:21

**everywhere**
499:14 618:13
740:1

**evidence** 511:6
518:21 527:2
528:10,13 572:2
573:1,11,15
588:4,13,25
590:13 592:10
601:7,14 604:2
610:24 623:2
627:6 650:10

674:16,22
677:16 682:19
688:9 721:10
724:21

**evolution** 759:15

**evolved** 689:17

**evolves** 759:16

**exacerbated**
692:9

**exact** 488:18
513:25 521:14
523:11 545:10
551:3 600:1
605:24 640:4,23
653:2 694:13
725:18

**exactly** 489:25
493:4 531:23
534:7 551:1
602:17 604:22
605:21 610:15
619:10 621:9
624:16 647:11
649:16,17
663:16 687:2
740:14 754:16

**exam** 487:19
489:21 491:16,
18,19,21 492:9,
13,22 494:11
495:23,24 496:3
497:1,5 500:25
503:19 518:12
520:3 521:2,4
534:13,15 541:8
542:5 545:12
546:13 548:11
604:9,12 606:1

612:3 614:24
618:7,8,9,15,22
621:11 623:8
624:2 636:11
638:2 668:9
687:18 697:12
701:3,14,18,25
702:1,2,9

**examination**
475:25 517:10
604:12

**examine** 497:12
498:2 661:16
701:13

**examined**
475:24 494:7
501:12 549:11,
12 624:18 631:2
637:20 706:10

**examining**
497:10

**example** 477:19
490:16 553:9
554:5 684:10
745:2

**exams** 481:13
492:4 702:11

**except** 497:17

**exception** 610:17
612:23

**excerpts** 487:3

**excess** 639:22

**excessive** 565:9,
18,20,23
566:13,14,17,24
567:2,6,8 568:6,
7,8,11,23 569:1,
5,14 638:12

639:9,10,19,21
640:6,7,13

**excessively**
638:15

**excise** 633:6

**excised** 699:10,
700:16,19
703:11 704:6,20
705:14,24
706:3,5,10,16,
19 707:9

**excision** 632:21
644:15

**exclude** 744:14

**excluded** 527:11

**excluding** 521:3

**excuse** 482:1
495:6 514:11
598:17 605:22
615:4 623:12
632:5 646:2
647:17 688:2
701:16 711:6
712:8 722:6

**excused** 760:4

**executed** 751:7

**exhibit** 477:16,
20 483:23
484:2,8,12
485:2,21 486:19
487:1 509:13,
18,21 511:2,5,
10 559:22
560:1,2,4,11
564:15 569:17
589:24 607:22
608:1,4,18,19
609:18 641:14,

16,20 643:8
656:14,23
717:12,20,21,22
718:14,19,22
729:15,18,21,24
730:22 731:19,
23 732:12 748:5
750:19,23 756:6

**Exhibits** 659:10
717:18

**exist** 548:8

**exists** 503:1
548:12

**exit** 495:25
496:4 689:16
730:12

**expect** 578:13
614:21,22

**expected** 557:7
731:8

**experience**
514:10 515:14
516:10 517:9
520:23 521:17
525:6 528:22
529:5,8 540:5
542:20 543:24
545:12,25 546:7
547:17 548:1,21
549:6 550:16
551:9 557:11
587:15 594:1,4,
12,21 595:7
596:6,7 601:14
614:25 619:4
625:3,17,22
626:6 627:20
640:11 651:17

685:18 701:14 702:6 738:2 742:13 744:15 752:16

**experienced** 515:25 543:6 571:24 573:9 593:8,25 594:7 595:2,13 597:18 601:4 618:20 627:10 650:6,18 651:13 652:1,14 653:2 680:22 681:24 682:14 698:3

**experiences** 611:6 615:10

**experiencing** 517:6 544:8 552:7 594:18 615:24 621:19 624:8 626:5 635:15 652:4 662:16 668:8 688:6 692:2 694:22

**expert** 477:21,25 478:21 483:22 486:2 487:11 493:15,23 498:3 501:24 502:13 503:25 512:1 523:25 527:17 574:20 582:5 583:6,17 619:25 620:5,20 628:5, 7,9,20 629:2 646:12,18 655:23 656:24

657:12 664:21 688:11 702:14 705:17,23 707:4 708:19 711:16 718:20 719:13 739:14 742:17 745:19 746:3,6, 7,22 747:2

**expertise** 747:3, 7

**experts** 497:9 507:24

**explain** 688:21 689:8

**explants** 699:23

**explore** 479:9,22 650:15 716:10 731:13 732:1

**exposure** 537:2 571:24 630:4 670:19 726:8

**expressly** 720:23

**expulsion** 670:19

**exquisitely** 701:17

**extend** 688:2,3

**extended** 542:6

**extensive** 490:17 491:6 528:8 531:17 565:9 670:6,18

**extensively** 605:13 657:14

**extent** 590:12 595:8 628:13 657:8 696:4

**external** 756:23

**extrapolate** 487:8 678:3

**extreme** 620:8

**extremely** 638:4

**extrusion** 531:15 573:20 590:5, 10,11 615:9 616:11, 619:12 624:15 629:24 631:20,22 632:1,12,17,20 633:18 634:15, 16,23 635:4 645:11,16 650:22 670:13, 24 671:7 672:6, 14 679:24,25 680:4 683:7 684:4,7 685:17 686:10

**eye** 518:1

**eyes** 631:11 636:10

---

**F**

---

**F-** 585:11

**face-to-face** 489:18,21

**facility** 488:16 497:9

**fact** 527:13 529:15 530:2,24 532:10 534:24 537:25 541:6 571:12 592:13 613:9 614:15

622:1 641:20 642:15 676:19 678:18 681:23 682:10 690:7 694:21 730:16 740:23 749:14 752:22

**factor** 515:2 685:22

**factors** 517:13, 15 538:23 546:21 601:11

**facts** 547:25 601:7 721:10

**failed** 575:17 580:11,12,13 583:23 584:15

**failure** 758:11

**fair** 480:8 490:14 515:24 516:7 562:3 575:9 579:24 608:11 611:9 612:22 625:15 636:6 660:11 668:3 670:20 673:3 699:4 710:14 713:21 732:2 733:5,10 736:3 747:15

**fairly** 489:24 528:8 591:14 613:13 664:1

**familial** 546:21

**familiar** 616:8 653:9 672:19 717:24 718:17

**family** 496:16,17 548:9 578:21

**far** 491:10 494:5 495:13 503:7 504:21 506:14 526:9 532:14 534:13 537:8 549:14 553:5 558:11 581:18 585:10 591:25 595:8 601:9,11 617:3,15 619:19 621:10 633:6,7 634:5,23 639:8 665:20 670:25 681:2 685:5 692:19 695:11 696:8 746:19 747:2

**fast** 748:1

**fat** 686:17,18

**fault** 565:17 636:4 731:9

**FDA** 580:16,23 581:8,19,20,23 582:7,23 583:1, 3,16 585:8,11 602:14 674:5 675:7,8,14,19, 20,21,24 676:4, 8 732:24 733:20 734:24 735:1,2, 17,25 736:12, 14,17 737:12 738:2,4 740:13

**FDA'S** 675:5 738:12

**fee** 484:8

**feel** 553:11,25 568:21 586:20 636:2 640:5 710:8 734:7,14

**feelings** 503:9 539:20 626:7

**fellowship** 532:11 552:23 687:3 744:22

**felt** 549:13 638:3 712:12 720:9

**female** 519:3 551:21 615:1 625:9

**females** 647:6

**fever** 527:24 528:13

**few** 496:6 597:5 619:15 681:18

**fibromyalgia** 518:8 552:7

**field** 532:13 618:3

**fields** 628:8,9

**figure** 518:10 624:16

**filed** 542:16

**fill** 498:13,16

**final** 492:16 511:4, 609:11, 17 713:13 759:17

**find** 504:19 519:23 604:8 635:6 685:21, 23,25 693:13 719:5

**finding** 582:21

**findings** 701:4

**fine** 480:12 493:10 509:15 563:12 584:7,19 606:11,16 622:18 647:14 655:25 656:19 658:23 698:16 731:22

**finish** 495:6,19 499:2

**finished** 496:7 563:13 570:5

**firm** 475:9 532:18 701:15

**first** 477:24 562:5 570:7 581:19,20,22 583:1,2,5 585:7, 12 630:8 650:21 691:3 718:13 724:21 733:17 745:8 750:22, 23,24,25 755:21 756:2

**fit** 643:23

**five** 478:2 542:16 544:23 676:13 708:22

**fix** 513:5 652:20 749:23

**fixation** 561:2

**flare-up** 665:1

**flat** 644:20

**flight** 607:2

**flights** 476:24 748:4

**flip** 494:1 563:14 726:4 736:8

**floor** 518:7 522:10 569:7 602:11 611:6 664:17 753:16

**flopped** 505:14

**Florida** 475:10

**fluids** 718:25 735:9

**focus** 703:14 722:24

**focused** 490:10

**focusing** 477:7 596:15

**fold** 573:25

**folding** 566:7 573:20 645:14

**follow** 689:13

**follow-up** 633:15,16 646:23 748:1

**followed** 572:10

**following** 527:10 528:24 530:17 550:19 576:20 640:5,7,11,12 644:19 716:25

**follows** 475:24

**Food** 733:19

**foot** 532:19 687:8 688:4

**foramen** 513:24 534:16 547:3,10

593:19 605:24
638:4 667:12
687:11 701:17

**forbidden**
711:19

**force** 618:3

**forcing** 648:12

**Ford** 727:19

**foreign** 633:7

**forget** 587:15
638:3 652:9

**forgotten** 499:15

**form** 480:23
490:19 492:1,20
497:15 500:12
501:19 505:20,
24 506:2,8,25
513:3,19 514:20
515:11 516:5,8,
22 518:19
519:17 521:25
522:15 523:7
524:6,14,21
526:6 529:21
531:7 534:3,21
535:10 537:5
538:2,19 540:8
541:2,11 543:21
544:2,9,17,24
545:18 546:2,10
549:23 551:16
559:9 566:4
568:1,18 570:15
571:14 572:1,
13,24 573:10
574:3 580:2
584:6 586:17,25
587:21 588:24

591:23 592:9
595:4,16,
597:20 598:12
599:10,25
601:6,22 604:5,
25 605:6,18
611:22 612:8
613:18 614:4
615:14 616:25
617:23 618:25
620:22 621:23
622:11 623:1
625:19,25
628:22 633:25
634:11 635:17
636:7 637:3
639:25 643:18
644:1,24 645:7,
20 647:11
648:10,22
649:14 650:9
651:15 652:5
653:22 654:10
655:14 660:24
661:8 666:12
667:7 668:1,13
669:6 670:21
671:9,19 672:16
673:9,14 674:20
675:10 677:21
678:11 679:21
680:10,23
681:13 686:3
688:13 690:4
691:20 693:5,21
695:8,17 696:2,
20 697:6 700:23
702:16 706:8,21
707:20 710:8,16
711:1,12 712:24

713:15 715:6,24
720:5,25 721:9,
18 722:14 723:1
724:3,19 725:14
726:24 727:14
728:13 729:3
733:23 735:22
736:4 737:9
738:6 739:4
740:5,16 741:3,
9 744:11
746:12,24
749:10,18
750:1,12 751:14
752:6,19,25
753:14 755:6,15
756:17,20
757:8,16 758:7,
25 759:18

**formal** 476:21
483:8 507:12
588:11

**formed** 494:19
608:11

**former** 637:14
671:12,23
672:1,2 677:5,6
680:15 682:18

**forming** 610:3
641:11

**forms** 498:14

**formulate**
491:24 492:5

**formulating**
481:3 483:10,14

**forth** 479:23
487:11 505:14
556:21 610:12

664:20 683:15
734:11 740:3
756:1

**forthcoming**
750:10

**forward** 623:18

**found** 486:6
503:18 524:2,3
527:2 609:20
612:3 646:21
655:19 727:22
755:11

**four** 485:10
487:4 517:5
539:3 548:22
584:11 644:16,
22

**fourth** 560:18

**frame** 585:7
589:17,21

**Frank** 714:13
722:19

**free** 509:11
548:16 734:14

**frequency**
529:24 576:1
652:19 709:5

**frequently**
627:13

**fresh** 500:20

**from** 475:11,13
479:17 481:6,9
482:8 488:4
498:20 501:16,
17 508:18
515:19 537:24
539:4 543:10

548:9,16 555:23
556:4 558:17
566:7 567:24
568:9 577:15
578:24 579:3
590:1,14,15
592:14 596:5,
16,22 598:16
601:1,24 602:3,
6,14 603:2
605:10 609:18,
21 615:8 619:7,
22 624:17
625:18,24
627:21,22 629:1
631:7 632:3,18
634:17 635:1
638:11,14
642:9, 644:13
646:12 647:17
654:8,21 665:25
667:24 674:23
681:19 688:10
690:19 692:11
695:13 697:14
698:25 699:10,
24 700:20
702:13 703:1,8,
11,18 704:6,20
705:24 706:6,
10,19 709:17
710:1 712:15
714:3,15 720:22
725:1 726:15
727:7 729:6,8
731:16 733:1,19
734:24 735:1
738:2 739:1
740:9 746:1,12
747:13 750:2,13

752:14,23
753:10 756:22
758:24 759:15

**front** 508:5
574:20 688:4
718:7,19 725:4
731:5 732:12,23

**full** 477:24
722:12 732:2
739:16

**fully** 510:7
575:20,21 576:1
586:11 589:5
615:2 692:7
727:2

**function** 531:11
550:21 689:20
692:25

**functions** 551:13

**fund** 661:1

**fundamental**
713:17

**further** 475:24
486:13 492:12
567:24 627:6
697:24 747:20

---

### G

**gained** 577:15
740:21

**gaining** 740:22

**game** 514:23

**gaps** 635:10

**gave** 526:11
555:8 636:12
651:23 698:10

699:3 740:8

**Gayle** 475:7
476:16 479:13
480:23 490:19
492:1,18 495:6,
9 497:15,21
500:12 501:19
502:10 505:20,
24 506:8,
509:25 510:18
511:7 513:3,19
514:20 515:11
516:5,8,22
518:19 519:17
520:16 521:11,
25 522:15,18
523:4,7,21
524:14,17,21
525:3 526:6,18,
20 528:5 529:21
531:2,7 532:4,7,
24 533:4,14,18
534:3,21 535:7,
10,20,23 536:1
537:5 538:2,19
540:8 541:2,11,
15,22 542:10,
543:21 544:2,9,
17,24 545:18
546:2,10 547:18
548:2,22 549:23
551:16 552:1
554:6,12 559:9,
13 560:9 562:11
566:4 567:17
568:1,18 570:15
571:14 572:1,
13,24 573:10
574:3 577:6
579:13,16

580:2,18 581:1,
11 582:10
583:8,20
584:17,20
586:17,25
587:21 588:17,
21,24 590:18
591:23 592:9
595:4,16,20
596:10 597:20
598:9,12 599:7,
10,25 601:6,19,
22 602:16,23
604:5,25 605:6,
18 606:20,22,25
607:4 608:17
609:13,16
611:22 612:8
613:18 614:4
615:14 616:25
617:8,23 618:25
620:6,16,22
621:20,23
622:11 623:1,
625:19,25
628:22 633:25
634:11 635:17
636:7 637:3
638:16 639:25
641:22,25
642:16,21
643:18 644:1,8,
24 645:7,20
646:2,5 647:11
648:10,22
649:14 650:9
651:15 652:5,16
653:22 654:10
655:14 656:3,6
657:1,3 658:23

660:24 661:8 663:2 666:12 667:7 668:1,13 669:6,11,15,21, 24 670:1,7,21 671:9,19 672:16 673:9,14 674:2, 20 675:10,16 676:2 677:21 678:11 679:21 680:10,23 681:13 682:1,16 683:12 686:3 687:22 688:13 690:4 691:20 693:5,21 695:8, 17 696:2,20 697:6 698:14 700:23 702:16 706:8,21 707:6, 709:20 710:4,16 711:1,12 712:6, 24 713:15,22 715:6,24 717:25 718:4 719:2 720:5,25 721:9, 18 722:14 723:1,10,20 724:3,19 725:14,22, 726:24 727:14 728:3,13,21 729:3 730:5,10, 13 731:11,15 732:3 733:23 734:4 735:22 736:4 737:9 738:6,15 739:4, 12,17 740:5,16 741:3,9,16

743:2 744:11 746:12, 747:24 752:7 753:20 754:1,14 756:19 759:23

**Geist** 475:13 476:1,20 477:2, 18 479:21 480:1 483:7,13 491:4 495:8,10 497:19,23 498:1 502:17,18 505:22 507:12, 17 509:20 510:2,4,20 511:1,8,9 513:4 515:9,12 516:6, 23 521:22 522:16 523:5 524:15,18 531:3 532:5 533:6,15 535:8,21,24 541:12 542:13 543:22 559:15, 24 560:10 574:18 579:14, 17 580:20 583:14 584:5, 19,24 585:3 588:18,22 590:19 592:11, 22 593:4 595:17 596:14 598:10 599:8 600:3 601:20 602:19 603:3,7 606:24 607:7,13 608:3, 21,23 610:2 615:15 621:21 638:20 640:24

641:5,14,18,24 642:1,3,18,25 646:4 647:14,15 653:23 656:4,8, 20 657:2,4 658:24 663:7 668:2 669:10, 12,20 670:2,8 673:10 675:12, 18,22 683:16,23 684:1 687:23 691:21 696:3 698:16 713:1 716:4 717:9,14, 16 718:2,5 721:1 728:15,23 729:17,20 730:8 731:2,12,22 732:11 734:1 737:10 738:7,18 739:11,14 740:6 741:4,19 747:18 749:10,18 750:1,12 751:14 752:6,19,25 753:14,18,23 754:13 755:6,15 756:17,20 757:8,16 758:7, 25 759:5,18,25

**general** 477:24 479:17,19,23 482:2,14,17 484:14,16 580:19 581:16 583:21,22,25 584:1,21 601:23 602:24 603:2 628:10 646:12 669:11,15,19

678:4 708:19 730:1,6,10,14, 16,17,23 731:16,17 752:12

**generality** 755:2

**generalized** 687:20

**generally** 542:11 552:22 608:7 688:23

**generic** 477:4 479:14 480:13 481:3,9,21,25 483:10 484:6,10 498:25 660:7

**get** 476:16 496:2, 5 499:17 501:7 504:8 505:11, 13,23 506:3 507:11 515:4 533:16 534:20 544:6 553:13, 14,15,16 607:3 608:22 618:5 628:16 633:6 669:12 732:4,23

**gets** 501:6 515:3 598:23 728:7 732:2 745:16

**getting** 580:17 585:10,15 728:1

**Gill** 485:12,13, 14

**give** 480:17 488:2,19 514:16 585:7 590:11 594:15,19,20

597:13 642:16
651:24 653:5
711:6 717:23
733:6 734:12
739:14 744:8,9

**given** 579:19
605:9 607:20
634:21 706:16
730:14 741:22

**giving** 516:11
625:2 746:9

**glass** 705:11
707:22

**glove** 703:5

**go** 479:10,16
480:21 483:14
485:13 487:6
493:5,7 496:5
499:2 503:10
504:18 506:14
509:7 510:18
518:14 519:6,7,
19 520:20,25
521:4,15,19
522:2,7,11
524:6,25 525:10
530:11 531:22
534:20 538:6
542:2 555:25
557:15 560:18
561:3 563:12
565:5,24 569:11
572:5 573:3
574:14 580:8,16
582:7,8 583:10
588:9 590:24
591:16 592:20,
22 604:8,10
605:20 606:14

607:6,7 616:9
617:15 618:4
624:8 629:10
630:16 631:9,12
637:5,6 640:24
646:13 647:17
659:18 669:8
674:24 675:8,9,
15 676:6 679:3
680:13,16
681:7,21 687:6
692:18 694:14
704:2 711:7
712:10 713:3,18
719:10 731:19,
20 732:3,4,16
733:17 734:15,
20 740:19 745:4
748:21 750:15,
18,19 753:22
757:17,25
759:15

**goal** 656:8

**God** 656:19

**goes** 502:6 519:7
522:23 544:12
545:10 566:12
584:11 605:23
728:8

**going** 476:17,21,
22 477:14 478:7
488:2,3 492:6,
16 493:4 497:15
503:7 508:12
509:13 510:3
512:10 513:12
514:2,7,16,22
515:4 519:25
521:2,14,18

522:7,9,20
525:14 530:6
539:1 543:19
545:13 548:25
553:15 554:3
574:23 575:1
581:15,25 583:9
584:5 594:15
602:16,20 605:8
608:7,22
609:13,14
613:13 614:1
619:10 620:25
626:16 628:1
633:8 634:14
641:22 646:11
647:13 649:8
650:24 653:6
656:21 662:14
675:16 677:4,14
681:4 682:7,22
683:9 688:7
694:13,23
697:10 698:5
712:10 713:5,18
716:2,13 720:20
728:19 729:11
730:25 731:3,
20,25 732:1
743:4,24
744:17,19 745:9
748:18 750:19
753:18 754:15
755:25 757:4

**gone** 501:5
506:4,7 520:18
544:23 548:9
616:13 673:23
697:12 709:6
731:17

**good** 476:2,3
537:12 549:15
568:16 609:24
610:1 635:19
671:22,24
672:3,5 683:14
686:8 687:1
702:2 747:25

**Goodwin** 583:12

**got** 478:12
534:25 535:18
580:22 582:5,19
583:6,17 591:15
636:13 681:5
690:12 705:16
707:17 744:1

**gotten** 561:16,17
759:12

**grab** 754:16

**grade** 601:1,10
711:18 721:15
723:22 724:17,
18,22,25
725:10,19,20
727:6,8 728:25
729:7 731:6

**graded** 615:25
616:4 755:10

**grades** 724:22,
23 727:9,13,16,
17,18,21

**grading** 616:6

**graft** 564:22
565:2,8,13
655:8

**gran-** 701:16

**granulate** 633:8

**granulated** 701:16

**greater** 653:12 654:17 670:18 671:7 673:6 676:16 677:18 684:4,12,15,18 685:3

**Grey's** 690:2

**gross** 521:2

**ground** 675:10 716:2

**group** 519:3 637:14 685:17 693:11

**guess** 526:10 581:14 624:6 682:3 716:25 738:19

**guidance** 582:8 583:16

**guidelines** 581:19

**guilt** 540:15 625:11

**guys** 730:6

**GYN** 518:7 522:10

**gynecologist** 753:3

---

**H**

---

**habit** 504:6 673:5

**half** 575:6,7,12 576:8 579:5,22

585:18,21 632:16 633:17 673:7

**hand** 559:25 560:7 641:19 705:6

**handed** 608:18 609:17 729:24

**handicapped** 532:22 533:13, 17,21,22 534:1, 20,24 535:19

**handing** 717:17

**hands** 703:2

**handwriting** 500:17

**handwritten** 499:4 500:1,2 505:4,5,6,9,10, 15,17 506:14 508:11 509:23

**happen** 536:20 650:24

**happened** 514:8 616:16 624:13 649:23 693:25

**happens** 534:14 536:13 645:16 703:8

**happy** 536:5 544:12 549:15 581:5 606:11,13 683:16 738:13

**hard** 533:24

**hardest** 606:15

**has** 482:11 483:8 484:1,12 490:16

491:6 513:13 514:18 515:4,25 517:21 530:16, 20 531:16 533:12,24,25 534:19 536:7,10 539:16 543:6,7, 8,10,25 547:5, 12,13 549:12 560:23 562:4 563:25 565:6 568:13,20 577:15,21 578:9,21 579:1 581:25 594:3 595:12,14 598:19 601:12 602:5 603:9 606:1,15 611:20 614:14 615:5 616:7,17,23 619:9,20 622:8, 18 623:9,13 628:14 635:2,22 645:5 650:1 653:8 654:5,21 659:11 660:3 664:23 665:3 666:19 668:5,16 670:5 673:1,5,7, 23 678:20 682:7 684:3 687:14 691:7 693:13, 14,23 694:3 696:11 699:13, 14 700:8,15,17 711:19 720:21 726:2,18,19 727:22 729:10 730:22 733:14

734:20 736:9,14 739:24 741:21 744:2,25 749:8 752:18

**having** 475:23 510:8 527:11 547:21 548:6 589:9 593:13 594:3 622:16 624:14 652:15 658:11 695:23 745:9 752:23 753:10,11,21

**he's** 475:16 518:19 541:23 542:4 547:21 548:16 562:23 570:19 582:12 584:1 589:18 602:20 609:13 620:20 639:25 700:12 730:18, 19 733:23 738:15,17 739:12,18

**head** 522:3,13 525:11 556:1 599:17 600:15 602:4 690:14 695:1 700:12 714:9

**heading** 748:20

**heal** 633:3 686:18

**healing** 536:20, 23 537:16,18 557:22 566:20 574:12 600:22 629:15 630:22

631:3,6,11,13, 14 635:24 645:17 654:22 655:12 670:14 671:2 677:15, 18,19 678:2,6, 16,19,20 679:7 685:4,6,7,11 686:2,12 690:11,18 691:2,6 756:25

**health** 538:22 628:10,20 710:23 711:9 726:7

**hear** 669:16

**heard** 571:18 670:25 715:2 721:12 744:5

**hearing** 482:8

**heavier** 598:21

**heavy** 527:5,8

**heavy-duty** 703:6

**heavyweight** 513:24 600:18 601:12 602:2 605:23 653:8 654:6

**Hegar** 643:3,4, 16,17,23

**help** 481:2 486:10 511:14 599:18 635:20 719:6

**helped** 482:17 636:1 654:25

**helpful** 558:21 635:25 729:8 739:15 743:20 751:25

**hematoma** 630:18

**hemorrhoids** 528:15,16,18,20

**here** 478:14 479:10 483:4,12 484:14,24 485:7 486:9,19 487:11 493:5,6,7 497:16 501:15, 24 503:20,22,25 504:14 507:4 509:5 512:23 513:13 515:6 516:14 517:3 521:24 522:22 530:12 534:9,18 539:12 540:4 549:25 555:7,9 561:3 562:7 563:6 570:4 574:22 575:12 578:6 579:5 584:2 585:21 586:14 588:13 590:25 591:1,7, 9 598:5 600:24 604:8,9 606:12, 13 617:6 618:12 626:4 630:1 632:3 635:11,13 636:4 640:20 643:3 644:4 647:2 648:16 649:8 650:21

653:7 660:13, 17,19 661:11 664:20 669:13 672:2,10 673:19 674:14 677:5 680:6,15 682:18 692:19 693:1 698:10 699:2 716:21 718:2 719:7,8,9 720:8 722:6 724:11,24 725:18 729:21 730:18,19 733:14 736:7 740:20 742:24 744:7

**herein** 475:23

**hernias** 619:23

**hers** 754:16 756:5

**herself** 540:5 659:17

**hesitant** 730:24

**Hey** 636:13 735:25

**HG6030-01** 724:24

**HGX030-01** 726:2

**hide** 720:10,12 740:23 749:16, 21,24

**high** 569:3 574:8 653:14

**high-density** 612:24 638:1

**high-volume**

594:1 595:25 596:20 615:1 651:18

**higher** 600:20 654:5 672:13 684:23 756:14, 17,19

**highest** 599:2

**highlight** 504:25 609:22

**highlighted** 508:8,9,23 609:7

**highlighting** 509:23

**highlights** 511:13

**highly** 550:12,17 551:6 595:25 626:10 755:18

**him** 479:13 495:6 523:11 544:16,20 579:3 583:9 584:2 585:4 586:10,13 602:16 609:18, 21,23 619:24 620:1,4 642:16 647:13 675:18 700:9 717:25 719:2 730:21,25 731:3,21,23 732:1,4 738:16 739:19 752:23 753:10

**hindsight** 631:4, 5

**his** 479:17,
481:19 483:9,10
505:20 507:14
509:22 518:20
525:4 533:5
540:9 541:23
544:25 554:12
562:15,16
567:19 571:6
572:13,25
577:20 578:16,
24 580:19
583:22 584:13
589:17 591:6
592:21 595:4,20
602:25 609:18
619:20 620:14,
18,19,25 626:1
645:23 649:12
669:6 672:16
700:11,18
709:20 714:11
730:10,14,16,21
731:4,6,10,13,
16,17 739:9
741:16 746:12,
17 752:24 753:9

**history** 484:9
490:17 491:7,8
494:25 495:12
496:22 498:11,
19 500:25 503:8
526:3,13,15
527:5 531:16
542:6 548:19
636:22 668:21
670:6,18,20
682:12 759:8

**hit** 689:18,19

**hold** 551:24
552:9,14 628:8
629:2,3 663:2
674:11 694:9
700:1 701:20
703:2,10 704:1
717:25 747:8

**holding** 746:2

**home** 544:20
548:17

**honest** 586:8

**honestly** 609:19

**hope** 633:7
669:13

**hoped** 656:10

**hopefully** 694:11

**hormonal**
613:12

**host** 560:25
655:8

**Hotel** 743:1,3

**hour** 489:3,9
490:25

**hour-and-12-
minute** 742:14

**hour-and-21-
minute** 742:16

**hours** 476:18
656:8 743:12

**how** 479:24
480:14,18
481:3,7,12,17
482:4,5,22
483:3,14
485:15,17
486:25 489:17
504:15 517:4

528:15 533:23
537:8 541:9,13,
17 556:2 557:13
586:1 589:15
606:10 616:19
626:20 649:16
682:24 683:11
685:2 687:20
693:17,18 695:1
728:16 730:1,21
744:8 749:21

**however** 489:10
492:6 515:1
526:23 527:9,16
539:19 547:2
556:24 579:12
582:23 598:1
604:11 614:20
623:6 632:15
637:24 640:4
653:13 655:20
692:21 696:23
701:13 737:15
748:23

**huge** 586:6

**human** 567:13
619:21 620:11
668:25 669:4
718:25 719:18
722:11 723:18
728:9 735:8
736:3 737:2,20

**humans** 647:6
711:20 740:1
747:4

**hundred** 519:4

**hundreds** 533:10
600:11

**hunker** 745:4

**husband** 540:25
541:4,7,10,14
542:6,15 543:7,
15,25 544:8
547:6,7,12,14,
20 548:8,16,19
549:8,19
695:15,23
696:18 697:4
752:14,18

**husband's**
542:22 548:13
622:12 694:17

**hypermobility**
604:10

**hypersensitivity**
612:25 655:7
756:25

**hypothetical**
649:3,5 712:3

**hyst-** 495:5

---

### I

**I've** 477:20
481:18 514:3
515:18 517:2
520:18 522:2,20
523:10 533:20
534:8,23 542:1
546:22 559:4,25
570:4 573:10
594:21 596:17
605:20 608:4
615:18 619:5
620:15,18
624:12 636:20
637:25 656:23

661:14,15,16
676:1 682:3,4
697:10 706:16
712:18 714:8,11
715:2 716:25
717:5,17 718:14
721:12 729:23
733:2,3 741:11,
21 744:5 747:3
749:12

**Ickelov** 699:13,
22 700:3,6

**Ickelov's** 703:21
704:11,15 705:2

**idea** 494:13
533:12 559:16
725:9

**ideas** 492:20

**identical** 477:13,
15 479:5 539:24
550:22 698:5
735:16

**identification**
477:17 509:19
559:23 608:2
641:17 656:15
717:13 729:19

**identify** 475:5

**IFU** 478:23
479:4 480:7
537:8 556:21,24
558:13,15,16
560:3,12
561:10,17,23
562:1,2,8,18
565:1,12,18
566:22 570:13
572:8,11,17,22

573:6,23 574:2
575:8,13,23
577:16 579:10,
24 580:12,13,17
581:10 582:3,17
584:14 585:18
588:2,16
589:14,15,23,25
590:8 591:10
635:20 636:13
638:8,13,17,18
639:3, 640:5,7,
14 647:19
648:7,17 649:10
672:4,8 673:18,
22 674:1,25
675:9,15,25
676:5 677:16
681:5,16 709:6
710:12,14,25
711:21,23 714:5
720:4 731:8
738:24

**IFUS** 562:16,21
574:6 581:17,18
638:22

**ignorance**
700:14 711:5

**IME** 481:13
482:5 487:18
489:11 491:25
492:12,17,24
493:14 494:3,20
497:2 498:6,17
499:2 500:10
501:1,7 503:6,
18,24 569:23

**IMES** 488:8
489:6 491:12

494:23 496:13

**immediately**
499:2,15 500:19
504:6 616:12
630:15

**immune** 655:7
681:17

**impact** 516:21
539:18,20
547:16 595:8
611:9 621:13
622:10 623:9
624:22 662:19
668:24 669:3
673:1 678:25
681:10 685:11
686:1 690:18,25
693:16,17,19,25
694:1,6,8,23
695:3,5 696:13,
14 741:22

**impacted** 544:22

**impacts** 516:2

**impair** 677:15
681:4

**impaired** 574:11
600:21 631:6,14
654:22 670:14
677:19 691:5

**impairment**
534:25

**impairs** 678:2

**implant** 530:4,
10 536:8 563:14
568:13 588:7
597:5 602:8,11
604:17 627:1,
12,22 644:16

653:3 654:14
665:10 668:11
677:12 680:19,
22 681:10
682:12,15 690:9
692:13 694:18
695:6,16 696:1,
19 697:5 722:10
735:19

**implantation**
530:17 550:19
557:9 563:18,22
564:1 587:20
590:2 592:6
630:9 645:12
662:11 682:20
718:24 719:18
726:3 735:8
737:2 739:25
757:4,7,13

**implanted** 510:9
512:15,25
543:13 546:8
556:18 557:5,23
558:3, 562:9
564:11 566:24
567:11,13
570:1,11 589:10
597:17 598:7
599:23 600:5
603:9,11,22
612:12,17
636:25 639:4
643:14,25
644:6,20 652:25
653:20 654:13
658:12 661:20
662:2 666:20
667:5,19 677:1
678:21 680:9

698:25 723:18
727:6 737:20
756:24

**implanter**
712:10

**implanting**
485:16 556:15
557:4 558:14
565:13 568:16
569:8 571:10
614:13 640:16
642:14 648:9,25
716:9

**implants** 737:5

**implementation**
636:23

**implied** 629:19

**importance**
627:16

**important** 534:5
536:24 572:4
596:21 616:16
622:3 623:5
640:22 651:8
660:20 686:25
733:4 734:8

**impossible**
650:23

**impotence** 753:5

**impression**
582:2,4 588:2

**improve** 543:17

**improved** 561:1

**improves** 543:1

**inability** 593:16
621:6 625:11
652:20

**inaccuracies**
509:5

**inappropriate**
636:2

**incarcerated**
541:14 542:16
543:7,16 547:7,
15 548:9

**incarceration**
542:7

**inch** 635:5,7

**incidence** 574:9
594:24

**incised** 699:24

**incision** 536:18,
21,23 537:2
629:20

**inciting** 515:7

**include** 519:24
523:25 524:19
590:3 658:21
710:13,24

**included** 562:22
573:23 575:8,13
581:9 588:16
590:5,7 591:9
647:18 648:7
658:20 704:15
705:1 709:13
711:22 714:5
716:8 720:1
731:9 738:23,25

**includes** 522:4
704:11 759:3

**including** 543:6
576:3 577:16
619:6 703:24

753:12

**inclusion**
722:22,24 741:1

**incomplete**
659:14 660:2

**inconsistent**
728:24 729:1
747:10

**incontinence**
516:1,20 519:16
529:2,6,17,19,
25 603:23
604:4,13,15,23
605:3,10 611:7,
16 662:3,17
692:2,5,11,17,
20,21 693:4,9,
20

**incorporate**
484:13,23

**incorporated**
479:20 731:11,
15

**incorrect** 493:13
637:18 671:11
700:25 701:9
704:25

**incorrectly**
658:11

**increase** 531:15
670:24 676:11
678:19,24 683:8
685:7

**increased** 530:17
581:25 654:22
668:5 670:13
671:16,18,25
672:14,21 675:6

676:16 679:19
680:4 684:7
692:22 697:23
756:24

**increases** 530:21
655:7 671:2
672:6 678:15
679:6 685:17
686:9,11,12

**increasing** 531:5
674:8 685:6

**independent**
487:19 664:22
665:17 678:14

**indicate** 566:17
569:25 570:11
639:16 758:15

**indicated** 547:6
570:12 608:6
610:18 622:21

**indicates** 566:2,
23

**indicating**
508:13 606:18
719:8

**indication** 571:2
603:25 660:14

**individual**
476:19 479:25
481:12,22
482:14 489:18
492:10,13
496:19 499:17
512:24 517:22,
24 530:20 567:7
594:21 596:1
617:25 619:9
620:2 627:3

628:16 631:12
648:13 649:3,6
660:11 676:19
699:14 710:23
715:21 755:19

**individual's**
492:4

**individuals**
482:4,16 494:22
496:24 504:5
550:2 554:25
587:15 627:8
628:12 637:7
638:11 697:13,
22 699:12
702:11 706:14,
16 707:23
712:15 730:20

**infected** 515:3,5
529:12 633:3

**infection** 630:10

**inferred** 753:9,
21 759:12

**inferring** 750:1
759:20

**infers** 750:12

**infinite** 518:9
520:22 521:16
523:12

**inflamed** 529:12

**inflammation**
526:25 527:1
531:13 590:5
655:1 701:19

**inflammatory**
655:12 701:2

**inform** 482:18

486:10 575:21,
24 576:4 578:1,
10,11 579:3
591:19 592:1
642:11 659:3
660:21

**information**
479:5,11 480:7,
17,22 498:20
499:6,10 500:4,
10,13, 501:15
502:20,21
503:6,18,23
507:9,13 511:15
561:11 563:21
567:24 577:3,
14,25 578:9
579:4,9,19,21,
22 580:12 581:9
585:17,25
586:3,15,23
588:15 635:23
648:7,8,17,21,
25 649:2,4,9,11,
19 650:2 655:16
660:20 661:5
667:2 672:11
675:1,2 676:6
709:17 710:24
711:10,22 712:5
719:20 720:4
721:2,5 729:22,
23 731:13
738:24 739:15
742:5 743:13
744:2 750:9,11
751:2,10,19

**informed** 510:8
575:16,20,23
576:8,9,21,22,

24 577:3,8,11,
13,14,19,20
578:3,24 580:10
584:15 585:20
587:12,18,25
588:11 590:14
591:6,8,13,15
592:1,14,17
675:3 715:12
736:25 738:20

**informs** 590:1

**ingrown** 645:5

**ingrowth** 557:7
560:25 566:1,3
644:23 645:4

**inherently**
478:1,4 708:21

**inhibit** 753:6

**inhibiting**
753:10

**initial** 494:19,25
644:21

**initially** 483:16
486:2 498:9
504:16 505:9
520:20

**injection** 554:19

**injections**
553:15,19,24
554:4,9

**injuries** 521:10
524:4 525:21

**injury** 520:2,6
524:4 525:25
668:24 728:2

**input** 503:16

**inserted** 643:5

**insertion** 697:1

**insertional**
664:12,18
665:13

**inside** 494:12
578:21 618:13
665:24 666:15
687:10

**instance** 630:8

**instead** 509:2
651:12 671:5
679:18

**institution** 706:2

**instruct** 583:9
602:16 634:25
635:15 647:13
675:16 730:25
731:21

**instructed**
536:11 538:5,7,
11 558:13 574:2

**instructing**
497:19 669:13

**instruction**
573:23 636:1

**instructions**
536:14,15 539:7
561:11 567:16,
22 580:25
644:19

**instructs** 572:11

**instrument**
755:12

**insulate** 738:25

**intended** 604:22
605:5 709:17

722:13

**intent** 710:1 739:5 750:2,12, 17

**intention** 746:4

**intentions** 746:4

**interact** 617:25

**interaction** 492:13 494:25 534:8,13 542:24,25 578:22 615:20 618:5 619:22 620:3 623:7 625:9 722:17

**interchangeably** 529:19

**intercourse** 536:12,19 537:16 538:1 545:5 548:18 613:16 616:4, 20,21,24 621:6, 8 632:7 635:2, 16 664:11 666:2 667:5,15 668:11,17 695:6,24 696:5, 25 753:17

**interest** 525:13 670:15 754:8

**interested** 622:24

**interesting** 655:4

**internal** 481:25 528:15,16,18,20 612:1 646:24 654:21 655:17

709:12,14,19 735:9 756:23

**international** 516:12 522:5 525:7 527:18 528:9 532:12 540:13 551:10 553:3 594:2 687:4

**interpretation** 640:8

**interrupted** 565:16

**interrupting** 596:11

**interstitial** 519:21 524:2 525:22

**intimacy** 516:3, 21 532:6 539:16 540:15 545:5 623:14 624:21 625:10 626:15 628:3 662:19 694:3,23 696:11,13 752:17,23

**intimate** 549:16 752:23

**into** 479:20 480:18,21 481:24 499:3, 11,12,16 500:5, 16,20,24 501:1, 7 502:6 503:25 506:1 507:3 511:6 513:24 538:23 544:20

553:16 554:4 580:17,24 582:8,25 585:8 601:23 615:11 675:9,15 709:6 713:18 721:5,14 726:22 730:4 737:15 749:1 750:23 759:16

**intraabdominal** 528:14

**introitus** 664:19 666:7,16 696:25

**invoice** 481:11, 19,20,21,22 482:6

**invoices** 481:1 482:25 483:8 743:15

**involved** 511:23 553:14, 580:17, 22 581:17 582:5,19 583:6, 17 585:10 618:11 670:14 688:7,9 689:20 700:12 705:16, 22

**involving** 718:24 735:7 737:2

**ipad** 499:3,11

**irreversible** 654:4

**irritated** 689:13

**isn't** 613:14 634:25 645:6 673:12 691:17 728:2,24 729:1

754:3

**isolate** 532:19 642:5

**isolated** 532:17

**isolation** 539:21 540:14,16 625:10 626:7 627:5

**issue** 536:24 541:7 555:14 572:21 605:11 622:4,24 712:16 714:25 715:19 722:9 723:5 731:3,4,5 732:1 751:23

**issued** 713:7 724:6

**issues** 478:11 519:4,20 522:10 526:24 527:9, 11,15 534:9 540:6,21 541:5 542:8,20 543:8, 9,10,12 544:1 571:24 573:5 591:12 592:19 593:8 610:11 612:24 621:5 626:22 628:12 657:6 674:7 675:24 681:18 683:10 694:8 698:4 700:9

**itemized** 481:11

**itself** 479:23 626:1 629:12 683:6 723:9

753:5

**J**

**jail** 540:25
541:5,8,10
544:1,23 548:16

**January** 512:11,
12 561:25

**job** 578:23
606:15 708:5

**joint** 531:17

**joy** 545:3

**Juan** 485:15

**judge** 522:24
523:10 583:12

**July** 558:4,
560:6 569:18
603:20 612:13
629:8,10 630:24
637:1 642:6
657:21 661:20
667:18 677:12
744:15

**jump** 496:9

**June** 585:14
732:24 744:15,
21

**jury** 629:13
727:4

**just** 476:17,
479:20,23
481:20 482:11
483:7 487:6
495:1,5,6,12,16,
24 497:6,23
498:25 500:8
501:1 502:2,10,

13 504:24
505:11,15
507:12,13
508:15 509:13
510:2,18 511:1
514:13 516:24
519:10 520:8
523:17 526:11,
22 531:14
536:23 537:15
541:19 559:4
561:19 563:5,
11,13 567:8
568:10 570:24
572:12 573:14
574:9 575:4
578:8 579:18
584:17 588:12
591:5 599:16
602:1 607:14
608:8,17,19
609:8,9,10,21,
22 611:1,2
612:5 614:6
617:5,15 620:8
629:13,18,24
630:2 632:20
633:6 634:13,19
635:6 638:16
640:12 642:4,5,
16 643:8 645:22
646:8,15 647:8,
21 651:25 652:8
653:25 657:5,25
658:21 659:10
660:3 662:14
667:4 668:7,11,
16 670:3,16
672:12 675:4,20
681:15 682:9,10

689:8 690:1,19
692:10 697:9
698:8 699:7
701:21 702:1,2
703:9,12
704:10,18
706:25 707:1
709:14 714:1,22
717:8,23
720:14,16 722:4
725:17,21
729:23 732:24
734:2,9,11
735:12 736:18
740:3,8 741:15
742:3,10,19
743:4,9,24,25
744:24 746:1,9
748:16 749:23
750:19 755:3,21
756:1

**K**

**Karram** 596:22

**keep** 492:6 501:5
502:7 504:6
506:13 517:24
543:14 546:18
548:25 566:7
574:16 596:11
597:12 655:21
656:1 739:21
751:24 752:22

**keeping** 610:8
623:25

**kill** 540:5

**kind** 506:13
580:5 750:19

**king** 619:19

**kit** 598:25 599:3,
5,24

**kits** 596:4

**Klosterhalfen**
600:19 602:3
616:15 619:7,
15,17 620:12
653:11 702:4

**knew** 478:22
557:11 576:14
579:23,25
580:9,11 585:17
648:18 709:11
719:19

**knit** 560:24,25

**knocking** 521:18

**knot** 638:3

**know** 476:9,23
481:17 484:20
486:9 488:22,24
491:17 496:18
500:17 506:11
515:24 517:9
519:4 522:22
533:21 534:7,
18,23 535:1,5,
18 536:14 538:5
539:4,7 541:9,
13,18,19
544:14,16 549:2
554:10 555:22
556:3,7 558:13,
16 562:1,18,22,
24 563:10
567:6,9,15
570:23,25
571:18 572:5,9

574:10 576:3
581:20 583:2,12
586:1 587:16
591:25 599:14
601:12 603:11,
13,14 606:3,25
617:6 618:2,10,
14 619:7 621:11
624:14 627:6
630:10 634:4,22
635:9,21,22
636:3,11 640:22
646:8,15 659:7
661:5,11 670:13
671:24 672:10
673:16,24
674:8,14 679:6
680:14 682:10
691:13 693:25
696:4,17 697:3
698:8 724:12,23
725:21 726:13
727:5,7,8,9,10
729:11 733:17
738:2 739:16
740:18 744:4,5,
23 746:1,17
748:4 750:7
752:2,5

**knowing** 722:12
728:19 738:24
739:2

**knowledge**
494:15 501:25
504:2 533:1
573:14 620:9
661:2 672:8
681:1,3 688:18
701:14

**knowledgeable**
589:5

**known** 576:8,21
577:22 578:18
602:5 630:7,12
649:20 674:7
710:19 711:20

**knows** 547:13
618:3 753:24

**Kreis** 475:12

―――――――

## L

**L-e-t-o-u-r-z-n-e-y** 558:1

**L-e-t-o-u-z-e-y**
646:18

**L-i-c-h-e-n**
663:4

**L2** 688:1

**L3** 688:2

**label** 582:9
675:25 676:6
711:11

**labeled** 499:16
502:24

**lack** 516:21
532:6 540:15
571:23 624:21
625:12 628:3
694:2 696:11

**ladies** 497:18
754:10 757:3

**lady** 758:2

**laid** 547:25
631:11 636:10

**language** 577:19
639:2,5 715:19,
22 718:16,17,
20,21 720:1
722:6,23,24
724:1 725:7
726:6 735:12,17
736:1 738:22
740:14 741:1,7
743:21

**large** 486:4
504:5 514:1
525:18 544:5,7
629:1 634:16
640:11 703:5

**larger** 606:3

**last** 509:1 510:5
557:17 576:19
585:1 599:14
658:11 659:1
683:23 702:6
731:2 733:18
743:2 748:10,25
749:1 750:24

**later** 562:10
632:16 644:23

**lateral** 561:1

**laws** 727:8

**lawsuit** 549:21,
22 728:2

**lawsuits** 497:14

**lawyers** 484:21
496:12 618:2

**lay** 585:20

**layperson**
573:24

**lead** 520:1,2

**language** 577:19

**leaders** 532:13

**leading** 532:17
624:22

**leads** 539:20
694:8

**learn** 758:14

**least** 516:15
546:22 591:9
679:3 688:11
741:20,25

**leaves** 568:4

**leaving** 597:12

**lectures** 516:11

**led** 633:22 759:8

**left** 543:8 545:4
632:7 663:22
732:18

**left-hand** 527:25

**leg** 532:20 687:7
688:4

**Legacy** 488:25

**legal** 498:22
618:3 710:4

**legibility** 504:5

**legible** 499:13
500:16,20

**legitimate**
602:20

**legs** 534:10
687:7

**length** 676:10

**less** 490:2,10,12
635:5 645:4

522:4,8 531:14
540:16 625:13
626:5,6,19

**lesser** 618:18
754:21

**let** 476:9,20,24
479:13 487:18
495:6 509:7
510:2 513:5
515:24 524:8
548:15 559:25
560:7 570:4
574:19 580:8
593:22 613:2
635:5 641:19
650:15 651:6
652:12 658:2
659:18 670:3,
709:16 724:15
726:10 727:4
731:18 734:13
745:4 749:23
750:6,7 755:21

**let's** 521:1 534:6
535:14 536:5
542:1,2,3,4
548:15 557:16
559:13,15 569:2
579:4,8 585:16,
19 607:7,15
609:10 642:5
663:8 668:20
674:24 704:2
720:14 730:4
750:18 755:3
757:25

**Letourzney**
557:25

**Letouzey**
646:17,18

**letter** 602:13

**letters** 734:11

**letting** 717:25

**level** 553:5 620:1
664:13,19
665:14 666:5,10
668:5 696:9
701:17

**liability** 727:25
728:1,11 730:2,
6 737:4,14,23
739:1 749:5,9

**lich-** 689:1

**lichen** 662:22
663:1,4,17,18,
19,21 664:1,4,
25 665:1,12,22
666:1,14 667:9
688:12,17
689:2,3 696:24

**life** 539:17,18
540:19 541:6
543:1,9,17,19,
24 544:6,12
549:15,17 595:9
611:8 616:4
621:14 623:9
626:22 665:6
694:4,6,24
695:3 696:1

**life-changing**
596:19

**lifelong** 586:8
590:10

**light** 751:20

**like** 486:22
488:18 490:25
491:16 492:10
494:7 495:4

504:18 526:24
531:15 534:5,7
535:3,15 536:4,
8 541:25 547:5
549:4 552:7
558:20 559:11
573:13 574:7,16
583:1,12 591:5,
13,15 596:3
599:14,15
600:10 601:9
602:12,15,21
606:18,22
609:23 618:16
619:13 621:25
627:4 651:22
653:10 655:3,
16,21 662:13
672:5,10 685:19
701:11 717:14
720:13 722:2
728:6 743:20,21
750:5

**likely** 514:24
515:15 586:23
633:5 645:4

**likewise** 753:8

**limit** 476:21
727:25

**limitations**
628:15,19

**limited** 590:9

**limiting** 706:24

**line** 496:20
565:7 596:11
624:17 698:20
715:25 745:24
748:13 751:8

752:10 753:18
754:24

**line-by-line**
609:19

**lines** 612:11
716:16

**list** 484:12,18
485:3,22 504:20
518:3,9,12
519:2,6,19,25
520:10,25
521:5,6,15,16,
20,23,24 522:7,
13,25 523:2,14,
17 524:10,25
525:2,10,18
526:11,22 576:7
577:23 609:1
610:13 638:25
646:14 647:22,
23 648:1 656:16
658:19 659:2,
11,18,24,25
660:1,6,10
663:11 668:22
681:16,18 714:7
716:22 717:2
739:10

**list-** 561:5

**listed** 485:7
486:19 487:1
576:3 590:4
659:19 660:6,
17,19

**listened** 659:19

**listening** 561:7

**lists** 519:12
522:3 576:20

**literature**
482:14,17
483:20 484:18
514:9 515:15
516:11 517:10
520:23 529:7
538:13 540:2,
545:12 546:22
553:4 596:5
597:8 598:16,17
619:4 625:9
626:6 636:12
652:8 653:10
654:19,24
655:3,10,18
661:16 664:15
668:22 671:8,11
678:4,7 685:18
689:25 709:15
711:5 723:8
742:12 745:5

**litigation**  477:5
481:16 497:17
507:19,24
511:23 512:2,5,
8 540:7 580:17,
22 581:7,24
582:6,20 583:7,
17 620:14,21
705:17,23 710:3
741:23 746:6,
10,11,23

**little**  490:1,24
496:9 516:16
550:5 669:2
700:13 718:3
720:20 731:19
745:18 753:6

**live**  567:13

**lives**  551:8
562:25

**living**  522:6

**local**  525:25

**located**  527:25
528:1 530:6
531:11

**location**  513:25
545:10 546:13
593:15 594:22
605:24 651:22
652:19 666:25
667:3 668:4
690:13,22

**logical**  500:16,20
504:8 610:24
645:5 689:12

**logically**  591:16

**loneliness**
539:21 626:7,15
627:5 628:2

**long**  521:21
526:11 537:8
541:9,13,17
562:25 698:9
726:15 731:20
759:19

**long-term**  516:2,
20 539:18,20
550:6 554:21
595:18 611:8
621:5 622:10,23
624:21 646:19
662:20 670:17
694:6,8 696:14
726:8

**longer**  503:1
527:11 737:1

742:2

**longest**  490:3

**look**  477:19,23
480:21 485:1,14
501:10 502:11
508:2 510:3
514:8 515:21
518:1,16
519:11,21,22
520:9 530:11,12
531:22 535:2,14
536:5 537:8
538:6,10,12,25
546:12,20 551:1
554:4 555:25
556:23 558:15,
17 559:2,5,11
562:3 564:7
567:19 569:12,
16 576:24
589:15 590:23
596:21 598:1
609:14 614:19
616:9 617:8
619:10,20
621:25 624:9
634:13 635:11
637:24 656:3
670:10 672:3
674:11 677:3,8
680:13,17
681:8,21 687:5
690:16,20,23
691:14 692:18
693:12 695:11,
20,21 699:23
703:17,18,22
704:6,19,23
705:5,7,12,
717:24 718:1

719:7 720:14
724:13,15 727:3
732:16,22
733:8,17 734:24
740:7 745:5

**looked**  504:16
518:3,4 557:24
569:21 583:1,6
585:12 616:17
638:9,19,22
639:11,15
642:10 686:1
700:3 703:20,21
704:14,25
705:9,14 706:1,
5,13,14,18
707:3,17 720:14
725:11 735:12
740:3

**looking**  494:6
514:9 515:19
516:25 518:11
558:16 563:13
564:15 568:5
573:4 582:20,25
585:8 589:16
616:6 636:21
647:4 686:6
693:7 707:23
723:15 734:2
745:10

**loose**  638:12

**loosely**  643:6

**Lord**  753:24

**loses**  549:17

**loss**  516:2 611:8
625:10 626:15
662:19

**lost** 499:22 580:7
583:25 623:13

**lot** 499:13 539:2
557:18 574:11
640:21 656:5,9
753:17 754:5
755:1

**lubricant** 613:23

**lubricants**
614:11

**lumbar** 524:4,5
525:22 531:17,
23,24 532:16,18
534:10,15

**lunch** 606:20,23
607:15

**lung** 683:6 726:9

**lying** 534:14

**lymphoma**
690:8,20

## M

**M.D.** 475:22
750:16

**ma'am** 641:24
642:1

**Madam** 645:22,
24 669:21
683:24

**Madame** 606:25
656:11 663:3
717:9

**made** 484:4
510:14 513:11
555:7 601:1
616:22 658:17

716:13

**major** 492:14
539:17 541:7
550:16 627:7
628:12 694:3
696:12

**make** 478:12
483:7 491:22,23
499:15 500:18
504:8,18 507:12
510:7 555:6
564:13 567:8,9
569:3 575:16
576:5 586:6
588:12 609:10
647:21 650:3
651:7 658:22
670:16 707:2
715:9 716:12
720:7 734:25
746:9 748:1
750:8 753:6
755:21

**makes** 514:1
572:7 627:15
677:6 733:18

**making** 656:5
726:16

**male** 753:4

**malingering**
618:9 624:1

**malpractice**
637:9

**man** 544:6

**manage** 554:5

**management**
553:8,22,23
554:2 555:4,23

556:4,8 636:23

**manifestations**
703:7

**manifested**
629:12

**manufacture**
737:19

**manufacturer**
568:25 577:11
597:17 698:25
713:3,6,8 739:1

**manufactures**
510:16

**manufacturing**
726:21 740:18

**manuscripts**
482:2 612:1
625:8 701:5
756:23

**many** 526:23
533:9 538:21
539:19 546:7
562:23 579:12
686:5 694:7
702:4 712:18
724:16

**marital** 544:20
548:17 621:19
622:8,16

**mark** 509:13

**marked** 477:17,
20 483:23
509:19 511:10
559:23,25
569:16 589:23
607:18 608:2,4
641:17,20 642:4
643:8 656:15,23

658:19 717:13,
17 718:14
729:19,24

**market** 557:17
602:15

**Marlex** 478:1,3
601:2,12
708:20,23
711:17 712:4,
16,22 713:10
715:16 716:2
721:15 722:10
723:16,23
724:17 727:12
728:17 732:25
735:3,13,21
736:23 737:6
740:2,9 749:7,
17,25

**marriage**
542:15,19 543:6
544:15 547:14
548:20

**married** 696:5

**Martina** 607:16

**material** 487:12
490:24 713:20
718:23 719:17
720:19,21 721:7
722:13 724:15
726:20 735:2,3,
7,14,19,21
737:19,22 749:3

**materials** 484:12
609:1,2 641:10
660:6,10 709:13
717:20 721:4
725:11 741:20

**matter** 542:3
730:23 740:12

**may** 486:5
493:12 517:20
526:12 528:21
530:18,21
545:25 553:15
566:10 571:12
573:25 574:1
581:11 611:8
617:21 626:23
645:21 678:18
683:8,23 696:14
737:19 742:1
753:6

**maybe** 549:14
575:6 622:22
635:5

**Mayo** 546:23

**me** 476:9,20,24
477:11 480:14,
17,22 481:5
482:1,19,22
483:3,16 484:5
487:13,18 489:2
491:5,25 492:24
493:10 495:6
498:9 502:4,19,
20 503:7,13
506:19 508:2
509:7 510:2
512:25 513:5
514:11 515:24
517:4 518:15,24
520:4,9,14
521:1,24 523:3,
10,14,17 524:8
525:14 526:11
534:24 536:3

537:10,15
538:16 542:8
543:19 545:15
546:9 548:15
555:13 556:5
559:25 560:7,18
563:6,8,13
564:14 565:5,24
566:6 568:12
569:6,16 570:4
571:8,22 573:7
574:19 578:17
579:18 580:4,6,
8 582:17 583:5
585:6,23 586:5,
6 587:8,17
588:23 590:20
591:7,17 593:8,
17,22,24
597:13,18
598:17 601:10
605:22 607:3
608:18,25
609:17 613:2,17
615:4 617:18
621:12 622:25
623:8,12 627:9,
18,22 628:4
630:23 632:5
635:6,13
639:14,20
641:19 645:3
646:2 647:17
648:4,12,15
649:25 650:6,15
651:6 652:12,13
653:1 654:7
656:11 658:3,23
659:18 663:15
664:2,20 668:6,

7 669:11 670:3,
16,19 672:8
676:9 681:12
682:21 684:9
688:2,21 689:8,
25 693:18
698:2,9,10
699:3 701:16
703:6 704:2
706:16 707:11,
25 709:16
710:21 711:11
712:9 714:22
715:9 719:7,15
724:10,13,15
726:5,10,15,16
727:7 728:12
729:21 732:16
734:9,13 736:8
741:24 742:10,
19 743:20 744:8
745:2,4,20
748:5 749:23
755:21 756:8

**mean** 495:13
506:10,14
520:18 521:13
526:9 531:4
552:6 554:10
573:15 578:5
581:4 592:12
599:13 624:12
659:21 694:19
716:15 717:7
722:5 723:4
724:11 727:16
728:24 733:5
734:7 741:5
753:11 755:2

**meaning** 606:3

**meaningful**
623:12,13 624:4

**means** 503:14
529:19 565:4,19
567:8,10
570:23,25 571:1
624:12 627:15,
16 629:18 638:2
643:4,5,22
715:4,10 753:2

**measure** 755:5,
12

**Measurement**
755:14

**medical** 481:13
482:1,5 483:16,
18 485:5,10
486:5 487:19
490:11,17
491:6,8 492:22
495:14 498:25
504:9,25 505:7,
11 506:23
507:6,15,23
513:16 514:24
517:9,11,19
518:11 519:12,
22 520:10,23
521:7,18 522:10
524:20 525:7,15
526:2,10,13,14
527:22 529:18
530:9 533:16
534:1,19 535:5,
18 538:6,7,13,
25 540:2 545:13
550:1 551:9,25
552:10,15 555:7

558:8 562:20
568:16 569:8
573:22 576:25
577:11 578:15
580:24 582:15
586:2 592:12
598:17 599:5,
23,24 600:6
601:3 603:25
604:3 610:11
615:12,16,18
616:6 618:17,21
619:4 621:17
622:21 636:22
637:9 639:15
648:5 652:25
655:18 659:2,12
661:14,15
664:14 665:9,
17,25 667:3,11
668:6,10
673:22,23
677:17 680:7
690:17 693:2
697:18 706:3
709:15,18
710:13,22 711:8
712:20,21
715:19,21
718:15,21,23
719:7,25 720:1,
15,19 721:6
722:22 723:7,17
724:1 725:6
726:5,13,14,19
728:18 735:5,7
736:1 737:4,19
738:21 740:25
741:1,23
742:12,13

744:22 745:9,16
747:6 751:18

**medication**
553:23

**medicine** 551:21
553:1 615:2

**Medina** 485:17,
18

**meet** 748:5

**meetings** 553:4
742:20 743:5

**Melissa** 475:13

**member** 496:17
522:5 525:7
527:17 528:9
540:12 551:10
553:3 594:2
687:3

**members** 496:16

**memorialization**
506:22

**memory** 539:14
542:1 556:24
591:12 690:24
695:10 697:17
716:13

**men** 753:3

**menopausal**
613:10

**menopause**
614:1

**mental** 628:10,
20

**mention** 605:2
645:22

**mentioned**

486:14 487:17
528:7 529:1
531:25 534:15
540:17 543:15
545:9 601:15
604:20 619:15
639:9 640:13
646:19 674:23
680:25 747:5

**mentions** 486:14
579:1 658:11

**mesh** 478:1,3
494:8 511:22
513:11,23
514:2,11,23
515:2,3,4,8,16
521:9 529:8,
531:12,15 536:9
537:2 546:8
550:19 556:17
557:5,20,23
558:9,14,22
559:6 560:22
561:2,12 562:9
563:18 565:25
566:3,10,18
570:1,3,11,14,
21 571:4,13,16,
23 573:24
574:1,15 575:17
582:6 587:13,20
588:7 589:9
591:21 593:17
594:6 596:4,24
597:5,16 598:4,
7,25 599:3,5,24
600:6,8,18,25
602:8 605:25
606:3 618:14
619:7,22 624:14

625:18, 629:24
630:4,9 631:20,
21 632:12,17
633:6,18,23
634:14 635:4,8
636:16 637:1,
20,25 638:7
639:4,16,23
642:15 643:5,
14,23,25 644:6,
14,18,20 645:1,
5,11,13,19
646:9,13,20
647:4,5,9
650:22 651:12
652:25 653:13,
14,16 654:20
670:13,19
671:5,7 672:14,
22 678:9,20
679:9,18 680:9
681:2 684:5,7,
11,17 685:16
686:7 689:6
690:8 698:25
699:10,16,23,24
700:1,2,4,16,20
701:11,18
703:11,17
704:6,20 705:7,
14,17,24 706:6,
10,19 707:9
708:20,24
711:17 713:18
721:8,17 724:18
726:22 728:20
735:18 736:2
746:6 747:5
757:7

**meshes** 525:8
536:22,25
618:11 619:19,
20 620:10,11
635:21 651:23
671:1 672:7
677:23 678:16,
22 703:2

**met** 496:2 555:3
620:12 742:22
743:2

**method** 504:17
506:5

**methodology**
657:12

**methods** 571:11
753:12 757:4

**Michael** 585:9

**microscope**
703:18,22
705:7,11,14,25
706:6,13,19
707:23 747:4

**microscopic**
700:17

**mid-50s** 613:10

**middle** 558:12

**midportion**
494:12

**midurethral**
601:17 602:12

**midvault** 593:18

**might** 492:10
544:12 569:1,2
588:3 616:13
622:1 756:6

**migraine** 554:17

**migraines**
554:19

**migration**
558:24 559:7
570:2,13 571:4,
12

**mild** 594:3
614:10 615:13
616:7

**millimeters**
635:6

**mind** 492:6,8
500:20 517:24
543:14 546:18
557:25 559:14
574:17 610:8
622:3,18 623:25
630:11 655:21
683:13 750:20
751:24

**mindset** 620:25

**mine** 587:5
659:14

**minimal** 588:3
595:9 634:20
693:14,15,23

**Minnesota**
489:14

**minor** 595:7

**minute** 592:23
640:24 722:7

**minutes** 489:19,
22,25 606:23
607:3 741:25
742:2,23 743:3

**mischaracterizes**

505:20 513:19
522:18 533:4
535:11 538:3
540:8 541:22
542:21 544:2,25
554:12 572:2,
13,25 573:1,11,
12 588:25
592:10 595:4,20
601:23 622:11
623:1,20 625:25
652:6 672:16
695:17 709:20
741:16

**misleading**
711:10

**missed** 645:22

**missing** 514:4
518:24

**mistake** 499:17

**mistakes** 504:8

**moderately**
691:10

**moment** 631:5
642:16 663:2
708:8 732:4
755:21

**moments** 748:16

**Monday** 484:21

**monofilament**
560:22

**months** 558:1

**moral** 648:24

**more** 476:18
480:22 490:1,6,
9,11,16 491:6,8
514:23,24

515:15 529:25
536:5,24 553:5,
22 557:18
594:10,11
600:12 602:5
606:4 612:3
620:19 627:2,5,
14,16 633:4
669:2 673:11
677:16 697:25
698:6 728:8
729:13 734:14
736:8 753:6
754:22

**morning** 476:2,3
742:22

**Morris** 475:11

**most** 615:7
616:3 635:7

**motion** 523:21
584:7,17

**motivations**
550:1 621:10
623:24

**move** 511:14
523:18 525:14
573:25 574:19
606:7 623:18,19
655:22 666:12
674:2 682:9
724:4 725:14,
726:24 728:3,
13,21 729:4

**moved** 542:17
549:19 667:24
741:17

**moving** 624:20

**MSDS** 712:22,25
713:12,13
715:20,23
716:1,5,24
717:4,20 718:6
722:25 723:8
724:2,14 725:4,
7 726:5, 727:12
729:15 730:9
731:4 732:25
735:5,20 736:24
737:6 738:22
740:3,8,15
741:2,7

**much** 480:14,18
481:3,8,12
482:4,5,22
483:3 489:10,17
491:18 536:24
612:3 618:17
642:20 698:6
727:10 731:20
733:6 734:12
744:8 747:19

**multiple** 518:8
519:20 538:23
542:18 546:4
553:16 577:15
588:10 625:8
682:4 717:1
724:22 734:4
750:6 755:17

**multispecialty**
553:12,17

**multivariate**
686:6,8

**muscle** 526:25

**must** 599:15
677:9 681:20

**myalgia** 518:8
611:7 662:18
664:17

**myositis** 518:8
519:5 525:25
526:24

---

### N

**name** 478:13
488:22,24
714:11 739:25
740:13

**narrative** 743:19

**narrow** 520:24

**Nashville** 488:9,
10,12,16 489:1,
5 501:12

**national** 516:12

**native** 589:17,18
593:5,13,20,23
594:16 595:1,12
596:2,7 597:2,9
650:4,16,23
651:1,11,19
652:15 678:1
679:5 684:10,
17,19,21 698:2

**natural** 670:15

**nature** 552:8
553:20 594:10,
23 596:19 745:6
746:9

**nauseam** 731:17

**nearing** 730:24

**necessarily**
482:13 490:21
494:7 505:12

513:22 538:8
540:5 568:23
598:15 632:25
676:18 745:15

**neck** 554:16

**need** 476:5,7
479:10,11,18
484:4 491:12
509:5 554:8
596:25 605:20
606:12,14,21
609:25 656:24
663:16 673:21
674:1,12 675:2
687:1 690:20
696:4,7,17
710:24 715:12
720:8 724:12
733:5 734:13,14
745:3

**needed** 494:18
558:9 658:8
714:5 751:25

**needs** 557:5
568:15 580:16
581:9 582:8
589:3 634:21
675:5,8 676:6

**negative** 539:20
549:10 669:3
673:1 694:8
696:14

**negatively**
544:22

**neither** 503:3

**nerve** 688:2,8,19

**nerves** 529:11,13
531:10,14 687:5

688:6 689:12,
14,19

**nervous** 525:19
527:2

**neuroanatomy**
532:14 552:24
687:2,3 688:18,
19 689:11,12,22

**neurologic** 518:5
521:2 522:10
524:3 531:25
534:9

**neurologically**
520:4,5

**neurourology**
532:11 552:24

**never** 481:7
496:1 543:12
549:4 561:15
567:11 583:15
594:4,19,21
596:1,20 627:11
650:22 651:19
675:7,13 676:4,
7 706:18 707:17
733:2,3

**new** 487:12
562:16 675:21
722:23,24
727:21 751:2,19

**next** 502:12
505:14 508:10
523:18 565:6,25
566:15 576:7
663:5 683:12

**nice** 568:9

**night** 743:2

**nodding** 606:16

**nodule** 532:18
701:16

**noise** 656:5

**non-debilitating**
726:9

**non-mesh** 679:5

**noncontroversial**
673:13

**none** 661:18

**nonmedical**
711:18 731:5

**nonmeshes**
670:15

**nonsmoker's**
671:3

**nonspecific**
545:16

**nor** 676:7

**normal** 520:4,5
550:21 551:12
557:22 566:2
631:13

**normally** 536:11

**Nos** 559:22
717:12

**notation** 486:6
507:2

**note** 491:1 502:6
504:18,22
508:13 521:6
545:7 558:17,22
559:1,2,5,11
571:6,9,20
603:17 608:19
617:7 629:25

632:3,5 634:14
637:5 638:11,14
639:11,15
640:18,23 641:7
692:1 757:19,24

**noted** 484:5
511:18 604:11
631:25 632:1,17
634:15 644:18
662:4 668:21

**notepad** 498:22,
23 499:1,8,23
500:5 501:17,23
502:21 503:3,24
504:4 759:15

**notes** 486:14
490:23 495:15
498:24,25
499:2,4,14,24
500:1,2,25
501:15 504:10,
13,14,21 505:4,
5,6,9,11,15,18,
23 506:1,3,4,6,
14,15,16,17
507:6,14 508:9,
11 509:24
516:14 581:18
587:24 592:20
609:8 616:10
617:11 632:13,
19,23 634:14,22
637:7 640:21
677:4,8 680:14
682:18,23
759:13

**nothing** 574:7
578:5 604:14
616:3 624:15

630:1 636:12,13
642:19 660:17,
19 664:23
672:10 720:2
726:18 757:24
758:9,17,20
759:8

**notice** 509:4
607:19

**noticed** 508:15,
18,25 631:20
632:12

**noting** 561:19

**novo** 692:8

**now** 475:1
487:14 500:23
502:9 506:6,18
507:10 509:16
510:2 520:19
522:2 524:8
548:3,23 549:16
557:19 558:3,20
564:25 576:6
585:15 591:7
594:9 595:24
601:11 606:8
609:6 615:11
621:2 624:13,20
627:4 631:3,16
632:10,19
639:11 650:7
655:22 656:21
666:9 667:20
673:19 676:9,21
693:25 694:1
698:7,20 708:16
718:11 723:7
724:13 725:3
727:10 730:3,22

731:12 734:9
740:2 742:3
750:18 754:16

**nowhere** 519:11
587:18 639:16
681:19

**nuance** 555:19

**number** 484:1
504:5 524:9
544:5,7 545:24
547:15 549:25
564:20,21
570:19 586:6
590:4 613:3
615:6 617:2,3
626:25 629:1
650:21 655:2
656:12 662:25
663:20 697:1
717:3,9 726:21
736:6 743:12
748:7 754:17

**numbered**
516:25

**numbers** 734:16

**nurse** 495:3,23,
25 496:4 497:6

**nursing** 490:23

---

**O**

---

**oath** 475:16,18

**OB/GYN**
488:17,22,25
496:1 497:9

**obesity** 686:7

**object** 480:23
490:19 492:1

497:15 500:12 501:19 505:20, 24 506:8,25 513:19 514:20 515:11 516:5,8, 22 518:19 519:17 522:15 523:7 524:14, 17, 529:21 532:4 534:3,21 537:5 539:8 543:21 545:18 546:2,10 549:23 551:16 574:3 584:5 588:21 592:9 622:11 628:22 644:24 652:5 666:12 667:7 668:1,13 671:19 674:20 679:21 695:8 720:5 727:14 728:3 735:22 736:4 737:9 738:6 739:4,6,7 740:5,16 741:3, 9 746:12,24 753:18

**objection** 492:18 513:3 520:16 521:11,25 523:4,21 525:3 526:6,18 528:5 531:2, 532:7,24 533:4,14,18 535:7,10,11,20, 23 536:1 538:2, 19 540:8 541:2, 11,15,22 542:10,21

544:2,9,17,24 547:18 548:2,22 552:1 554:6,12 559:9 562:11 566:4 567:17 568:1,18 570:15 571:14 572:1, 13,24,25 573:10 577:6 580:2,18 581:1,12 582:10,12 583:8 584:6,20 586:17,25 587:21 588:17, 24 590:18 591:23 592:9 595:4,16,20 596:10 597:20 598:9,12 599:7, 10,25 601:6,19, 22 602:16,22 604:5,25 605:6, 18 611:22 612:8 613:18 614:4 615:14 616:25 617:23 618:25 620:6,16,22 621:20,23 623:1,19,20 625:19, 633:25 634:11 635:17 636:7 637:3 639:25 642:16 643:18 644:1,8 645:7,20 647:11 648:10,22 649:14 650:9,10 651:15 652:5,6, 10,16 653:22 654:10 655:14

660:24 661:8 669:6 670:1,21 671:9 672:16 673:9,14 674:3 675:10,16 676:2 677:21 678:11 680:10,23 681:13 682:1,16 686:3 687:22 688:13 690:4 691:20 693:5,21 695:17 696:2,20 697:6 700:23 702:16 706:8,21 707:6, 709:20 710:4,16 711:1, 12 712:6,24 713:15,22 715:6,24 716:4 720:25 721:9,18 722:14 723:1, 10,20 724:3,19 725:14,22 726:24 728:13, 21 729:3 733:23 738:16 739:22 741:16 744:11 749:10,18 750:1,12 751:14 752:6,19,25 753:14 754:13 755:6,15 756:17,20 757:8,16 758:7, 25 759:5,18,19

**objections** 584:7 698:14 749:24

**objective** 568:22 569:11,15 572:6 573:4,18

**obligation** 648:24 720:3

**observe** 699:9,15

**obstructive** 682:24

**obtain** 578:23 592:14

**obtained** 499:10 503:18

**obturator** 494:8, 9 513:24 534:16 547:3,10 593:18 605:24 638:4 667:12 687:11 701:17

**obviously** 489:19 568:12 570:6 610:20 622:9,23 630:16 733:4

**occur** 529:12 538:18 574:1 692:8

**occurring** 623:6

**occurs** 598:3 645:4

**October** 488:7 492:25 493:1,2, 6,8,9,11,13,18 501:11 503:14 562:4,6 614:24 615:20 623:7 632:8,10,15,19 633:12 634:2 638:3

**odd** 742:13

**off** 493:4,5 505:16 510:18,

21 514:22
523:13 526:22
544:13 556:1
559:17 569:11
572:5 573:3
574:14 592:22,
24 597:12
599:16 600:15
602:4 607:6,7,
609:8 617:15
618:4 631:9,12
634:14 640:24,
25 669:17 677:4
682:22 683:18
690:14 695:1
697:10,17
700:11 714:9
716:13 732:3,5
750:15 760:2

**offense** 549:9

**offering** 477:5
512:20

**office** 481:12,19
482:25 483:9
488:17,20,24
562:15 578:21
588:1 631:19
742:25

**offices** 742:25

**official** 501:9
724:8

**often** 492:11

**oh** 485:13
491:15 541:4
561:3 564:19
609:12 632:5
636:19 663:4,14
719:9 752:21

**oil** 724:6 728:7

**okay** 476:14
477:19 478:9,20
482:10,21
483:2,7 484:23
487:6 493:10,23
508:16 509:14
512:17 514:13
515:18,21
516:15 517:4
518:15 519:10
521:23 522:13,
22 523:16
524:23 534:5
541:20 551:3
552:24 557:1
558:7 560:18
561:8,9,18,19,
20,23 562:3
563:4 564:14
565:1 568:7
569:2,14,25
570:4 575:3,4,
22 576:11,
577:17 579:6,
19,20 582:15
585:21,22,25
593:22 598:5
601:17 606:7
607:16,17
608:9,16 609:10
610:3,10 611:3,
4,11 612:5,12
613:2,5,6 625:2
629:5 633:14
635:4 642:13,23
644:11 646:7,17
647:16 653:18
654:1 656:2,21
657:24 658:17

659:7,10,13
661:19 662:1,5
663:10,15
667:24 668:20
670:16 691:17
695:20 698:5,
13,22 700:5,10,
15 703:14,15,
16,23 704:19
705:13 706:4,17
708:1,7,17
715:14,15 717:7
719:11 725:8
732:3,16,22
733:2,8,9,12
734:22 736:10
739:25 744:7
745:3 747:12,
18,22 748:3,6,
12,18,21,22
750:21 751:17
759:23

**old** 501:8 562:16

**omit** 709:17

**once** 498:7
594:21 596:1,20
645:4

**one** 476:8 481:18
490:25 495:1
496:17,18,25
502:15 508:13
509:16 517:11
521:19 524:12,
20 525:2 526:25
529:1 540:13
545:6 547:1
549:25 550:19
551:12 552:11
554:24 557:11,

25 564:9 567:2,
11 570:19,25
571:7 572:16
573:14,23
574:10 577:9
582:15 587:6
589:3, 592:22
594:5 598:22
603:11,16
609:7,17,20
617:2 619:3,12
624:17 630:12
635:13 636:5,10
640:19,24
642:16 646:15
650:21 651:14,
24 654:12 655:2
656:17 661:11
662:25 663:2,20
669:21,24
686:25 699:12
701:20 704:2
716:6 718:11,
13,15 724:24
729:13 731:6,
10,23,24 734:11
736:6 742:15
755:21 757:25

**one-year** 552:25
737:16

**ones** 562:17
655:5 698:6
706:3 712:11

**online** 583:4

**only** 479:21
482:13 484:4
487:3 496:16,25
497:4 508:12
548:10 549:12,

13 552:19
609:2,19 616:7,
23 617:11
622:21 666:10
685:23,25
693:14,23
694:15 695:4
703:25 705:9
709:23,25 710:7
731:23 732:2
738:25 745:12
753:3

**onset** 651:22
652:19

**open** 492:6,8
517:24 537:2
542:3 543:14
546:18 568:4
574:16 610:8
623:25 630:15,
17 655:21
751:24

**opening** 666:16

**opens** 629:20

**operating**
633:19

**operation**
561:24 679:20

**operative** 491:1
504:22 558:17,
22 560:4 564:6
569:17 571:2
591:14 603:17
637:5 638:10,14
639:11,15,24
640:18,21,23
641:7 642:5,9,
14 643:8

757:19,23

**opine** 478:22
625:16 708:22

**opines** 584:13

**opining** 613:7

**opinion** 491:20
492:5 513:6
514:7,16 515:6
524:23 529:4
536:6 539:24
544:22 545:11
550:22 551:5
558:10 575:11,
15,22,25 584:21
594:8,16,19,20
595:11 599:1
600:8 601:13
610:22 611:6
615:3,10 616:22
622:14 625:2
634:9 636:5
640:12 643:13,
24 644:6,10
645:18,21 649:9
650:1 652:2,8
654:15,23
655:9,23 661:18
669:15 672:12
674:25 675:4,5,
20 676:25 680:7
687:15 688:10
689:6 692:10,15
693:1 694:2,9,
17 695:25
696:10,17 697:3
698:19 701:6,
20,22,24
709:11,18
711:24 719:20,

730:21 738:23
741:14

**opinions** 477:4,
8,12 478:20
479:5,10,15,17,
19,23 480:14
481:4,9,23
482:18 483:4,
10,11,15 484:6
485:23 486:11
487:10 491:13,
24 494:2,19
507:20,25
512:21 513:2,16
515:20, 517:25
518:20 524:19
537:22 540:9
550:4,9,14
554:20 572:22
574:24 584:22
601:24 603:2
607:15 608:10,
12 610:4 611:2,
17,18 612:6,19,
21 618:19 621:4
626:21,24
636:15 642:11
647:9,16 656:22
657:13 659:3
660:21 661:6,12
662:6,7,15
663:11 669:6
677:13 680:21
681:11,24 683:3
686:23 694:5
697:20 698:10
700:18 709:21
716:7 731:25
741:22 742:6
751:22

**opportunity**
730:14 739:12

**opposite** 741:11

**option** 554:4

**options** 555:11
610:16

**order** 491:12
557:6 623:17
642:11 660:21
675:2 696:16

**organ** 536:9
560:24 570:8
593:6 600:9
653:16,21
674:10,22
684:16,24

**organized**
499:15 504:6

**organs** 674:12

**original** 569:23
585:16 627:25

**Orr** 660:2,6

**Osler-weber-
rendu** 610:18

**other** 478:6,15
479:12 480:5,8
486:13 492:4,5
495:7 496:22
497:2,8,12,13,
17 498:2 506:22
507:5,18,23
508:17 509:4
511:15 515:4
517:13,19
519:12 537:3,21
540:18,24
546:15 548:19
552:17,18

554:24 555:19
571:11 574:6
580:10 584:8
590:6 597:2
598:4 601:1
602:10 604:21
605:4 623:17
635:14 636:6
640:19 651:14
653:9,13,14
655:5 658:8
659:16 662:14
676:12 678:24
679:11 683:9
694:5 697:13
698:22 721:6
726:7 742:16,19
743:5 747:6
751:3 753:12
754:2,3 758:5

**others** 492:23
653:11 702:4
733:15

**otherwise**
508:22 618:3
682:22

**our** 476:17
479:13,14,17
583:24 584:20
594:23 631:21
634:22 656:6
703:3 706:11
707:12 710:11
729:14 730:13
731:18

**out** 475:8 477:24
481:7 486:22
496:14 498:13,
16 499:3 500:19

504:22 513:11
514:9 517:21
518:10,17
519:6,14,19
520:5,14 521:4,
8,15,19,20
522:7,11,12
524:16 525:1,10
526:3,16,22,23
534:6 538:14
542:17 543:16
547:25 551:24
552:10,14
553:7,8 557:18
562:6,16 572:5,
6 581:20
582:21,24
585:21 596:22
598:2 599:18
600:11,15
602:13 610:17
624:16 625:7
628:8,19 629:2
630:14 631:7
633:6,17 635:6,
20,21,22 637:16
638:10 646:12
653:9 663:23
665:11,18
666:3,22 667:6,
21,24,25
671:12,22
672:4,6,11
678:4 680:1
681:3 686:5
693:13 701:4
702:3,7 703:1,6
704:13 706:14
708:18 723:4,5
730:11 739:21

746:2,8 750:5

**outcome** 598:6
610:25 624:21
653:19 699:1

**outline** 515:6

**outlined** 516:13
517:3 608:14
610:6,15

**outside** 492:4
517:25 618:13
665:2 757:6,12,
20,24

**ovarian** 525:23

**over** 494:8
495:7,14 496:5
500:8 501:2
505:10 520:18
522:20 542:2
564:24 568:6
570:4 581:23
583:10 587:15
588:9 591:3
601:15 604:8
624:10 633:4
637:6 638:1
646:20 694:14
699:7 709:4
730:2,7 731:17
743:4 754:15
755:1 759:7,19

**overall** 668:5
738:11

**Overholtz**
475:12

**overlying** 513:12

**overreactive**
529:14,16,20,23
530:3,14,25

531:6 693:9

**owed** 712:8

**own** 508:7,8
555:10 596:6
646:24 649:22
650:3 666:18
676:16 702:6
707:8 727:25
728:10 737:14
738:2 739:14
745:13 758:23

---

**P**

**p.m.** 607:12
641:1,4 683:19,
22 732:6,10
760:3

**pack** 673:7
676:15

**pack-a-day**
673:5 682:12

**package** 738:11

**packet** 748:15

**page** 477:23
485:2 486:23
487:1 490:25
493:8 501:11
502:14 503:10
508:13,18,25
509:7 510:5,6
511:18 515:21,
22 560:19 562:5
563:13,14
564:13,14
565:25 573:14
574:19 575:1,2,
5, 576:6,12,13

589:24 642:19 643:7 646:17 647:23 657:18 658:10 659:1,5, 8,9 663:8,12,13 696:22 708:8,17 716:16 717:8 732:17,19,20,23 733:17,18 734:20 741:25 748:10,20 750:22 755:21, 22

**pages** 478:24 479:3 485:21 486:19,22 490:23,24 506:11 516:25 533:10 541:23 575:7,12 576:8 579:5,22 584:11 585:18,21 591:3 709:4, 717:5 736:9 741:24

**pain** 494:8,9,10 503:9,12,15 516:1,19 518:7 519:15 522:5,6 525:8 527:7,17, 18,20,22,23 528:4,10,12,13, 19,22,24 530:20 532:3,12,17,19, 20 533:25 534:7,10,13 535:22 540:13, 14 541:7,8 542:5 545:22 548:5,7,11 549:14 550:10,

13 551:6,10,11, 14,15,18,25 552:4,7,9,10,14, 17,18,19,22 553:2,3,8,20,23, 24 554:2,5,23 555:4,14,23 556:4,8 577:4 588:6 589:11, 18,19 590:6,16 593:9,12,25 594:2,8,9,18,22, 24 595:3,13,15, 18 596:3,7 597:4,10,19 598:3 601:5 602:7 606:1 611:6 613:9,15, 24 614:8 615:21,25 616:1,2,3,12 617:4 618:12 619:6,9 626:14 627:4,17 628:2, 14 650:18 651:6,9,13,21, 22 652:2,14 662:17,22,25 663:1,20,21 664:5,8,12,18, 23 665:11,13,23 666:21 667:1,4, 12,13,20 668:5, 8,11,19 683:8 686:24 687:4,7, 8,10,13,16,17, 21 688:5,11,16, 22 689:5,9,14 696:25 701:19 755:8

**painful** 545:4,22 624:3 638:4 664:10 666:2 667:4,14 668:16 702:9

**painless** 528:20

**Palmer** 743:1,3

**paper** 483:17 499:18 619:11 635:22

**papers** 573:4 596:22 600:11 619:5,21 620:19,25 626:14 747:3

**paperwork** 481:1 498:16

**paragraph** 477:24 478:5 509:2 560:21 570:7 576:14, 624:20,24 643:10, 658:11 662:18 708:9, 11,17 709:1 734:22 736:24 748:23,25 750:23,25 756:2

**paragraphs** 748:21

**paralegal** 481:19

**paraphrase** 605:21

**pardon** 556:5 613:17 627:22 670:19

**Parkinson's** 520:5 525:20

**part** 476:4 479:19 492:14 503:20 544:11 565:1 570:9 576:25 631:3,10 652:9,11 707:9, 11 716:7 738:11,12

**partake** 622:17

**particular** 502:15 577:18 578:14 715:12, 13 748:20 758:2

**particularized** 552:20

**particularly** 737:5

**parties** 538:3

**partly** 600:22

**partner** 547:20 625:12

**parts** 503:8

**passed** 588:14, 19

**passing** 552:25

**past** 491:8 616:16 636:22 642:10

**pathologic** 705:4 707:10,16

**pathological** 707:13

**pathologist** 619:17 700:10 703:3 707:4,25 708:1,4

**pathologists** 706:2,15

**pathology** 700:7, 13 704:23 705:1 707:11,18 708:2

**patience** 747:19

**patient** 494:15 495:1,13,15,16 496:2,5,25 497:6 499:16 516:13 519:9 520:20 546:17 577:20 578:1,4, 11,14,17,21,24 579:3 586:12 589:5,7,9 592:1, 13 603:1,4,8 604:7 618:10,12 631:17 632:2,6 634:21 635:12 636:11,20,21,24 649:2,12 650:1 659:10 661:16 669:8 675:5 693:13 700:18 720:3,8 756:14

**patient's** 491:19 710:23

**patients** 517:10 540:11 553:7,8 554:3 586:10,11 592:16,17 616:1 625:10 651:19 673:24 674:7 707:8 712:9 724:12

**Patricia** 656:22 659:19 660:4

**Patty** 475:7

**pellet** 713:21 726:20

**pelvic** 491:19 516:1,19 518:7 519:3,15 522:5, 10 525:8,23 527:17,18,22,23 528:4,10,14,19 530:20 532:12, 17 536:7,9 540:13,14 541:7 550:10,13 551:5,11,14,18, 21 552:18,19,24 553:1,2,3,23 555:14 569:7 570:8 593:6,9, 12,25 594:2,7,9, 18,24 595:3,13, 15,18 596:7 597:4,10,18 599:24 600:5,9 601:4,16 602:10 611:6 613:8 615:2 646:20 647:5 650:18 651:23 652:2,14 653:16,21 662:17,22,25 663:1,20,21 664:17,23 681:17 684:16, 24 687:4,18,20 688:11,16,19, 22,25 689:5 705:17 728:20 746:6 753:16

**pelvis** 532:15

688:6,7

**pending** 579:16

**penetration** 754:4

**Pensacola** 475:9

**people** 492:5 552:6 553:17 584:22,23 618:1 697:9

**people's** 533:10

**per** 476:18 504:6 528:21 635:24 652:4 656:8 741:25

**percent** 558:2 619:12, 645:13, 19,22 646:10, 15,22,25 647:1, 2 753:4

**percentagewise** 600:2

**perception** 625:11

**Perfect** 487:6

**perfectly** 509:15

**perforate** 674:12

**perforated** 527:19

**perforation** 674:11,16,22

**perform** 487:18 489:6 553:19

**performed** 493:14 494:3,24 570:6 644:15 754:9

**perhaps** 562:23 600:12 727:3, 21,24 753:12

**Perigee** 598:2 600:13

**perimenopausal** 614:21

**period** 476:7 536:12 606:6 691:3

**periods** 527:9

**permanence** 576:2

**permanency** 555:14 652:20

**permanent** 594:5,6,10 718:24,25 719:17,18 735:7,8,19 737:5

**permission** 740:21,22

**peroneum** 688:16,20

**person** 496:22 542:11 549:12, 13 715:11

**person's** 745:14

**personal** 543:5 596:6 618:5 707:8 728:1

**personally** 501:12 602:7 624:18 699:20 700:1,2 701:13 703:22 705:11

706:5,10

**personnel**
710:10

**perspective**
681:20 702:13,
14 747:13

**pertain** 487:5

**pertaining**
483:18 485:6
612:25 630:2
725:10

**pertinent** 483:20
743:23

**Ph.d.** 619:17
747:8 750:16

**Phillip** 739:5

**Phillips** 713:4,8
714:10,15
715:16,17
716:24 717:19
718:23 719:22
720:19,22
721:5,14 722:8
723:12,16,25
728:24 733:1
735:6 737:1,12,
16 738:21
740:14 741:6
750:7

**photograph**
705:9,10 706:1

**photographic**
707:24

**photographs**
703:21 704:12,
14,19 705:3,4
706:15 707:3,
15,16

**photos** 699:13,
21 700:4

**phrase** 625:12

**physical** 491:18
492:12,22
494:11 495:23,
24 496:3 497:5
500:25 503:19
516:3,21 520:18
532:6 534:15
539:16 540:15
545:24 546:13
548:11 554:22,
25 555:1,2,4
618:6,8,15
623:8 624:2,21
662:19 694:3,23
696:11,13
697:11 701:3,
14,24 702:1,2,9
752:17

**physician** 561:11
614:13 628:11,
13 635:20

**physician's**
495:3

**physicians** 497:2
660:15 711:23
716:9 751:6

**picture** 732:2

**piece** 503:23

**pieces** 514:1

**Pinnacle** 598:3
600:13 730:1
738:3,12

**pinpoint** 534:16
547:3,10 548:12
690:21

**place** 488:8,18
512:10 518:23
520:9 536:25
550:19 557:10
642:15 692:24
754:6 755:10

**placed** 479:4
513:10,14
529:9,10 556:25
561:12,15,22
564:9 570:19
598:18 601:15
639:16,23 643:6
654:3 655:6
692:22

**placement**
646:20 657:21

**places** 728:8

**placing** 572:16

**plaintiff** 496:23
501:4 525:17
618:19 623:16
659:17 660:11
670:5

**plaintiff's**
481:22 742:20

**plaintiffs** 475:8,
11 477:9,13
478:6 481:16
490:4,14 492:25
494:24 496:13
497:17 498:6,
10,21 499:7
500:11 511:24
556:7 582:6
584:4 620:21
699:11,24
703:11,15

704:7,24 705:23
743:5

**plaintiffs'**
483:11 488:5
497:8

**plan** 731:23

**plane** 531:11

**play** 538:23
691:4

**played** 681:20
693:3

**playing** 514:22
518:10 610:25

**plays** 573:19

**plead** 700:13

**please** 475:5
642:25 646:5
656:11 683:24
730:11 732:22
735:18 749:1

**plexus** 531:10
692:25

**plowed** 675:11

**Plus** 560:2,12,23
563:18 564:1
567:14 590:3
598:19 599:1,
18,19 603:10
612:20 638:17,
19,22 639:3
654:8 749:7,25
756:13 757:1

**point** 480:4
498:16 504:7
518:24 520:14
522:22 544:15
558:7 565:18,

21,22 566:15
570:18 580:15
584:10 632:14
633:1 637:8
638:21 668:6
672:3 673:17
674:15 677:9
694:15 703:19
711:7 719:2
730:24 734:13
751:3 756:14

**pointed** 499:14
639:2

**points** 554:15,
16,17 566:19

**poke** 703:5

**poking** 634:19

**police** 618:3

**polymer** 746:8

**polymers** 620:2

**polypropylene**
478:1,3 513:23
560:22 574:12
600:8 601:1,2,
13 602:12
653:16 708:20,
23 711:17,19
712:4,17,22
713:11,21
721:16 722:10
723:16,23
724:17,18
726:20 727:12
728:17,25 731:6
733:1 735:13
736:23 737:13
739:1 740:2,9

**poor** 550:11
629:15 630:19,
22 645:17
678:15 705:22

**POP** 514:11,25
515:3 570:8
605:15

**pops** 555:19

**porcine** 510:15

**pore** 600:18
601:10 602:3
605:23 612:24
638:1 653:8
654:6

**portion** 497:2
571:17

**portions** 733:7

**position** 476:17
479:14,18
583:24 730:13

**positioned** 565:8

**positions** 731:18

**positive** 570:21,
23 639:19

**possibilities**
574:1 610:9,10

**possibility** 486:5
519:24 521:5,15
538:24 549:19,
22 624:23 638:6
654:4 661:17
674:10 728:2

**possible** 476:23
478:18 520:25
522:4,7 523:25
524:10,12
525:10 527:6

528:3,19 537:4
571:22 573:7
599:2 644:22
752:17,21

**possibly** 524:10
527:23 530:7
532:2 537:7,12
540:16 544:11
571:17 616:12
637:21 691:4

**Post-it** 506:15,
16,17

**post-menopausal**
613:21

**posterior** 570:22
611:13,14
612:18 630:2
639:20 644:19
650:17 661:21
671:6 756:3

**postimplant**
667:21,25

**postmenopausal**
614:22

**postop** 539:3
629:7 633:15

**potential** 516:2
517:12 518:4
519:2 524:24
526:4 590:16
591:20 592:5
649:20 653:12
662:19 668:24
669:3 690:10
695:2,5

**potentially**
690:18 696:14
733:11

**practice** 488:23
491:10 492:7
536:14 568:17
584:18 595:24
602:7 649:19
651:17 702:10
752:16 753:4

**precautions**
681:16

**predate** 621:1

**predispose**
758:11,23

**predominant**
611:19

**preexisting**
518:5,6 530:18
662:24 663:25
697:19,23

**preface** 523:22
674:2 741:17

**preimplant**
616:19 666:4
667:15,25

**Premarin**
691:11,14

**prematurely**
758:5,16

**preop** 696:8

**preoperative**
617:14

**preparation**
563:18 669:4
670:3,11
743:21,22
744:13,21,24,25
745:11

**prepare** 742:11,

21 743:6,22

**prepared** 502:5 591:1

**preparing** 483:14 743:13 744:9 745:4,12

**presence** 574:12 692:9

**present** 495:23 496:12 596:3 624:1

**presentation** 527:21

**presented** 734:9

**preserve** 500:10, 12

**preserved** 500:15

**pressure** 568:10 570:21,24 639:19 645:14, 17

**pretend** 573:22

**pretty** 476:12 626:10,11 744:20

**prevent** 558:24 566:7 568:9 569:4 570:2,13 571:4

**previous** 530:5 653:6 657:16 694:12 698:6,19 699:6 709:8

**previously** 475:20,23 532:8 607:18 610:6

636:20 640:1 732:14 736:18 739:9

**primary** 526:24 527:21 530:18

**printout** 498:24

**prior** 483:18 527:10 530:4, 10,14,20 538:1 563:22 592:14 626:25 665:10 666:19 668:10, 15 671:22 681:17 692:13 694:14,17,19 695:6 696:19,22 697:5,15 698:9 716:23 745:17 746:5

**prison** 542:4 544:13 547:21

**probability** 586:2 648:6 693:2

**probably** 503:12 519:4 534:6 536:23 563:7 585:12,14 616:9 623:5 630:10,18 631:6 634:20 636:1 697:23 745:7,8,13

**problem** 513:9 514:12 515:16 524:20 526:24 530:22 553:18 590:12 604:19 627:7,14 646:4

678:19 686:18

**problems** 514:5, 18 515:1,7 516:3,15,17 517:5,19 519:13 520:11 521:10 524:11,13 525:16 526:4,17 528:4 531:19 540:18,24 543:5 604:24 616:23 621:19 622:8 625:4 627:21 653:2 678:8 679:6 680:22 682:14 686:12 690:11 695:24 720:9 727:22

**procedure** 536:10 560:5 565:6 568:21 569:18 570:8 578:25 592:15 593:7 594:17 596:2 597:6, 603:19 641:8 650:5,19 651:12 652:15 671:5,18 672:25 679:9,12 680:2,4 684:13, 22 685:4 691:19 698:3

**procedures** 563:15 570:7 589:17, 595:19 596:8 597:11 651:14

**proceed** 682:22

**process** 517:8 518:14 519:8 530:16 536:20 537:17 557:22 566:20 581:25 585:14 608:15 610:7,16 616:14,18 619:8 631:3,11 645:12 665:8 685:1 701:2 738:3 745:10 759:14, 15

**processes** 726:21 740:19

**product** 510:16 512:24 513:8,13 514:6 516:4,19 517:7 526:17 527:1 529:5 530:4, 536:9 537:24 543:11, 12 545:8,10,11, 14 556:22 558:4,9 562:23 564:10 566:3, 567:22 575:9 577:5 579:10 582:18 592:7 598:18,21 599:17,24 600:10,14 602:12,14 603:11,15 604:18,22 605:4,9,11,15 612:6,21 616:23 627:24 638:18, 22,23 639:3 645:17 648:8

649:10 662:7,8,
16,24 666:20
667:6 687:10
688:19 689:17,
18 692:9,23
693:15,19
713:6,9,14
728:1,8,17,20
735:4 737:23
738:12 739:1
740:19 749:5,9,
21,25 756:8,12
759:9,17

**products** 513:10,
14 531:5 574:7,
8 601:2 602:15
611:12 612:13,
17,20 613:8
614:17 626:23
640:16 653:4,9,
13,14 661:21
664:24 665:4,
10,22 667:19
677:2 683:4
692:6,13,16
693:3 709:7
721:8,16,17
724:18 738:24
740:4 749:7
758:24

**prognosis** 550:6,
11 554:21
555:11

**progresses**
619:11

**progression**
531:14,15
616:16,17

**progressive**
594:6,12,22
596:3,18 616:14
619:8 645:12

**prohibit** 752:23

**project** 743:18
744:16

**prolapse** 536:10
570:8 593:6
600:9 653:16,21
683:9 684:8,12,
16,21,24 728:20

**Prolift** 574:7
598:2 600:10,11

**prongs** 634:19

**pronunciation**
488:2

**proper** 558:23,
25 559:6, 569:8
590:2 592:12

**properly** 574:2
578:1

**Prouty** 661:20

**prove** 492:9

**proven** 726:2

**provide** 481:21,
23 498:3 561:1
577:10,22
578:3,18 584:16
708:22 710:7,19
735:18 743:19

**provided** 477:3,
8 479:6 483:24
484:10,17
487:2,13 490:23
498:20 499:7
501:15 512:1,4

539:25 562:20
579:2,6,10
586:1,3,7,15,16,
23 587:19 649:9
655:23 660:7,15
668:22 699:21
706:2 707:10
710:2,8 714:19
716:8 720:21
732:14 735:3,20
739:8 741:21
742:5 751:2

**provides** 484:8
520:10 563:21
707:25 708:2

**providing** 513:1
555:13 592:17
722:11

**proving** 723:4,5

**provoked** 663:24

**proximal** 571:17

**psychiatrist**
628:25

**psychiatry**
628:5,6,9,20
629:3

**psychological**
545:25 546:24
547:1,16

**psychologist**
628:25

**psychology**
628:5,6,9,20
629:3

**public** 542:25
585:9

**publications**

706:12

**pudendal** 688:8

**pull** 534:6
581:18 637:16
638:10 646:11
750:5

**pulling** 645:16
702:7

**pulmonary**
682:24

**purchase** 737:17

**purchased** 733:1

**pure** 508:21
649:22

**purely** 631:9

**purpose** 549:21
592:1 602:2
603:22

**purposely**
579:23

**purposes** 499:25
511:14 574:24
585:19 609:23
737:5

**pursuing** 549:21

**put** 478:23
499:3,11,15
500:5,16,20,24,
25 502:21
503:25 505:1
506:15 507:3
508:25 509:1
511:5 513:24
520:2 524:6,10,
12 549:10 551:4
558:23 559:6
564:4 569:5

577:18 578:2
579:9,23
580:12,13,24
581:9 585:18
593:14,21,22
599:17 613:20
620:24 631:21
638:12 648:16
691:25 711:10
720:3 731:8
741:7 746:15,
17,20

**puts** 654:16
731:5,13

**putting** 517:14
567:7 628:19
739:6 747:11

## Q

**qualifiers** 539:2
590:11 593:15,
21,22 594:13
596:18 597:12,
13 602:1 613:20
614:7 652:18,21
746:15,17,19

**quality** 539:17,
18 543:1,9,17,
18,24 595:9
611:8 613:24
617:3 621:13
623:9 626:22
686:8 694:4,6,
24 695:3 696:1

**quality-of-life**
540:20 542:8,20
621:5 622:10,24
624:22

**quarter** 635:5,7

**question** 476:11
491:3 493:14
495:7 502:12
508:10 523:1,3,
6,19,22 524:8
526:10 532:16
533:20 534:11
535:17 537:21
543:2 547:11,
23,24 548:15
550:3 568:15,25
571:8,9 576:18
579:15,16
580:6,18,21
581:5,6,11
582:5,13,16
583:18,21,24,25
584:1,22 585:1,
6,16,19 586:13
587:7 589:4
594:25 600:7
602:21,24,25
618:5 621:14
622:21 638:18
640:1 642:24,25
643:21 651:7,10
652:12,23 662:5
669:8,14,18,19,
20 675:18,21
683:12,23
694:15 698:22
702:2 705:22
710:4,9 712:2
719:24 722:8
724:16 729:22
736:14,17
738:19 741:18
742:4 746:18
749:23 757:11,
22

**question-and-**
**answer** 476:7

**questioning**
596:12 628:2
697:10 698:20
745:25 748:14
751:8 752:11
753:19 754:24

**questions** 479:12
480:5 509:12
555:13 583:23
608:8 618:15
623:25 628:15
674:2 682:7,9
730:15,20
736:12 738:16
739:19 747:20
748:1,14 751:5
752:9,13 754:8,
20 755:1 757:3
758:1,19 759:11

**quick** 478:18
559:13,15
607:14 617:11
656:3

**quickly** 496:10
510:3 511:15

**quiet** 652:10

**quite** 480:10
514:1 619:15
681:18

**quoted** 754:21

**quotes** 504:22
626:14

## R

**rabbit** 706:11

**rabbits** 705:19

**radiated** 691:2

**radiating** 690:22

**radiation** 525:20
690:9,10,13,14,
15,21,25 691:4

**raise** 584:6
602:20

**raised** 540:22
674:15 675:20

**raises** 672:3

**random** 542:11

**rapidly** 520:22,
24

**rare** 519:19
664:1,3

**rate** 489:3,8,12,
15 598:20 667:6
668:12

**rated** 665:11,18
666:3,21,22

**rates** 600:20
667:21

**rather** 747:13

**rationale** 735:18

**raw** 726:20

**reach** 491:13
492:16 700:21

**reached** 513:15
700:6

**reaching** 485:23
518:17 519:1

520:12 524:19
525:17 526:4,16
527:4,12 537:22
554:20 556:11,
14 572:22
610:21 613:4
614:16 615:10
616:22 618:19,
23 621:4
626:21,24
636:15 647:9
654:23 655:9
657:12 681:24
683:3 685:9
686:23 694:17
697:20

**reaction** 550:20
590:7 591:10

**Reactions**
589:24,25

**read** 500:2
510:11 523:24
533:2,7,8,9,23
534:6 539:22
541:20 563:10
566:20 568:22
570:4 574:6
581:7 585:3
587:8 610:13
614:12 620:14,
15,18,25 624:12
637:11 640:21
642:25 643:1
645:23 646:1
655:4 659:16,22
669:18,20,25
672:9 675:2
683:23,25 700:2
712:15,18,19,23

714:3,8,9,11,23
720:16 727:4
735:9 736:18
738:13 741:24
746:5 749:1,13
750:23 751:20

**readily** 709:15

**reading** 561:6
564:24 568:6
570:5,10 588:2
637:7 669:2

**reads** 510:7
566:17

**ready** 496:2
718:4

**real** 572:9 712:3

**reality** 744:13
745:7,8

**realize** 687:1
708:15

**really** 480:18
503:10 567:9
569:3 691:17
722:9 731:23
733:15

**reask** 478:10
480:5

**reason** 488:1
502:7 504:3
533:25 557:19
562:7 645:5
664:22 667:11
672:23 712:21
713:7 715:3,22
719:25 720:2
722:22 723:18
740:25 746:22
753:8

**reasonable**
513:16 530:8
586:1,9,21
589:4,8,10
601:3 648:5
649:1,18 693:2
741:23

**reasonably**
653:10

**reasoning** 739:6

**reasons** 478:3
545:25 546:24
547:1 617:19
708:22 738:20

**recall** 485:14
486:4,7 490:5,9
494:4,16,21
528:17 539:11,
12,13 544:19
556:1,9 558:19
564:8,10 567:20
577:9 581:16,
19,22 582:1
585:6 587:11,14
588:8 590:22
598:16 600:15
603:16 604:9,19
605:2 615:7
621:9 637:19,23
644:13,17
652:11 655:2
659:20 660:18
677:4 690:14,19
691:14 695:1,12
699:13 700:12,
14 715:8 717:6
723:22,23
729:25 732:15
743:10 746:16

**received** 486:4
597:2 690:15
744:6

**recess** 510:23
559:19 593:1
607:10 641:2
683:20 732:7

**recognize**
628:14,15,18

**recollection**
637:15 638:11
639:6

**recommendation**
s 555:8

**reconciled** 545:3
549:15

**reconstruction**
553:2

**reconstructive**
528:9 551:21

**record** 475:1,6
476:17 498:19
506:13 509:21
510:18,21,24
511:1,5 549:10
559:17,20 560:2
575:4 592:22,24
593:2 607:7,8,
11 608:17,20
614:19 618:21
630:17 631:10,
13,24 632:19,23
634:5 638:16
639:15 640:24,
25 641:3 646:1
647:22 656:6
658:18,22 668:6
669:25 683:18,

21,25 695:22
703:10 704:3
707:2 717:1,19
725:9 732:3,5,9
749:1 750:24
760:2

**recorded** 501:22
502:20 503:6,7,
24 571:6

**records** 481:13
482:1,5,24
483:16,17,18
485:4,5,10,14,
22 486:1,5,10,
13,19 489:20
490:11,12,13,22
492:4,22 495:14
498:25 503:15
504:9,11,16,25
505:1,7,11,18
506:14,23
507:4,6,15
516:13 518:12
519:22 521:18
526:2,10,14
529:10 530:12
531:23 538:6,11
539:1,4,10,14
556:1 564:8
577:1 587:18
588:4,9 590:14,
22,23,25 598:17
599:15 604:3,14
609:3 612:15
615:12,16,18
616:7,8 617:22
621:17,25
622:22 623:5
624:9,13 629:6
632:4,14 634:7

636:22 642:4
644:13 659:2,6
661:25 662:2
665:9,25 666:2,
8,19,22,24
667:3,11,15
668:10 680:7,
14,16,17 681:8,
22 690:17,20,23
691:9,15
692:12,18
693:7,12,18
695:11,14 696:8
697:15,18 706:3
710:2 717:1
722:2,3,18
729:6,8, 745:9,
16 754:22
756:10 758:9,
13,17,21,22

**recover** 551:12

**rectum** 528:21

**recurrence**
604:3 683:8
684:7,12,16,18,
21,24

**red** 528:21

**reduces** 671:23

**reduction** 614:2

**Reed** 475:13

**refer** 483:22
487:14 509:11
553:7 554:3
555:4 653:6
748:18

**reference**
589:17,21 697:1

**referenced**
638:18 724:24

**referred** 708:11
748:19

**referring** 589:23
643:7 659:5
714:13

**reflect** 612:15
618:17

**reflected** 617:22
666:2 693:18
743:14

**reflecting** 604:14

**refrain** 635:1

**refresh** 539:14
690:24 695:10
697:17

**regain** 538:14
696:12

**regained** 539:1

**regaining** 550:21

**regard** 502:12
749:6 752:9
754:7 757:2,5
758:1,3

**Regard-** 570:18

**regarding**
499:24 507:14
561:12 563:17,
22 570:19 581:8
605:3 619:6
624:20 662:18
669:7 681:24
758:14

**regardless**
548:13 577:23
578:19 598:21

**referenced**
654:2 684:24
691:16 710:20
741:15

**region** 513:11
514:2 593:19
606:2 664:6

**regulation**
581:24

**regulations**
580:16,23 581:8
582:7 583:16
585:8 675:20

**rehab** 555:2

**rehash** 584:1

**rehashed** 479:18

**rehashing**
730:17

**reiterated**
582:10 584:21
596:17

**rel-** 615:22

**related** 534:9
730:15 751:3

**relates** 713:20
730:21

**relating** 480:6,
13 505:7 540:21
547:6 580:23
609:3 633:23
662:6,7 668:23
675:24 694:8
711:17 712:4
721:5 722:10

**relation** 584:3
669:8

**relations** 696:18
754:3

In Re: CR Bard 200     Daniel Elliott M.D., Vol. II     11/16/2014

**relative** 614:9 616:10

**relay** 589:4,6,8 649:1,18

**relayed** 586:9 648:21 649:11

**relevant** 497:21

**reliability** 616:5

**reliable** 755:12

**reliance** 504:20 638:25 658:19 659:18 670:10 709:13 714:7 716:22 717:2 725:12 739:9

**relied** 484:13 609:1

**relieve** 662:3 740:24

**rely** 609:8,13

**relying** 646:9,11

**remainder** 665:6

**remember** 480:15 490:3,6 533:9 591:4 598:15 602:4 616:14 619:11 640:19 695:13 705:21 708:13, 16 745:18 748:13,15,17 751:7,9 752:10, 13 754:23,25 755:1,2

**remembers** 592:18

**remind** 475:15 476:5

**remnant** 525:23

**remotely** 624:4

**removal** 602:14

**remove** 504:3

**removed** 703:17

**render** 478:1 536:6 696:16 708:24

**rendered** 478:6 696:10

**rendering** 708:21

**repair** 536:9 593:6,13,17,20, 23 595:1,12 597:2,9 631:16, 23 632:9 633:10 650:4,16,23 651:1,11,20 672:24 679:14, 15 684:10,11,25

**repaired** 632:8, 24 684:21

**repairs** 596:7 671:3,21 672:22 678:1 679:5 684:17 686:7

**repeat** 576:17 647:8

**repetitive** 685:1

**rephrase** 476:11

**replaced** 562:16

**replow** 602:9

**replowing**

602:17,24 603:2

**report** 477:12, 21,23,25 478:24 479:3,23 483:22,23 484:10,14,16 486:2,20 487:11 493:18,24 498:3 501:10,24 502:13,16 503:5,17 504:1 508:3 509:5,12, 22 510:6 511:3, 4,11,14 512:19 513:1,6 514:3,4 515:20,22 518:16,19,23,25 519:11,12 520:9,10,13 521:6,24 522:14,25 523:2,15,18,24 524:12,24,25 539:15 540:22 550:4,7 560:4 569:17 571:3 574:20 575:1,12 579:6 581:16 584:11,13 591:14 602:5 607:20 608:5,24 609:11 610:13, 19 612:7,11 620:14 624:9 626:1,3,12 627:23 639:24 640:8 642:5,9, 14 643:8 646:12,18 647:17,24 648:2

656:24 657:19 658:2,5,9,18 659:1 660:7 663:8,16 664:21 688:11,14,23 692:1 699:13 700:3 703:21 704:11,15 708:2,7,9,18,19 709:2 718:20 730:10,14, 731:16, 742:17 750:18 751:1,7, 23,25 752:2 755:23

**reported** 550:10 624:7 636:17

**reporter** 475:15, 17 585:3 606:10,14,25 607:6 641:15 645:23,24 656:11,13,18 663:3 669:22,23 683:24 717:9,11 729:16

**reporter's** 495:9

**reporting** 737:12

**reports** 477:9 478:5,21 479:6, 20 488:5 493:15 512:1 550:24 615:12 616:21 617:20 620:18 621:17 658:14 660:9 670:25 711:16,18 716:7 718:12 719:13 731:7,10,14,16

745:5

**represent** 475:6

**representation** 715:10 735:1 743:17

**representative** 705:10 706:15 714:24 715:17 723:13 724:7,8 741:12

**representatives** 714:15

**representing** 481:16 715:1

**reproducible** 755:18

**request** 483:8 486:16 507:13

**requested** 486:7, 13 496:17 641:6 646:1 683:25 744:5

**require** 596:24 675:21

**required** 582:1 710:19 737:20 749:2 751:25

**requirements** 710:18

**research** 483:21 582:7

**reserve** 750:25 751:1

**residency** 582:16 744:22

**resin** 737:1,4,13, 17

**resolution** 550:13

**resolve** 593:6 604:23

**resolved** 551:6

**respect** 477:4 484:16 485:23 486:11 487:10 494:2,16 500:10 505:18 507:6,20 511:15 512:21 513:2,7 515:20 516:17 520:11 521:8 529:1 537:18,23 545:7 549:3, 550:5 572:22 608:8,10 610:4 611:18 612:6,19 613:4 618:23 647:16 657:7 661:19 663:17 675:8 676:5 685:3 686:23 692:11 694:2,9 698:23 700:7,21 701:6 704:20 736:23

**respects** 477:13, 14

**response** 602:21 603:1 618:6 650:14 736:12, 21 748:19

**responses** 555:16

**responsibility** 569:7 577:10, 18,22,24 578:2

**resolution** 728:11 749:8

**responsible** 569:13 612:2 664:25 665:22, 23 692:25 728:6,8,16 737:21 749:3

**rest** 551:8

**result** 543:18 595:13 597:19 625:4,17 653:3 655:13 664:10, 12 670:20 678:19 684:3

**resulted** 537:24 571:12 573:8

**resume** 539:2

**resuming** 539:5

**retrievable** 482:24

**retrieving** 502:8

**return** 489:14

**returned** 632:16

**review** 479:2 481:25 482:14, 17 486:18 487:1 492:3,4 504:9 505:7 507:14 509:11 515:15 516:10,12,13 517:9,11,12 520:23 529:7 539:4 545:12 576:25 580:16, 23 582:7 583:16 591:4 594:23 617:12 621:16 625:8 626:6

629:5 631:24 632:4 636:20 642:17 644:13 655:5,10,17,18 659:15 660:21 661:14,15 685:17,20 690:23 691:8 692:12 695:13, 697:14 699:9 701:10 703:3 707:10,11 709:19 710:2 714:6 721:4 722:18 725:8 733:5,16,24 734:13 738:15 739:13,18 741:20 742:4 743:23 751:3, 12,17 757:15, 19,23

**reviewed** 483:19 484:13 485:6,23 486:6,23 495:13 504:11 526:1,9, 13 541:23 558:19 560:15 569:23 581:18, 21 619:5 641:10 646:19 659:3,6, 11,24 660:6,10, 14,18 690:16 699:20 700:19 701:3 704:11 705:19 707:4,24 716:23 717:1,3, 5 725:17 729:25 734:10 738:17 742:12,14,17

745:8 749:12, 15,20 750:4 751:6

**reviewing** 481:13 482:4 483:20 488:4 489:20 490:10 504:20,25 529:9 553:4 581:17 661:13 673:18 680:6 743:13 745:14

**reviews** 756:23

**revised** 737:6

**revision** 688:24

**revisions** 658:8

**rid** 499:17 501:8 505:23 506:3 633:6 759:12

**ridiculous** 739:22

**right** 478:13 481:10 488:6 489:3 495:22 498:11 525:13 529:17 544:21 548:17 555:21 557:11 558:20 561:16 564:24 566:15 578:12, 23 587:9 592:3 594:10 601:11 603:3,12 615:24 622:6,15,19 633:13 644:4 650:2, 651:25 654:9 668:18 670:3 673:19

674:24 679:1 693:25 694:1 700:10 710:21 712:8 717:4 718:19 719:8,13 720:16 729:10, 13 744:18 751:1 759:23

**risk** 577:4 590:11 593:12 594:17 595:18 598:24 599:2, 20,22 646:25 654:17,22 655:1, 670:13, 18,24 671:7,16, 18,23,25 672:6, 13,14,21 673:6 674:8 675:3,6 676:16 678:15, 24 679:19 680:4 683:8 684:4, 685:7,17 686:9, 11 697:23 710:22,23 711:3,9,14,15 712:3,13,14 714:4 756:15, 17,19

**risk-benefit** 578:4

**risks** 478:22 479:4 575:18,24 576:7,9,20 577:22 578:15 580:1,9,11 584:14,15,16 586:8 587:12,19 588:3,5 589:6,

11,13 590:16 591:9 592:2,5 648:18 710:12, 14,20 711:5

**road** 694:1

**robotic** 651:20

**role** 518:11 573:19 578:5,7, 8,16,18,20,21 610:25 681:20 691:4 693:3

**roll** 573:25

**rolled** 644:15

**rolling** 644:22 645:14

**room** 495:2,25 496:15,16,22 500:19 549:12 568:4 578:20 633:19 730:11 753:22

**roots** 688:2

**Rosaida** 477:21 502:24

**Ross** 660:1,5

**roughly** 489:19, 22 619:13 632:15 655:5 742:2,23 743:3, 11

**routine** 707:10, 12

**rule** 517:19,21

**ruled** 518:17,25 519:14 521:8 524:16 526:3, 15,22,23 610:17

**rules** 476:5,12 520:5 580:16,23 581:8 582:7 583:16

**rupture** 629:16

**ruptures** 527:23

---

**S**

**S-c-l-e-r-o-s-i-s** 663:5

**S-m-y-r-n-a** 489:1

**sacro-** 596:2

**sacrocolpopexies** 594:23 670:12 672:20

**sacrocolpopexy** 593:7,16,19 596:2 597:3 650:5 651:2,11, 20,21 670:23 671:5 679:9,18 680:3

**safe** 653:17 723:24 725:1 726:2 729:9 735:19 736:2

**safety** 717:20 720:3 722:9 726:14 735:3

**said** 479:16 492:23 493:2,12 499:23 502:2 508:15 510:5,11 511:20 523:10 524:9 530:25 531:4 533:2

541:19, 567:20
572:12 602:1
606:25 607:4
614:20,24
617:15 624:19
630:23 632:6,20
636:9 639:19
651:1,5,6 654:2
690:1 706:25
714:22 722:19,
21 724:7,8
745:3,19 746:7,
21

**sake** 609:9,21

**salesperson**
714:17,22

**same** 479:11,12
480:5 482:6
484:9 488:6
489:15,22 497:9
502:14 506:5
512:18 513:10,
11,25 514:2
521:3,14 522:21
523:12 529:17
530:19 545:10
550:22 555:15
556:6 564:13
578:12 579:1
593:8,20 599:6,
22 600:1,13,14
603:10,19
608:7,12,15
609:1 610:7,8,
16 624:24 625:6
639:5,7 644:8
647:22,25 648:1
650:6,20 651:5,
23,24 652:3

653:2,7 657:13,
17 662:5,18
675:16 676:2
678:8 694:13
697:12 698:3,
10,15,20,24
699:2 706:18
708:11 709:1
717:8 721:15
724:14,17,22
725:18,20 727:9
728:25 729:7
735:12 736:17
740:2,9,10
743:24 746:10
757:11,22,23
758:17,19,20
759:5

**sat** 706:12
707:22

**satisfy** 625:12

**Saturday** 742:22

**save** 506:16

**saved** 499:21

**saw** 486:15
488:6 581:19
582:1 615:23
665:9,16 677:9
714:7 716:22
725:2,18 757:24
758:9,17,20
759:7

**say** 479:21
485:20 486:12,
16 489:25
490:21 492:20
493:8,9 494:15
502:4 506:12

516:18 519:6
521:1 522:24
530:8 537:24
542:4 550:11
557:17 558:11,
12 561:21
563:11 566:14
567:2 568:8
569:2,14 575:19
576:6,20 579:9,
22 585:17
586:14 588:15
592:21 598:5,23
604:8 608:11
612:22 625:15,
18,21,23 626:22
627:19 634:13
636:3,6,9,10,13
637:8 639:18,
22,23 648:15,
17,20 649:8,12
653:10,19
660:11 661:13
663:20 666:8
667:4 668:11
670:20 678:7
684:18,19
688:23 691:10
698:25 700:16
702:15 707:13
709:6 711:21
713:8 722:25
725:18 727:12,
19 729:9 743:20
744:24 753:23
758:3

**saying** 492:3
540:4 563:5,10
564:12 569:11
574:14 578:12

580:8 587:14
596:23 626:17,
18 627:25
631:4,9,13
640:6 649:21
661:4 666:10
676:21 693:24
708:18 719:15,
16 729:9,10
739:20,25
741:12 742:3
744:23

**says** 477:24
503:11 543:10
563:14 564:20,
22 565:7,18,25
566:9,12,14
568:5,6,11
574:10 627:21
631:3,19 634:14
639:3 643:15
647:1 657:20
659:10,11
671:24 673:16
678:5 680:15
696:22 714:12
718:22 719:7
720:18,21
723:13 727:18
735:17 736:11,
20 737:15

**scale** 503:15
614:8 615:21
616:1,2 617:5,
12, 665:14
666:21 667:6
755:5,8,12,18

**scarification**
590:6

**scarred** 547:9 550:18 624:3

**scarring** 534:17 547:3 548:12 550:18 566:8 574:9 593:18 606:2

**scary** 728:7

**scattered** 500:17

**schedule** 484:9

**scheduled** 512:7

**school** 582:15 673:23 744:22

**sciatic** 688:3

**sciatic-type** 532:20

**scientific** 689:24 712:21 715:22 719:25 721:12, 13 722:4,12,13, 18,22 723:17 728:18,19 729:1,6 730:23 732:25 733:22 734:3 735:2,18, 25 736:21,24,25 737:11,15,17, 18,21 738:5 740:1,13,20,21, 25 749:2

**scientist** 747:14

**scissors** 703:6

**sclerosis** 518:8 519:20 663:1,4, 5,18,19,21,22 664:1,5 665:1,2, 12,23 666:1,14

667:9 688:12,17 689:2,3 696:24

**sclerosus** 662:23

**scope** 730:18

**second** 485:1 510:19 564:21 565:1,17 570:9 643:10 708:9 717:23 726:11 736:24

**second-to-the-last** 643:11

**secondary** 662:22,25 663:20 689:1,5

**section** 478:24 479:2 481:24 482:7 502:11,15 550:25 560:24 561:19,21 563:17, 589:25 590:8 591:10 646:13 681:16 709:10 711:21

**sections** 674:6 734:14

**secure** 566:10

**see** 476:25 478:9, 25 492:10 496:15,20 503:15 504:5 509:10 519:22 520:8 526:1 531:15 535:1,3, 16 536:4 538:11 539:1,10,14 542:1 544:5,7 545:2 546:17

550:6,19 551:11,12 558:20 559:1 561:2 563:15,16 564:23 565:9, 566:11 569:2 570:17 571:5,9 574:16 576:9 577:8 587:24 588:4,9 589:15 590:9,21 591:5, 13,15 596:4 599:15 615:9,16 617:5,11,14 621:2,16,22 623:4,6 624:9 629:5,11 634:4 640:18,23 642:7 644:22 645:2,4, 11,19 646:9 655:3,16,21 656:16 659:23 660:13 661:10 667:20 672:4,5 673:19 678:13 680:17 685:20 686:8 690:17 691:8 693:7,8, 11 695:22 696:7 711:14 718:17 719:7 720:10 722:2 724:25 726:1,7 727:5 729:22 732:18, 20,24 734:15, 17,18,21,22 735:11,21,24 736:1,6,11,15, 16,19,22 737:7, 11, 739:24

740:1,10,11,20, 22 741:21 742:5 745:20,23 753:3 757:5,12,20 758:13,22

**seeing** 556:8 596:25 655:2 691:17 723:23 732:15

**seeking** 602:14

**seem** 720:13

**seems** 591:13

**seen** 509:25 546:22 549:4 571:18 596:1,20 615:18 651:19, 23 655:19,20 662:1 678:22,23 679:8,13 685:18 722:2 723:15,19 725:13 729:6,8, 23 733:2,3 738:10 741:5,11 749:8,16

**sees** 589:18 753:3

**segment** 549:17 570:5

**selling** 729:2

**send** 481:18

**sensation** 540:15 689:21

**sense** 733:18

**sent** 481:11 483:16 484:21 486:1 577:2 602:13

**sentence** 510:7
564:21,24 566:9
576:19 643:11,
15 644:7 748:25
749:1 750:24

**separate** 477:9,
12 481:9,21,22
482:7 506:21
543:10 602:13
660:9 664:22
679:12 689:23

**separated**
541:13

**separately** 481:7
522:12 608:25

**separation**
629:15,19,21
630:3

**September**
631:25 632:6,9,
11

**sequence**
505:12,13
507:3,5 566:2

**series** 720:11
749:20 750:15
751:5 752:9
754:19 757:3
759:11

**serious** 626:11
627:7

**seriously** 716:17
722:20 723:14
724:9 741:13

**set** 477:24
479:22 487:11
556:21 609:8
610:12 644:11

664:20 708:18
740:3

**setting** 592:3
633:19 686:14,
16

**several** 477:25
520:19 522:2
708:19

**severe** 550:20
594:6,10,11,22
596:3 597:13
598:3 606:1
615:11,24 616:3
618:20,23
621:12 624:8
626:19 754:22

**severely** 624:3

**severity** 530:13
531:6 546:13
576:2 577:23
578:19 590:12
593:15 596:18
613:24 614:8,9
615:22 617:4,
16,20 651:21
652:18 692:19,
20 693:8 710:20

**sex** 545:22
621:18 622:9,
17,23,25 697:9
753:10,11,21

**sexual** 536:12,
16,19 537:9,11,
16 538:1,11,15,
17 539:2,5
545:22,23
547:20,21
548:6,7,11,18

550:13,21
551:13 616:20,
21,24 617:4,12
621:6,8,10,12
622:1,7 623:13
624:4,15 633:21
634:17 635:1,
10,16 664:10
667:5,15 668:11
694:17,19
695:6,24 696:5,
8,18 752:10
753:6 754:3,5
755:9 758:4,6,
10,15

**sexually** 503:12
549:16 634:6,8,
10 695:2,11
696:23 697:3

**sharp** 702:8
703:4

**she's** 513:10
517:6 521:10
527:7 534:25
540:6 549:15
594:9 599:1
604:3 606:11,16
622:21,24 624:7
627:21 631:13
650:7 652:3
653:2 668:8
681:5,25
691:11,13
694:21,25
696:12 698:4

**shed** 751:19

**sheet** 712:22
713:12,13
715:23 716:24

717:4,20 722:25
723:9 724:2
725:4,7,12
726:5,12,14
727:12,18 735:3
736:24 738:22
740:4,8,15
741:2,7

**sheets** 718:6
724:14

**shelf** 562:25

**shelves** 562:24

**shift** 656:21
668:20

**shifting** 658:25

**short** 593:1
606:22 641:2
683:13

**short-lived**
595:8

**short-term**
589:19 595:14

**shortcut** 698:12

**shorter** 607:5

**shortly** 690:8

**should** 478:23
479:4 485:19
510:11 520:21
546:5 556:25
561:12 563:22
565:15,25
566:13,18,23,24
568:15,24
575:8,13 579:9,
25 580:9,24
583:20 584:5,14
585:18 601:15

609:22 622:6,14
634:9 639:4
642:1,4 647:18,
25 648:17,20,24
655:12 658:1,12
659:25 662:4
663:1 672:7
674:25 675:15,
24 677:16
691:25 709:6
710:12,13
711:22 712:4,
11,13 716:3,8,
719:17,19
722:5,20
723:14,18 724:9
727:3 738:23
739:2 741:12
751:10

**show**  510:2
600:21 666:23
678:15 680:16,
18 682:20 684:6
712:14 717:8
722:7 726:16
727:7 729:13
731:3,25

**showed**  646:25
741:15

**showing**  538:14
572:6 574:11
723:24 726:15
730:21 731:23

**shown**  539:20
694:7

**shows**  600:12,19

**shredded**  499:4,
23 500:3

**shrinkage**
566:19

**sic**  663:6 714:10

**side**  527:25
551:4 638:3
639:7 705:11

**sides**  561:1

**sigmoid**  528:1

**signature**
493:21,22 658:5

**signed**  493:15
585:13

**significant**
613:15 623:11
670:6 695:3,5

**significantly**
695:4

**similar**  477:15
479:16 551:2
652:23 653:5
694:4 735:15
743:21

**similarly**  478:20
479:2 611:7,17
640:16 756:8

**since**  536:22
576:14 604:15,
17 674:15

**single**  519:9
533:11 591:4
741:5

**Sir**  475:17

**SIS**  510:14
511:20,22 598:3

**sit**  483:4 649:8
705:11

**site**  546:23
629:17 631:22

**sitting**  486:9
503:22 534:14,
18 539:12
562:7,24 563:6
578:13 584:2
586:14 588:13
591:7 598:5
635:13 640:20
648:16 661:11
680:6 693:1
744:7

**situation**  514:10
530:13 755:9

**situations**
626:19

**six**  536:16 539:3
558:1 646:23

**six-or-so**  691:3

**six-week**  536:20

**sixth**  565:7

**size**  601:11

**skin**  662:22
663:1,21,22,23
664:7,9,12,18
665:2,14 666:5,
667:10,13 685:8
688:16,20,22,25
689:15,18

**skip**  720:20
754:15

**skipped**  656:18

**slide**  705:6
706:13

**slides**  699:20
701:10 704:23

705:1,6 706:19
707:3,14,18

**sling**  510:14
511:21,22
512:15,21,24
513:2,7, 514:17
515:1,10,17
570:9 601:17
602:2,12 603:9,
13, 604:21
605:9,11,15,23
611:19 612:6
661:23 662:2
756:11

**slow**  718:3

**small**  600:18
602:2 605:23
612:24 638:1
653:8 654:6
661:18

**Smith**  475:13

**smoke**  673:11
680:20

**smoker**  671:17
672:1,2,13
677:5,7,11
680:8,15,18
681:3,9,22
682:11,19,20,21

**smokers**  671:11,
13,15,24 673:20
677:18,20

**smokes**  673:8
676:11,13,14,15

**smoking**  668:21,
24 669:3,7
670:6,12,14,18,
20,24 671:2

672:6,10,15
673:1,22,24
674:7,8,13,24
675:1,3,6 676:9,
19,20 677:1,10,
19 678:5,15,18
679:6 681:1,19
759:3,8

**Smyrna** 488:25

**Snell** 746:17

**So-and-so**
486:15

**societies** 540:14

**Society** 522:6
525:8 527:18
528:10 532:12
540:13 551:10,
11 594:3 687:4

**soft** 560:23

**sold** 562:19
728:16,25

**sole** 547:20

**Solo** 564:4
603:10 611:12,
14,15 612:2,17,
18,23 638:17,22
639:5 640:16
648:8 649:10
653:7,13 654:5,
8,13 661:21
749:7 756:3,15

**somebody**
628:16 672:13
673:5,7,8
676:10,12,13,15
678:8,20 685:2
715:18 743:20

**someone** 567:7
659:20

**someplace**
520:14

**sometimes**
490:22,25 496:9
505:15 543:1
587:15

**somewhat** 492:5
581:14 660:2

**somewhere**
505:6 514:5
599:16 617:6,7
624:17 662:1

**soon** 538:17

**sorry** 540:20
557:15 561:4
564:19 565:16
576:11,17
579:13 601:9
608:6 636:19
642:21 645:20,
23 656:5
676:23,24
679:3,17,25
699:5 715:17
717:22 718:3
745:7

**sort** 537:2
545:16 565:6
568:13 629:16

**sought** 555:23
556:3

**sounded** 669:11

**sounds** 518:9
728:6

**source** 528:23,24
529:14 545:2

597:14

**sources** 577:15

**space** 529:9
692:24

**speak** 478:7
496:14 506:10
507:19 536:13
586:10,19,20
587:5 589:2,12,
20 615:19 634:6
719:21 722:17

**speaking** 545:13
567:1 584:7
606:2,4 612:2
715:11,18

**speaks** 626:1

**specialist**
551:14,15,18
552:14 553:8
554:2 555:5,24
556:4

**specialists**
551:25 552:4,9,
10

**specializing**
619:18

**specific** 477:8
482:18 483:11,
15 499:16
525:15,16 526:2
529:25 534:1,19
542:12 545:20,
23 581:6 583:3
584:10 585:8
590:22 598:18
603:1,4,8
607:20 614:19
626:20 637:23

640:5 646:13
659:2 660:3,10
669:8,16 685:24
687:16 691:15
700:18 708:22
715:2 723:22
725:10 727:6
730:20 731:10
737:22 743:25
745:2 749:4

**specifically**
479:24 481:3
482:21 486:12
494:4,11 513:9
519:13 525:14
580:21 584:12
587:24 610:12
615:7,19 616:9,
20 634:25 637:6
638:13 661:17
662:11 686:1
700:25 708:8
721:7 723:16
724:25 745:13

**specifics** 539:13
584:2 603:6
730:19

**specimen** 705:4,
10 707:16,22

**specimens**
704:12 706:1,13
707:10,13

**speculate** 585:7
586:12 587:2,3
648:12 649:2,25
650:1 709:23

**speculation**
568:2,18 598:13
599:11 601:7

625:15,21
649:22 712:6
722:15

**spell** 522:12
663:3

**spelling** 714:14

**spend** 489:17
490:6,25 498:5

**spent** 476:4
480:15,18
481:3,8,13
482:4,5,13,22
483:3 489:11
743:13,17 744:9

**spinal** 520:2,6
524:4 525:21

**spine** 554:16

**spoke** 621:9
624:19 755:4

**Sprock** 612:13
631:3,5,10,16,
21 632:12
635:7,12 636:1,
10,25 640:15
642:10 643:14,
25 644:3,6,18
649:6,10

**Sprock's** 614:12
629:25 637:14
638:7

**stabilize** 566:1

**staff** 582:16

**stage** 516:12

**stand** 746:18

**standard**
591:22,25 592:3
633:5,10 634:25

635:14,21
757:6,12,20,24

**standards**
637:10

**standing** 534:14

**stands** 596:16
670:1 739:22

**stapler** 641:25

**staples** 641:21

**start** 476:24
503:10 505:16
523:12 613:2
629:11 630:22
631:6 745:3,10

**started** 476:16
503:13 566:17
582:24,25
585:14 630:24
631:8 635:9
669:17 708:12

**starting** 484:2
576:14 748:23
750:25

**starts** 708:18
714:11

**state** 475:6 493:7
514:2, 520:3
522:21 539:18
566:21 571:20
573:3 589:2,16
595:24 599:19
601:3 603:17
612:10 618:14
623:23 626:4
648:5 649:16,
17,18 666:24
667:23 678:22
694:5,25 696:8,

22 711:17
719:22 722:19
750:5

**stated** 514:3
522:2,20 534:23
559:4 561:14
571:5 572:17
573:11 578:8
587:16,23 591:5
605:20,21 614:6
617:3 620:8
621:2,11 623:8
625:6 636:20
637:17,25
639:18 649:16
653:25 696:7
698:18 714:1
723:3 725:17
735:20 746:3,15
750:4 757:20

**statement** 520:4
596:16 625:6
711:7 716:12,14
725:15 748:19
759:20

**statements** 698:9
724:11 730:17

**states** 524:24,25
535:15 560:22
561:15,21 564:7
565:21 570:17
572:8 576:23
621:2 627:23,24
631:10 638:13
643:3 644:4
662:25 670:14
672:2 677:5
701:15 721:3
724:11 735:2,4,

5 736:25

**stating** 536:4
627:24 638:14
678:23 693:15
724:25 725:23
726:1 736:6

**statistically**
545:13 567:1
606:2,4 612:1

**statistics** 514:10,
23 515:14
611:25

**status** 538:23
544:14 548:13
613:12,13
694:16 696:18
752:10

**staying** 743:2

**step** 565:6 704:2
730:11

**steroid** 538:23

**stick** 698:8

**sticker** 532:22
533:13,17,21,22
534:1,20,24
535:6,19

**sticking** 741:14

**still** 475:16,17
501:3 548:14
593:24 594:7
595:2 598:24
599:5,21 600:4
613:13 627:10
651:13 653:1
722:3 745:23

**stimuli** 689:14

**stitches** 571:21

572:17

**stopped** 677:1,9

**stopping** 671:22

**stops** 676:20

**story** 739:16

**streamline** 516:16

**strength** 561:1

**stress** 541:6 543:15 547:14 603:23 604:3, 15,23 605:3,10 627:17 628:2 662:3

**stressor** 627:4

**stressors** 547:2,5 548:20 627:14 697:24

**strike** 488:15 523:22 556:12 623:19 666:12 674:2 685:24 715:15 724:4,10 725:15, 726:24 728:3,13,21 729:4 741:17

**strong** 491:20 560:25

**studies** 538:13 539:19 571:18 572:6 573:4 574:6 619:21,22 645:14 646:8,14 678:13,17,18 686:5,6 689:24 694:7 700:2 705:19,21

706:11 716:14 724:25 755:17

**study** 486:7 616:1 647:3,9 678:14 684:17 685:15 686:9 688:18 723:7, 15,19,24 741:6

**studying** 747:4

**stuff** 730:6

**stuttering** 683:14

**Suarez** 485:15, 16 556:15 558:3,16 560:5 562:2,9,14 563:2,3 564:11 567:15 569:17 570:1,11 572:10 575:20,23 577:12 579:6, 11,19 580:10 584:16 585:20 586:1,3,7,12,15, 16,19,22 587:2, 5,6 588:5,14 589:3 590:15 591:8,19 592:4, 8,13,21

**Suarez's** 558:18 572:21 573:13 587:18

**subject** 581:11 602:22 726:25 738:4 747:8 751:20

**subjective** 569:12,15

**submitted** 483:1, 9

**Subsection** 657:19

**subsequently** 575:20 674:13 737:6

**subset** 530:1

**subspecialists** 553:25

**subspecialized** 550:17 595:25 615:1

**subspecialty** 551:22

**substantial** 611:19 646:25

**substrate** 713:10,11 714:2

**suburb** 489:1

**success** 571:20

**such** 536:10 540:24 548:20 589:11 684:2 696:16 711:8 723:19

**suffer** 629:1

**suffered** 752:14

**suffering** 549:11

**sufficiently** 565:25

**SUI** 604:10

**suicide** 539:21 540:16 624:23 625:4 626:8,10, 17

**suited** 737:22 749:4

**Sumika** 713:4,8 714:16 715:17 716:24 717:19 719:22 721:15 722:8 723:13, 16, 728:25 737:1,12,16 738:21 740:14 741:6 750:7

**Sumika's** 739:5

**summarize** 515:19 516:16 574:24 611:2 662:14

**summary** 490:14 515:24 516:7 563:23 575:9 579:25 611:9 657:5 668:3 710:15 713:21 736:3 747:15

**superficial** 663:22 664:18

**supplement** 658:21 751:1

**supplemental** 751:2

**supplier** 711:19

**supply** 737:1,13

**support** 519:23 524:2, 560:3,13, 23,24 562:17 564:2 590:3 646:9 655:20 677:24, 689:25 691:5 697:2

738:9 758:18

**supporting**
723:8

**supports**  652:9
655:3 668:7
676:18

**supposed**  556:18
579:7

**sure**  478:12
495:8 500:19
502:1,17 503:22
509:8,9,15
510:20 564:13,
22 569:3 576:19
581:23 588:12
609:10 647:21
651:7 657:1
670:16 718:2
746:9 750:8
755:3,21

**surg-**  668:15

**surgeon**  485:16,
18 528:9 549:6,
25 567:21
568:4,13 569:7
571:10 574:5
577:15 584:16
586:21 589:4,8,
10,16 590:1
640:10 642:14
648:25 649:1,
660:18

**surgeon's**
529:10 589:21

**surgeons**  602:11

**surgeries**  512:18
546:20 595:14
681:18

**surgery**  483:19
504:21 527:10
528:25 530:20
536:8 558:18
578:10 617:6,7
627:1,12,21,22
629:8 630:9,15,
18 631:1,7
636:24 644:21
667:18 668:15
677:12 678:9
680:19 681:23
682:15,21 686:2
690:9 695:16
696:19,23
697:16

**surgical**  553:22
556:14 558:25
559:8 560:5
565:6 569:8,18
572:10,21
578:25 629:19
630:12,19 632:2
636:18,23
637:10 638:8
685:4 702:6
757:23

**surgically**
553:11 637:17

**surprising**
691:17

**susceptible**
697:25

**suture**  566:18
629:16

**sutured**  631:22

**sutures**  566:10
571:3,11

**suturing**  632:2
633:1

**swelling**  531:17

**sworn**  475:20,24

**symptomatology**
611:5 664:4

**symptoms**
529:24 626:5
636:17 662:3

**syndrome**
525:24 529:20
531:1,6 610:18

**syndromes**
518:7

**synthetic**  684:11

**system**  525:19
560:3,13,23
562:19 564:2
590:3 655:7
673:25 681:17

**systemic**  527:24

---

**T**

---

**tack**  573:24

**tacked**  570:18
574:2 644:18

**tacking**  558:23
559:7 570:2,12
571:3,7,11,19,
21,23 572:16
573:5,19,22
574:8,15

**tailed**  669:17

**take**  476:18
488:8 490:11
499:13 504:7,

10,15,21 505:4,
15 506:6 512:10
535:14 549:9
559:13,15
577:24 578:9
579:2 584:17
606:8,22 607:3
615:11 617:8
641:22 642:20
652:21 678:7
680:17 681:7
683:13,16 703:1
732:22 733:8
741:25 750:16
754:6 755:9

**taken**  488:18
505:9 609:16
638:21 659:16
700:20 704:12
706:14 716:17
722:20 723:14
724:9 741:12

**takes**  549:7
550:18 640:10

**taking**  490:9
495:1,12 552:25
615:5 623:4
624:17, 651:18
702:7

**talk**  476:8
478:14 479:3
495:7 497:16
512:23 521:1
539:15 555:10
589:11 590:10
591:1 616:9
635:12 656:22
667:3 668:20
675:19 678:18

693:13 694:21
706:17 716:5
730:8 731:3

**talked** 534:9
549:13 550:5
563:2 567:12
588:5 601:21
603:8 605:13
647:7 657:14
701:21 703:12
716:1 730:6
745:18

**talking** 492:13
502:14 516:17
522:9 542:10,
11,14 554:18
561:10 565:12
578:14 593:17,
18 600:1 603:3
630:22 633:11
649:5, 655:6
679:5 687:17
688:8,22 689:9
702:12,13
707:14 711:3,4
718:20 719:12
727:9 730:4
747:2

**talks** 479:24
565:2 590:9
616:15

**tape** 570:20

**team** 707:11

**technically**
629:18

**TECHNICIAN**
475:1,15
510:21,24

559:17,20
592:24 593:2
607:8,11 640:25
641:3 656:7
683:18,21
732:5,9 760:1

**technique**
556:15 558:25
569:8 572:10,21
630:19 636:18
638:8

**techniques** 564:1

**telephone** 743:9

**tell** 480:14,
482:22 500:9
502:19 517:4
518:16,25
523:14,17
525:14 573:7
582:17,25
583:2,5 587:3
591:7 592:5
601:10 606:19
618:1 623:17
642:13 656:11
663:15 715:4
719:15 742:10
745:2 756:8

**telling** 482:19
491:25 566:6
618:12,22
624:10 681:12
698:9 728:12
740:13

**tells** 534:24

**temperature**
689:15

**ten** 606:22

630:14,21
633:17 671:22
676:14

**ten-and-a-half-
week** 633:16

**ten-week** 633:15

**tender** 701:18

**tenderness**
534:16 547:3,10
548:12

**tends** 500:17

**Tennessee**
488:10,12,16,25
489:6 501:12

**tensed** 643:3,15

**tension** 557:12
558:23 559:6
565:9,13,19,20,
23 566:13,14,
18,24 567:2,6,8
568:7,8,11,23
569:1,5,14
570:1,12,19
638:12 639:10,
21,22 640:6,7,
13,22 644:21

**tension-free**
556:18,25
557:2,6,19
558:10,14
561:2,13,15
564:22 565:2,3,
15,20,22
566:10,14,23,24
567:3 637:1
639:4,9,17,23
642:15 643:14,
25 644:7

**term** 554:11
569:15 570:20
626:10,11

**terminology**
590:22 644:17

**terms** 529:19
567:4 611:5
667:14 731:8
743:12 745:17

**territory** 583:10

**tertiary** 492:7
517:23 549:7
550:16 551:9
594:1 595:25
596:20,24 615:1
651:18

**test** 491:17 542:1
591:12

**test-** 714:17

**testified** 475:24
518:20 533:24
542:18 614:14
681:25 714:18
749:15 756:13

**testify** 715:21
722:1

**testifying** 637:19
739:7,20

**testimony** 477:3
484:9 505:21
512:4, 513:20
522:18 525:4
533:5 535:12
538:3 541:23
542:22 544:3,25
554:13 572:14,
25 573:12,13
580:19 582:11

583:13 587:9,11 592:4,10 593:13,14 595:5,21 601:23 610:15 611:24 622:12 623:2,20 625:7 626:1 637:11 652:4, 653:6 657:16 660:15 672:17 695:14,18 698:5,19 699:5 709:8 712:15,19 714:3,6,13,19 716:18,20 741:17 742:11, 21 744:9 745:17,20 746:5,10,12,16, 22 747:10,13

**than** 476:18 490:17 491:7 496:23 497:13 507:18 514:24 515:15 527:20 536:5 552:18 553:5 565:20 600:12 601:1 606:5 612:3 623:17 635:5 653:13 656:9 659:17 673:7 698:6 699:1 747:14 754:4,22 756:15

**thank** 483:12 487:9 488:1 509:16 511:7,8 515:18 560:9 585:15 608:21

629:5 641:19,24 642:1 644:11 657:3 658:1,25 670:7 705:13 747:18 754:7,19 759:24,25

**their** 482:4 486:18 487:2,4 490:10 544:6 551:8 568:5,20, 21 574:8 620:2, 10 625:12 628:15 636:21, 22 661:14 673:17 674:10 676:16 677:19 708:4 721:16 724:7,8 728:10, 20 729:1 737:4, 13 750:17 758:23

**them** 479:22 482:15 490:9 492:14 496:18 498:13 499:3 501:6 504:15 506:10,20 508:23 517:14, 21 519:14,23 544:8 547:25 550:2,3,9 551:4 552:11 555:6 577:23 592:2,19 618:11 639:6 646:14 648:19 661:17 689:13 702:7 703:2,3,6, 19,23 717:8 718:1 727:4 737:12 747:4

750:5

**themselves** 505:2 545:3 551:24 552:9

**theoretical** 598:1

**theoretically** 528:23

**theorize** 586:5

**theory** 709:25 710:7

**therapist** 555:4

**therapists** 555:1, 2

**therapy** 554:22 615:5 632:18 690:9,10,25

**there's** 485:9 513:12 519:10 538:21 554:16 565:19 566:16 578:5 579:13 600:11,21 612:5 634:7,20 635:10 642:19 645:15 694:1 734:11 754:2,25 756:24

**thereafter** 680:9, 20

**therefore** 478:23 585:17 592:19

**they'd** 551:2

**they're** 477:14 479:19,20,22 491:10 505:14 506:7,19 513:11 545:3 549:21 551:3 552:4

553:15 554:3 566:6 567:3,5 569:13 596:23 608:25 638:2 655:25 657:8 671:24 672:25 691:15 702:8 703:4 720:12 726:16 736:6 739:21 740:22

**they've** 545:3 549:15 625:18, 23

**thigh** 618:13 688:4

**thin** 614:14

**thing** 479:21 491:16 508:12 520:25 521:3 522:4,21 530:19 534:5 535:14 537:12 566:7 578:13 579:1 593:20 600:13, 14 635:8,20 697:12 706:18 743:24

**things** 476:25 481:14 484:5 489:20 494:7 496:6 503:21 504:6,23 506:15 518:10,13 519:5,22 521:3 526:12 529:1,17 540:21 541:1 542:19 545:6 546:4 547:12,15 552:8 564:21

574:1,9 575:7,
12,19 581:21
582:20 587:15
589:20 590:4,6
613:4 619:14
626:18 629:2
630:10 681:16
702:7 709:6
742:17 743:20
745:5,10 746:8

**think** 476:11
480:9 491:8,15
492:6 497:21
508:24 517:2,3
519:21 521:13
535:14 543:2,23
545:20 547:23
548:14 557:4
567:1,5,21,23
568:4 569:2,12
575:7,15 578:12
583:11 599:13
602:20,25
606:13 626:15
628:1,11,24
632:10 634:17
635:11,19
641:14 656:18
658:20 660:23
661:1 669:12,16
672:23 673:3
675:4 676:18
677:6 678:3
687:13 698:18
703:9 706:17
709:11,16
710:12 712:8
716:2,22 722:8
728:10 729:14
730:17,25

731:24 732:1
736:2 738:1
752:8 756:13
759:10

**thinking** 589:18

**thinned** 614:20,
23

**thinning** 613:25

**third** 485:1
565:12 642:19
655:23 732:17,
19,20

**thoracic** 525:21

**thorough** 700:8

**thoroughly**
578:11

**though** 486:17
501:4 522:12
525:2 543:3
547:11 626:13
629:10 744:18

**thought** 493:2,
10 495:20
518:14 519:8
533:2 537:15
541:20 567:15,
22 581:14 640:1
681:15 717:2
725:11

**thousand** 591:3

**thousands**
541:23 717:5

**three** 477:8,9,12
478:21 479:15
483:11 488:5,6
489:10 490:4
492:25 493:16

494:22 496:13
497:4,18 498:5,
10 499:24
500:11 548:2
550:24 551:5
584:3 607:20
619:13 625:16
674:23 699:7,
10,24 701:21,23
703:11,14
704:5,7,24
716:8,9 718:6
727:11 730:20
741:25 742:9
748:10,21
754:8,10 757:2
758:1

**three-
dimensional**
646:21

**three-page**
642:17

**threshold** 673:17

**thrilled** 544:6

**through** 478:11,
24 479:3,11
482:24 483:21
486:6 493:7
494:1 503:7
504:10,18
506:22 508:13
509:7 510:3
514:7 518:3,14
519:6,7,8,19
520:20,22,25
521:15,18,19
522:2,7 524:25
525:10,11 536:5
561:17 584:8

590:25 591:16
605:23 608:8
614:1 634:19
646:14 673:23
703:5 716:16
725:8 726:4
738:3 745:5,9
753:12,22

**throw** 626:11
636:4

**tied** 584:12

**tight** 567:8,9
637:1,21 638:2,
5,7,15

**time** 475:2
476:22 480:14,
18 481:3,8,13
482:4,5,12,13,
22 489:3,11,17,
18,20,21 490:7,
10,24 491:2
494:14 496:12,
17,21 498:5,17
504:7 510:21,25
512:18 525:13
536:12 538:22
544:15 553:24
558:7,13
559:17,21
565:12 567:2
583:11 585:7
587:16 592:24
593:3 599:14
603:10 604:11
607:8,12 609:16
617:8,25 632:14
633:1,22 636:19
638:1 640:25
641:4 642:20

644:21 646:20
656:6 657:20
673:17 676:10
677:9,11 680:8,
9,18,19 681:9,
23 682:11,20
683:18,22
691:18 703:19
704:3 726:15
730:3 732:5,10
733:6 734:12,14
743:17 744:9,17
745:12 747:19,
21 751:7 752:2
754:9 759:19
760:3

**times** 487:17
490:11 496:24
497:4 520:19
522:2 524:9
542:18 548:3,23
553:10,13
619:16 682:4
729:22 743:11
750:6

**timing** 690:13

**tissue** 557:7
560:25 566:1,3
568:10 593:6,
13,20,23 594:16
595:1,12 596:2,
7 597:9 614:15
631:2 633:4,8
644:23 645:4,6
650:4,16 651:11
652:15 684:10,
11,19,21 703:2
719:1

**tissues** 568:9

643:23 645:15
691:1 702:5
735:9

**today** 476:18
478:7 480:22
483:5,12 486:9
503:22 509:6
534:18 539:12
562:7 563:6
583:19 584:1
588:14 595:22
596:17 598:5
635:13 637:7
640:20 646:19
648:16 652:4
653:3 661:11
680:6 682:8
693:1 698:4
708:12 730:17,
18,19 742:8,21
743:4,6 744:7,
10,13 747:5
754:11,24
756:14

**today's** 760:1

**together** 476:5
564:15 578:3
638:9 699:8
720:15 735:13

**told** 481:18
488:13 489:2
492:24 493:10
496:18 498:9
502:20 506:11
537:15 555:8
580:7 582:2
586:10 587:8
590:15 615:23
617:17,18

623:15 634:9
654:7 665:16
666:19 668:7
674:1 697:10
711:23 715:8
719:16,19
731:22 737:12
743:11

**too** 482:16 496:9
521:21 538:17,
21 558:16 618:2
637:1,20 638:5,
7 727:10 731:20
744:16 758:10

**took** 485:18
490:3,24 496:21
498:11,24,25
499:1,6,24
502:21 503:23
505:18 507:2,6
511:1 544:16,20
557:10 562:15
609:18,21

**top** 503:11 556:1
599:16 600:15
602:4 630:10
690:14 695:1
700:12 714:9
732:18 736:11

**topic** 715:12,13
729:15

**topics** 733:14

**toss** 509:16

**tossed** 544:1

**TOT** 611:15

**total** 743:12

**totality** 636:21
743:18

**touch** 618:10,13

**touching** 494:12

**towards** 733:17

**traction** 564:20

**tragic** 627:7

**trained** 520:21
628:6

**training** 550:17
552:21,25
628:17

**trans-** 679:17

**transabdominal**
620:11 679:12,
14 685:6

**transcripts**
486:25 751:6,
11,19 752:3

**transferred**
500:7,18 501:1,
7

**translabial**
646:21 647:5

**transobturator**
605:22 756:11

**transvaginal**
536:9 546:8
557:22 558:9
575:17 587:13,
20 588:7 589:9
591:21 596:4
597:16 598:7
599:3 600:6,8,
25 602:8 651:12
652:25 653:16
671:1,3,5,21
672:22,24
677:23 678:1,9,

14,16,20 679:15,18 681:2 685:5,16,24 686:2,7 698:24 721:8,16,17

**traps** 531:13

**trauma** 520:1 525:20

**travel** 489:5,14 641:25

**treat** 552:6,17,19 553:25 604:23 605:10 611:12 671:6 673:23 728:20

**treatable** 614:10

**treated** 615:8 690:21

**treaters** 659:23 661:13 752:4

**treating** 617:21 624:10 660:15 666:19 751:6 753:5

**treatment** 552:22 555:11 556:3 616:11 632:14 633:5

**treatments** 753:7

**tremendous** 621:13 623:10

**tremendously** 671:23

**trial** 522:23,24

**tricky** 520:8 717:7

**tried** 515:18 749:16

**trigger** 554:15, 16,17

**trigger-point** 553:19 554:4,8, 18

**trimmed** 631:21 633:18 635:8

**trocar** 674:11,16

**trocars** 674:10, 18,23

**trouble** 488:2 616:20

**true** 493:23 514:6,19 527:22 535:9,25 540:1 553:21 557:8 559:4 563:23 566:3 571:13 577:5,20 590:8 592:4 595:3 598:11,15 599:24 602:15 604:4,15 605:16 613:14 622:10 628:5 645:6 658:4 662:9 664:24 665:6 668:12 740:4 745:15 746:23

**truly** 711:15

**trust** 536:3 577:25

**truth** 618:2

**try** 478:17 518:1 548:15 574:23 593:22 618:9

662:14 748:1 749:24

**trying** 478:9 497:23 516:16 520:7 564:3 566:6 617:5 692:10 707:1 719:5,6 720:10, 12 739:19,21 744:23,24

**Tuesday** 484:21

**turn** 564:14 748:5 750:22 755:20,22 756:5

**turned** 631:2

**twice** 508:15 567:1 639:9 640:13

**two** 476:18 478:6,15 479:12 480:6,8 484:17 490:25 502:7 512:18 513:10, 13 514:1 539:2 549:20 575:6,12 576:7 579:5,21 585:18,21 602:4 617:3 626:13,14 630:17 631:7 632:16 673:8 689:9 694:12 699:6 701:11 706:12 731:18 741:25 742:18 743:9 755:1

**two-and-a-half** 647:23

**type** 491:15

513:11 527:20 528:13 534:7 536:8 552:17 570:12 571:3 602:14 613:23 622:16 653:20 684:25 687:8 688:5

**types** 479:15 480:5 481:14 504:23 541:5 597:2 697:9 727:20

**typo** 510:6 511:18 658:13

**typographical** 508:25 509:3 657:23 658:15

**typos** 658:8

---

**U**

---

**ultimately** 726:22 737:21 738:1 749:3 750:6

**ultrasonography** 647:6

**ultrasound** 646:21

**unable** 480:17 510:7

**unaware** 537:7 685:15 722:21 723:3,6

**unclear** 568:14

**uncommon** 691:25

**under** 475:16,18 476:12 541:25 558:23 559:6 560:21 565:8,17 570:1,11 582:2, 17 588:2 589:24 604:9 657:19 703:18,22 705:7,14,25 706:6,19 707:23 720:22 747:4 748:20

**underestimated** 647:1

**undergoes** 726:20

**undergoing** 543:15 678:9

**undergone** 684:13

**underlying** 530:22 627:3

**underneath** 566:16 720:18 736:20 737:14

**understand** 475:17 476:6,9 477:7 481:2,6, 20 497:23 504:24 512:19 514:14 550:9 556:19 558:4 563:8 569:7 573:25 582:4 602:9,10 620:20,24 623:15 644:5 651:7,25 670:16

688:23 689:8,11 692:10,11 697:14 707:2 713:12 714:23 726:10,11,23 727:2,3 730:2 733:14 736:2 739:11 745:1

**understandable** 499:13 622:2

**understanding** 488:4 532:14 541:25 553:5 564:4 570:20 581:24 582:17, 19,22 591:11 619:4,19 620:10 666:25 687:2 689:22 701:4 737:18

**understands** 620:2 629:13

**understood** 513:15 520:7 555:20,22 559:3 590:13 599:4,21 652:23 666:18 705:5 709:11 733:6 759:14

**underwent** 690:9

**uneven** 645:14, 15

**unfair** 518:21 739:17

**unfortunately** 592:18 626:8 627:13 634:22

665:6

**unique** 610:19

**unknown** 557:2, 4

**unless** 480:9 487:12 512:23 514:4 630:18 720:21

**unlikely** 550:12 551:6 696:12

**unsafe** 478:1,4 708:21,24

**until** 492:17 718:1

**unusual** 691:22

**unwillingness** 737:3

**up** 517:15 525:11 555:9,19 558:1 566:8 569:3,4 581:18 584:17 602:19 626:13 633:1 641:14 644:15 645:13 646:10, 25 654:21 656:12 663:2 671:22 674:11 717:10 720:11 726:10 727:22 729:15 753:20

**update** 670:10

**updated** 484:18, 24 668:22

**updates** 484:4

**upfront** 555:9 720:13

**upon** 484:13 490:12 492:21 515:14 516:10 525:6 529:8 532:10,15 536:6 538:22 545:11 549:6 553:10 557:9 564:6 577:13,14 594:11 595:8 601:14 611:25 621:11,13 623:9 625:7 626:6 638:2 645:13 646:11 653:10 654:19 668:9 678:25 683:7 685:21 688:18 689:21 692:23 693:16,25 695:3 701:14 711:3 747:1

**urethral** 570:9 604:10

**urge** 516:1,20 519:15 529:2,5, 16,19,24,25 611:7 662:17 692:2,5,11,17, 20 693:4,9,20

**urgency** 529:24

**urinary** 603:23 604:4,13,15,23 662:3

**urogyn** 551:22

**urogynecology** 553:13

**urologist** 697:8

753:2,16

**urologists** 552:5

**urology** 551:23

**us** 481:2 484:10,
506:17 511:14
518:17,25
520:10 599:18
606:15 668:22
683:14 731:24
733:15 744:2

**use** 478:2,4
487:7 529:18
536:22 554:10
567:22 570:12
571:11 575:17
580:25 614:7
626:10 640:4
649:22 656:2
703:5 708:21,24
711:20 712:16
718:22 720:18,
24 721:7,16
726:3 728:19
735:6,19 736:2
737:4,18 739:8,
25 749:6,16,24
753:12

**used** 494:6
560:22 562:9,15
563:2,7 566:10
571:3 599:4
601:2,12 608:13
610:7 615:20
642:1 674:18
679:23 719:17
732:25 735:4
755:8

**user** 627:11

**using** 562:2,23
570:20 608:12
626:25 646:20
647:5 724:17
749:21

**usually** 527:25
528:20 552:3
562:21 594:3
613:22 614:7,10
688:1 690:21
708:3

**uterine** 518:6
527:9

**uterus** 527:11
614:22

**utilizes** 711:18

---

**V**

---

**vagina** 494:12
532:18 534:17
547:4,9 548:12
549:14 613:16
614:24 619:22
624:3 635:24
645:16 655:6
665:3,24
666:15,17
667:10 686:17,
19 687:10
689:21 691:2

**vaginal** 497:1
528:22,24
538:18 541:8
542:5 550:18
570:20 613:21,
22,23,25 614:11
615:6 620:11
629:22 630:4

632:12 635:2,15
664:5 667:12
683:7,8 684:4
686:10,15
691:1,7,13,15,
23

**vague** 567:16,23

**vaguely** 751:9

**validated** 616:1

**variable** 678:14

**variables** 538:21

**various** 482:3
557:24 581:23
582:20 596:21
615:18 623:24
746:19 748:14

**VAS** 755:5,11

**vascular** 673:6

**vasculature**
673:2,6,25
676:12,17 678:5

**vast** 744:25

**verbal** 650:14

**version** 509:12
511:4 562:8,14,
22 563:2,7,9,10
609:5 659:7
717:21,22
718:16,19
720:15 725:3
726:4

**versions** 716:23,
24 717:3 724:14
727:11

**versus** 624:13
655:8 688:22
740:20

**very** 477:15
490:24 503:10
505:13 518:4
520:22 532:13
542:3 545:20,23
549:5, 555:6
562:23 565:22
574:8 591:12
598:24 599:13
602:5 614:14
619:2 624:1
626:4,18
635:19,25
640:22 655:4
661:18 665:21
670:5 686:25
687:1 689:12
693:10 700:8
702:1 703:5
706:24 720:11
721:15 733:4
734:8 740:9,10
747:19 750:16
751:20

**Vesicare** 530:4

**vesicovaginal**
529:9 531:10,11
692:24

**via** 503:18
679:10

**video** 475:1,4,15
510:21,24
559:17,20
592:24 593:2
607:8,11 640:25
641:3 656:7
683:18,21
732:5,9 760:1

**view** 716:17
722:19 723:13
724:8

**visibly** 704:6

**visit** 631:19
632:11 633:15

**visits** 588:10

**Visual** 503:15
614:8 615:21,25
617:5,12,
665:14 755:8,18

**volume** 475:3
490:12,13,21
491:2 514:23
606:3

**volumes** 646:20
647:5

---

## W

**Wait** 704:1

**waiting** 496:15
538:9

**walk** 533:24

**walking** 535:22

**walks** 533:25

**wall** 570:22
619:23 629:22
630:4

**Wallace** 742:25

**Wallace's**
742:24

**want** 476:23
478:12 480:4
514:13 520:8
524:7 539:10,14
551:4 564:12

584:6 587:23
588:12 602:9
606:7,8 611:2
616:9 622:1,9,
17 631:9
640:21,23
642:20 646:8,15
647:7,21 651:3
655:22 669:17
682:9,10 694:14
698:8 703:9,14
707:2 711:14
719:7 722:23
724:10,24 726:1
727:5 732:24
733:7 734:12
736:2 741:20
742:4 745:20,
23,24 746:1,9
747:18 751:13,
17

**wanted** 500:18
586:11 608:19
641:6 727:24

**wants** 624:15

**warn** 672:4
674:6,9,13

**warned** 681:5
719:22 720:9

**warning** 581:20
634:21 673:19,
21 674:5 713:4,
7,17 714:11,12
716:17 720:8
722:20 723:14
724:7,9 726:17
727:21 729:12

**warnings** 582:24
634:5,7 636:11

726:17 727:6

**warns** 537:8

**wasn't** 496:22
547:11 580:21

**wasted** 730:3

**way** 500:16
502:8 523:12
530:10 548:15
555:12 563:23
566:7 567:16,23
615:22 635:13
636:5 640:19
649:21 657:5
661:11 691:25
758:4

**ways** 753:17
754:2,5

**we'd** 538:12
605:20 639:6
690:20 711:7
722:18

**we'll** 476:25
559:5 584:17

**we're** 475:1
478:7 483:11
497:16 510:21,
24 516:17,24
521:13,18
559:17,20
564:13,15
578:12 581:15
583:11 590:9
592:24 593:2,18
603:2,3,5
606:13 607:8,11
609:10,23 610:1
612:5 636:21
640:25 641:3

647:21 649:5,6
665:21 679:2
683:18,21
687:16,17 688:8
703:9 704:10
706:17 711:3,4
727:9 730:3
732:1,5 747:1
759:23 760:2

**we've** 483:23
511:10 567:12
569:16 594:23
605:12 607:18
641:20 657:6
667:24 703:12
744:1 747:4
754:10

**week** 702:7

**weeks** 536:16
539:3 549:20
629:7 630:14,21
631:7 632:16
633:17 691:3

**weight** 598:21
601:10

**welcome** 670:8
733:16

**well** 476:12,20
479:21 483:10
484:14,20 485:7
487:5,9 491:5
502:17 503:19
504:15 506:1
508:10,19
512:23 513:5,22
514:4 516:1
517:22 518:23
519:2 523:20
526:11 531:22

532:13 536:22
541:4,20 545:8
549:2,6 550:23
551:3,14 561:16
567:1 568:24
573:21 582:11
586:5 587:8,17
589:2,8,23
590:24 593:22
595:21 596:15
597:11 598:4
599:13 602:19
607:4 613:25
620:8 621:16
622:5 623:15
624:1,6,12
626:9 627:18,23
628:24 629:18
630:1,20,23
632:1,25 634:4,
7,13,24 635:3,
19 636:9 638:21
643:20 644:3
649:5,25 651:3
660:5 664:10,14
665:25 666:6,10
668:9,10,15
673:1,21 677:6
678:7 679:23
680:16,25
685:15 691:8
695:4,23
696:10,22
698:19 701:10
703:20 709:9,16
711:8,16 712:15
715:9 716:4
719:15 720:14
722:7,12 723:25
726:7,18 731:2,

732:22 734:2
739:11 744:13,
17 747:1 748:17
751:24 759:4

**well-being**
710:23

**well-documented**
720:12

**well-established**
557:5 678:4

**well-**
**estrogenized**
614:25 615:3

**well-known**
556:24 558:8
677:17

**went** 486:6
495:14 504:10
506:22 517:4
518:3 525:11
526:22 583:10,
21 584:8 588:1
606:18 608:8
650:20 699:7
709:4 730:2,
759:7,19

**were** 480:17
482:25 483:16
486:1, 487:2,12
488:13 490:1
495:20 496:12
497:2,8 498:20
500:2,24,25
501:1 513:14
517:6 519:15
526:23 546:20
556:11 559:23
561:4,6,10

567:16,22
576:1,8,21
591:1 603:19
610:16 613:8
614:17 621:18
622:2,18 626:22
634:16 637:20
638:7 640:1
669:7 676:23
681:3 683:4
691:2 699:21
704:14 705:1
710:2 714:19
717:13 720:10
724:16 725:12
727:25 732:14
745:19 746:2
752:4,8 754:19
755:9 756:12
757:3 759:11

**weren't** 494:7
739:8 750:10
753:21

**Wexler** 742:24,
25

**what's** 510:13
532:11 590:4,5
608:18 619:10
645:18 656:6
697:2

**whatever** 480:6
493:7 622:16
700:15 714:10
716:14 731:13
733:18 743:11

**whatsoever**
681:11 692:16
730:9

**Wheeler** 475:8
478:12 479:6
487:5,21 489:23
490:7,18 491:7
497:13 506:5,23
507:7,15,21
550:23 555:16
556:2 606:8
607:16,21
610:3,12,18
611:20 612:7
613:1,4,9
614:14 615:5,17
616:6 623:16,23
624:7,24 625:3,
22 627:9,19
631:18,24
632:16 633:21
634:8 637:20
640:2,17 641:7
642:6 643:9
647:17 648:9,21
649:12,24
650:4,15,22
652:1,13,24
654:13 657:7
658:10 674:17
698:11,23
699:3,8,17,18,
21 700:3,16,20
701:1 703:20,
24,25 704:4,10,
17,18 705:1,7
718:13 754:16,
23 755:4,22
756:2 757:11
758:14

**Wheeler's**
491:14 494:17
539:25 608:5,

11,24 610:13,23
611:3,11 612:22
616:19 617:20
621:4,7,17
622:12 626:20
629:6 636:16
637:12 641:7,11
649:7 653:18
658:2,4,18
662:6 700:7
709:2 742:9
754:18 755:22

**whenever**
744:16

**WHEREUPON**
475:21

**wherever** 689:13

**whether** 486:9
490:6 494:18
539:6 544:16,
555:22 556:3,7,
11 559:12
561:10 562:18
571:19 572:18
573:4,7,19
583:5 591:8
605:9 613:3
615:4 635:14
636:25 642:14
685:10 690:17
740:12 745:18
751:5,18 752:3

**which** 489:1
490:23 493:5,11
501:6,16 504:20
507:3,13 509:22
511:11 514:12
515:4,7 518:6
531:10 535:18,

22 551:11
552:24 553:2
560:12 564:9,10
570:20 572:21
574:25 583:10
589:19 594:6
598:17,22
599:17 600:10,
19 602:3
603:11,15
605:11,23
607:2,20 611:8
612:20 616:1
619:5 621:1
623:5,8 624:4
632:10 633:11
635:4 637:6
638:3,19 640:13
643:8 646:18
654:2,13,20
655:12, 662:23
665:3 679:9,11
680:4 683:7
687:2,16 688:3
689:16 692:25
698:6 699:13
703:12 706:11
710:14 711:19
720:23 723:13
729:24 733:3
737:19 738:4
739:24 740:3
744:2 747:6
754:17

**who** 475:6
485:12,14,15,18
488:15 490:3
492:10 494:23
497:13 510:16
525:8 540:25

543:7,8,15,16,
25 549:7,8,11,
12 551:11,24
552:4,6,8,9
553:25 568:5
570:25 576:4
589:3,9 595:12
596:6 597:1,9
614:12 619:16
620:2 629:1
640:10 670:5
671:17 672:13
673:5,7,8,23
676:13,15
678:20 684:3
697:22 699:13
712:9,11 724:7,
9 752:14 753:3

**who's** 549:13

**whole** 535:3
725:9 733:16,24
753:18

**whom** 498:2

**whomever**
482:11

**whose** 488:24
577:10 613:16

**why** 478:3
488:12 493:11
523:14,17
533:12,22,25
534:18 536:17
543:14 544:12
546:19 571:5,24
583:18 587:23
588:8 591:5,13
592:20 614:7
617:19 633:2
645:10,11

650:25 681:24
686:15 687:1,2
696:7 708:22
710:7 714:4
715:19 720:10
723:25 735:18
736:2 738:20
740:14

**wife** 752:24

**will** 475:5 476:9
478:22 481:24
482:2,3,15
485:3 492:20
503:8 509:21
512:25 522:24
528:22 529:13
534:15,17
536:5,22 541:5,
8 542:4 547:2,9
548:7,9 550:12
551:7 553:10,
12,13,14 554:18
561:20 562:13,
14 565:7 569:4
574:16 597:15
599:19 607:3,4
617:7 618:9
625:3,17,22
626:4,17 653:12
657:2,17 665:5
666:15,16
674:12 698:19
700:18 729:14
730:11 741:25
742:1,2 748:25

**willing** 630:16
751:12,20

**wish** 484:23

**with** 477:4, 478:11,22 480:9,10 481:2, 5 484:2,16,18 485:23 486:7, 11,21 487:3,10 489:17,25 490:7 491:5,9 492:13, 23 494:2,6,16 495:13,16 496:4,25 498:5, 7,10 499:1 500:10 502:12 505:16,18 506:12 507:6, 18,19,20 508:2, 8 509:14,23 512:15,21 513:2,7 514:8, 24 515:20 516:17 517:15 518:1,15 520:8, 10,11 521:4,7, 24 523:13 525:8,12,19 527:5,14,17,24 528:12,21 529:1,7,16 530:3, 534:8,12, 13 535:22 537:10,14,17,23 538:16 540:2,11 542:6,8,24,25 543:19 545:4,7, 13,15,22,23 546:9,24 547:2 548:19,25 549:2,5,20 550:5,17,18,20 551:11 553:2,

18,22 555:2,3,6, 9 557:7,11 559:12 560:18 561:6,20 562:16 563:6,8,12 564:14 565:3,5, 13,17,21,24 568:12 569:6, 10,16 571:22,24 572:11,22 574:12 576:14 577:5,17,21 578:13,16,17,20 579:18 580:14 581:8 582:24 583:3 584:8 587:12,17,19 588:6,23 590:2, 20 591:18,21 592:6,8,16,19 593:7,8,16,17, 20,24 594:13, 14,21 595:19,25 596:1,3,4 597:1, 15,17 598:3,7, 20,21,25 599:2, 23 600:6,17,20, 22,23 602:6,15 604:7,10 606:3 607:15 608:8, 10,25 609:7 610:1,3,4,17 611:1,12,17,24 612:6,12,17,19, 23 613:4,15 614:3,10,20 615:8,9,20 616:2,8,20,21, 24 617:4,12,25 618:11,23

619:10 620:3,12 621:18 622:9, 15,20,23,25 623:7 624:4,15, 19 625:7, 626:9 627:3,9,18 628:4,11,12,13, 16,25 631:5 632:7,13 633:7 634:10 635:21 636:14,20 637:24 638:12 639:8,14 640:10 641:25 642:23 643:3,15 645:3, 6,15 646:24 647:16 648:4,15 649:16,17 650:6,20 651:21,23,24 652:13,18,21,22 653:1,9,12,15, 17,20 657:6,17 658:23 660:7 661:19 662:13 663:16 664:2,4, 20,23 665:15 666:20,24 667:5,19 668:11,22 669:16 670:12, 15,25 671:1 672:7,19,24 674:9,10,13,22 675:7,8,14 676:5,9 677:1, 18,23 678:1,19, 22 684:9,11,15 685:3 686:12,23 690:8,11,21

692:11 693:15, 18,24 694:2,9 696:18,25 697:11,24 698:2,8,23 700:6,21 701:3, 6,18,22 702:3,6, 9,10 703:20 704:19 705:11 706:12 707:22 708:2 709:4,9, 24 710:21 711:11,15 713:4 714:11,19 715:3,9,11,18 718:17,25 720:2,10 721:6, 12,14 722:13,17 723:22 724:13, 25 726:5,18,19 727:6,22 728:11 729:1 730:22 732:14,16 734:18,25 736:8,23 737:16,17 738:16 741:2,14 742:13,15,18, 20,22 743:2,5 746:3 747:16 748:5,7 749:6 750:10,25 752:9,18,24 753:16 754:7,23 755:4 756:25 757:2,5 758:1,3 759:22

**withdrawn** 511:5

**withholding**
709:24

**within** 555:1
591:22 633:9
635:14 637:10
689:21

**without** 491:21,
24 521:2 558:23
559:6 565:9,18,
568:22 569:11
570:1 597:14
639:10 644:21
677:23 678:16

**Witkin** 475:9,12

**witness** 475:16,
19,20,23 480:24
490:20 492:2,19
495:11 497:19
500:14 501:20
505:25 506:9
507:1 514:21
516:9 519:18
520:17 521:12
522:1,19 523:9,
23 524:22 525:5
526:8,19,21
528:6 529:22
531:8 532:9,25
533:19 534:4,22
535:13 536:2
537:6 538:4,20
539:9 540:10
541:3,16,24
542:23 544:4,
10,18 545:1,19
546:3,11 547:19
548:4, 549:24
551:17 552:2
554:7,14 559:10

562:12 566:5
567:18 568:3,19
570:16 571:15
572:3,15 573:2,
13,17 574:4
577:7 581:3,13
582:14 585:5
586:18 587:1,22
589:1 591:24
595:6,23 597:21
598:14 599:12
601:8,25 604:6
605:1,7,19
606:21 607:2
609:15,25
611:23 612:9
613:19 614:5
617:1,10,24
619:1 620:7,17,
23 621:24
622:13 623:3,22
626:2 628:23
634:1,12 635:18
636:8 637:4
640:3 642:22
643:2,19 644:2,
9,25 645:8
646:6 648:11,23
649:15 650:11
651:16 652:7,17
654:11 655:15
656:16,19
660:25 661:9
663:4 666:13
667:8 668:14
670:9,22
671:10,20
672:18 673:15
674:4,21 676:3
677:22 678:12

679:22 680:12,
24 681:14
682:2,17 686:4
688:15 690:5
693:6,22 695:9,
19 696:21 697:7
698:17 700:24
702:17 706:9,22
707:7,21 709:22
710:6,17 711:2,
13 712:7 713:2,
16,23 714:24
715:5,7,18
716:11 719:4
720:6 721:11,19
722:16 723:2,
11,21 724:5,20
725:16,23,25
727:1,15 729:5
730:12 732:8
734:6 735:23
736:5 739:23
740:17 741:10
744:12 746:14,
25 747:22
749:11,19
750:3,14 751:16
752:20 753:1,15
755:7,16 756:21
757:9,18 758:8
759:1,6,21
760:4

**woman** 536:7,
10,19 537:10,15
538:17,22 542:7
543:23 545:25
546:5,24
547:12,13,16
548:1,6,20
549:11,12

550:20 553:12
595:11 613:16
614:1,22 622:14
635:1,15 654:16
671:17 691:18,
23 729:10
752:17

**woman's** 655:6
705:24 706:6

**women** 488:6
497:10,12 498:2
542:24,25
543:15 544:5,
546:7 547:2
551:7,11 596:6
597:1,9 600:13
601:16 615:7
625:17 629:1
647:4 703:18
706:20 713:19
726:3 727:5,6
753:3 758:23

**won't** 523:14
524:8 568:22
569:5 633:3

**wonder** 723:25

**wonderful** 545:2

**word** 499:12,19,
21 500:5,22
501:3,16,23
502:5,22
503:23,25 504:4
506:21 533:9,11
550:24 591:4
631:21 663:5
679:23 759:16

**words** 537:3
604:21 605:4

626:3 640:4,5
649:22 676:12
758:5

**work** 481:21,23,
25 483:9 494:6
517:23 519:9
568:20 677:23
678:14,16 681:2

**worked** 476:12
605:4 675:7,14,
23

**world** 620:9

**worries** 496:11

**worrisome**
627:2,6

**worse** 627:15

**worsen** 530:19
628:3

**worsening** 530:7
697:24

**worsens** 530:22

**wouldn't** 573:22
583:2 593:11
622:9 628:8
632:25 681:10
682:6 686:15
691:22 696:4

**wound** 557:22
566:19 629:15,
16 630:9,13,15,
17 631:25
633:10,20,23
634:10,24
635:2,15,23
671:2 678:15
679:7 685:6,7,
11 686:1,12
690:11

**woven** 726:21

**wrap** 689:16

**write** 488:3
521:19

**write-up** 700:9

**writing** 500:2

**written** 493:6
506:3,4,6 747:3

**wrong** 564:19
637:16 672:9

**wrote** 493:5
626:3 680:14

---

**X**

**X-ray** 491:17

---

**Y**

**y'all** 495:7
502:13 716:1

**yeah** 477:14
480:11 485:5,9
493:8,9 500:15
502:6,17 506:10
507:2 508:12,
13,20 512:3
514:15 516:10
517:2 520:18
521:13 526:9,11
548:25 551:1,9
553:4 555:18
559:15 563:9
567:6 578:18
579:8 580:4,8
585:11 588:8
604:9 605:2
609:7,25 615:18

616:8 617:2,11
626:3,14 629:8,
18 632:3 637:13
644:17 651:1
658:15 660:17
694:14,21,25
699:5 706:23
710:7 715:1
718:18 719:6
726:13 734:7
737:25 741:24
746:21 759:7

**year** 505:13,14
562:10,24
619:12

**years** 522:9
542:4,16 543:7
544:23 547:15
557:10 558:12
596:8 597:5,10
615:6 619:13
624:11 626:25
644:16,22
645:11 646:23
676:13,14,15
724:16 742:13
744:14,18

**years'** 616:15

**yellow** 498:22
499:1,7,23
500:5 501:17,23
502:20 503:3,24

**yellowish** 631:2

**yesterday** 476:4,
12 477:3 479:17
480:12 481:7
484:5,18 489:2
512:20 567:12
580:19 581:2,15

583:9,10,15,18,
22,23,24 584:8
595:21 596:13,
16 601:21,24
602:10,18,24
603:2 619:11
645:21 646:12
647:7,12,14
669:7 675:11,
17,19 682:8
705:20 712:25
716:1,3,5 730:3,
7,15 731:4
734:10 742:21
743:8 744:10
745:18 746:2,
13,15

**yesterday's**
582:11

**yet** 550:19
551:12 561:17
579:15 686:8
718:1 739:24
744:2

**you'd** 601:10
750:5

**you'll** 550:2
748:5

**you're** 476:17
477:4 482:19
491:25 492:16
499:19 502:10
504:24 513:1
514:16 522:9
531:21 543:19
548:14 549:3,4
551:14 554:18
555:13,21
576:11 580:4,6,

8 584:2 585:6
586:5 594:15
596:5,9 605:13
609:5 623:4
624:17 628:5,7
632:5 633:4
648:12 649:8,25
654:7 659:5
669:13 670:8
681:12 698:9
700:15 702:12,
13 706:24
709:10 714:13
718:20 719:12,
15 721:13
726:15 728:12
730:16,19,21
733:16 739:19,
20 741:14
744:3,17,23
746:9

**you've** 477:8
479:5,16 481:7,
8 511:13 540:22
560:15 566:17
567:11 607:20
619:15 632:20
636:13 658:17
675:7,13 688:21
696:10 707:3,17
709:13 724:7
729:21 741:22
743:13 744:4,6
749:14 754:10

**yours** 609:8

**yourself** 552:14
581:8 602:23
628:8,19 734:25
745:3 746:2,8

**yourselves** 475:5

---

**Z**

---

**Zakrzewski**
714:14 722:19

**Zakrzewski's**
724:10

**zero** 594:24
678:1 679:6

**Zimmerman**
596:22

**Zipper** 637:11,
13,19 644:14

**Zumika** 714:10